UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| IN RE: FORD MOTOR CO. F-150 AND RANGER TRUCK FUEL ECONOMY MARKETING AND SALES PRACTICES LITIGATION, | Case No. 2:19-md-02901-SFC |
| | Honorable Sean F. Cox |
| This Document Relates To: All Actions | **JURY TRIAL DEMANDED CLASS ACTION** |

**FIRST AMENDED CONSOLIDATED MASTER CLASS ACTION
<u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>**

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................ 1

II.  JURISDICTION ................................................................ 8

III. VENUE ........................................................................ 9

IV.  PARTIES ...................................................................... 9

    A.   Plaintiffs ................................................................. 9

        1.   Alabama Plaintiffs .......................................... 9

        2.   Arizona Plaintiff ............................................ 15

        3.   California Plaintiffs ......................................... 17

        4.   Florida Plaintiffs ........................................... 20

        5.   Georgia Plaintiff ........................................... 26

        6.   Hawaii Plaintiff ............................................ 28

        7.   Illinois Plaintiffs ........................................... 30

        8.   Louisiana Plaintiffs ........................................ 33

        9.   Maryland Plaintiff ......................................... 37

        10.  Massachusetts Plaintiff .................................... 39

        11.  Michigan Plaintiffs ........................................ 41

        12.  Minnesota Plaintiff ........................................ 48

        13.  Missouri Plaintiffs ......................................... 50

        14.  Nebraska Plaintiff .......................................... 54

        15.  New Jersey Plaintiffs ...................................... 56

        16.  New York Plaintiff ......................................... 61

        17.  Ohio Plaintiff............................................... 63

        18.  Oklahoma Plaintiff ........................................ 65

19.   Oregon Plaintiff............................................................... 67

20.   Pennsylvania Plaintiff..................................................... 69

21.   South Carolina Plaintiff.................................................. 70

22.   South Dakota Plaintiff..................................................... 72

23.   Tennessee Plaintiff.......................................................... 74

24.   Texas Plaintiffs ............................................................... 76

25.   Utah Plaintiff................................................................... 83

26.   Virginia Plaintiff............................................................. 85

27.   Washington Plaintiffs..................................................... 87

28.   Wisconsin Plaintiff.......................................................... 93

B.   Defendant ................................................................................... 95

1.   Ford Motor Company ..................................................... 95

V.   FACTUAL ALLEGATIONS ................................................................. 95

A.   Coastdown testing ..................................................................... 95

B.   The coastdown results are used to create fuel economy information posted on vehicles' windows and used in advertising. ................................................................................ 98

C.   Ford admits improper coastdown testing on the 2019 Ranger................................................................................... 103

D.   CAFE standards provide manufacturers with credits for low emissions. ................................................................................ 106

E.   Criminal investigation ................................................................ 112

F.   Mechanism of coastdown cheating ............................................. 113

G.   F-150 and Ranger test results ..................................................... 117

H.   Ford's History of Cheating.......................................................... 127

I.   Ford advertising for the Ranger emphasizes fuel economy........... 128

     J.    Ford promotes the F-150 as best in class for fuel economy or publishes MPG estimates to beat its competition. ......................... 129

     K.    Economic harm.................................................................. 137

VI.    TOLLING OF THE STATUTE OF LIMITATIONS ............................. 137

     A.    Discovery rule tolling........................................................ 137

     B.    Fraudulent concealment tolling........................................ 138

     C.    Estoppel ............................................................................ 138

VII.   CLASS DEFINITIONS ................................................................. 139

VIII.  CLASS ALLEGATIONS ............................................................. 149

     A.    Claims Brought on Behalf of the Alabama Subclass..................... 149

COUNT 1 VIOLATION OF THE ALABAMA DECEPTIVE TRADE PRACTICES ACT (ALA. CODE § 8-19-1 *ET SEQ.*) ............................. 149

COUNT 2 BREACH OF CONTRACT  (BASED ON ALABAMA LAW)........................................................................................ 153

COUNT 3 BREACH OF EXPRESS WARRANTY (ALA. CODE § 7-2-313)..................................................................................... 154

COUNT 4 FRAUDULENT CONCEALMENT (BASED ON ALABAMA LAW).................................................................. 157

COUNT 5 ................................................................................... 163

NEGLIGENT MISREPRESENTATION ........................................... 163

COUNT 6 UNJUST ENRICHMENT................................................. 164

     B.    Claims brought on behalf of the Alaska Subclass.......................... 165

COUNT 7 VIOLATION OF THE ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT (ALASKA STAT. ANN. § 45.50.471 *ET SEQ.*) ......................................... 165

COUNT 8 BREACH OF CONTRACT  (BASED ON ALASKA LAW).......... 169

COUNT 9 BREACH OF EXPRESS WARRANTY (AK. STAT. § 45.02.313) ................................................................. 170

COUNT 10 FRAUDULENT CONCEALMENT (BASED ON ALASKA LAW) ................................................................................. 173

COUNT 11 .................................................................................... 179

NEGLIGENT MISREPRESENTATION ........................................... 179

COUNT 12 UNJUST ENRICHMENT .............................................. 180

    C.    Claims brought on behalf of the Arizona Subclass ........................ 181

COUNT 13 VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT (ARIZONA REV. STAT. § 44-1521 *ET SEQ.*) ............................... 181

COUNT 14 BREACH OF CONTRACT  (BASED ON ARIZONA LAW) .................................................................................. 185

COUNT 15 BREACH OF EXPRESS WARRANTY (ARIZ. REV. STAT. § 47-2313, *ET SEQ.*) ....................................................... 186

COUNT 16 FRAUDULENT CONCEALMENT (BASED ON ARIZONA LAW) ..................................................................... 189

COUNT 17 .................................................................................... 195

NEGLIGENT MISREPRESENTATION ........................................... 195

COUNT 18 UNJUST ENRICHMENT .............................................. 196

    D.    Claims brought on behalf of the Arkansas Subclass ...................... 197

COUNT 19 VIOLATION OF THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT (ARK. CODE ANN. § 4-88-101 *ET SEQ.*) .............. 197

COUNT 20 BREACH OF CONTRACT  (BASED ON ARKANSAS LAW) .................................................................................. 201

COUNT 21 BREACH OF EXPRESS WARRANTY (ARK. CODE § 4-2-313) ................................................................................. 202

COUNT 22 FRAUDULENT CONCEALMENT (BASED ON ARKANSAS LAW) .................................................................... 205

COUNT 23 .................................................................................... 211

NEGLIGENT MISREPRESENTATION ........................................... 211

COUNT 24 UNJUST ENRICHMENT............................................................ 211

    E.    Claims Brought on Behalf of the California Subclass .................. 212

COUNT 25 VIOLATIONS OF THE CALIFORNIA UNFAIR
    COMPETITION LAW  (CAL. BUS. & PROF. CODE § 17200
    *ET SEQ.*) ................................................................................ 212

COUNT 26 VIOLATIONS OF THE CALIFORNIA'S CONSUMERS
    LEGAL REMEDIES ACT (CAL. BUS. & PROF. CODE § 1750
    *ET SEQ.*) ................................................................................ 217

COUNT 27 VIOLATIONS OF THE CALIFORNIA FALSE
    ADVERTISING LAW (CAL. BUS. & PROF. CODE § 17500
    *ET SEQ.*) ................................................................................ 220

COUNT 28 BREACH OF CONTRACT  (BASED ON CALIFORNIA
    LAW)........................................................................................ 223

COUNT 29 BREACH OF EXPRESS WARRANTY SONG-BEVERLY
    CONSUMER WARRANTY ACT (CAL. CIV. CODE §§ 1791.2
    & 1793.2(D)) ............................................................................ 224

COUNT 30 FRAUDULENT CONCEALMENT (BASED ON
    CALIFORNIA LAW)................................................................ 228

COUNT 31 ................................................................................................ 234

NEGLIGENT MISREPRESENTATION............................................................ 234

COUNT 32 UNJUST ENRICHMENT............................................................ 235

    F.    Claims Brought on Behalf of the Colorado Subclass .................... 236

COUNT 33 VIOLATION OF THE COLORADO CONSUMER
    PROTECTION ACT (COLO. REV. STAT. § 6-1-101 *ET SEQ.*)........... 236

COUNT 34 BREACH OF CONTRACT  (BASED ON COLORADO
    LAW)........................................................................................ 240

COUNT 35 BREACH OF EXPRESS WARRANTY (COLO. REV.
    STAT. §§ 4-2-313 AND 4-2.5-210)........................................ 241

COUNT 36 FRAUDULENT CONCEALMENT (BASED ON
    COLORADO LAW)................................................................ 244

COUNT 37 ...................................................................................................... 250

NEGLIGENT MISREPRESENTATION ............................................................ 250

COUNT 38 UNJUST ENRICHMENT ................................................................ 251

     G.    Claims brought on behalf of the Connecticut Subclass ................. 252

COUNT 39 VIOLATION OF THE CONNECTICUT UNFAIR TRADE
    PRACTICES ACT (CONN. GEN. STAT. § 42-110A *ET SEQ.*) ............ 252

COUNT 40 BREACH OF CONTRACT  (BASED ON CONNECTICUT
    LAW) ....................................................................................................... 256

COUNT 41 BREACH OF EXPRESS WARRANTY (CONN. GEN.
    STAT. §§ 42-179 & 42-186) ..................................................................... 257

COUNT 42 FRAUDULENT CONCEALMENT (BASED ON
    CONNECTICUT LAW).............................................................................. 260

COUNT 43 ...................................................................................................... 266

NEGLIGENT MISREPRESENTATION ............................................................ 266

COUNT 44 UNJUST ENRICHMENT ................................................................ 267

     H.    Claims brought on behalf of the Delaware Subclass .................... 268

COUNT 45 VIOLATION OF THE DELAWARE CONSUMER FRAUD
    ACT (DEL. CODE TIT. 6, § 2513 *ET SEQ.*)........................................... 268

COUNT 46 BREACH OF CONTRACT  (BASED ON DELAWARE
    LAW) ....................................................................................................... 272

COUNT 47 BREACH OF EXPRESS WARRANTY (5A DEL. C. 1953,
    §§ 2-313 & 2A-210) ................................................................................ 273

COUNT 48 FRAUDULENT CONCEALMENT (BASED ON
    DELAWARE LAW) ................................................................................. 276

COUNT 49 ...................................................................................................... 282

NEGLIGENT MISREPRESENTATION ............................................................ 282

COUNT 50 UNJUST ENRICHMENT ................................................................ 282

     I.    Claims Brought on Behalf of the Florida Subclass ....................... 283

COUNT 51 VIOLATIONS OF THE FLORIDA UNFAIR AND
DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. § 501.201
*ET SEQ.*) ............................................................................... 283

COUNT 52 BREACH OF CONTRACT  (BASED ON FLORIDA LAW) ...... 287

COUNT 53 BREACH OF EXPRESS WARRANTY (FLA. STAT. §
672.313) ................................................................................... 289

COUNT 54 FRAUDULENT CONCEALMENT (BASED ON FLORIDA
LAW) ....................................................................................... 291

COUNT 55 ........................................................................................... 297

NEGLIGENT MISREPRESENTATION ............................................... 297

COUNT 56 UNJUST ENRICHMENT ................................................... 298

   J.    Claims Brought on Behalf of the Georgia Subclass ...................... 299

COUNT 57 VIOLATION OF THE GEORGIA FAIR BUSINESS
PRACTICES ACT (GA. CODE ANN. § 10-1-390 *ET SEQ.*)................. 299

COUNT 58 VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE
TRADE PRACTICES ACT (GA. CODE ANN § 10-1-370
*ET SEQ.*) ............................................................................... 303

COUNT 59 BREACH OF CONTRACT (BASED ON GEORGIA LAW)....... 307

COUNT 60 BREACH OF EXPRESS WARRANTY (GA. CODE ANN.
§ 11-2-313) ............................................................................... 308

COUNT 61 FRAUDULENT CONCEALMENT (BASED ON
GEORGIA LAW) ..................................................................... 311

COUNT 62 ........................................................................................... 317

NEGLIGENT MISREPRESENTATION ............................................... 317

COUNT 63 UNJUST ENRICHMENT ................................................... 317

   K.    Claims brought on behalf of the Hawaii Subclass ........................ 318

COUNT 64 VIOLATION OF THE HAWAII ACT § 480-2(A) (HAW.
REV. STAT. § 480 *ET SEQ.*)................................................... 318

COUNT 65 BREACH OF CONTRACT  (BASED ON HAWAII LAW)......... 323

COUNT 66 BREACH OF EXPRESS WARRANTY (HI REV. STAT. §§ 490:2-313 & 490:2A-519) ....................................................................... 324

COUNT 67 FRAUDULENT CONCEALMENT (BASED ON HAWAII LAW) ......................................................................................................... 327

COUNT 68 ............................................................................................................ 333

NEGLIGENT MISREPRESENTATION ........................................................... 333

COUNT 69 UNJUST ENRICHMENT .............................................................. 333

L.      Claims Brought on Behalf of the Idaho Subclass .......................... 334

COUNT 70 VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT (IDAHO CODE ANN. § 48-601 *ET SEQ.*) ........... 334

COUNT 71 BREACH OF CONTRACT  (BASED ON IDAHO LAW) ........... 338

COUNT 72 BREACH OF EXPRESS WARRANTY (I.C. § 28-2-316) ........... 340

COUNT 73 FRAUDULENT CONCEALMENT (BASED ON IDAHO LAW) ......................................................................................................... 342

COUNT 74 ............................................................................................................ 348

NEGLIGENT MISREPRESENTATION ........................................................... 348

COUNT 75 UNJUST ENRICHMENT .............................................................. 349

M.      Claims Brought on Behalf of the Illinois Subclass ....................... 350

COUNT 76 VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1, *ET SEQ.* AND 720 ILCS 295/1A) ................................................. 350

COUNT 77 BREACH OF CONTRACT (BASED ON ILLINOIS LAW) ........ 354

COUNT 78 BREACH OF EXPRESS WARRANTY (810 ILCS 5/2-313) ....... 355

COUNT 79 FRAUDULENT CONCEALMENT (BASED ON ILLINOIS LAW) ......................................................................................................... 358

COUNT 80 ............................................................................................................ 363

NEGLIGENT MISREPRESENTATION ........................................................... 363

COUNT 81 UNJUST ENRICHMENT.............................................................. 364

    N.    Claims brought on behalf of the Indiana Subclass......................... 365

COUNT 82 VIOLATION OF THE INDIANA DECEPTIVE
CONSUMER SALES ACT (IND. CODE § 24-5-0.5-3)......................... 365

COUNT 83 BREACH OF CONTRACT  (BASED ON INDIANA LAW)....... 369

COUNT 84 BREACH OF EXPRESS WARRANTY (IC 26-1-2-316) ............. 371

COUNT 85 FRAUDULENT CONCEALMENT (BASED ON INDIANA
LAW)................................................................................................... 373

COUNT 86.............................................................................................. 379

NEGLIGENT MISREPRESENTATION........................................................... 379

COUNT 87 UNJUST ENRICHMENT.............................................................. 380

    O.    Claims brought on behalf of the Iowa Subclass............................. 381

COUNT 88 VIOLATION OF THE IOWA PRIVATE RIGHT OF
ACTION FOR CONSUMER FRAUDS ACT (IOWA CODE
§ 714H.1 *ET SEQ.*) ...................................................................... 381

COUNT 89 BREACH OF CONTRACT  (BASED ON IOWA LAW)............. 385

COUNT 90 BREACH OF EXPRESS WARRANTY (IOWA CODE §
554.2313 AND 554.13210) ....................................................... 386

COUNT 91 FRAUDULENT CONCEALMENT (BASED ON IOWA
LAW)................................................................................................... 390

COUNT 92.............................................................................................. 395

NEGLIGENT MISREPRESENTATION........................................................... 395

COUNT 93 UNJUST ENRICHMENT.............................................................. 396

    P.    Claims brought on behalf of the Kansas Subclass ......................... 397

COUNT 94 VIOLATION OF THE KANSAS CONSUMER
PROTECTION ACT (KAN. STAT. ANN. § 50-623 *ET SEQ.*).............. 397

COUNT 95 BREACH OF CONTRACT  (BASED ON KANSAS LAW)........ 401

COUNT 96 BREACH OF EXPRESS WARRANTY (K.S.A. § 50-645).......... 402

COUNT 97 FRAUDULENT CONCEALMENT (BASED ON KANSAS
    LAW)............................................................................... 406

COUNT 98 ........................................................................................... 412

NEGLIGENT MISREPRESENTATION............................................. 412

COUNT 99 UNJUST ENRICHMENT.................................................. 412

    Q.    Claims brought on behalf of the Kentucky Subclass ..................... 413

COUNT 100 VIOLATIONS OF THE KENTUCKY CONSUMER
    PROTECTION ACT (KY. REV. STAT. § 367.110 *ET SEQ.*)................ 413

COUNT 101 BREACH OF CONTRACT  (BASED ON KENTUCKY
    LAW)................................................................................... 417

COUNT 102 BREACH OF EXPRESS WARRANTY (KY. REV. STAT.
    § 355.2-313)........................................................................ 418

COUNT 103 FRAUDULENT CONCEALMENT (BASED ON
    KENTUCKY LAW)............................................................. 421

COUNT 104 ......................................................................................... 427

NEGLIGENT MISREPRESENTATION............................................. 427

COUNT 105 UNJUST ENRICHMENT................................................ 427

    R.    Claims Brought on Behalf of the Louisiana Subclass.................... 428

COUNT 106 VIOLATION OF THE LOUISIANA UNFAIR TRADE
    PRACTICES AND CONSUMER PROTECTION LAW (LA.
    REV. STAT. § 51:1401 *ET SEQ.*)............................................ 428

COUNT 107 BREACH OF CONTRACT (BASED ON LOUISIANA
    LAW)................................................................................... 432

COUNT 108 BREACH OF WARRANTY AGAINST REDHIBITORY
    DEFECTS (LA. CIV. CODE 2520) ......................................... 433

COUNT 109 FRAUDULENT CONCEALMENT (BASED ON
    LOUISIANA LAW) ............................................................. 434

COUNT 110 ......................................................................................... 440

NEGLIGENT MISREPRESENTATION ............................................................. 440

COUNT 111 UNJUST ENRICHMENT ............................................................. 441

  S. Claims brought on behalf of the Maine Subclass .......................... 442

COUNT 112 VIOLATION OF THE MAINE UNFAIR TRADE
  PRACTICES ACT (ME. REV. STAT. ANN. TIT. 5, § 205-A
  *ET SEQ.*) .................................................................................................. 442

COUNT 113 BREACH OF CONTRACT  (BASED ON MAINE LAW) ......... 445

COUNT 114 BREACH OF EXPRESS WARRANTY (ME. REV. STAT.
  ANN. § 2-313) .......................................................................................... 447

COUNT 115 FRAUDULENT CONCEALMENT (BASED ON MAINE
  LAW) ........................................................................................................ 450

COUNT 116 ....................................................................................................... 456

NEGLIGENT MISREPRESENTATION ............................................................. 456

COUNT 117 UNJUST ENRICHMENT ............................................................. 456

  T. Claims Brought on Behalf of the Maryland Subclass .................... 457

COUNT 118 VIOLATION OF THE MARYLAND CONSUMER
  PROTECTION ACT (MD. CODE ANN., COM. LAW § 13-101
  *ET SEQ.*) .................................................................................................. 457

COUNT 119 BREACH OF CONTRACT  (BASED ON MARYLAND
  LAW) ........................................................................................................ 461

COUNT 120 BREACH OF EXPRESS WARRANTY (MD. CODE
  COM. LAW § 2-313) ................................................................................ 462

COUNT 121 FRAUDULENT CONCEALMENT (BASED ON
  MARYLAND LAW) .................................................................................. 465

COUNT 122 ....................................................................................................... 471

NEGLIGENT MISREPRESENTATION ............................................................. 471

COUNT 123 UNJUST ENRICHMENT ............................................................. 471

  U. Claims brought on behalf of the Massachusetts Subclass ............. 472

COUNT 124 VIOLATION OF THE MASSACHUSETTS GENERAL
    LAW CHAPTER 93(A) (MASS. GEN. LAWS CH. 93A, § 1,
    *ET SEQ.*) ................................................................................ 472

COUNT 125 BREACH OF CONTRACT  (BASED ON
    MASSACHUSETTS LAW)...................................................... 476

COUNT 126 BREACH OF EXPRESS WARRANTY (MASS. GEN.
    LAWS CH. 106, § 2-313)........................................................ 478

COUNT 127 FRAUDULENT CONCEALMENT (BASED ON
    MASSACHUSETTS LAW)...................................................... 482

COUNT 128 ................................................................................ 488

NEGLIGENT MISREPRESENTATION ........................................... 488

COUNT 129 UNJUST ENRICHMENT.............................................. 488

    V.    Claims Brought on Behalf of the Michigan Subclass ................... 489

COUNT 130 VIOLATION OF THE MICHIGAN CONSUMER
    PROTECTION ACT (MICH. COMP. LAWS § 445.903 *ET SEQ.*) ....... 489

COUNT 131 BREACH OF CONTRACT  (BASED ON MICHIGAN
    LAW).................................................................................... 493

COUNT 132 BREACH OF EXPRESS WARRANTY (MICH. COMP.
    LAWS ANN. 440.2313 AND 440.2860) .................................. 495

COUNT 133 FRAUDULENT CONCEALMENT (BASED ON
    MICHIGAN LAW) ................................................................ 499

COUNT 134 ................................................................................ 504

NEGLIGENT MISREPRESENTATION ........................................... 504

COUNT 135 UNJUST ENRICHMENT.............................................. 505

    W.    Claims Brought on Behalf of the Minnesota Subclass ................. 506

COUNT 136 VIOLATION OF THE MINNESOTA PREVENTION OF
    CONSUMER FRAUD ACT (MINN. STAT. § 325F.68 *ET SEQ.*)......... 506

COUNT 137 VIOLATION OF THE MINNESOTA DECEPTIVE
TRADE PRACTICES ACT (MINN. STAT. § 325D.43-48
*ET SEQ.*) ............................................................................... 510

COUNT 138 BREACH OF CONTRACT  (BASED ON MINNESOTA
LAW) ..................................................................................... 513

COUNT 139 BREACH OF EXPRESS WARRANTY (MINN. STAT. §
336.2-313, AND § 336.2A-210)................................................ 515

COUNT 140 FRAUDULENT CONCEALMENT (BASED ON
MINNESOTA LAW) ............................................................... 519

COUNT 141 ...................................................................................... 524

NEGLIGENT MISREPRESENTATION ........................................... 524

COUNT 142 UNJUST ENRICHMENT.............................................. 525

X.     Claims brought on behalf of the Mississippi Subclass ................. 526

COUNT 143 VIOLATION OF THE MISSISSIPPI CONSUMER
PROTECTION ACT (MISS. CODE. ANN. § 75-24-1 *ET SEQ.*)........... 526

COUNT 144 BREACH OF CONTRACT  (BASED ON MISSISSIPPI
LAW) ..................................................................................... 530

COUNT 145 BREACH OF EXPRESS WARRANTY (MISS. CODE §
75-2-313 AND MISS. CODE § 75-2A-210)............................... 531

COUNT 146 FRAUDULENT CONCEALMENT (BASED ON
MISSISSIPPI LAW)................................................................ 535

COUNT 147 ...................................................................................... 541

NEGLIGENT MISREPRESENTATION ........................................... 541

COUNT 148 UNJUST ENRICHMENT.............................................. 542

Y.     Claims Brought on Behalf of the Missouri Subclass .................... 543

COUNT 149 VIOLATION OF THE MISSOURI MERCHANDISING
PRACTICES ACT (MO. REV. STAT. § 407.010, *ET SEQ.*) ................. 543

COUNT 150 BREACH OF CONTRACT  (BASED ON MISSOURI
LAW) ..................................................................................... 547

COUNT 151 BREACH OF EXPRESS WARRANTY (MO. STAT. § 400.2-313, AND § 400.2A-210) .................................................. 549

COUNT 152 FRAUDULENT CONCEALMENT (BASED ON MISSOURI LAW) .................................................................... 553

COUNT 153 ......................................................................................... 558

NEGLIGENT MISREPRESENTATION ............................................. 558

COUNT 154 UNJUST ENRICHMENT .............................................. 559

Z.      Claims Brought on Behalf of the Montana Subclass .................... 560

COUNT 155 VIOLATION OF THE MONTANA UNFAIR TRADE PRACTICES  AND CONSUMER PROTECTION ACT OF 1973 (MONT. CODE ANN. § 30-14-101 *ET SEQ.*) ........................................ 560

COUNT 156 BREACH OF CONTRACT  (BASED ON MONTANA LAW) .................................................................. 564

COUNT 157 BREACH OF EXPRESS WARRANTY (MONT. CODE ANN. § 30-2-313) ..................................................... 565

COUNT 158 FRAUDULENT CONCEALMENT (BASED ON MONTANA LAW) .................................................... 568

COUNT 159 ......................................................................................... 574

NEGLIGENT MISREPRESENTATION ............................................. 574

COUNT 160 UNJUST ENRICHMENT .............................................. 574

AA.   Claims Brought on Behalf of the Nebraska Subclass .................... 575

COUNT 161 VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT (NEB. REV. STAT. § 59-1601 *ET SEQ.*) ............. 575

COUNT 162 BREACH OF CONTRACT (BASED ON NEBRASKA LAW) .................................................................. 579

COUNT 163 BREACH OF EXPRESS WARRANTY (NEB. REV. STAT. (U.C.C.) § 2-313) ............................................. 580

COUNT 164 FRAUDULENT CONCEALMENT (BASED ON NEBRASKA LAW) .................................................... 583

COUNT 165 .................................................................................... 589

NEGLIGENT MISREPRESENTATION ............................................ 589

COUNT 166 UNJUST ENRICHMENT ............................................. 589

    BB.   Claims Brought on Behalf of the Nevada Subclass ...................... 590

COUNT 167 VIOLATION OF THE NEVADA DECEPTIVE TRADE
    PRACTICES ACT (NEV. REV. STAT. § 598.0903 *ET SEQ.*) .............. 590

COUNT 168 BREACH OF CONTRACT  (BASED ON NEVADA
    LAW) ........................................................................................ 594

COUNT 169 BREACH OF EXPRESS WARRANTY (NEV. REV.
    STAT. § 104.2313) .................................................................... 596

COUNT 170 FRAUDULENT CONCEALMENT (BASED ON
    NEVADA LAW) ........................................................................ 599

COUNT 171 .................................................................................... 604

NEGLIGENT MISREPRESENTATION ............................................ 604

COUNT 172 UNJUST ENRICHMENT ............................................. 605

    CC.   Claims brought on behalf of the New Hampshire Subclass .......... 606

COUNT 173 VIOLATION OF THE NEW HAMPSHIRE  CONSUMER
    PROTECTION ACT (N.H. REV. STAT. ANN. § 358-A:1
    *ET SEQ.*) ................................................................................ 606

COUNT 174 BREACH OF CONTRACT  (BASED ON NEW
    HAMPSHIRE LAW) .................................................................. 610

COUNT 175 BREACH OF EXPRESS WARRANTY (N.H. REV.
    STAT. ANN. 382-A:2-313) ........................................................ 611

COUNT 176 FRAUDULENT CONCEALMENT (BASED ON NEW
    HAMPSHIRE LAW) .................................................................. 614

COUNT 177 .................................................................................... 620

NEGLIGENT MISREPRESENTATION ............................................ 620

COUNT 178 UNJUST ENRICHMENT ............................................. 621

DD.   Claims Brought on Behalf of the New Jersey Subclass ................ 622

COUNT 179 VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT (N.J. STAT. ANN. § 56:8-1 *ET SEQ.*) ............................ 622

COUNT 180 BREACH OF CONTRACT  (BASED ON NEW JERSEY LAW) ............................................................................................ 626

COUNT 181 BREACH OF EXPRESS WARRANTY (N.J. STAT. § 12A:2-313) ............................................................................... 627

COUNT 182 FRAUDULENT CONCEALMENT (BASED ON NEW JERSEY LAW) ....................................................................... 630

COUNT 183 ................................................................................... 635

NEGLIGENT MISREPRESENTATION ........................................... 635

COUNT 184 UNJUST ENRICHMENT ............................................. 636

EE.   Claims brought on behalf of the New Mexico Subclass ............... 637

COUNT 185 VIOLATION OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT (N.M. STAT. ANN. § 57-12-1 *ET SEQ.*) ................ 637

COUNT 186 BREACH OF CONTRACT  (BASED ON NEW MEXICO LAW) ....................................................................... 641

COUNT 187 BREACH OF EXPRESS WARRANTY (N.M. STAT. ANN. § 55-2-313) ......................................................................... 642

COUNT 188 FRAUDULENT CONCEALMENT (BASED ON NEW MEXICO LAW) ......................................................................... 645

COUNT 189 ................................................................................... 651

NEGLIGENT MISREPRESENTATION ........................................... 651

COUNT 190 UNJUST ENRICHMENT ............................................. 651

FF.   Claims Brought on Behalf of the New York Subclass ................. 652

COUNT 191 VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW (N.Y. GEN. BUS. LAW § 349) ................................. 652

COUNT 192 VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW (N.Y. GEN. BUS. LAW § 350) ................................. 654

COUNT 193 BREACH OF CONTRACT  (BASED ON NEW YORK
LAW) .................................................................................... 656

COUNT 194 BREACH OF EXPRESS WARRANTY (N.Y.U.C.C. § 2-
313) ..................................................................................... 658

COUNT 195 FRAUDULENT CONCEALMENT (BASED ON NEW
YORK LAW) ....................................................................... 661

COUNT 196 .................................................................................... 666

NEGLIGENT MISREPRESENTATION ........................................... 666

COUNT 197 UNJUST ENRICHMENT ............................................. 667

    GG.   Claims Brought on Behalf of the North Carolina Subclass .......... 668

COUNT 198 VIOLATION OF THE NORTH CAROLINA UNFAIR
AND DECEPTIVE ACTS AND PRACTICES ACT (N.C. GEN.
STAT. § 75-1.1 *ET SEQ.*) ........................................................... 668

COUNT 199 BREACH OF CONTRACT  (BASED ON NORTH
CAROLINA LAW) ............................................................... 672

COUNT 200 BREACH OF EXPRESS WARRANTY (N.C. GEN.
STAT. § 25-2-313) .............................................................. 674

COUNT 201 FRAUDULENT CONCEALMENT (BASED ON NORTH
CAROLINA LAW) ............................................................... 677

COUNT 202 .................................................................................... 683

NEGLIGENT MISREPRESENTATION ........................................... 683

COUNT 203 UNJUST ENRICHMENT ............................................. 684

    HH.   Claims brought on behalf of the North Dakota Subclass ............... 685

COUNT 204 VIOLATION OF THE NORTH DAKOTA CONSUMER
FRAUD ACT (N.D. CENT. CODE § 51-15-02) .................................... 685

COUNT 205 BREACH OF CONTRACT  (BASED ON NORTH
DAKOTA LAW) ................................................................... 689

COUNT 206 BREACH OF EXPRESS WARRANTY (N.D. CENT.
CODE § 41-02-30) ................................................................... 690

COUNT 207 FRAUDULENT CONCEALMENT (BASED ON NORTH DAKOTA LAW) ..................................................................... 693

COUNT 208 ................................................................................... 699

NEGLIGENT MISREPRESENTATION ........................................... 699

COUNT 209 UNJUST ENRICHMENT ............................................. 699

    II.    Claims Brought on Behalf of the Ohio Subclass ........................... 700

COUNT 210 VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT (OHIO REV. CODE ANN. § 1345.01 *ET SEQ.*) ............................................................................... 700

COUNT 211 BREACH OF CONTRACT (BASED ON OHIO LAW) ............. 706

COUNT 212 BREACH OF EXPRESS WARRANTY (OHIO REV. CODE ANN. § 1302.26) ............................................................. 707

COUNT 213 FRAUDULENT CONCEALMENT (BASED ON OHIO LAW) ................................................................................... 710

COUNT 214 ................................................................................... 715

NEGLIGENT MISREPRESENTATION ........................................... 715

COUNT 215 UNJUST ENRICHMENT ............................................. 716

    JJ.    Claims Brought on Behalf of the Oklahoma Subclass ................... 717

COUNT 216 VIOLATION OF THE OKLAHOMA CONSUMER PROTECTION ACT (OKLA. STAT. TIT. 15, § 751 *ET SEQ.*) ............. 717

COUNT 217 BREACH OF CONTRACT  (BASED ON OKLAHOMA LAW) ................................................................................... 720

COUNT 218 BREACH OF EXPRESS WARRANTY (12A OKA. STAT. § 2-313) ................................................................................. 722

COUNT 219 FRAUDULENT CONCEALMENT (BASED ON OKLAHOMA LAW) ................................................................. 724

COUNT 220 ................................................................................... 730

NEGLIGENT MISREPRESENTATION ........................................... 730

COUNT 221 UNJUST ENRICHMENT.............................................................. 731

    KK.   Claims Brought on Behalf of the Oregon Subclass ....................... 732

COUNT 222 VIOLATION OF THE OREGON UNLAWFUL TRADE
    PRACTICES ACT (OR. REV. STAT. § 646.605 *ET SEQ.*) ................... 732

COUNT 223 BREACH OF CONTRACT  (BASED ON OREGON
    LAW)...................................................................................................... 736

COUNT 224 BREACH OF EXPRESS WARRANTY (OR. REV. STAT.
    § 72.3130).............................................................................................. 737

COUNT 225 FRAUDULENT CONCEALMENT (BASED ON
    OREGON LAW) .................................................................................... 740

COUNT 226 ...................................................................................................... 746

NEGLIGENT MISREPRESENTATION ................................................................ 746

COUNT 227 UNJUST ENRICHMENT.............................................................. 746

    LL.   Claims Brought on Behalf of the Pennsylvania Subclass.............. 747

COUNT 228 VIOLATION OF THE PENNSYLVANIA UNFAIR
    TRADE PRACTICES AND CONSUMER PROTECTION LAW
    (73 PA. CONS. STAT. § 201-1 *ET SEQ.*) ............................................... 747

COUNT 229 BREACH OF CONTRACT  (BASED ON
    PENNSYLVANIA LAW)........................................................................ 752

COUNT 230 BREACH OF EXPRESS WARRANTY (13 PA. STAT.
    ANN. § 2313) ........................................................................................ 753

COUNT 231 FRAUDULENT CONCEALMENT (BASED ON
    PENNSYLVANIA LAW)........................................................................ 756

COUNT 232 ...................................................................................................... 762

NEGLIGENT MISREPRESENTATION ................................................................ 762

COUNT 233 UNJUST ENRICHMENT.............................................................. 762

    MM.  Claims brought on behalf of the Rhode Island Subclass ............... 763

COUNT 234 VIOLATION OF THE RHODE ISLAND UNFAIR
     TRADE PRACTICES AND CONSUMER PROTECTION ACT
     (R.I. GEN. LAWS § 6-13.1 *ET SEQ.*) ...................................................... 763

COUNT 235 BREACH OF CONTRACT  (BASED ON RHODE
     ISLAND LAW) ..................................................................................... 767

COUNT 236 BREACH OF EXPRESS WARRANTY (R.I. GEN. LAWS
     § 6A-2-313) ......................................................................................... 769

COUNT 237 FRAUDULENT CONCEALMENT (BASED ON RHODE
     ISLAND LAW) ..................................................................................... 772

COUNT 238 .................................................................................................... 778

NEGLIGENT MISREPRESENTATION ............................................................ 778

COUNT 239 UNJUST ENRICHMENT ............................................................. 778

     NN.   Claims Brought on Behalf of the South Carolina Subclass ........... 779

COUNT 240 VIOLATION OF THE SOUTH CAROLINA UNFAIR
     TRADE PRACTICES ACT (S.C. CODE ANN. § 39-5-10
     *ET SEQ.*) ............................................................................................. 779

COUNT 241 VIOLATION OF THE SOUTH CAROLINA
     REGULATION OF MANUFACTURERS, DISTRIBUTORS,
     AND DEALERS ACT (S.C. CODE ANN. § 56-15-10 *ET SEQ.*) .......... 783

COUNT 242 BREACH OF CONTRACT (BASED ON SOUTH
     CAROLINA LAW) ................................................................................ 786

COUNT 243 BREACH OF EXPRESS WARRANTY (S.C. CODE ANN.
     § 36-2-313) ......................................................................................... 787

COUNT 244 FRAUDULENT CONCEALMENT (BASED ON SOUTH
     CAROLINA LAW) ................................................................................ 790

COUNT 245 .................................................................................................... 796

NEGLIGENT MISREPRESENTATION ............................................................ 796

COUNT 246 UNJUST ENRICHMENT ............................................................. 796

     OO.   Claims Brought on Behalf of the South Dakota Subclass ............. 797

COUNT 247 VIOLATION OF THE SOUTH DAKOTA DECEPTIVE
TRADE PRACTICES AND CONSUMER PROTECTION LAW
(S.D. CODIFIED LAWS § 37-24-6).......................................................... 797

COUNT 248 BREACH OF CONTRACT (BASED ON SOUTH
DAKOTA LAW)..................................................................................... 801

COUNT 249 BREACH OF EXPRESS WARRANTY (S.D. CODIFIED
LAWS § 57A-2-313) ............................................................................... 803

COUNT 250 FRAUDULENT CONCEALMENT (BASED ON SOUTH
DAKOTA LAW)..................................................................................... 805

COUNT 251 ....................................................................................................... 811

NEGLIGENT MISREPRESENTATION................................................................ 811

COUNT 252 UNJUST ENRICHMENT............................................................... 812

PP.    Claims Brought on Behalf of the Tennessee Subclass................... 813

COUNT 253 VIOLATION OF THE TENNESSEE CONSUMER
PROTECTION ACT (TENN. CODE § 47-18-101, *ET SEQ.*) ................ 813

COUNT 254 BREACH OF CONTRACT  (BASED ON TENNESSEE
LAW)..................................................................................................... 817

COUNT 255 BREACH OF EXPRESS WARRANTY (TENN. CODE
ANN. § 47-2-313)................................................................................... 818

COUNT 256 FRAUDULENT CONCEALMENT (BASED ON
TENNESSEE LAW) ............................................................................... 821

COUNT 257 ....................................................................................................... 827

NEGLIGENT MISREPRESENTATION................................................................ 827

COUNT 258 UNJUST ENRICHMENT............................................................... 827

QQ.   Claims Brought on Behalf of the Texas Subclass.......................... 828

COUNT 259 VIOLATIONS OF THE TEXAS DECEPTIVE TRADE
PRACTICES AND CONSUMER PROTECTION ACT (TEX.
BUS. & COM. CODE § 17.4 *ET SEQ.*)................................................... 828

COUNT 260 BREACH OF CONTRACT  (BASED ON TEXAS LAW)......... 833

COUNT 261 BREACH OF EXPRESS WARRANTY (TEX. BUS. & COM. CODE § 2.313) .............................................................................. 835

COUNT 262 FRAUDULENT CONCEALMENT (BASED ON TEXAS LAW) .................................................................................................... 838

COUNT 263 ................................................................................................. 843

NEGLIGENT MISREPRESENTATION ............................................................ 843

COUNT 264 UNJUST ENRICHMENT ............................................................. 844

    RR.   Claims Brought on Behalf of the Utah Subclass ........................... 845

COUNT 265 VIOLATION OF THE UTAH CONSUMER SALE PRACTICES ACT (UTAH CODE ANN. § 13-11-1 *ET SEQ.*) .............. 845

COUNT 266 BREACH OF CONTRACT  (BASED ON UTAH LAW) .......... 849

COUNT 267 BREACH OF EXPRESS WARRANTY (UTAH CODE ANN. § 70A-2-313) ..................................................................................... 850

COUNT 268 FRAUDULENT CONCEALMENT (BASED ON UTAH LAW) .................................................................................................... 853

COUNT 269 ................................................................................................. 859

NEGLIGENT MISREPRESENTATION ............................................................ 859

COUNT 270 UNJUST ENRICHMENT ............................................................. 859

    SS.   Claims brought on behalf of the Vermont Subclass ..................... 860

COUNT 271 VIOLATION OF THE VERMONT CONSUMER FRAUD ACT (VT. STAT. ANN. TIT. 9, § 2451 *ET SEQ.*) .................................. 860

COUNT 272 BREACH OF CONTRACT  (BASED ON VERMONT LAW) ................................................................................................... 864

COUNT 273 BREACH OF EXPRESS WARRANTY (9A VT. STAT. ANN. § 2-313) ........................................................................................... 865

COUNT 274 FRAUDULENT CONCEALMENT (BASED ON VERMONT LAW) ................................................................................... 868

COUNT 275 ................................................................................................. 874

NEGLIGENT MISREPRESENTATION ............................................................ 874

COUNT 276 UNJUST ENRICHMENT ............................................................ 874

    TT.   Claims Brought on Behalf of the Virginia Subclass ...................... 875

COUNT 277 VIOLATION OF THE VIRGINIA CONSUMER
    PROTECTION ACT (VA. CODE ANN. § 59.1-196 *ET SEQ.*).............. 875

COUNT 278 BREACH OF CONTRACT  (BASED ON VIRGINIA
    LAW) ................................................................................................ 879

COUNT 279 BREACH OF EXPRESS WARRANTY (VA. CODE ANN.
    § 8.2-313) ........................................................................................ 881

COUNT 280 FRAUDULENT CONCEALMENT (BASED ON
    VIRGINIA LAW) .............................................................................. 883

COUNT 281 ............................................................................................... 889

NEGLIGENT MISREPRESENTATION ............................................................ 889

COUNT 282 UNJUST ENRICHMENT ............................................................ 890

    UU.   Claims Brought on Behalf of the Washington Subclass ................ 891

COUNT 283 VIOLATION OF THE WASHINGTON CONSUMER
    PROTECTION ACT (WASH. REV. CODE ANN. § 19.86.010
    *ET SEQ.*) ........................................................................................ 891

COUNT 284 BREACH OF CONTRACT  (BASED ON WASHINGTON
    LAW) ................................................................................................ 895

COUNT 285 BREACH OF EXPRESS WARRANTY (WASH. REV.
    CODE § 62A.2-313) ......................................................................... 896

COUNT 286 FRAUDULENT CONCEALMENT (BASED ON
    WASHINGTON LAW) ....................................................................... 899

COUNT 287 ............................................................................................... 905

NEGLIGENT MISREPRESENTATION ............................................................ 905

COUNT 288 UNJUST ENRICHMENT ............................................................ 905

    VV.   Claims brought on behalf of the West Virginia Subclass .............. 906

COUNT 289 VIOLATION OF THE WEST VIRGINIA CONSUMER
  CREDIT AND PROTECTION ACT (W. VA. CODE § 46A-1-101
  *ET SEQ.*) ............................................................................ 906

COUNT 290 BREACH OF CONTRACT  (BASED ON WEST
  VIRGINIA LAW)................................................................... 911

COUNT 291 BREACH OF EXPRESS WARRANTY (W. VA. CODE §
  46-2-313) ............................................................................ 913

COUNT 292 FRAUDULENT CONCEALMENT (BASED ON WEST
  VIRGINIA LAW)................................................................... 916

COUNT 293 ........................................................................................ 922

NEGLIGENT MISREPRESENTATION................................................ 922

COUNT 294 UNJUST ENRICHMENT................................................... 922

  WW.  Claims Brought on Behalf of the Wisconsin Subclass ................. 923

COUNT 295 VIOLATION OF THE WISCONSIN DECEPTIVE
  TRADE PRACTICES ACT (WIS. STAT. § 110.18) .............................. 923

COUNT 296 BREACH OF CONTRACT (BASED ON WISCONSIN
  LAW)................................................................................... 927

COUNT 297 BREACH OF EXPRESS WARRANTY (WIS. STAT. §
  402.313)............................................................................... 928

COUNT 298 FRAUDULENT CONCEALMENT (BASED ON
  WISCONSIN LAW)............................................................... 931

COUNT 299 ........................................................................................ 937

NEGLIGENT MISREPRESENTATION................................................ 937

COUNT 300 UNJUST ENRICHMENT................................................... 937

  XX.   Claims brought on behalf of the Wyoming Subclass..................... 938

COUNT 301 VIOLATION OF THE WYOMING CONSUMER
  PROTECTION ACT (WYO. STAT. § 40-12-105 *ET SEQ.*) ................. 938

COUNT 302 BREACH OF CONTRACT  (BASED ON WYOMING
  LAW)................................................................................... 942

COUNT 303 BREACH OF EXPRESS WARRANTY (WYO. STAT. § 34.1-2-313) ............................................................................. 943

COUNT 304 FRAUDULENT CONCEALMENT (BASED ON WYOMING LAW)................................................................................... 946

COUNT 305 .................................................................................... 952

NEGLIGENT MISREPRESENTATION............................................................ 952

COUNT 306 UNJUST ENRICHMENT............................................................. 952

YY.   Claims Brought on Behalf of the Nationwide Class ...................... 953

COUNT 307 VIOLATION OF THE MAGNUSSON-MOSS WARRANTY ACT (15 U.S.C. §§ 2301 *ET SEQ.*) ................................. 953

COUNT 308 BREACH OF EXPRESS WARRANTY ....................................... 957

COUNT 309 FRAUD ........................................................................ 958

COUNT 310 NEGLIGENT MISREPRESENTATION ..................................... 959

COUNT 311 UNJUST ENRICHMENT............................................................ 959

REQUEST FOR RELIEF ................................................................... 960

DEMAND FOR JURY TRIAL ....................................................................... 961

The allegations herein are based on Plaintiffs' personal knowledge and allege the following based upon the investigation of counsel, the review of scientific papers, and the proprietary investigation of experts.

## I.   INTRODUCTION

1.     Car makers know that one of the most important factors for a consumer purchasing a vehicle is fuel economy. With vehicle purchases and leases among the largest transactions most consumers will carry out in their lifetime, consumers trust the fuel economy rating displayed in a vehicle's window sticker to help them make important financial decisions.

2.     This case arises because Defendant Ford Motor Company ("Ford") cheated on its fuel economy testing on some of its best-selling and most popular trucks. Ford then used its inaccurate fuel economy ratings on the window stickers to sell and lease these trucks to consumers. Over a million Ford truck owners are now driving vehicles that will cost them thousands of dollars more to own or lease than they anticipated. Because of Ford's deception, all purchasers and lessees of these vehicles paid more for these vehicles than they are actually worth.

3.     Plaintiffs bring this class action for a Class defined as:

> All persons who purchased or leased a Ford vehicle whose published EPA fuel economy ratings, as printed on the vehicles' window sticker, were more than the fuel economy rating produced by a properly conducted applicable federal mileage test. The vehicles in the Class include but are not limited to the model year 2019 and

- 1 -

2020 Ford Ranger and the 2018, 2019, and 2020 Ford F-150.

4.      These vehicles are hereinafter referred to as the "Coastdown Cheating Vehicles" and include the 2019 and 2020 Ford Ranger and the 2018, 2019, and 2020 F-150 series trucks, and likely also include other Ford vehicles.

5.      A Coastdown test is a procedure that determines metrics used to calculate a vehicle's fuel economy values or "MPG Rating" (miles per gallon). Coastdown testing tells a manufacturer how much rolling resistance and drag a vehicle has so that when a vehicle is testing on a dynamometer, the manufacturer knows how much drag and rolling resistance to apply to the vehicle to simulate the road.

6.      Ford fudged its coastdown testing and used inaccurate drag and resistance figures to boost the vehicles' "EPA" (Environmental Protection Agency) mileage ratings.

7.      On the window sticker of every Ford F-150 and Ford Ranger are EPA-required indications of fuel economy including city and highway mileage, miles per gallon, and a combined city and highway miles per gallon statement.

8.      Ford knows that fuel economy is material to consumers.

9.      Testing of the 2018 F-150 using the mandated coastdown procedure reveals that Ford did not follow appropriate coastdown testing procedures. The window sticker or "Monroney sticker" for a 2018 Ford F-150 V6 indicates mileage

of 20 city, 26 highway, and 22 combined.   Accurate coastdown testing of a 2018 Ford F-150 V6 reveals the following:  The real highway fuel number is 22.7 MPG compared to 26.6 reported by Ford to the EPA.  For city driving it is 17.7 MPG compared to 19.6 reported to the EPA.  Thus, the highway fuel difference is 15% and the city difference 10%.  Assuming the lifetime of a truck is 150,000 miles, at the real city miles per gallon rates, city driving would consume an extra 821 gallons over the lifetime of the truck.   The highway extra fuel (extra means real MPG versus Ford's reported MPG) is 968 gallons.

10.    These are material differences as manufacturers fight for every 1/10th of a difference in miles per gallon both to attract customers and to earn credits under the applicable environmental emissions regulations.

11.    Ford's motives in overstating vehicle miles per gallon were: (1) to advertise the vehicles as "Best in Class" for fuel economy or to advertise a fuel economy that would beat the competition and/or be attractive to consumers, (2) to attract customers based on fuel economy ratings, and (3) to earn more credits for Ford under the U.S. CAFE environmental regulations since less fuel burned means less emission.

12.    Ford has admitted that the 2019 Ranger is just the first model that is being investigated by the government for improper coastdown testing.  As explained herein, Plaintiffs' testing of the 2018 F-150 reveals similar coastdown cheating.

13.   Ford sold approximately 1 million 2018 and 2019 F-150s.  The extra fuel costs, with the same assumptions above, for all 2018 and 2019 F-150s would be approximately $2.32 billion for city driving, $2.09 billion highway, and $1.9 billion combined.

14.   The 2018, 2019, and 2020 F-150 are virtually identical in engine and body configuration.  In fact, on its applications to certify fuel economy ratings and emissions certifications for the 2019 and 2020 F-150, Ford used the same vehicle serial numbers and presented the same emissions test numbers to the EPA as it did for the 2018 F-150 application. Likewise, the 2020 Ranger is virtually identical in engine and body configuration to the 2019 Ranger and Ford has used the same vehicle serial number and presented the same emissions test numbers to the EPA as it did for the 2019 Ranger application.

15.   Ford deliberately misrepresented or miscalculated certain road testing factors during internal vehicle testing processes in order to report that its vehicles were more fuel efficient than they actually were.  In particular, Ford miscalculated something called "Road Load," which is the force that is imparted on a vehicle while driving at a constant speed over a smooth, level surface from sources such as tire rolling resistance, driveline losses, and aerodynamic drag.[1]  Ford's internal lab tests

---

[1] *See* Exhibit 1, *Determination and Use of Vehicle Road-Load Force and Dynamometer Settings*, United States Environmental Protection Agency (Feb. 23,

did not account for these forces, which lead to better—and entirely inaccurate—fuel economy projections.

16.     Despite Ford's own employees questioning its testing practices and the calculations that Ford was utilizing for fuel economy ratings, at least by September 2018,[2] Ford took no action to correct the problems nor to alert consumers that their test methods were flawed and that consumers would not get the promised fuel economy.

17.     With respect to its 2019 Ford Ranger, Ford promised that its midsize truck "will deliver with durability, capability and fuel efficiency, while also providing in-city maneuverability and the freedom desired by many midsize pickup truck buyers to go off the grid."[3]  Ford also claimed that its "All-New Ford Ranger [was] Rated Most Fuel Efficient Gas-Powered Midsize Pickup in America."[4]  "With

---

2015),  https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=34102&flag=1 (last visited Aug. 11, 2020).

    [2] Exhibit 2, Natasha Singer, *Ford is Investigating Emissions and Fuel Efficiency Data*, The New York Times (Feb. 21, 2019), https://www.nytimes.com/2019/02/21/business/ford-emissions.html?module=inline (last visited Aug. 11, 2020).

    [3] Exhibit 3*, 2019 Ford Ranger Most Fuel-Efficient in its Class, Because Of Course It Is*, The Newswheel (Dec. 21, 2018), https://thenewswheel.com/2019-ford-ranger-most-fuel-efficient/ (last visited Aug. 11, 2020) ("Statement from Todd Eckert, Ford Truck Group's Marketing Manager").

    [4] Exhibit 4, *Adventure Further: All-New Ford Ranger Rated Most Fuel-Efficient Gas-Powered Midsize Pickup in America*, Ford Media Center (Dec. 11, 2018), https://media.ford.com/content/fordmedia/fna/us/en/news/2018/12/11/ford-ranger-rated-most-fuel-efficient-gas-powered-midsize-pickup.html (last visited Aug. 11, 2020).

EPA-estimated fuel economy ratings of 21 mpg city, 26 mpg highway and 23 mpg combined, 2019 Ford Ranger is the most fuel efficient gas-powered midsize pickup in America."[5]  Ford claimed the 2019 Ranger "is the no-compromise choice for power, technology, capability, and efficiency whether the path is on road or off."[6]

18.    Ford knew that to sell the Ranger, it had to tout it had fuel efficiency, and this promise was material to consumers.

19.    There is no question that Ford used the fuel efficiency ratings as a selling tool to entice consumers into purchasing the 2019 Ford Ranger.  Indeed, Ford promised that "[t]he adventure-ready 2019 Ford Ranger is the most fuel-efficient gas-powered midsize pickup in America—providing a superior EPA-estimated city fuel economy rating and an unsurpassed EPA-estimated combined fuel economy rating versus the competition.  The all-new Ranger has earned EPA-estimated fuel economy ratings of 21 mpg city, 26 mpg highway and 23 mpg combined for 4x2 trucks."[7]  Ford claimed that "[t]his is the best-in-class EPA-estimated city fuel economy rating of any gasoline-powered four-wheel-drive midsize pickup and it is an unsurpassed EPA-estimated combined fuel economy rating."[8]

---

[5] *Id*.

[6] *Id*.

[7] *Id.*

[8] *Id*.

20.    Fuel economy was also used as a tool to entice customers to buy the Ford F-150.  Ford promised that certain of the 2018 F-150s were "best in class" for fuel economy, or promised certain city, highway and combined fuel miles per gallon for other F-150 models that were robust enough that Ford believed would make them attractive to consumers.

21.    In contrast to Ford's promises, as noted above, scientifically valid testing has revealed that the vehicles (i) are not as fuel efficient as promised; (ii) are not what a reasonable consumer would expect; and (iii) are not what Ford had advertised. Further, the vehicles' promised power, fuel economy and efficiency, and towing capacity are obtained only by altering the testing calculations.

22.    Ford's representations are deceptive and false, and Ford sold its 2019 and 2020 Ford Rangers and 2018, 2019, and 2020 F-150 models while omitting information that would be material to a reasonable consumer; namely, that Ford miscalculated factors during internal vehicle testing processes in order to report that its vehicles were more fuel efficient than they actually were, and discounted common real-world driving conditions.

23.    Plaintiffs bring this action individually and on behalf of all other current and former owners or lessees of the Coastdown Cheating Vehicles. Plaintiffs seek damages, injunctive relief, and equitable relief for Ford's misconduct related to the

design, manufacture, marketing, sale, and lease of the Coastdown Cheating Vehicles, as alleged in this Complaint.

## II.   JURISDICTION

24.   This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because Plaintiffs and Defendant reside in different states. The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

25.   This Court also has original jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332(a)(1), as modified by the Class Action Fairness Act of 2005, because Plaintiffs and Defendant are citizens of different states; there are more than 100 members of the Class (as defined herein); the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest, and costs; and Class members reside across the United States 28 U.S.C. § 1332(d)(1), (2). The citizenship of each party is described further below in the "Parties" section.

26.   This Court has personal jurisdiction over Ford pursuant to 18 U.S.C. § 1965(b) & (d). This Court has personal jurisdiction over Ford because it has its principal place of business here, minimum contacts with the United States, this judicial district, and this State, and it intentionally availed itself of the laws of the United States and this state by conducting a substantial amount of business throughout the state, including the design, manufacture, distribution, testing, sale,

lease, and/or warranty of Ford vehicles in this State and District. At least in part because of Ford's misconduct as alleged in this lawsuit, the Coastdown Cheating Vehicles ended up on this state's roads and in dozens of franchise dealerships.

### III.   VENUE

27.    Venue is proper in this Court under 28 U.S.C. § 1391 because Ford maintains its principal place of business in this District, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, including, *inter alia*, Ford's decision-making, design, promotion, marketing, and distribution of the Coastdown Cheating Vehicles occurred in this District, and because Defendant conducts a substantial amount of business in this District. Accordingly, Defendant has sufficient contacts with this District to subject Defendant to personal jurisdiction in the District and venue is proper.  Venue is also proper under 18 U.S.C. § 1965(a) because Ford is subject to personal jurisdiction in this District, as alleged in the preceding paragraph, and Ford has agents located in this District. Thus, venue is proper in this District for all pre-trial or trial proceedings.

### IV.   PARTIES

**A.    Plaintiffs**

**1.    Alabama Plaintiffs**

**a. William Don Cook**

28.    Plaintiff William Don Cook is an Alabama citizen and resident of Montgomery, Alabama.  On or around March 12, 2019, he purchased a new 2018

Ford F-150 Lariat FX4, paying approximately $56,225.92. Plaintiff Cook compared the alleged fuel efficiency of the F-150 with other similar trucks and selected the F-150 truck based in part on Ford's representations about the vehicle's fuel efficiency.

29.    Plaintiff Cook purchased the new 2018 F-150 with VIN 1FTEW1EG4JKD13378 from Collier Ford, an authorized Ford dealership located in Wetumpka, Alabama. Plaintiff Cook purchased and still owns this vehicle. Unbeknownst to Plaintiff Cook at the time the vehicle was purchased, it consumes more fuel than advertised.

30.    Plaintiff Cook selected and ultimately purchased his vehicle in part because of the stated "best in class" fuel economy.  Before he purchased the 2018 Ford F-150, Plaintiff Cook saw representations about the vehicle's performance, including its fuel economy, on Ford's website, dealer brochures, television commercials and on the vehicle's window sticker.

31.    Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

32.    Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

33.     Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

34.     Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

35.     Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### b.  Ronald J. Dismukes

36.     Plaintiff Ronald J. Dismukes is an Alabama citizen and resident of Eufaula, Alabama.  On or around February 20, 2018, he purchased a new 2018 Ford F-150 SuperCrew XLT, paying approximately $51,148.46. Plaintiff Dismukes compared the alleged fuel efficiency of the F-150 with other similar trucks and selected the F-150 truck based in part on Ford's representations about the vehicle's fuel efficiency.

37.     Plaintiff Dismukes purchased the new 2018 F-150 with VIN 1FTEW1EGXJFA56025 from Money Ford, an authorized Ford dealership located in Abbeville, Alabama. Plaintiff Dismukes purchased and still owns this vehicle. Unbeknownst to Plaintiff Dismukes at the time the vehicle was purchased, it consumes more fuel than advertised.

38.     Plaintiff Dismukes selected and ultimately purchased his vehicle, in part, because of the stated "best in class" fuel economy.  Before he purchased the 2018 Ford F-150, Plaintiff Dismukes saw representations about the vehicle's performance, including its fuel economy, on Ford's website and on the vehicle's window sticker.

39.     Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

40.     Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

41.     Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had

better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

42.    Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

43.    Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### c.  Jeffrey Foshee

44.    Plaintiff Jeffrey Foshee is an Alabama citizen and resident of Jasper, Alabama.  On or around March 30, 2019, he purchased a new 2019 Ford F-150 SuperCrew XLT, paying approximately $40,000. Plaintiff Foshee compared the alleged fuel efficiency of the F-150 with other similar trucks and selected the F-150 truck based in part on Ford's representations about the vehicle's fuel efficiency.

45.    Plaintiff Foshee purchased the new 2019 F-150 with VIN 1FTEW1EP4KFB32937 from Long-Lewis Ford, an authorized Ford dealership located in Prattville, Alabama. Plaintiff Foshee purchased and still owns this vehicle. Unbeknownst to Plaintiff Foshee at the time the vehicle was purchased, it consumes more fuel than advertised.

46.     Plaintiff Foshee selected and ultimately purchased his vehicle, in part, because of the stated "best in class" fuel economy. Plaintiff Foshee recalls that before he purchased the 2019 Ford F-150, he saw representations about the vehicle's performance, including its fuel economy, in Ford's print brochures, Ford's radio and television ads, and on the vehicle's window sticker. Plaintiff Foshee also recalls discussing fuel economy with the dealer in advance of purchase.

47.     Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

48.     Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

49.     Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff. So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

50.     Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to

a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

51.     Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### 2.     Arizona Plaintiff

#### a.  Ronald Ceremello

52.     Plaintiff Ronald Ceremello is an Arizona citizen and resident of Gilbert, Arizona.  On or around January 25, 2019, he purchased a new 2019 Ford Ranger XLT, paying approximately $53,000. Plaintiff Ceremello compared the alleged fuel efficiency of the Ranger with other similar trucks and selected the Ranger truck based in part on Ford's representations about the vehicle's fuel efficiency.

53.     Plaintiff Ceremello purchased the new 2019 Ranger from San Tan Ford, an authorized Ford dealership located in Gilbert, Arizona. Plaintiff Ceremello purchased and still owns this vehicle.  Unbeknownst to Plaintiff Ceremello at the time the vehicle was purchased, it consumes more fuel than advertised.

54.     Plaintiff Ceremello selected and ultimately purchased his vehicle in part because of the stated "best in class" fuel economy.  Before he purchased the 2019 Ranger, Plaintiff Ceremello saw representations about the vehicle's

performance, including its fuel economy, on Ford's website, dealer brochures, television commercials and on the vehicle's window sticker.

55.    Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

56.    Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

57.    Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

58.    Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

59.    Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### 3.    California Plaintiffs

#### a.  Victor Perez

60.    Plaintiff Victor Perez is a California citizen and resident of El Centro, California, located in Imperial County.  On or about February 16, 2019, he purchased a new 2019 Ford Ranger pickup, paying approximately $32,000. Plaintiff Perez compared the alleged fuel efficiency of the Ranger with other similar trucks, including the Toyota Tacoma, Chevy Colorado, and GMC Canyon and selected the Ranger truck based in part on Ford's representations about the vehicle's fuel efficiency.

61.    Plaintiff Perez purchased the new 2019 Ranger, with VIN 1FTER4EH0KLA05637, from El Centro Motors, an authorized Ford dealership located in El Centro, California. Plaintiff Perez purchased and still owns this vehicle. Unbeknownst to Plaintiff Perez at the time the vehicle was purchased, it consumes more fuel than advertised.

62.    Plaintiff Perez selected and ultimately purchased his vehicle, in part, because of the stated "best in class" fuel economy. Plaintiff Perez recalls that before the purchase of the 2019 Ford Ranger, he saw representations online about the

vehicle's performance, including its fuel economy, on Ford's website and on the vehicle's window sticker.  Plaintiff Perez recalls that before he purchased the 2019 Ford Ranger, the dealer highlighted the best in class fuel economy and pointed to the Monroney sticker to highlight how much he would save on gas.

63.    Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

64.    Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

65.    Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

66.    Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

67.    Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### b. Harold Brower

68.    Plaintiff Harold Brower is a California citizen and resident of Escondido, California.  In February 2019, he leased a new 2019 Ford F-150 pickup for approximately $47,000.  Prior to leasing the F-150, Plaintiff Brower compared the alleged fuel efficiency of the F-150 with other similar trucks, including the Dodge Ram 1500 and the Chevy Silverado, Plaintiff Brower selected the F-150 in part based on Ford's representations about the vehicle's fuel efficiency.

69.    Plaintiff Brower leased the new 2019 F-150 with VIN 1FTEW1CP5KFA17590 from Penske La Mesa Ford, an authorized Ford dealership located in La Mesa, California. Plaintiff is still leasing this vehicle.  Unbeknownst to Plaintiff at the time the vehicle was leased, it consumes more fuel than advertised.

70.    Plaintiff Brower selected and ultimately leased his vehicle in part because of the stated fuel economy.

71.    Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have leased the vehicle or would have paid less for it.

72.     Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and leasing the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of lease in addition to added fuel costs.

73.     Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he leased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

74.     Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of lease and added fuel costs.

75.     Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the fuel economy of the Coastdown Cheating Vehicles prior to lease.

### 4.     Florida Plaintiffs

#### a.  Steve Beavers

76.     Plaintiff Steve Beavers is a Florida citizen and resident of Winter Haven, Florida.  In or about August 2018, he purchased a new 2018 Ford F-150 XLT

Super Crew pickup, paying approximately $35,779.93. Plaintiff Beavers selected the 2018 F-150 truck based in part on Ford's representations about the vehicle's fuel efficiency.

77.    Plaintiff Beavers purchased the new 2018 F-150 with VIN 1FTEW1EB2JFB51960 from Jarret-Gordon Ford, an authorized Ford dealership located in Winter Haven, Florida.  Unbeknownst to Plaintiff Beavers at the time the vehicle was purchased, it consumes more fuel than advertised.

78.    Plaintiff Beavers selected and ultimately purchased his vehicle, in part, because of the stated fuel economy, as represented through advertisements and representations made by Ford.  Plaintiff Beavers recalls that before he purchased the 2018 F-150, he saw representations about the vehicle's performance, including its fuel economy, on Ford advertisements for the vehicle and on the vehicle's window sticker.

79.    Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

80.    Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

81.     Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

82.     Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

83.     Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### b. Dillon Drake

84.     Plaintiff Dillon Drake is a Florida citizen and resident of Sebring Park, Florida.  In or around March 2019, Plaintiff Drake purchased a Ford F-150 Raptor Class Vehicle.  Plaintiff Drake selected the 2018 F-150 truck based in part on Ford's representations about the vehicle's fuel efficiency.

85.     Plaintiff Drake purchased the 2018 F-150 truck from Bill Jarret Ford, an authorized Ford dealership located in Avon Park, Florida.  Unbeknownst to

Plaintiff Drake at the time the vehicle was purchased, it consumes more fuel than advertised.

86.    Plaintiff Drake selected and ultimately purchased his vehicle, in part, because of the stated fuel economy, as represented through advertisements and representations made by Ford.

87.    Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

88.    Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

89.    Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

90.    Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to

a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

91.     Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### c. Randall Maingot

92.     Plaintiff Randall Maingot is a Florida citizen and resident of Miami, Florida.  On or around July 26, 2019, Plaintiff Maingot purchased a 2019 Ford Ranger XLT Class Vehicle for approximately $35,000.  Plaintiff Maingot selected the 2019 Ford Ranger truck based in part on Ford's representations about the vehicle's fuel efficiency.   Prior to purchasing the Ranger, Plaintiff Maingot compared the alleged fuel efficiency of the 2019 Ranger with other similar trucks, including the Chevy Colorado, GMC Canyon, and Toyota Tacoma, and selected the 2019 Ranger based in part on Ford's representations about the vehicle's fuel efficiency.

93.     Plaintiff Maingot purchased the 2019 Ranger truck with VIN 1FTER4EH47622 from Ford of Kendall, an authorized Ford dealership located in Miami, Florida.  Unbeknownst to Plaintiff Maingot at the time the vehicle was purchased, it consumes more fuel than advertised.

94.    Plaintiff Maingot selected and ultimately purchased his vehicle, in part, because of the stated fuel economy, as represented through advertisements and representations made by Ford.

95.    Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

96.    Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

97.    Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

98.    Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

99.     Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### 5.     Georgia Plaintiff

#### a.  Jamar Haynes

100.  Plaintiff Jamar Haynes is a Georgia citizen and resident of Lawrenceville, Georgia.  In May 2019, he purchased a new 2019 Ford F-150 pickup, paying approximately $38,000.  Plaintiff Haynes compared the alleged fuel efficiency of the F-150 with other similar trucks and selected the F-150 truck based in part on Ford's representations about the vehicle's fuel efficiency.

101.  Plaintiff Haynes purchased the new 2019 F-150, with VIN 1FTEW1CPOKFA28481 from Gwinnett Place Ford, an authorized Ford dealership located in Duluth, Georgia. Plaintiff Haynes purchased and still owns this vehicle. Unbeknownst to Plaintiff Haynes at the time the vehicle was purchased, it consumes more fuel than advertised.

102.  Plaintiff Haynes selected and ultimately purchased his vehicle, in part, because of the stated "best in class" fuel economy.  Before he purchased the 2019 F-150, Plaintiff Haynes saw representations about the vehicle's performance, including its fuel economy, on the vehicle's window sticker. He also discussed the fuel economy with the dealer before purchase.

103.   Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

104.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

105.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

106.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

107.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### 6.   Hawaii Plaintiff

#### a.  George Andrew Rayne

108.   Plaintiff George Andrew Rayne is a Hawaii citizen and resident of Kalaheo, Hawaii. In July 2018, he purchased a new 2018 Ford F-150 pickup paying approximately $46,400.59. Plaintiff Rayne compared the alleged fuel efficiency of the 2018 Ford F-150 with other similar trucks and selected the 2018 Ford F-150 truck based in part on Ford's representations about the vehicle's fuel efficiency.

109.   Plaintiff Rayne purchased the 2018 Ford F-150, with VIN 1FTEW1EPXJKC85019 from Midpac Auto Center (Kuhio Ford), an authorized Ford dealership located in Lihue, Hawaii. Plaintiff Rayne purchased and still owns this vehicle.  Unbeknownst to Plaintiff Rayne at the time the vehicle was purchased, it consumes more fuel than advertised.

110.   Plaintiff Rayne selected and ultimately purchased his vehicle, in part, because of the stated fuel economy as represented through advertisements and representations made by Ford.  Plaintiff Rayne recalls that before he purchased the 2018 Ford F-150, he saw representations about the vehicle's performance, including its fuel economy, on Ford's website and on the vehicle's window sticker.  He also discussed the vehicle's fuel economy with the dealer before purchasing.

111.   Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

112.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

113.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

114.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

115.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### 7.   Illinois Plaintiffs

#### a.  Cassandra Morrison

116.   Plaintiff Cassandra Morrison is an Illinois citizen and resident of Chicago, Illinois.  In or around June 4, 2019, she purchased a new 2019 Ford F-150 XLT SuperCrew pickup, paying approximately $49,016.50.   Ms. Morrison compared the alleged fuel efficiency of the F-150 with other similar trucks, including the Chevrolet Silverado and GMC Sierra, and selected the F-150 truck based in part on Ford's representations about the vehicle's fuel efficiency.

117.   Plaintiff Morrison purchased the new 2019 F-150, with VIN 1FTEW1EP8KFB13355 from McCarthy Ford, an authorized Ford dealership located in Chicago, Illinois. Plaintiff Morrison purchased and still owns this vehicle. Unbeknownst to Plaintiff at the time the vehicle was purchased, it consumes more fuel than advertised.

118.   Plaintiff Morrison selected and ultimately purchased her vehicle, in part, because of the stated "best in class" fuel economy.  Plaintiff Morrison recalls that before she purchased the 2019 Ford F-150, she saw representations about the vehicle's performance, including its fuel economy, in Ford's advertisements and on the vehicle's window sticker.

119.   Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

120.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

121.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, she purchased her vehicle on the reasonable, but mistaken, belief that her vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

122.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

123.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### b.  Ryan Hubert

124.   Plaintiff Ryan Hubert is an Illinois citizen and resident of Champaign, Illinois.  In or about February 2019, he purchased a new 2018 Ford F-150 XL pickup. Plaintiff Hubert selected the F-150 truck based in part on Ford's representations about the vehicle's fuel efficiency.

125.   Plaintiff Hubert purchased the new 2018 F-150 from Heller Ford, an authorized Ford dealership located in El Paso, Illinois. Plaintiff Hubert purchased and still owns this vehicle.  Unbeknownst to Plaintiff at the time the vehicle was purchased, it consumes more fuel than advertised.

126.   Plaintiff Hubert selected and ultimately purchased his vehicle, in part, because of the stated fuel economy.  Plaintiff Hubert recalls that before he purchased the 2018 F-150, he saw representations about the vehicle's performance, including its fuel economy, in Ford advertisements and on the vehicle's window sticker.

127.   Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

128.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

129.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

130.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

131.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### 8. Louisiana Plaintiffs

#### a. Evan Allen

132.   Plaintiff Evan Allen is a Louisiana citizen and resident of Ruston, Louisiana.  On or around April 27, 2019, he purchased a new 2019 Ford Ranger pickup for approximately $27,000. Plaintiff Allen compared the alleged fuel efficiency of the 2019 Ranger with other similar trucks, including the Chevy Colorado and Toyota Tacoma, and selected the 2019 Ranger based in part on Ford's representations about the vehicle's fuel efficiency.

133.   Plaintiff Allen purchased the 2019 Ford Ranger, with VIN 1FTER1EH9KLA32860 from Jim Taylor Ford, an authorized Ford dealership located in Ruston, Louisiana. Plaintiff Allen purchased and still owns this vehicle. Unbeknownst to Plaintiff Allen at the time the vehicle was purchased, it consumes more fuel than advertised.

134.   Plaintiff Allen selected and ultimately purchased his vehicle, in part, because of the stated fuel economy, as represented through advertisements and representations made by Ford.  Plaintiff Allen recalls that before he purchased the 2019 Ranger, he saw representations about the vehicle's performance, including its fuel economy, on Ford's television advertisements and sales pamphlets.

135.   Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

136.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

137.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had

better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

138.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

139.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### b. Benjamin Bischoff

140.   Plaintiff Benjamin Bischoff is a Louisiana citizen and resident of Eunice, Louisiana.  In June 2018, he purchased a used 2018 Ford F-150 pickup for approximately $53,000.  Plaintiff Bischoff compared the alleged fuel efficiency of the 2018 F-150 with other similar trucks and selected the 2018 F-150 truck based in part on Ford's representations about the vehicle's fuel efficiency.

141.   Plaintiff   Bischoff   purchased   the   2018   F-150   with   VIN 1FTEW1E52JKC76720 from Pitre Ford, an authorized Ford dealership located in Eunice, Louisiana. Plaintiff Bischoff purchased and still owns this vehicle. Unbeknownst to Plaintiff Bischoff at the time the vehicle was purchased, it consumes more fuel than advertised.

142.   Plaintiff Bischoff selected and ultimately purchased his vehicle, in part, because of the stated fuel economy, as represented through advertisements and representations made by Ford.  Plaintiff Bischoff recalls that before he purchased the 2018 F-150, he saw representations about the vehicle's performance, including its fuel economy, on Ford's website and on the vehicle's window sticker.

143.   Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

144.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

145.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

146.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to

a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

147.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### 9.   Maryland Plaintiff

#### a.   Randy Transue

148.   Plaintiff Randy Transue is a Maryland citizen and resident of Mount Airy, Maryland.  In or around April 2019, he purchased a new 2019 Ford Ranger pickup paying approximately $45,000.  Plaintiff Transue compared the alleged fuel efficiency of the 2019 Ford Ranger XLT with other similar trucks, including the Toyota Tundra, and selected the 2019 Ford Ranger truck based in part on Ford's representations about the vehicle's fuel efficiency.

149.   Plaintiff Transue purchased the 2019 Ford Ranger with VIN 1FTER4FH2KLA03175 from Century Ford of Mount Airy, an authorized Ford dealership located in Mount Airy, Maryland. Plaintiff Transue purchased and still owns this vehicle.  Unbeknownst to Plaintiff Transue at the time the vehicle was purchased, it consumes more fuel than advertised.

150.   Plaintiff Transue selected and ultimately purchased his vehicle, in part, because of the stated fuel economy as represented through advertisements and

representations made by Ford.  Plaintiff Transue recalls that before he purchased the 2019 Ford Ranger, he saw representations about the vehicle's performance, including its fuel economy, on the vehicle's window sticker.

151.    Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

152.    Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

153.    Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

154.    Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

155.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### 10.   Massachusetts Plaintiff

#### a.   Robert Lovell

156.   Plaintiff Robert Lovell is a Massachusetts citizen and resident of Fitchburg, Massachusetts.  On or about December 26, 2018, he leased a new 2018 Ford F-150 pickup paying approximately $42,570.  Plaintiff Lovell compared the alleged fuel efficiency of the 2018 Ford F-150 with other similar trucks, including the Chevrolet Silverado, Dodge Ram, and GMC Sierra, and selected the 2018 Ford F-150 truck based in part on Ford's representations about the vehicle's fuel efficiency.

157.  Plaintiff Lovell leased the 2018 Ford F-150 with VIN 1FTEW1E5JFES2850 from Gervais Ford, an authorized Ford dealership located in Ayers, Massachusetts. Plaintiff Lovell continues to lease this vehicle.  Unbeknownst to Plaintiff Lovell at the time the vehicle was leased, it consumed more fuel than advertised.

158.   Plaintiff Lovell selected and ultimately leased his vehicle, in part, because of the stated fuel economy as represented through advertisements and representations made by Ford.  Plaintiff Lovell recalls that before he leased the 2018

Ford F-150, he saw representations about the vehicle's performance, including its fuel economy, on the vehicle's window sticker.

159.   Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have leased the vehicle or would have paid less for it.

160.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of lease in addition to added fuel costs.

161.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he leased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

162.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and lease and added fuel costs.

163. Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase or lease.

### 11. Michigan Plaintiffs

#### a. Mark Hill

164. Plaintiff Mark Hill is a Michigan citizen and resident of Rockford, Michigan. On or about January 23, 2019, he purchased a new 2019 Ford Ranger pickup paying approximately $37,504.88. Plaintiff Hill compared the alleged fuel efficiency of the 2019 Ford Ranger with other similar trucks, such as the Chevy Colorado and the Toyota Tacoma, and selected the 2019 Ford Ranger truck based in part on Ford's representations about the vehicle's fuel efficiency.

165. Plaintiff Hill purchased the 2019 Ford Ranger with VIN 1FTER4FH3KLA03802 from Tony Betten & Sons Ford, an authorized Ford dealership located in Grand Rapids, Michigan. Plaintiff Hill purchased and still owns this vehicle. Unbeknownst to Plaintiff Hill at the time the vehicle was purchased, it consumes more fuel than advertised.

166. Plaintiff Hill selected and ultimately purchased his vehicle, in part, because of the stated fuel economy as represented through advertisements and representations made by Ford. Plaintiff Hill recalls that before he purchased the

2019 Ford Ranger, he saw representations about the vehicle's performance, including its fuel economy, on Ford's website and on the vehicle's window sticker.

167.   Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

168.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

169.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

170.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

171.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### b.  Brian Leja

172.   Plaintiff Brian Leja is a Michigan citizen and resident of Omer, Michigan.  On or about April 10, 2019, he leased a new 2019 Ford Ranger pickup paying approximately $624 per month. Plaintiff Leja compared the alleged fuel efficiency of the 2019 Ford Ranger with other similar trucks and selected the 2019 Ford Ranger truck based in part on Ford's representations about the vehicle's fuel efficiency.

173.   Plaintiff Leja leased the 2019 Ford Ranger with VIN 1FTER4FH1KLA24521 from Richardson Ford, an authorized Ford dealership located in Standish, Michigan. Plaintiff Leja continues to lease this vehicle. Unbeknownst to Plaintiff Leja at the time the vehicle was purchased, it consumes more fuel than advertised.

174.   Plaintiff Leja selected and ultimately leased his vehicle, in part, because of the stated fuel economy as represented through advertisements and representations made by Ford.  Plaintiff Leja recalls that before he leased the 2019 Ford Ranger, he saw representations about the vehicle's performance, including its fuel economy, on Ford's website.

175.   Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have leased the vehicle or would have paid less for it.

176.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and leasing the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

177.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he leased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

178.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time lease and added fuel costs.

179.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to lease.

### c.  Nicholas Leonardi

180.   Plaintiff Nicholas Leonardi is a Michigan citizen and resident of Warren, Michigan, located in Macomb County.  In February 2019, he leased a new 2019 Ford F-150 pickup paying approximately $317 per month.  Plaintiff Leonardi compared the alleged fuel efficiency of the F-150 with other similar trucks, such as the Dodge Ram and Chevy Silverado, and selected the F-150 truck based in part on Ford's representations about the vehicle's fuel efficiency.

181.   Plaintiff Leonardi leased the new 2019 F-150 with VIN 1FTEW1EP3KFA40671 from Russ Milne Ford, an authorized Ford dealership located in Macomb, Michigan. Plaintiff Leonardi continues to lease this vehicle. Unbeknownst to Plaintiff at the time the vehicle was leased, it consumes more fuel than advertised.

182.   Plaintiff Leonardi selected and ultimately leased his vehicle, in part, because of the stated fuel economy.  Plaintiff Leonardi recalls that before he leased the 2018 Ford F-150, he saw representations about the vehicle's performance, including its fuel economy, on Ford's website and on the vehicle's window sticker.

183.   Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have leased the vehicle or would have paid less for it.

184.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and leasing the vehicle with exaggerated fuel economy

caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

185.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he leased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

186.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of lease and added fuel costs.

187.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to lease.

### d.  Jeffrey Kaloustian

188.   Plaintiff Jeffrey Kaloustian is a Michigan citizen and resident of Whitmore Lake, Michigan, located in County of Livingston.  On or around May 18, 2018, he leased a new 2018 Ford F-150 pickup.  Plaintiff Kaloustian selected the F-150 truck based in part on Ford's representations about the vehicle's fuel efficiency.

189.  Plaintiff Kaloustian leased the new 2018 F-150 with VIN 1FTEW1EP9JFC99776 from Varsity Ford, an authorized Ford dealership located in Ann Arbor, Michigan.  Unbeknownst to Plaintiff at the time the vehicle was leased, it consumes more fuel than advertised.

190.  Plaintiff Kaloustian selected and ultimately leased his vehicle, in part, because of the stated fuel economy. Plaintiff Kaloustian recalls that he saw representations about the vehicle's performance, including its fuel economy, on the vehicle's window sticker.

191.  Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have leased the vehicle or would have paid less for it.

192.  Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and leasing the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

193.  Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he leased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

194.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of lease and added fuel costs.

195.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to lease.

### 12.   Minnesota Plaintiff

#### a.  Mark Arendt

196.  Plaintiff Mark Arendt is a Minnesota citizen and resident of Bloomington, Minnesota.  On or around December 4, 2018, he purchased a new 2018 Ford F-150 SuperCrew pickup for approximately $49,249.  Plaintiff Arendt compared the alleged fuel efficiency of the F-150 with other similar trucks, including the Chevy 1500, and selected the F-150 truck in part based on Ford's representations about the vehicle's fuel efficiency.

197.  Plaintiff Arendt purchased the new 2018 F-150 with VIN 1FTEW1EG9JKF78877 from Apple Ford, an authorized Ford dealership located in Shakopee, Minnesota. Plaintiff purchased and still owns this vehicle.  Unbeknownst to Plaintiff at the time the vehicle was purchased, it consumes more fuel than advertised.

198.    Plaintiff Arendt selected and ultimately purchased his vehicle, in part, because of the stated fuel economy. Plaintiff Arendt recalls that before he purchased the 2018 Ford F-150, he saw representations about the vehicle's performance, including its fuel economy, in Ford's television commercials and on the vehicle's window sticker.  Plaintiff Arendt also discussed gas mileage with the dealer before purchase.

199.    Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

200.    Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

201.    Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

202.    Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to

a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

203.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### 13.   Missouri Plaintiffs

#### a.  Josh Brumbaugh

204.   Plaintiff Josh Brumbaugh is a Missouri citizen and resident of Marshfield, Missouri.  In or about July of 2019, he purchased a new 2019 Ford F-150 Crewcab XLT pickup paying approximately $39,000. Plaintiff Brumbaugh compared the alleged fuel efficiency of the 2019 Ford F-150 with other similar trucks, such as the Dodge Ram 1500 and the Chevy Silverado 1500, and selected the 2019 Ford F-150 truck based in part on Ford's representations about the vehicle's fuel efficiency.

205.   Plaintiff Brumbaugh purchased the 2019 Ford F-150 with VIN 1FTEW1EP9KKC76796 from Don Vance Ford, an authorized Ford dealership located in Marshfield, Missouri. Plaintiff Brumbaugh purchased and still owns this vehicle.  Unbeknownst to Plaintiff Brumbaugh at the time the vehicle was purchased, it consumes more fuel than advertised.

206.   Plaintiff Brumbaugh selected and ultimately purchased his vehicle, in part, because of the stated fuel economy as represented through advertisements and representations made by Ford.  Plaintiff Brumbaugh recalls that before he purchased the 2019 Ford F-150, he saw representations about the vehicle's performance, including its fuel economy, on Ford's website and on the vehicle's window sticker.

207.   Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

208.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

209.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

210.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to

a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

211.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### b. Darren Honeycutt

212.   Plaintiff Darren Honeycutt is a Missouri citizen and resident of Billings, Missouri.  In or around January 2018, he purchased a new 2018 Ford F-150 2.7L EcoBoost pickup, paying approximately $46,131.60. Plaintiff Honeycutt compared the alleged fuel efficiency of the 2018 Ford F-150 with other similar trucks and selected the 2018 Ford F-150 truck based in part on Ford's representations about the vehicle's fuel efficiency.

213.   Plaintiff Honeycutt purchased the 2018 Ford F-150 with VIN 1FTEW1EP5JKC82187 from Don Vance Ford, an authorized Ford dealership located in Marshfield, Missouri. Due to the poor fuel economy he experienced, in April 2018, Plaintiff Honeycutt traded in the 2018 Ford F-150 for approximately $31,230.  Unbeknownst to Plaintiff Honeycutt at the time the vehicle was purchased, it consumes more fuel than advertised.

214.   Plaintiff Honeycutt selected and ultimately purchased his vehicle, in part, because of the stated fuel economy as represented through advertisements and

representations made by Ford.  Plaintiff Honeycutt recalls that before he purchased the 2018 Ford F-150, he saw representations about the vehicle's performance, including its fuel economy, on Ford's website and on the vehicle's window sticker.

215.   Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

216.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

217.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

218.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

219.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### 14.   Nebraska Plaintiff

#### a.  Scott Whitehill

220.   Plaintiff Scott Whitehill is a Nebraska citizen and resident of Omaha, Nebraska.   On or about July 31, 2018, he purchased a new 2018 Ford F-150 SuperCrew pickup, paying approximately $49,380.  Prior to purchasing the F-150, Plaintiff Whitehill compared the alleged fuel efficiency of the F-150 with other similar trucks, such as the Chevrolet Silverado 1500.  Plaintiff Whitehill selected the F-150 truck based in part on Ford's representations on the window sticker about the vehicle's fuel efficiency.

221.  Plaintiff Whitehill purchased the new 2018 F-150 with VIN 1FTEW1E52JKE30312 from Woodhouse Ford, an authorized Ford dealership located in Omaha, Nebraska. Plaintiff Whitehill purchased and still owns this vehicle. Unbeknownst to Plaintiff at the time the vehicle was purchased, it consumes more fuel than advertised.

222.   Plaintiff Whitehill selected and ultimately purchased his vehicle, in part, because of the stated fuel economy.  Plaintiff Whitehill recalls that before he purchased the 2018 Ford F-150, he saw representations about the vehicle's

performance, including its fuel economy, on Ford's website, television and radio commercials and on the vehicle's window sticker. Plaintiff Whitehill also recalls that before he purchased the vehicle, the dealer pointed to the MPG ratings listed on the Monroney Sticker and highlighted the auto stop/start feature as a fuel saving feature.

223.   Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

224.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

225.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

226.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

227.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### 15. New Jersey Plaintiffs

#### a. Dean Kriner

228.   Plaintiff Dean Kriner is a New Jersey citizen and resident of Voorhees Township, New Jersey.  On or about November 9, 2018, he purchased a used 2018 Ford F-150 pickup, paying approximately $27,000.  Plaintiff Kriner compared the alleged fuel efficiency of the 2018 F-150 with other similar trucks and selected the 2018 F-150 truck based in part on Ford's representations about the vehicle's fuel efficiency.

229. Plaintiff   Kriner   purchased   the   2018   F-150   with   VIN 1FTEW1EP0JFC47257 from Matt Blatt Glassboro, an authorized Ford dealership located in Glassboro, New Jersey. Plaintiff Kriner purchased and still owns this vehicle.  Unbeknownst to Plaintiff Kriner at the time the vehicle was purchased, it consumes more fuel than advertised.

230.   Plaintiff Kriner selected and ultimately purchased his vehicle, in part, because of the stated fuel economy as represented through advertisements and representations made by Ford.  Plaintiff Kriner recalls that before he purchased the

2018 F-150, he saw representations about the vehicle's performance, including its fuel economy, on Ford's website and on the vehicle's window sticker.

231.   Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

232.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

233.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

234.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

235.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### b. Keith Fencl

236.   Plaintiff Keith Fencl is a citizen and resident of Riverton, New Jersey. On or about November 24, 2018, he leased a new 2018 Ford F-150 pickup.  Plaintiff Fencl selected the F-150 truck based in part on Ford's representations about the vehicle's fuel-efficiency.

237.   Plaintiff leased the new 2018 F-150 from Holman Ford Maple Shade, an authorized Ford dealership, located in Maple Shade, New Jersey. Unbeknownst to Plaintiff at the time the vehicle was leased, it consumes more fuel than advertised.

238.   Plaintiff selected and ultimately leased his vehicle in part because of the stated "fuel economy."  Plaintiff Fencl recalls that he saw representations about the vehicle's performance, including its fuel economy, on the vehicle's window sticker.

239.   Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have leased the vehicle or would have paid less for it.

240.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and leasing the vehicle with exaggerated fuel economy

caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

241.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he leased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

242.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of lease and added fuel costs.

243.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to lease.

### c.  Tracey Travis

244.   Plaintiff Tracey Travis is a New Jersey citizen and resident of Little Falls, New Jersey located in Passaic County.  On or about March 11, 2019, he purchased a new 2019 Ford Ranger pickup, paying approximately $45,000.  Plaintiff Travis compared the alleged fuel-efficiency of the Ranger with other similar trucks

and selected the Ranger truck based in part on Ford's representations about the vehicle's fuel-efficiency.

245.    Plaintiff purchased the new 2019 Ranger Lariat model with VIN 1FTER4FH2KLA10885 from All American Ford located in Hackensack, New Jersey. Plaintiff purchased and still owns this vehicle. Unbeknownst to Plaintiff at the time the vehicle was purchased, it consumes more fuel than advertised.

246.    Plaintiff selected and ultimately purchased his vehicle, in part, because of the stated "best in class" fuel economy.

247.    Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

248.    Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

249.    Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff. So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

250.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

251.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### 16. New York Plaintiff

#### a. Cody Smith

252.   Plaintiff Cody Smith is a New York citizen and resident of Binghamton, New York.   On or about April 26, 2019, he purchased a new 2019 Ford F-150 pickup, paying approximately $36,000. Plaintiff Smith compared the alleged fuel efficiency of the 2019 Ford F-150 with other similar trucks, such as the Dodge Ram 1500 and the Chevy Colorado, and selected the 2019 Ford F-150 truck based in part on Ford's representations about the vehicle's fuel efficiency.

253.   Plaintiff   Smith   purchased   the   2019   Ford   F-150   with   VIN 1FTEW1EP2KFB75026   from   Maguire   Ford   of   Ithaca,   an   authorized   Ford dealership located in Ithaca, New York. Plaintiff Smith purchased and still owns this vehicle.   Unbeknownst to Plaintiff Smith at the time the vehicle was purchased, it consumes more fuel than advertised.

254.   Plaintiff Smith selected and ultimately purchased his vehicle, in part, because of the stated fuel economy as represented through advertisements and representations made by Ford.  Plaintiff Smith recalls that before he purchased the 2019 Ford F-150, he saw representations about the vehicle's performance, including its fuel economy, on Ford's website and television ads.

255.   Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

256.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

257.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

258.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to

a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

259. Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### 17. Ohio Plaintiff

#### a. David Polley

260. Plaintiff David Polley is an Ohio citizen and resident of Bellevue, Ohio. On or about December 10, 2018, he leased a new 2018 Ford F-150 XLT pickup, paying approximately $50,205. Plaintiff Polley compared the alleged fuel-efficiency of the 2018 Ford F-150 with other similar trucks such as the Chevy Silverado 1500 and selected the 2018 Ford F-150 truck based in part on Ford's representations about the vehicle's fuel-efficiency.

261. Plaintiff Polley leased the 2018 Ford F-150 with VIN 1FTEW1EP0JFE22008 from Don Tester Ford, an authorized Ford dealership located in Norwalk, Ohio. Plaintiff Polley leased and is still leasing this vehicle. Unbeknownst to Plaintiff Polley at the time the vehicle was leased, it consumes more fuel than advertised.

262. Plaintiff Polley selected and ultimately leased his vehicle, in part, because of the stated fuel economy as represented through advertisements and

representations made by Ford. Plaintiff Polley recalls that before he leased the 2018 Ford F-150, he saw representations about the vehicle's performance, including its fuel economy, on Ford's television commercials and on the vehicle's window sticker. Plaintiff Polley recalls discussing fuel mileage with the dealer in advance of purchasing the vehicle.

263.   Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have leased the vehicle or would have paid less for it.

264.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and leasing the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

265.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff. So, he leased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

266.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to

a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of lease and added fuel costs.

267.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to lease.

### 18. Oklahoma Plaintiff

#### a.  Ahmed Abdi

268.   Plaintiff Ahmed Abdi is an Oklahoma citizen and resident of Oklahoma City, Oklahoma.  On or about March 2019, he purchased a new 2018 Ford F-150 with a 2.7L EcoBoost pickup, paying approximately $38,300.   Plaintiff Abdi compared the alleged fuel-efficiency of the 2018 Ford F-150 with other similar trucks, including the Toyota Tundra and Tacoma, and selected the 2018 Ford F-150 truck based in part on Ford's representations about the vehicle's fuel-efficiency.

269.   Plaintiff Abdi purchased the 2018 Ford F-150 with VIN 1FPEW1CP4JKF74920 from Billingsley Ford, an authorized Ford dealership located in Duncan, Oklahoma.   Plaintiff Abdi purchased and still owns this vehicle.  Unbeknownst to Plaintiff Abdi at the time the vehicle was purchased, it consumes more fuel than advertised.

270.   Plaintiff Abdi selected and ultimately leased his vehicle, in part, because of the stated fuel economy as represented through advertisements and

representations made by Ford.  Plaintiff Abdi recalls that before he purchased the 2018 Ford F-150, he saw representations about the vehicle's performance, including its fuel economy, on the vehicle's window sticker.

271.    Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have leased the vehicle or would have paid less for it.

272.    Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and leasing the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

273.    Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he leased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

274.    Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of lease and added fuel costs.

275.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to lease.

### 19. Oregon Plaintiff

#### a.  Samuel Huffman

276.   Plaintiff Samuel Huffman is an Oregon citizen and resident of North Plains, Oregon.  On or about December 20, 2017, he purchased a new 2018 Ford F-150 pickup paying approximately $55,000. Plaintiff Huffman compared the alleged fuel efficiency of the 2018 F-150 with other similar trucks, including the Dodge Ram, and selected the 2018 F-150 based in part on Ford's representations about the vehicle's fuel efficiency.

277.   Plaintiff Huffman purchased the 2018 F-150 from Damerow Ford, an authorized Ford dealership located in Beaverton, Oregon. Plaintiff Huffman purchased and still owns this vehicle.  Unbeknownst to Plaintiff Huffman at the time the vehicle was purchased, it consumes more fuel than advertised.

278.   Plaintiff Huffman selected and ultimately purchased his vehicle, in part, because of the stated fuel economy as represented through advertisements and representations made by Ford.  Plaintiff Huffman recalls that before he purchased the 2018 F-150, he saw representations about the vehicle's performance, including its fuel economy, on Ford's television commercials, Ford's website and on the

vehicle's window sticker. Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

279.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

280.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

281.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

282.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase

### 20. Pennsylvania Plaintiff

#### a. Steven Hull

283.    Plaintiff Steven Hull is a Pennsylvania citizen and resident of Orefield, Pennsylvania.  In or about July of 2019, he purchased a new 2019 Ford F-150 King Ranch pickup, paying approximately $69,544. Plaintiff Hull compared the alleged fuel efficiency of the 2019 F-150 with other similar trucks and selected the 2019 F-150 truck based in part on Ford's representations about the vehicle's fuel efficiency.

284.    Plaintiff    Hull    purchased    the    2019    F-150    with    VIN 1FTEW1E42KFB00106 from Ciocca Ford, an authorized Ford dealership located in Souderton,    Pennsylvania.    Plaintiff    Hull    purchased    and    still    owns    this vehicle.  Unbeknownst to Plaintiff Hull at the time the vehicle was purchased, it consumes more fuel than advertised.

285.    Plaintiff Hull selected and ultimately purchased his vehicle, in part, because of the stated fuel economy as represented through advertisements and representations made by Ford.  Plaintiff Hull recalls that before he purchased the 2019 F-150, he saw representations about the vehicle's performance, including its fuel economy, on Ford's website and on the vehicle's window sticker.

286.    Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

287.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

288.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

289.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

290.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### 21. South Carolina Plaintiff

#### a.  Matthew Brownlee

291.   Plaintiff Matthew Brownlee is a South Carolina citizen and resident of Central, South Carolina.  In December 2018, he purchased a new 2018 Ford F-150

pickup, paying approximately $36,411.  Plaintiff Brownlee compared the alleged fuel efficiency of the 2018 F-150 with other similar trucks and selected the 2018 F-150 truck based in part on Ford's representations about the vehicle's fuel efficiency.

292.  Plaintiff Brownlee purchased the new 2018 F-150 with VIN 1FTFW1E56JFE72902 from Fairway Ford, an authorized Ford dealership located in Greenville, South Carolina.  Plaintiff Brownlee purchased and still owns this vehicle. Unbeknownst to Plaintiff Brownlee at the time the vehicle was purchased, it consumes more fuel than advertised.

293.  Plaintiff Brownlee selected and ultimately purchased his vehicle, in part, because of the stated fuel economy as represented through advertisements and representations made by Ford. Plaintiff Brownlee recalls that before he purchased the 2018 F-150's, he saw representations about the vehicle's performance, including its fuel economy, on television and internet advertisements and on the vehicle's window sticker.

294.  Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

295.  Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy

caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

296.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

297.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

298.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### 22. South Dakota Plaintiff

#### a.  Robert Raney

299.   Plaintiff Robert Raney is a South Dakota citizen and resident of Box Elder, South Dakota.  On or about May 30, 2019, he purchased a new 2018 Ford Roush F-150 pickup, paying approximately $82,280.13. Plaintiff Raney compared the alleged fuel efficiency of the Ford F-150 with other similar trucks, including the

Toyota Tundra, Chevy Silverado 1500, and Dodge Ram 1500, and selected the Ford F-150 truck based in part on Ford's representations about the vehicle's fuel efficiency.

300.    Plaintiff    Raney    purchased    his    Ford    F-150    with    VIN 1FTEW1E51JFD88045 from McKie Ford, an authorized Ford dealership located in Rapid City, South Dakota. Plaintiff Raney purchased and still owns this vehicle. Unbeknownst to Plaintiff Raney at the time the vehicle was purchased, it consumes more fuel than advertised.

301.    Plaintiff Raney selected and ultimately purchased his vehicle, in part, because of the stated fuel economy as represented through advertisements and representations made by Ford.  Plaintiff Raney recalls that before he purchased the Ford F-150, he saw representations about the vehicle's performance, including its fuel economy, on Ford's website, on television and radio advertisements and on the vehicle's window sticker.  Plaintiff Raney also recalls that prior to purchase, the dealer touted the vehicle's best in class fuel economy.

302.    Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

303.    Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy

caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

304.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

305.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

306.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### 23. Tennessee Plaintiff

#### a.  James Williams

307.   Plaintiff James Williams is a Tennessee citizen and resident of Hendersonville, Tennessee, located in Sumner County.  On or around May 7, 2019, he purchased a new 2018 Ford F-150 diesel pickup for approximately $57,653.81. Plaintiff Williams compared the alleged fuel efficiency of the F-150 with other

similar trucks, such as the Dodge Ram, and selected the F-150 truck based in part on Ford's representations about the vehicle's fuel efficiency.

308.   Plaintiff Williams purchased the new 2018 F-150 with VIN 1FTFW1E10JFD80181 from Two Rivers Ford, an authorized Ford dealership located in Mt. Juliet, Tennessee. Plaintiff Williams purchased and still owns this vehicle. Unbeknownst to Plaintiff at the time the vehicle was purchased, it consumes more fuel than advertised.

309.   Plaintiff Williams selected and ultimately purchased his vehicle, in part, because of the stated fuel economy. Plaintiff Williams recalls that before he purchased the Ford F-150, he saw representations about the vehicle's performance, including its fuel economy, on Ford's website and on the vehicle's window sticker. Specifically, Plaintiff Williams also looked at the vehicle's window sticker and discussed the vehicle's fuel economy with the dealer prior to purchase.

310.   Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

311.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

312.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

313.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

314.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### 24. Texas Plaintiffs

#### a.  David Brewer

315.   Plaintiff David Brewer is a Texas citizen and resident of Jacksonville, Texas, located in Cherokee County.  On or about March 6, 2019, he purchased a new 2019 Ford F-150 pickup, paying $48,042.  Plaintiff Brewer selected the F-150 truck based in part on Ford's representations about the vehicle's fuel efficiency.

316.  Plaintiff  Brewer  purchased  the  new  2019  F-150  with  VIN 1FTEW1EP3KFA79860  from  Bill  McRae  Ford  Lincoln,  an  authorized  Ford

dealership located in Jacksonville, Texas. Plaintiff purchased and still owns this vehicle. Unbeknownst to Plaintiff at the time the vehicle was purchased, it consumes more fuel than advertised.

317.   Plaintiff Brewer selected and ultimately purchased his vehicle, in part, because of the stated fuel economy. Plaintiff Brewer recalls that before he purchased the Ford F-150, he saw representations about the vehicle's lightweight aluminum frame and fuel economy, in television and radio advertisements and observed the purported fuel economy on the vehicle's window sticker.

318.   Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

319.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

320.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff. So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

321.    Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

322.    Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### b. Rosalynda Garza

323.    Plaintiff Rosalynda Garza is a Texas citizen and resident of Helotes, Texas.  On or around June 11, 2018, Plaintiff Garza purchased a new 2018 Ford F-150 pickup, paying $37,944.25.  Plaintiff Garza compared the alleged fuel efficiency of the F-150 with other similar trucks and selected the F-150 truck based in part on Ford's representations about the vehicle's fuel efficiency.

324.  Plaintiff Garza purchased the new 2018 F-150 with VIN 1FTEW1CP1JKD04415 from Red McCombs Ford, an authorized Ford dealership located in San Antonio, Texas. Plaintiff purchased and still owns this vehicle. Unbeknownst to Plaintiff at the time the vehicle was purchased, it consumes more fuel than advertised.

325.    Plaintiff Garza selected and ultimately purchased her vehicle, in part, because of the stated fuel economy.  Plaintiff Garza recalls that before she purchased

the Ford F-150, she saw representations about the vehicle's performance, including its fuel economy, on the vehicle's window sticker.

326.   Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

327.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

328.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, she purchased her vehicle on the reasonable, but mistaken, belief that her vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

329.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

330.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### c.  Marshall B. Lloyd

331.   Plaintiff Marshall B. Lloyd is a Texas citizen and resident of San Antonio, Texas.  On or about March 13, 2019, he purchased a new 2019 Ford Ranger pickup for approximately $35,000.   Plaintiff Lloyd compared the alleged fuel-efficiency of the Ranger with other similar trucks, including the Toyota Tacoma and Nissan trucks, and selected the Ranger truck based in part on Ford's representations about the vehicle's fuel-efficiency.

332.   Plaintiff purchased the new Ranger crew cab Lariat XLT model with VIN 1FER4EH9KLA128993 from Red McCombs Ford in San Antonio, Texas. Plaintiff purchased and still owns this vehicle.  Unbeknownst to Plaintiff at the time the vehicle was purchased, it consumes more fuel than advertised.

333.   Plaintiff selected and ultimately purchased his vehicle, in part, because of the stated "best in class" fuel economy.

334.   Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

335.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

336.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

337.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

338.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### d.  Michael Smith

339.   Plaintiff Michael Smith, a Texas citizen and resident of Blanco, Texas. On or about August 8, 2019, he purchased a new 2019 Ford Ranger pickup for approximately $36,808.16. Plaintiff Smith compared the alleged fuel efficiency of

the Ranger with other similar trucks and selected the Ranger truck based in part on Ford's representations about the vehicle's fuel-efficiency.

340.   Plaintiff purchased the new Ranger, with VIN 1FTER4EH1KLA44866 from Ford of Boerne, an authorized Ford dealership in Boerne, Texas. Plaintiff purchased and still owns this vehicle.  Unbeknownst to Plaintiff at the time the vehicle was purchased, it consumes more fuel than advertised.

341.   Plaintiff Smith selected and ultimately purchased his vehicle, in part, because of the stated "best in class" fuel economy. Plaintiff Smith recalls that before he purchased the Ford F-150, he saw representations about the vehicle's performance, including its fuel economy, on Ford's website.

342.   Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

343.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

344.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had

better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

345.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

346.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### 25. Utah Plaintiff

#### a.  Al Balls

347.   Plaintiff Al Balls is a Utah citizen and resident of Logan, Utah.  In or around May 2019, he purchased a new 2019 Ford Ranger XLT pickup, paying approximately $41,000. Plaintiff Balls compared the alleged fuel efficiency of the 2019 Ranger with other similar trucks from Honda and Toyota and selected the 2019 Ranger truck based in part on Ford's representations about the vehicle's fuel efficiency.

348.   Plaintiff Balls purchased the 2019 Ford Ranger with VIN 1FTER4FH7KLA34745 from Wilson Motor Group, an authorized Ford dealership located in Logan, Utah. Plaintiff Balls purchased and still owns this vehicle.

Unbeknownst to Plaintiff Balls at the time the vehicle was purchased, it consumes more fuel than advertised.

349.   Plaintiff Balls selected and ultimately purchased his vehicle, in part, because of the stated fuel economy as represented through advertisements and representations made by Ford.  Plaintiff Balls recalls that before he purchased the 2019 Ranger, he saw representations about the vehicle's performance, including its fuel economy, on Ford's website and on the vehicle's window sticker.

350.   Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

351.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

352.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

353.    Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

354.    Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### 26. Virginia Plaintiff

#### a.  Kenneth Bernard

355.    Plaintiff Kenneth Bernard is a Virginia citizen and resident of Chesapeake, Virginia.  On or about March 11, 2019, he purchased a new 2019 Ford F-150 Lariat pickup, paying approximately $57,000. Plaintiff Bernard compared the alleged fuel efficiency of the 2019 F-150 with other similar trucks, such as the Dodge Ram 1500, and selected the 2019 F-150 truck based in part on Ford's representations about the vehicle's fuel efficiency.

356.    Plaintiff  Bernard  purchased  the  2019  F-150  with  VIN 1FTEW1E49KKC08164 from Cavalier Ford, an authorized Ford dealership located in Chesapeake, Virginia. Plaintiff Bernard purchased and still owns this vehicle. Unbeknownst to Plaintiff Bernard at the time the vehicle was purchased, it consumes more fuel than advertised.

357.   Plaintiff Bernard selected and ultimately purchased his vehicle, in part, because of the stated fuel economy as represented through advertisements and representations made by Ford.  Plaintiff Bernard recalls that before he purchased the 2019 F-150, he saw representations about the vehicle's performance, including its fuel economy, on television and on the vehicle's window sticker.

358.   Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

359.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

360.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

361.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to

a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

362.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### 27. Washington Plaintiffs

#### a. John Jung

363.   Plaintiff John Jung is a Washington citizen and resident of Puyallup, Washington, located in Pierce County. On or about January 12, 2019, he purchased a new 2019 Ford F-150 Raptor truck, paying approximately $76,000. Plaintiff Jung compared the alleged fuel efficiency of the F-150 Raptor with other similar trucks, including the Dodge Ram, Toyota Tundra and GMC Denali, and selected the F-150 Raptor truck based in part on Ford's representations about the vehicle's fuel efficiency.

364.   Plaintiff Jung purchased the new 2019 F-150 Raptor with VIN 1FTFW1RG8KFA18907 from Dwayne Lane's Skagit Ford, an authorized Ford dealership located in Burlington, Washington. Plaintiff Jung purchased and still owns this vehicle. Unbeknownst to Plaintiff Jung at the time the vehicle was purchased, it consumes more fuel than advertised.

365.   Plaintiff Jung selected and ultimately purchased his vehicle, in part, because of the stated fuel economy as represented through advertisements and representations made by Ford.  Plaintiff Jung recalls that before he purchased the 2019 Ford F-150, he saw representations about the vehicle's performance, including its fuel economy, on Ford's website and television ads and on the vehicle's window sticker.  Plaintiff Jung also recalls that the dealer stated that the vehicle was more fuel efficiency than previous generation Raptors.

366.   Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

367.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

368.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

369.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

370.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### b.   Jeffrey Quizhpi

371.   Plaintiff Jeffrey Quizhpi is currently a Texas citizen and resident of El Paso, Texas.  On or around January 27, 2019, while a citizen of and residing in Washington, Plaintiff Quizhpi purchased a new 2018 Ford F-150 pickup, paying $47,116.32.  Plaintiff Quizhpi compared the alleged fuel efficiency of the F-150 with other similar trucks manufactured by Toyota and Chevrolet and selected the F-150 truck based in part on Ford's representations about the vehicle's fuel efficiency.

372.   Plaintiff Quizhpi purchased the new 2018 F-150 with VIN 1FTEW1EP3JKF82780 from Titus-Will Ford, an authorized Ford dealership located in Tacoma, Washington. Plaintiff purchased and still owns this vehicle. Unbeknownst to Plaintiff at the time the vehicle was purchased, it consumes more fuel than advertised.

373.    Plaintiff Quizhpi selected and ultimately purchased his vehicle, in part, because of the stated fuel economy.    Plaintiff Quizhpi recalls that before he purchased the Ford F-150, he saw representations about the vehicle's performance, including its fuel economy, on Ford's website and on the vehicle's window sticker. The dealer also told him that the Ford F-150 had better gas mileage compared to trucks made by Chevrolet and Toyota.

374.    Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

375.    Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

376.    Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

377.    Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to

a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

378.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### c. Rick Shurtliff

379.   Plaintiff Rick Shurtliff is a Washington citizen and resident of Ridgefield, Washington. In or around April 2019, he purchased a new 2019 Ford Ranger truck, paying approximately $42,000. Plaintiff Shurtliff selected the Ranger truck based in part on Ford's representations about the vehicle's fuel efficiency.

380.   Plaintiff Shurtliff purchased the new 2019 Ranger with VIN 1FTER4FH1KLA24924 from Titus-Will Ford, an authorized Ford dealership located in Tacoma, Washington. Plaintiff Shurtliff purchased and still owns this vehicle. Unbeknownst to Plaintiff Shurtliff at the time the vehicle was purchased, it consumes more fuel than advertised.

381.   Plaintiff Shurtliff selected and ultimately purchased his vehicle, in part, because of the stated fuel economy as represented through advertisements and representations made by Ford.  Plaintiff Shurtliff recalls that before he purchased the 2019 Ford Ranger, he saw representations about the vehicle's performance, including its fuel economy, on Ford's website and on the vehicle's window sticker.

382.   Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

383.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

384.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

385.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

386.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### 28. Wisconsin Plaintiff

#### a.  Stephen Leszczynski

387.   Plaintiff Stephen Leszczynski is a Wisconsin citizen and resident of Mount Pleasant, Wisconsin.  On or about July 24, 2019, he purchased a new 2019 Ford Ranger pickup, paying approximately $38,299.00.   Plaintiff Leszczynski selected the 2019 Ford Ranger truck based in part on Ford's representations about the vehicle's fuel efficiency.

388.   Plaintiff Leszczynski purchased the 2019 Ford Ranger with VIN 1FTER4FH7KLA33465 from Hieser Ford, an authorized Ford dealership located in Glendale, Wisconsin.  Plaintiff Leszczynski purchased and still owns this vehicle. Unbeknownst to Plaintiff Leszczynski at the time the vehicle was purchased, it consumes more fuel than advertised.

389.   Plaintiff Leszczynski selected and ultimately purchased his vehicle, in part, because of the stated fuel economy as represented through advertisements and representations made by Ford.  Plaintiff Leszczynski recalls that before he purchased the 2019 Ford Ranger, he saw representations about the vehicle's performance, including its fuel economy, on Ford's website, in television and radio ads and on the vehicle's window sticker.  Plaintiff Leszczynski also recalls the dealer telling him that the truck had "great" gas mileage.

390.   Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff would not have purchased the vehicle or would have paid less for it.

391.   Ford's unfair, unlawful and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff to suffer out-of-pocket loss in the form of overpayment at the time of purchase in addition to added fuel costs.

392.   Ford knew about or recklessly disregarded the inaccurate fuel economy representations, but did not disclose such facts or their effects to Plaintiff.  So, he purchased his vehicle on the reasonable, but mistaken, belief that his vehicle had better fuel economy than the competition, was properly EPA-certified and would retain all of its promised fuel economy and performance throughout its useful life.

393.   Plaintiff and each Class member have suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, out-of-pocket losses by overpaying for vehicles at the time of purchase and added fuel costs.

394.   Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

B.     **Defendant**

1.     **Ford Motor Company**

395.   Ford Motor Company is a corporation doing business in all 50 states and the District of Columbia and is organized under the laws of the State of Delaware, with its principal place of business in Dearborn, Michigan.

396.   At all times relevant to this action, Ford designed, manufactured, sold, and warranted the Coastdown Cheating Vehicles throughout the United States. Ford and/or its agents, divisions, or subsidiaries designed, and manufactured the Coastdown Cheating Vehicles.  Ford also developed and disseminated the owner's manuals, supplements, and warranty booklets, advertisements, and other promotional materials relating to the Coastdown Cheating Vehicles; and Ford provided these to its authorized dealers for the express purpose of having these dealers pass such materials to potential purchasers at the point of sale. Ford also created, designed, and disseminated information about the quality of the Coastdown Cheating Vehicles to various agents of various publications for the express purpose of having that information reach potential consumers.

## V.     FACTUAL ALLEGATIONS

A.     **Coastdown testing**

397.   Ford deliberately miscalculated and misrepresented factors used in vehicle certification testing in order to report that its vehicles used less fuel and

emitted less pollution than they actually did.  The certification test-related cheating centers on the "Coastdown" testing and "Road Load" calculations.

398.   A coastdown test is a procedure that determines metrics later used to calculate a vehicle's fuel economy values or "MPG rating." MPG ratings are established using a machine called a "dynamometer." A dynamometer is like a treadmill for vehicles, enabling vehicles to be operated indoors on a stationary platform to simulate real-world vehicle operation. The level of resistance on the dynamometer is adjusted based on coastdown testing for each specific vehicle model to simulate the level of resistance that the vehicle would encounter if operated on the road. Coastdown testing is used to determine the appropriate resistance levels (or "road loads") to use on the dynamometer for a given vehicle model. Coastdown testing is used to measure all types of resistance encountered by a given vehicle model during real-world operation, including:

- Vehicle aerodynamic resistance, a factor affected by the vehicle's shape, which determines how much energy the vehicle uses to push air out of the way as it moves. The more resistance, the more energy has to be expended.

- Tire rolling resistance, a factor related to tire design that determines how much energy the vehicle has to use to overcome the resistance caused by the interface between the tires and the road.

- Driveline and powertrain mechanical resistance, a factor measuring the vehicle's drivetrain and how much energy the vehicle has to use to overcome internal friction to drive the wheels.

399.   A vehicle that has been properly broken in prior to the test (generally includes vehicle and tire mileage, fluids and fuel, and vehicle warm-up) is driven up to a certain speed, typically around 80 MPH, after which it is put into neutral and allowed to coast until its speed drops below 9 MPH.

400.   Special devices in the vehicle accurately measure environmental conditions (ambient temperature, humidity and barometric pressure), performance data, and speed and distance traveled during the coastdown test.

401.   In order to eliminate the effect of wind speed and direction, the test is performed multiple times (a minimum of 5 runs) on a completely flat, straight, and dry road in both directions of the track. Analysis of the recorded speed and distance information provides the vehicle's road load force.

402.   Ford miscalculated "Road Load," which is a measure of those forces, defined as the force that is imparted on a vehicle while driving at a constant speed over a smooth, level surface from sources such as tire rolling resistance, driveline losses, and aerodynamic drag.[9]

403.   This measure of forces acting against the vehicle during real-world driving is critical to the simulation of actual driving when a vehicle is tested in the laboratory.  Ford's internal lab tests did not account for these forces, which lead to

---

[9] *See* Exhibit 1, *supra* fn. 1.

better—and entirely inaccurate—fuel economy projections, and claims that the vehicles emitted less pollution than they emitted in reality.

**B.      The coastdown results are used to create fuel economy information posted on vehicles' windows and used in advertising.**

404.    The Coastdown test results are sent by Ford to the EPA to be used as the basis for mileage information used on window stickers, also called a "Monroney sticker."

405.    The Monroney sticker is on the window of every new car and includes information about the vehicle's price, engine and transmission specifications, other mechanical and performance specs, fuel economy and emissions ratings, safety ratings, and standard and optional features.

406.    The Monroney sticker is named for A.S. "Mike" Monroney, a longtime Oklahoma congressman who wrote the 1958 Automobile Information Disclosure Act, the federal law that requires the Monroney sticker.

407.    The Monroney sticker lists all features that come standard to the vehicle. This might include air bags, anti-lock brakes, a radio and CD or MP3 player, plus any warranties or additional services such as roadside assistance. Also included on the sticker is a section called "the EPA sticker." The Environmental Protection Agency section of the sticker tells how many miles per gallon of gas the vehicle gets on the highway and in the city. The EPA label provides miles-per-gallon equivalent (MPGe) figures for electric and hybrid cars to help consumers compare the fuel

economy of these vehicles with gas- and diesel-powered cars. The EPA section hereinafter will detail the vehicle's potential environmental impact with greenhouse gas emissions.

408.   The fuel economy figures are used by car reviewers and used by consumers to rate cars. For example, trucks are ranked on fuel economy as follows with the Ford F-150 at the top:

### 9 Best Ranked MPG Trucks of 2018: Ranked:

- 2016 Ford F-150 Automatic 2.7L
- 2016 Chevrolet Colorado Automatic 3.6L
- 2015 Chevrolet Silverado 1500 Automatic 4.3L
- 2015 Ford F-150 Automatic 3.5L
- 2014 Chevrolet Silverado 1500 Automatic 4.3L
- 2016 Chevrolet Silverado 1500 Automatic 4.3L
- 2016 Dodge Ram 1500 Automatic 3.6L
- 2016 Ford F-150 Automatic 3.5L[10]

409.   On the popular CarMax site[11], based on fuel economy numbers provided by Ford and published by EPA, CarMax had this to say about putting Ford F-150s near the top:

---

[10] Exhibit 15, Google and related search for F-150 fuel economy.

[11] Exhibit 16, *8 Best Ranked MPG Trucks of 2019: Ranked* (June 27, 2019), https://www.carmax.com/articles/best-mpg-trucks-ranking (last visited Aug. 11, 2020).

# 8 Best Ranked MPG Trucks of 2019: Ranked

**PUBLISHED THURSDAY, JUNE 27, 2019**

## Achieve power and impressive fuel-economy.



Today, more and more manufacturers are producing trucks that get great fuel economy while still delivering impressive horsepower. If you're fuel-conscious and looking for the right truck, we've put together a power-packed list of trucks to help you on your search.

1. [2017 Chevrolet Colorado 2WD Automatic 2.5L](#)




2017 Chevrolet Colorado LT  ©EVOX Images

2. 2018 Ford F-150 2WD Automatic 3.3L

 

2018 Ford F-150 Lariat  ©EVOX Images

3. 2015 Ford F-150 2WD Automatic 2.7L

 

2015 Ford F-150 XL  © EVOX IMAGES

4. 2016 Ford F-150 2WD Automatic 2.7L

 

2016 Ford F-150 XL  © EVOX IMAGES

5. [2017 Nissan Frontier 2WD Automatic 2.5L](#)

 

6. [2015-2016 Ford F-150 4WD Automatic 2.7L](#) & [2017 Toyota Tacoma 4WD Automatic](#)

 

7. [2015 Ford F-150 4WD Automatic 3.5L](#)

 

8. 2015 Chevrolet Silverado 1500 4WD Automatic 4.3L



2015 Chevrolet Silverado 1500 1WT  © EVOX IMAGES

## C.  Ford admits improper coastdown testing on the 2019 Ranger.

410.  Ford has admitted that in September of 2018 several of its own employees were questioning its computer modeling and physical test practices for certification of fuel economy and emissions.[12]  Yet, Ford took no action to correct these ongoing misrepresentations or to alert consumers.

411.  Pressured by a pending governmental criminal investigation, Ford has now stated that it will look into the testing of the 2019 Ranger truck before looking at its other vehicles.

412.  When Ford released a statement regarding the problem, truck blogger Andre Smirnov of TheFastLaneTruck.com  (hereinafter "TFL") drove the new Ranger for 1,000 miles, from California to Colorado to test its "TFL" real-world

---

[12] Exhibit 2, *supra* fn. 2.

mileage, and found it achieved only 19.5 MPG, not the 24 MPG certified to the EPA for the 4x4 model.[13]

413.   Having concluded that the actual performance of the Ranger was "nowhere close" to the EPA rated MPG, in March of 2019, the truck blogger tested the Ranger truck on The Fast Lane Truck's 98-mile fuel economy loop.[14]   The highway mileage was only one MPG greater on the test loop than on its 1,000 mile drive.  The TFL test drivers were at a loss for words when they discovered a nearly four MPG discrepancy between the mileage reported on the Ranger's trip meter and what they measured at the pump (21.3 MPG actual versus 25.8 MPG on Ford's trip meter)[15]:

---

[13] Exhibit 5, Andrew Smirnov, *Real-world 2019 Ford Ranger Fuel Economy: Here Is the Unexpected Result after a 1,000 Mile Road Trip (Video)*, TheFastLaneTruck.com (Feb. 23, 2019), https://www.tfltruck.com/2019/02/real-world-2019-ford-ranger-fuel-economy-here-is-the-unexpected-result-after-a-1000-mile-road-trip-video/ (last visited Aug. 11, 2020).

[14] Exhibit 14, Stephen Elmer, *EPA Says the New Ford Ranger Gets 24 MPG on the Highway, But What Does It Really Get at 70 MPH? (Video)* (Mar. 19, 2019), https://www.tfltruck.com/2019/03/epa-says-the-new-ford-ranger-gets-24-mpg-on-the-highway-but-what-does-it-really-get-at-70-mph-video/ (last visited Aug. 11, 2020).

[15] Exhibit 6, Video of the testing located at https://youtu.be/W6iLtygCC7Y, embedded in the previously cited article, Exhibit 14, at: https://www.tfltruck.com/2019/03/epa-says-the-new-ford-ranger-gets-24-mpg-on-the-highway-but-what-does-it-really-get-at-70-mph-video/.



EPA Says the New Ford Ranger Gets 24 MPG on the Highway, But What Does It Really Get at 70 MPH?

414.    With respect to its 2019 Ford Ranger, Ford promised that its midsize truck "will deliver with durability, capability and fuel efficiency, while also providing in-city maneuverability and the freedom desired by many midsize pickup truck buyers to go off the grid."[16]  Ford also claimed that its "All-New Ford Ranger [was] Rated Most Fuel Efficient Gas-Powered Midsize Pickup in America."[17]  "With EPA-estimated fuel economy ratings of 21 mpg city, 26 mpg highway and 23 mph combined, 2019 Ford Ranger is the most fuel efficient gas-powered midsize pickup

---

[16] Exhibit 3, *supra* fn. 3.
[17] Exhibit 4, *supra* fn. 4.

in America."[18]   Ford claimed the 2019 Ranger "is the no-compromise choice for power, technology, capability, and efficiency whether the path is on road or off."[19] Ford knew that to sell the Ranger effectively, it had to tout it as having fuel efficiency and reduced emissions, and that such promises were material to consumers.

415.   There is no question that Ford used the fuel efficiency ratings as a sales tool to entice consumers into purchasing the 2019 Ford Ranger.   Indeed, Ford promised that "[t]he adventure-ready 2019 Ford Ranger is the most fuel-efficient gas-powered midsize pickup in America—providing a superior EPA-estimated city fuel economy rating and an unsurpassed EPA-estimated combined fuel economy rating versus the competition.   The all-new Ranger has earned EPA-estimated fuel economy ratings of 21 mpg city, 26 mpg highway and 23 mpg combined for 4x2 trucks."[20]   Ford claimed that "[t]his is the best-in-class EPA-estimated city fuel economy rating of any gasoline-powered four-wheel-drive midsize pickup and it is an unsurpassed EPA-estimated combined fuel economy rating."[21]

## D.   CAFE standards provide manufacturers with credits for low emissions.

416.   Ford also reaped a double reward from this cheating.   Cars and trucks are one of the major sources of air pollution, which includes ozone, particulate

---

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

matter, and other smog-forming emissions. The health risks of air pollution are extremely significant.

417.  Poor air quality increases respiratory ailments like asthma and bronchitis, heightens the risk of life-threatening conditions like cancer, and burdens the American health care system with substantial medical costs.  Passenger cars and trucks are major contributors to pollution, producing significant amounts of nitrogen oxides, carbon monoxide, and other pollution. The U.S. government, through the EPA, has passed and enforced laws designed to protect U.S. citizens from these pollutants and certain chemicals and agents known to cause disease in humans.

252.  The United States has two sets of parallel standards that affect fuel economy: (1) the corporate average fuel economy (CAFE) standards adopted by the National Highway Traffic Safety Administration (NHTSA), an agency within the Department of Transportation (DOT); and (2) greenhouse gas (GHG) emissions standards adopted by the EPA.

418.  Automobile manufacturers must abide by these laws and must adhere to EPA rules and regulations.  One of the major drivers of fuel efficiency improvement are the CAFE standards.  These requirements have nearly doubled the fuel efficiency of vehicles in the U.S.  In addition to the reduced health costs and human illness, CAFE standards are estimated to save each U.S. household approximately $2,000.00 per year in reduced fuel consumption as of 2016.  The

Energy Independence and Security Act (EISA) of 2007 mandated a 40% increase in fuel economy by 2020.

419.    The original CAFE standards set minimum average fuel consumption performance (average miles travelled per gallon of fuel used) for the fleets of new "passenger automobiles" (passenger cars) and "non-passenger automobiles" (light trucks, which includes many SUVs) produced by each manufacturer. The standards for these two types of vehicles differed.

420.    Before standards took effect, the average fuel efficiency for passenger cars was 15.2 MPG). Congress required manufacturers to achieve a fleet average of 18 MPG by 1978, 19 MPG by 1979, and 20 MPG by 1980, rising to 27.5 MPG by 1985, with interim standards to be set by NHTSA. But by 1981, average fuel efficiency for passenger cars had risen to 28.4 MPG, exceeding the standards.

421.    For light trucks, NHTSA set standards that required manufacturers to achieve a fleet average of 17.2 MPG for two-wheel drive vehicles and 15.8 MPG for four-wheel drive vehicles in 1979, rising to 21.5 MPG and 19 MPG respectively by 1989. Over this period, two-wheel drive vehicles increased from 13.4 to 16.9 MPG, while four-wheel drive vehicles increased from 12.3 MPG to 14.4 MPG.

422.    The National Highway Traffic Safety Administration (NHTSA) kept CAFE standards for cars the same from 1985 to 2010, except for a slight decrease in required MPG from 1986 to 1989. Truck standards, initially set in 1976 for 1989

vehicles at 21.5 MPG for 2-wheel drive vehicles and 19 MPG for 4-wheel drive vehicles, were frozen by Congress in the mid-1990s at 20.7 MPG and were not increased until 2005.

423.   However, starting in 2005, Washington policy makers ushered in a number of changes. Between 2005 and 2007, the Bush administration raised the truck fuel efficiency standard from 20.7 to 22.2 MPG. More significantly, in 2007, Congress passed the Energy Independence and Security Act (EISA), which requires model-year 2011 and later vehicles for sale in the U.S. that were manufactured outside the U.S. to achieve a fleetwide gas mileage of 35 MPG and requires vehicles for sale in the U.S. that were manufactured in the U.S. to achieve a fleetwide gas mileage of 27.5 MPG by 2020. In 2009, the Obama administration eliminated the default 27.5 MPG standard and established a new 27.3 MPG standard for 2011 model-year vehicles manufactured domestically and internationally. The new standard was scheduled to increase annually until it reached 35 MPG for 2020 model-year vehicles.

424.   Starting in 2005 for trucks and 2011 for all vehicles, the standard is based on one specific attribute: a manufacturer's collective vehicle footprint. The formula multiplies every vehicle's wheelbase by its average track width for each manufacturer. This creates a relatively simple inverse-linear formula with cutoff values. The attribute-based formula produces one number for each automaker. So

while each model sold does not have to achieve a specific target, the automaker's fleet on a whole must meet its target. This method helps balance earlier standards, which were biased against automakers whose overall vehicle lineup was fuel-efficient, but sold one or two models (typically work trucks) that were not fuel-efficient.

425.   For example, the GM Sierra Denali is a full-size work truck with an MPG range of 16 in the city and 23 on the highway. The Honda Ridgeline is a mid-size truck with an MPG range of 19 in the city and 26 on the highway. To balance the lower fuel efficiency of the Denali, GM also builds the hybrid Chevrolet Volt that gets 42 MPG. If the absolute standard was 20 miles per gallon, drivers would not be able to buy the Denali work truck, which averages 19. But because the standard is by manufacturer and not model, GM can use the Volt to help balance the Denali.

426.   In 2012, NHTSA and the EPA issued joint standards for 2017–2025. While NHTSA's standards continued to focus on fuel efficiency, the EPA's more-stringent regulations targeted reductions in carbon dioxide emissions (greenhouse gas emissions) and not fuel efficiency. NHTSA increased the CAFE standards to 41 MPG by 2021 and 49.7 MPG by 2025. The EPA's standard of 163 g/mi of $CO_2$-equivalent emissions effectively increased standards to 54.5 MPG by 2025. This

54.5 MPG 2025 standard is the first one benchmarked to emissions and not gasoline consumption.

427.   Both the NHTSA and EPA standards offer certain flexibilities, termed "components," to help manufacturers comply with the standards. The first component is a credit trading system that allows manufacturers to carry efficiency and greenhouse gas credits forward by up to five years and backwards by up to three years to achieve compliance and avoid fines. Manufacturers can transfer credit between cars and trucks and trade credits with other manufacturers. Carbon dioxide credits generated for EPA compliance from model year 2016 and before can be carried forward up to model year 2021.

428.   In 2016 NHTSA announced plans to more than double the fines for failing to meet CAFE standards from $5.50 per 0.1 MPG to $14.00. The fine is applied to each 0.1 MPG the automaker falls short and multiplied by the number of vehicles sold in a model year for the entire U.S domestic market. Companies must satisfy both EPA and NHTSA standards. Manufacturers passing EPA's greenhouse gas emissions standards that fail NHTSA's CAFE standards still pay the fine. Thus, manufacturers have a clear economic motivation to meet the standards.

429.   Under the increasing federal standards, Ford also began to market its gasoline powered vehicles as being cleaner with high fuel economy. As the Ford Ranger was out of the market for eight years, Ford took a targeted marketing

approach for the 2019 Ranger, focusing on "outdoorsy digital ads" that pitched the truck to outdoor adventurists.[22] Ford capitalized on its fuel efficiency as a selling point over its competitors.[23]  Ford sought a strong re-entry of the Ranger into the U.S. market by pitching it as amazingly fuel efficient.

### E.    Criminal investigation

430.   Ford Motor Company's March 2019 Securities and Exchange Commission filing revealed that it is under criminal investigation by the United States Department of Justice for its emissions certification practices.[24]

431.   Ford Motor Company is a leading auto manufacturer, having sold 2.5 million vehicles in 2018.   Ford's strategy has increasingly focused on the manufacture and sale of larger gas-guzzling pickup trucks, sport utility vehicles (SUVs) and vans.   These vehicles are, of course, the most challenged by emissions standards and fuel efficiency.   Ford's focus on this segment of the market created an immense incentive to cheat.

---

[22] Exhibit 8, E.J. Schultz, *Ford Takes Targeted Marketing Approach for Ranger Comeback*, AdAge (Mar. 1, 2019), https://adage.com/article/cmo-strategy/ford-takes-targeted-approach-ranger-comeback/316801 (last visited Aug. 11, 2020).

[23] Exhibit 9, Joey Capparella, *The 2019 Ford Ranger Pickup Gets Slightly Better MPG Ratings Than the Honda Ridgeline*, Car and Driver (Dec. 11, 2018), https://www.caranddriver.com/news/a25470574/2019-ford-ranger-pickup-mpg/ (last visited Aug. 11, 2020).

[24] Exhibit 10, Ford's March 31, 2019 Quarterly Report to the SEC, at page 70: https://www.sec.gov/Archives/edgar/data/37996/000003799619000026/f03312019 10-q.htm.

432.   In September 2018, several Ford employees expressed concerns about the testing practices at Ford pertaining to emissions and fuel efficiency.  In February 2019, Ford admitted it was looking into these concerns about its "computer-modeling methods and calculations used to measure fuel economy and emissions."[25] Kim Pittel, Ford's vice president for sustainability, environment and safety engineering, has admitted to the New York Times that these "calculations [are] used in testing cars for fuel economy ratings and emissions certifications."[26]

## F.    Mechanism of coastdown cheating

433.   The Environmental Protection Agency (EPA) defines "Road load" as follows:

> the force imparted on a vehicle while driving at a constant speed over a smooth level surface from sources such as tire rolling resistance, driveline losses, and aerodynamic drag.

EPA letter to manufacturers, titled: "*Determination and Use of Vehicle Road-Load Force and Dynamometer Settings*."[27]  These calculations are critical to laboratory fuel efficiency and emissions testing because the vehicle is placed on a dynamometer, which is essentially a treadmill for cars.  When driving on a

---

[25] Exhibit 11, Tiffany Hsu, *Ford Says Justice Dept. Has Opened Criminal Inquiry Into Emissions Issues*, The New York Times (Apr. 26, 2019), https://www.nytimes.com/2019/04/26/business/ford-emissions-criminal-investigation.html (last visited Aug. 11, 2020).

[26] Exhibit 2, *supra* fn. 2.

[27] Exhibit 1, *supra* fn. 1.

dynamometer, the vehicle is stationary and does not experience the drag of air against the vehicle; or of the resistance of the tire against the road surface; or the loss of horsepower that occurs in the drivetrain of the vehicle - the friction, heat, drag, and other various losses that occur between the engine and tires touching the road.



2017 Ford F-350 During Dynamometer Testing

434. Auto manufacturers use "coastdown" tests of vehicles on the actual roadway to help calculate variables to be utilized in conjunction with dynamometer testing. Coastdown testing provides data regarding aerodynamic drag, tire rolling resistance, and drivetrain frictional losses and provides technical data used to program the test dynamometers that generate EPA fuel economy and emissions ratings. In a coastdown test, a vehicle is brought to a high speed on a flat, straight road and then set coasting in neutral until it slows to a low speed. By recording the time the vehicle takes to slow down, it is possible to model the forces affecting the

vehicle.   Coastdown tests are governed by tests developed by the Society of Automotive of Engineers (SAE).  SAE developed a standard procedure (J2263-Dec 2008) to perform road load measurement using coastdown testing, and a standard procedure (J1263-Mar 2010) to perform road load measurement and dynamometer simulation using coastdown testing. The current government-approved standard for road load measurement using onboard anemometry and the coastdown testing technique is the SAE International Standard.  These standards must be followed by federal regulation.  The data relating to speed and distance are recorded by special instruments to account for various factors that might affect the results.  The test produces data that identifies or maps the drag and other forces acting on the vehicle in the real world.

435.   A coastdown requires planning, data collection, and data processing, but offers many opportunities for manipulation of the data.  Data variability and error can be controlled, but several factors must be considered under SAE standards, including calculation of the mass of the vehicle, tire pressure, weather, and environmental factors (e.g., wind speed, air temperature, humidity, and barometric pressure), aerodynamic factors, and road surface, as well as experiment design and methodology, measurement errors, data acquisition systems, and vehicle qualifications.  The SAE procedure on coastdown testing includes an appendix with

FORTRAN code that processes experimental velocity data and produces a mathematical vehicle force model.

436.   The protocol specifies all conditions under which the engine is tested, including lab temperature and vehicle conditions. Most importantly, the test cycle defines the vehicle speed over time that is used to simulate a typical driving scenario. An example of a driving cycle is shown in Figure A. This graph represents the FTP-75 (Federal Test Procedure) cycle that has been created by the EPA and is used for emission certification and fuel economy testing of passenger vehicles in the United States. The cycle simulates an urban route with frequent stops. The cycle lasts 1,877 seconds (about 31 minutes) and covers a distance of 11.04 miles (17.77 km) at an average speed of 21.2 mph (34.12 km/h).

Figure A



437.   To assess conformance, these tests are carried out on a chassis dynamometer, a fixture that holds a car in place while allowing its driven wheels to turn (a treadmill for cars) with varying resistance meant to simulate the actual load on the engine during on-road driving.  Fuel consumption and emissions are measured during the test and compared to an emissions standard that defines the maximum pollutant levels that can be released during such a test. In the United States, emissions standards are managed on a national level by the EPA. In addition, California has its own emissions standards that are defined and enforced by CARB. California standards are also adopted by a number of other states ("Section 177" states).[28] Together with California, these states cover a significant fraction of the U.S. market, making them a de facto second national standard.

## G.   F-150 and Ranger test results

438.   Testing was conducted on a 2018 Ford F-150 SuperCrew 4x2 truck and a 2019 Ford Ranger SuperCrew 4x2 truck to independently verify the model inputs used to calculate fuel economy of those vehicles.

439.   Fuel economy testing to provide the values listed on the Monroney label of passenger cars and light duty trucks for sale in the United States is performed on a chassis dynamometer, a kind of stationary treadmill that simulates the forces acting

---

[28] Those states are: Connecticut, Maine, Maryland, Massachusetts, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, Delaware, Georgia, and North Carolina.

on the vehicle during real world driving. Dynamometer testing is required by the United States Environmental Protection Agency (US EPA) for emissions certification and fuel economy testing, both for labeling purposes and for compliance with Corporate Average Fuel Economy, or CAFE, standards. Real world models specific to every vehicle tested, called "road load models," are used during testing to ensure the dynamometer accurately simulates the real world frictional losses a vehicle experiences during operation on the road. These models are specific to every vehicle tested for fuel economy. For vehicles having a variety of body configurations, like the F-150 and Ranger, each configuration and weight class (grouped according to "equivalent test weight" by the EPA) will have its own unique model. The road load model is obtained by performing a vehicle "coastdown," a process whereby the time to decelerate a vehicle from a high speed is measured. The standardized technique for performing a coastdown is prescribed in the Code of Federal Regulations, which references the use of Society or Automotive Engineering (SAE) Standard J2263.

440.   In the case of both the 2018 F-150 tested and the 2019 Ranger, the road load obtained in the J2263 coastdown for each vehicle was found to have more resistance (which would result in more fuel consumption) than the road load models reported to the EPA.

441.   In order to accurately measure fuel efficiency, the dynamometer rollers must simulate the parasitic frictional forces a vehicle would experience if it were to be driving on the road. The quadratic function below replicates these forces (a combination of driveline parasitic losses, rolling resistance, and aerodynamic drag). The coastdown test yields the coefficients (A, B, and C below) that are used to model a particular vehicle's road load. In certification documents and the EPA fuel economy test database, these are often referred to as the "target coefficients:" $Force(V) = A + B \cdot V + C \cdot V^2$, where V is the speed of the vehicle.

442.   Once a vehicle's target coefficients are obtained, the vehicle is calibrated, or "matched," to the dynamometer to determine the force the dynamometer must apply to simulate the target road load. The "match" accounts for the friction and inertia inherent in the dynamometer's driveline and rolls. This process produces a data set called the "Set Coefficients," values specific to a particulate vehicle and a particular dynamometer calibration. Once the set coefficients are obtained, the dynamometer can accurately replicate the weight (or inertia) of the vehicle as well as the road load forces. The processes required by the Code of Federal Regulations, as well as SAE J2264, were strictly followed to match the vehicle to the dynamometer and to perform fuel economy testing.

443.   The 2018 Ford F-150 SuperCrew and 2019 Ford Ranger SuperCrew used for testing were selected to replicate vehicles presented in the US EPA fuel

economy test database.[29] The EPA database provides vehicle and test data details including, cab length, drivetrain (4 wheel drive vs 2 wheel drive), axle ratio, engine, and transmission. Furthermore, the database provides the road load model, and the FTP-75, and HWFET results presented to the US EPA to certify the fuel economy. SAE J2263 and EPA Guidance Letter *CD-15-04* provided selection criteria for tire size and trim options based on vehicle population statistics. The test-truck configurations are shown in Table 1.

**Table 1 - Test Vehicles**

| MY/Make | Model | Cab Style | Drivetrain | Axle Ratio | Engine | Transmission | Equivalent Test Weight (lbs) |
|---|---|---|---|---|---|---|---|
| 2018 Ford | F-150 | SuperCrew (4 door) | 4x2 | 3.55 | 2.7L V6 Ecoboost | 10 Speed Auto | 5,000 |
| 2019 Ford | Ranger | SuperCrew (4 door) | 4x2 | 3.73 | 2.3L I4 Ecoboost | 10 Speed Auto | 4,750 |

444. In preparation for coastdown testing, the trucks and tires were aged to just over 4,000 miles as directed by SAE J2263. The trucks were fitted with an anemometer on a preceding boom, GPS antennae, and an eDAQ XR Lite data acquisition system. The body was checked for any damage that might affect aerodynamic drag. Tire tread depths and pressures were measured. The brakes were checked for contact and the alignment was checked and adjusted as necessary. The F-150 was loaded with sandbags to a scale weight of 4,990 lbs. and the Ranger to

---

[29] Exhibit 7, *Data on Cars used for Testing Fuel Economy*, United States Environmental Protection Agency, https://www.epa.gov/compliance-and-fuel-economy-data/data-cars-used-testing-fuel-economy (last visited Aug. 11, 2020).

4,750 lbs. The trucks were warmed to operating temperature, as per SAE J2263, by driving for more than 30 min at 50 mph. Once warmed, the tire pressures were re-adjusted and the truck immediately tested.

445.   The coastdown test-driver accelerated the test truck to approximately 80 mph, placed the transmission into neutral, and coasted the truck until deceleration reduced the speed below 9 mph. This process was repeated for each truck 12 times: 6 in each direction. Truck speed, time, apparent wind velocity, track temperature, ambient temperature, and pressure were measured and recorded for each run.  This data was used to generate the force target coefficients listed in Table 2 and compared to the EPA Fuel Economy Database target coefficients.

**Table 2 - Target Coefficients (A, B, and C) from Coastdown Tests with Comparison to Values from EPA Database**

| Target Coefficients | Ford F-150 | | Ford Ranger | |
|---|---|---|---|---|
| | From Test | From EPA Database | From Test | From EPA Database |
| A (lbf) | 25.1113 | 26.570 | 23.7939 | 31.540 |
| B (lbf/mph) | 0.9725 | 0.05130 | 0.8954 | 0.29320 |
| C (lbf/mph^2) | 0.0273 | 0.03385 | 0.0288 | 0.03433 |

446.   The quadratic coefficients above are used to tune the dynamometer during the dynamometer match. The effects of these different road load coefficients can be seen in Figure 1.



**Figure 1 – MY 2018 Ford F-150 Road Load Force**

447.   Ford has used the same road load force curves for the 2020 Ranger and the 2019-2020 F-150 as were used for the 2019 Ranger and 2018 F-150 shown in Table 2.

**Table 3 - Target Coefficients (A, B, and C) from EPA Database for Later Model Ford Trucks**

| Target Coefficients | Ford Ranger | Ford F-150 | |
|---|---|---|---|
| | MY 2020 From EPA Database | MY 2019 From EPA Database | MY 2020 From EPA Database |
| A (lbf) | 31.540 | 26.570 | 26.570 |
| B (lbf/mph) | 0.29320 | 0.05130 | 0.05130 |
| C (lbf/mph^2) | 0.03433 | 0.03385 | 0.03385 |

448.   The coefficients Ford supplied to the EPA underestimate the force acting on the truck. This underestimation of force yields the over estimation of fuel economy. In the speed ranges where the road load has the greatest effect on overall

engine load, road load forces are some 20-35% higher than those values reported to the EPA.

449. The Ranger measured road load model is some 5-8% higher in those same speed ranges, see Figure 2.



**Figure 2 – MY 2019 Ford Ranger Road Load Drag Force**

450. Fuel economy was quantified on both the FTP-75 and HWFET cycles in strict accordance with the federal regulations by accounting for both the fuel properties and the carbon-containing emissions from the test cycles. Testing was performed using Tier 2 gasoline, again as prescribed by regulations and as presented in the EPA fuel economy database. The fuel economy values calculated from FTP-75 and HWFET results were used to calculate label fuel economy using the derived

5-cycle method specified in 40 CFR § 600.115-11[30] and shown in the equations below:

$$City\ FE = \cfrac{1}{City\ Intercept + \cfrac{CitySlope}{FPT\ FE}}$$

And for highway fuel efficiency;

$$Highway\ FE = \cfrac{1}{Highway\ Intercept + \cfrac{Highway\ Slope}{HWFET\ FE}}$$

451.   The respective slopes and intercepts are created from a regression of fuel economies across multiple vehicles.   These values are periodically published by the EPA Administrator. The coefficients for the model years corresponding to the trucks tested are shown in Table 4.

**Table 4 Current Derived 5-cycle Coefficients.  Source CD-15-15**

|  | Coefficients of Model Year 2017 and Later |
|---|---|
| City Intercept | 0.004091 |
| City Slope | 1.1601 |
| Highway Intercept | 0.003191 |
| Highway Slope | 1.2945 |

---

[30] Current fuel economy regulations require that every manufacturer test their vehicle fuel economy using the same 5 test cycles used for emissions testing (FTP-75, HWFET, US06, SC03, and Cold CO). A complex calculation is used based on the results of each of those tests to determine the "City" and "Highway" fuel economy to be used on the Monroney label. If the emissions test vehicle used for emissions certification passes a "litmus test," the EPA allows a "derived 5 cycle" fuel economy calculation that is based on the results of two tests only: the FTP-75 and HWFET. The purpose of this litmus test is to reduce the number of total tests manufacturers must perform to test for fuel economy. Because the 2019 Ford Ranger and 2018 Ford F-150 both pass the litmus test in their certification applications, the "derived 5 cycle" calculation is used.

452.   The calculated fuel economies obtained from testing are compared to the fuel economies presented to the EPA in the application for certification and each vehicle's Monroney label in Table 5.

**Table 5 - Fuel Economy Comparison**

|  | Ford F-150 | | | Ford Ranger | | |
|---|---|---|---|---|---|---|
|  | FE Measured | FE EPA App | FE Monroney | FE Measured | FE EPA App | FE Monroney |
| City (mpg) | 17.7 | 19.6 | 20 | 18.3 | 20.0 | 20 |
| Highway (mpg) | 22.7 | 26.6 | 26 | 23.4 | 25.0 | 25 |
| Combined (mpg) | 20.0 | 22.8 | 22 | 20.6 | 22.3 | 22 |

453.   For the Ford F-150, if the measured fuel economy values are rounded to the nearest whole number, as prescribed for Monroney labeling calculations, the resulting city fuel economy label would be 18 mpg for city driving, 23 mph for highway driving, and 20 mph combined. Compared to the EPA label, this represents a difference in fuel economy of 2 mpg for the city (10%), 3 mpg highway (12%), and 2 mpg combined (9%). The certification application states a full useful life of 150,000 miles.   Over this lifetime mileage, there will be an additional 833 gallons consumed for city driving, 752 gallons for highway driving, and 682 gallons combined. Based on the current national average fuel price of $2.79, this would represent an added lifetime fuel cost of $2,324, $2,098, and $1,903 for city, highway, and combined, respectively.

454.   For the Ford Ranger, if the measured fuel economy values are rounded to the nearest whole number, as prescribed for Monroney labeling calculations, the

resulting city fuel economy label would be 18 mpg for city driving, 23 mph for highway driving, and 21 mph combined. Compared to the EPA label, this represents a loss in fuel economy of 2 mpg for the city (10%), 2 mpg highway (8%), and 1 mpg combined (5%). The certification application states a full useful life of 150,000 miles.   Over this lifetime mileage, there will be an additional 833 gallons for city driving, 522 gallons for highway driving, and 325 gallons combined. Based on the current national average fuel price of $2.79, this would represent an added lifetime fuel cost of $2,324, $1,456, and $907 for city, highway, and combined, respectively.

455.   The difference in fuel consumption and money spent over the 150,000 mile life of the vehicles is summarized in Table  below.

**Table 6 – Lifetime Additional Fuel Consumed and Money Spend on Fuel Based on Actual Testing Compared to EPA Reported Valued**

|  | Ford F-150 | | Ford Ranger | |
|---|---|---|---|---|
|  | Gallons | $ | Gallons | $ |
| City (mpg) | 833 | $2,324 | 833 | $2,324 |
| Highway (mpg) | 752 | $2,098 | 522 | $1,456 |
| Combined (mpg) | 682 | $1,903 | 325 | $907 |

456.   By cheating in the certification testing, Ford made its F-150 trucks more appealing and competitive in the marketplace, to the point of being named "best in class" for some F-150's and driving up sales and profits.

## H.    Ford's History of Cheating

457.    Ford has a long history of emissions cheating.  The recent Volkswagen emissions cheating debacle is definitely not the first.  In 1973, Ford and Volkswagen were caught in the EPA's first investigation into emission cheating devices.

458.    Ford was caught again in 1998, using a cheat device in 60,000 Econoline vans, which resulted in a multi-million-dollar settlement with the EPA.[31]

459.    Ford was caught just last year, cheating on emissions certification for over 500,000 heavy-duty diesel trucks for which Ford was sued and a motion to dismiss was denied in material respects.

460.    Ford is increasingly misrepresenting the fuel efficiency of its vehicles, which is a more indirect way of cheating on emissions requirements.  Through computer modeling, Ford constructs a fuel efficiency for each vehicle that does not exist in the real world.

461.    Ford over-stated the fuel efficiency of its Ford Fusion and C-MAX hybrid vehicles and was sued for it.  As a result, "[i]n 2013 and 2014, it lowered the gas mileage ratings on several hybrid cars by one to seven miles per gallon."[32]

---

[31] Exhibit 12, Ryan Beene, *VW Emissions 'Defeat Device' Isn't the First*, AutoWeek (Sep. 24, 2015), https://autoweek.com/article/car-news/vw-emissions-defeat-device-isnt-first (last visited Aug. 11, 2020).

[32] Exhibit 2, *supra* fn. 2.

## I.   Ford advertising for the Ranger emphasizes fuel economy.

462.   Even after Ford employees had come forward about the cheating, Ford's media center touted the 2019 Ranger truck as having amazing performance without compromise, and the claims of its fuel efficiency are front and center:



- With EPA-estimated fuel economy ratings of 21 mpg city, 26 mpg highway and 23 mpg combined, 2019 Ford Ranger is the most fuel-efficient gas-powered midsize pickup in America

December 11, 2018 Ford Media Press Release titled, "*Adventure Further: All-New Ford Ranger Rated Most Fuel-Efficient Gas-Powered Midsize Pickup in America.*"[33]

463.   Ford's claim of most fuel efficient in its class is repeated in sales brochures for the 2019 Ranger[34]:

---

[33] Exhibit 4, *supra* fn. 4.
[34] Exhibit 13, 2019 Ford Ranger brochure.



## J.   Ford promotes the F-150 as best in class for fuel economy or publishes MPG estimates to beat its competition.

464.   The F-150 is the best-selling vehicle in the United States and has been for decades.  In 2018, Ford sold more than 1.075 million F series vehicles globally, a sale every 29.3 seconds.  As Ford executive Jim Farley noted, "But it's our F-Series juggernaut that leads the world in sales, capability and smart technology, setting the bar others follow."[35]

---

[35] Exhibit 17, *Ford Surpasses 1 Million Truck Sales in 2018*, Ford Media Center (Jan. 12, 2019), https://media.ford.com/content/fordmedia/fna/us/en/news/2019/01/12/ford-surpasses-1-million-truck-sales-in-2018.html (last visited Aug. 11, 2020).

465.    To stimulate F-150 sales and maintain its lead over competitors like the Dodge Ram, Ford announced that the 2018 Ford F-150 would be best in class for fuel economy and/or published inflated MPG estimates.

466.    As early as August 2017, based on information from Ford, consumers were told to expect "better fuel economy" in the 2018 F-150.

467.    The Monroney sticker for a 2018 F-150 2.7 V6[36] lists the MPG as follows:



---

[36] Exhibit 18, Monroney sticker for 2018 F-150 2.7 V6.

468.   An August 10, 2017 cnet.com article "*2018 Ford F-150 touts best-in-class towing, payload, fuel economy*" states:

> Buyers have a choice of *five* different engines. The base offering is a 290-horsepower 3.3-liter V6, followed by a 325-hp 2.7-liter turbo V6. In the middle of the range is the 5.0-liter V8 with 395 horsepower. The top two engine choices are both 3.5-liter turbocharged V6s -- one putting out 375 horsepower, and the other putting out 450.[37]

469.   The cnet.com article emphasizes fuel economy:

> With these new engines comes better fuel economy. And once again, Ford gets to claim best-in-class, thanks to the 2.7-liter V6, which achieves 20 mpg city and 26 mpg highway in 2WD. The 3.3-liter V6 isn't very far behind it at 19 mpg city and 25 mpg highway. The thirstiest engine of the bunch is the high-output 3.5-liter turbo V6, which still isn't too bad at 15 mpg city and 18 mpg highway.[38]

470.   The 2018 F-150 brochure[39] lists the estimated fuel economy for the various types of 150s:

---

[37] Exhibit 19, Andrew Krok, *2018 Ford F-150 touts best-in-class towing, payload, fuel economy*, Road Show (Aug. 10, 2017), https://www.cnet.com/roadshow/news/2018-ford-f-150-touts-best-in-class-towing-payload-fuel-economy/ (last visited Aug. 11, 2020) (emphasis in original).

[38] *Id.*

[39] Exhibit 20, 2018 Ford F-150 brochure.



## ALL-NEW
## 3.3L Ti-VCT V6

The all-new, standard F-150 powerplant for 2018 delivers where it matters most: higher towing capability, more payload capacity, and improved fuel efficiency.² That's a clean sweep in any truck buyer's ledger. Plus, a higher compression ratio and higher max. combustion peak pressure help surpass previous horsepower and torque numbers. A dual-injection system features both direct injection and port fuel injection to improve power output and efficiency over a wide variety of engine loads.

A 6-speed SelectShift automatic transmission is paired with the 3.3L Ti-VCT engine.

| | |
|---|---|
| Horsepower | 290 @ 6,500 rpm |
| Torque | 265 lb.-ft. @ 4,000 rpm |
| EPA-estimated ratings[5] | 19 city/25 hwy/22 combined mpg |
| Max. payload capacity[6] | 1,990 lbs. |
| Max. towing capacity[8] | 7,700 lbs. |



## ENHANCED
## 2.7L ECOBOOST®

t   Named one of "Our 10 Favorite Gas
Burners" by *Car and Driver*. And that
was before the upgrades increased
torque to 400 lb.-ft. 2nd-generation
updates to this twin turbo[3] include
a new dual-injection system that
features both direct injection and
port fuel injection. Two injectors per
cylinder – one mounted in the intake
port and another inside the cylinder –
improve power output and efficiency.

Strength and durability come from
compacted graphite iron (CGI)
that forms the upper engine block
and cylinders. New for 2018, the
2.7L[3] is paired with the 10-speed
SelectShift automatic transmission
for exceptional driveability.

| | |
|---|---|
| 325 @ 5,000 rpm | |
| 400 lb.-ft. @ 2,750 rpm | |
| 20 city/26 hwy/22 combined mpg | |
| 2,470 lbs. | |
| 9,100 lbs. | |



## ENHANCED
## 5.0L Ti-VCT V8

Horsepower and torque – increased.
Fuel efficiency – improved. The trusted
5.0L V8 engine[3] – better than ever. A
new dual-injection system increases
compression ratio to 12:1. Upgraded
main and connecting rod bearings
provide greater durability. And, new
for 2018, the V8 is paired with the
10-speed SelectShift automatic
transmission for the first time. "The
5.0L ... roars with a burly truck V8
note," says *Motor Trend*.

An available, class-exclusive CNG/
Propane Gaseous Engine Prep
Package can ready your V8-equipped
F-150 to be upfit for compressed
natural gas (CNG), propane autogas,
or as a bi-fuel vehicle with the ability
to switch between CNG or propane
and gasoline.[4]

| |
|---|
| 395 @ 5,750 rpm |
| 400 lb.-ft. @ 4,500 rpm |
| 17 city/23 hwy/19 combined mpg |
| 3,270 lbs. |
| 11,600 lbs. |

- 134 -



## 2ND-GEN
# 3.5L ECOBOOST

All-new for the 2017 model year, the 3.5L EcoBoost[3] soldiers on for 2018 with a class-best 470 lb.-ft. of torque, along with 375 horsepower. Paired with the 10-speed SelectShift automatic transmission, engine torque is readily available across the speed range for instant acceleration and exceptional low-end and peak performance. Exactly what's needed for hauling heavy loads and towing heavy trailers.

A roller-finger follower valvetrain features durable intake and exhaust valves, as well as hydraulic valve-lash adjusters that optimize engine durability.

| |
|---|
| 375 @ 5,000 rpm |
| 470 lb.-ft. @ 3,500 rpm |
| 18 city/25 hwy/21 combined mpg |
| 3,230 lbs. |
| 13,200 lbs. |



# ALL-NEW 3.0L POWER STROKE DIESEL

As the first-ever diesel engine in Ford F-150, the 3.0L Power Stroke® Turbo Diesel[a] delivers 440 lb.-ft. of diesel torque and 250 diesel horsepower – both best in class. It's also paired with the 10-speed SelectShift automatic transmission to put all its usable low-end engine torque to good use.

With the transmission's 10-speed architecture, and the engine's peak torque arriving at a low 1,750 rpm, the diesel powertrain is an exceptional choice for towing – where strong torque delivery throughout the rpm range is exactly what you need.

| |
|---|
| 250 @ 3,250 rpm |
| 440 lb.-ft. @ 1,750 rpm |
| 22 city/30 hwy/25 combined mpg |
| 1,940 lbs. |
| 11,400 lbs. |

**K.    Economic harm**

471.    As a result of Defendant's unfair, deceptive, and/or fraudulent business practices, Plaintiffs did not receive the fuel efficiency that was advertised and will incur increased fuel costs over the life of their vehicle.  Had Ford told the truth, that it was cheating on its coastdown testing, Plaintiffs would not have bought their vehicle or would have paid substantially less.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

**A.    Discovery rule tolling**

472.    Class members had no way of knowing about Ford's deception with respect to the Coastdown Cheating Vehicles' performance in real-world driving. To be sure, Ford continues to market the Coastdown Cheating Vehicles, including the 2019-2020 Ranger and 2018-2020 F-150, with false representations of its fuel efficiency.

473.    Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed Class could not have discovered through the exercise of reasonable diligence that Ford was concealing the conduct complained of herein and misrepresenting the company's true position with respect to the performance of the Coastdown Cheating Vehicles.

474.    Plaintiffs and the other Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Ford did not report information within its knowledge to federal and state authorities, its

dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Ford had concealed information about the true emissions of the Coastdown Cheating Vehicles, which was discovered by Plaintiffs only shortly before this action was filed. Nor in any event would such an investigation on the part of Plaintiffs and other Class members have disclosed that Ford valued profits over truthful marketing and compliance with the law.

475.   For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Coastdown Cheating Vehicles.

## B.    Fraudulent concealment tolling

476.   All applicable statutes of limitation have also been tolled by Ford's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

477.   Instead of disclosing its fuel economy and emissions testing scheme, Ford continues to falsely represent that the Coastdown Cheating Vehicles have higher fuel economy and lower emissions than advertised.

## C.    Estoppel

478.   Ford was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the Coastdown Cheating Vehicles' fuel efficiency and emissions.

479.   Ford knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the fuel efficiency and emissions in the Coastdown Cheating Vehicles and continues to do so in its advertising and brochures for continued sale of these vehicles.

480.   Based on the foregoing, Ford is estopped from relying on any statutes of limitations in defense of this action.

## VII.   CLASS DEFINITIONS

481.   Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (collectively, the "Class"):

> **Nationwide Class**
> All persons who purchased or leased a Ford vehicle whose published EPA fuel economy ratings, as printed on the vehicles' window sticker, were more than the fuel economy rating produced by a properly conducted applicable federal mileage test. The vehicles in the Class include but are not limited to the model year 2019 and 2020 Ford Ranger and the 2018, 2019, and 2020 Ford F-150.

**Alabama Subclass**
All members of the Nationwide Class who are residents of Alabama or purchased or leased their Coastdown Cheating Vehicle in Alabama.

**Alaska Subclass**
All members of the Nationwide Class who are residents of Alaska or purchased or leased their Coastdown Cheating Vehicle in Alaska.

**Arizona Subclass**
All members of the Nationwide Class who are residents of Arizona or purchased or leased their Coastdown Cheating Vehicle in Arizona.

**Arkansas Subclass**
All members of the Nationwide Class who are residents of Arkansas or purchased or leased their Coastdown Cheating Vehicle in Arkansas.

**California Subclass**
All members of the Nationwide Class who are residents of California or purchased or leased their Coastdown Cheating Vehicle in California.

**Colorado Subclass**
All members of the Nationwide Class who are residents of Colorado or purchased or leased their Coastdown Cheating Vehicle in Colorado.

**Connecticut Subclass**
All members of the Nationwide Class who are residents of Connecticut or purchased or leased their Coastdown Cheating Vehicle in Connecticut.

**Delaware Subclass**
All members of the Nationwide Class who are residents of Delaware or purchased or leased their Coastdown Cheating Vehicle in Delaware.

**Florida Subclass**
All members of the Nationwide Class who are residents of Florida or purchased or leased their Coastdown Cheating Vehicle in Florida.

**Georgia Subclass**
All members of the Nationwide Class who are residents of Georgia or purchased or leased their Coastdown Cheating Vehicle in Georgia.

**Hawaii Subclass**

All members of the Nationwide Class who are residents of Hawaii or purchased or leased their Coastdown Cheating Vehicle in Hawaii.

**Idaho Subclass**

All members of the Nationwide Class who are residents of Idaho or purchased or leased their Coastdown Cheating Vehicle in Idaho.

**Illinois Subclass**

All members of the Nationwide Class who are residents of Illinois or purchased or leased their Coastdown Cheating Vehicle in Illinois.

**Indiana Subclass**

All members of the Nationwide Class who are residents of Indiana or purchased or leased their Coastdown Cheating Vehicle in Indiana.

**Iowa Subclass**

All members of the Nationwide Class who are residents of Iowa or purchased or leased their Coastdown Cheating Vehicle in Iowa.

**Kansas Subclass**

All members of the Nationwide Class who are residents of Kansas or purchased or leased their Coastdown Cheating Vehicle in Kansas.

**Kentucky Subclass**

All members of the Nationwide Class who are residents of Kentucky or purchased or leased their Coastdown Cheating Vehicle in Kentucky.

**Louisiana Subclass**

All members of the Nationwide Class who are residents of Louisiana or purchased or leased their Coastdown Cheating Vehicle in Louisiana.

**Maine Subclass**

All members of the Nationwide Class who are residents of Maine or purchased or leased their Coastdown Cheating Vehicle in Maine.

**Maryland Subclass**

All members of the Nationwide Class who are residents of Maryland or purchased or leased their Coastdown Cheating Vehicle in Maryland.

### Massachusetts Subclass

All members of the Nationwide Class who are residents of Massachusetts or purchased or leased their Coastdown Cheating Vehicle in Massachusetts.

### Michigan Subclass

All members of the Nationwide Class who are residents of Michigan or purchased or leased their Coastdown Cheating Vehicle in Michigan.

### Minnesota Subclass

All members of the Nationwide Class who are residents of Minnesota or purchased or leased their Coastdown Cheating Vehicle in Minnesota.

### Mississippi Subclass

All members of the Nationwide Class who are residents of Mississippi or purchased or leased their Coastdown Cheating Vehicle in Mississippi.

### Missouri Subclass

All members of the Nationwide Class who are residents of Missouri or purchased or leased their Coastdown Cheating Vehicle in Missouri.

### Montana Subclass

All members of the Nationwide Class who are residents of Montana or purchased or leased their Coastdown Cheating Vehicle in Montana.

### Nebraska Subclass

All members of the Nationwide Class who are residents of Nebraska or purchased or leased their Coastdown Cheating Vehicle in Nebraska.

### Nevada Subclass

All members of the Nationwide Class who are residents of Nevada or purchased or leased their Coastdown Cheating Vehicle in Nevada.

### New Hampshire Subclass

All members of the Nationwide Class who are residents of New Hampshire or purchased or leased their Coastdown Cheating Vehicle in New Hampshire.

### New Jersey Subclass

All members of the Nationwide Class who are residents of New Jersey or purchased or leased their Coastdown Cheating Vehicle in New Jersey.

### New Mexico Subclass

All members of the Nationwide Class who are residents of New Mexico or purchased or leased their Coastdown Cheating Vehicle in New Mexico.

### New York Subclass

All members of the Nationwide Class who are residents of New York or purchased or leased their Coastdown Cheating Vehicle in New York.

### North Carolina Subclass

All members of the Nationwide Class who are residents of North Carolina or purchased or leased their Coastdown Cheating Vehicle in North Carolina.

### North Dakota Subclass

All members of the Nationwide Class who are residents of North Dakota or purchased or leased their Coastdown Cheating Vehicle in North Dakota.

### Ohio Subclass

All members of the Nationwide Class who are residents of Ohio or purchased or leased their Coastdown Cheating Vehicle in Ohio.

### Oklahoma Subclass

All members of the Nationwide Class who are residents of Oklahoma or purchased or leased their Coastdown Cheating Vehicle in Oklahoma.

### Oregon Subclass

All members of the Nationwide Class who are residents of Oregon or purchased or leased their Coastdown Cheating Vehicle in Oregon.

### Pennsylvania Subclass

All members of the Nationwide Class who are residents of Pennsylvania or purchased or leased their Coastdown Cheating Vehicle in Pennsylvania.

**Rhode Island Subclass**

All members of the Nationwide Class who are residents of Rhode Island or purchased or leased their Coastdown Cheating Vehicle in Rhode Island.

**South Carolina Subclass**

All members of the Nationwide Class who are residents of South Carolina or purchased or leased their Coastdown Cheating Vehicle in South Carolina.

**South Dakota Subclass**

All members of the Nationwide Class who are residents of South Dakota or purchased or leased their Coastdown Cheating Vehicle in South Dakota.

**Tennessee Subclass**

All members of the Nationwide Class who are residents of Tennessee or purchased or leased their Coastdown Cheating Vehicle in Tennessee.

**Texas Subclass**

All members of the Nationwide Class who are residents of Texas or purchased or leased their Coastdown Cheating Vehicle in Texas.

**Utah Subclass**

All members of the Nationwide Class who are residents of Utah or purchased or leased their Coastdown Cheating Vehicle in Utah.

**Vermont Subclass**

All members of the Nationwide Class who are residents of Vermont or purchased or leased their Coastdown Cheating Vehicle in Vermont.

**Virginia Subclass**

All members of the Nationwide Class who are residents of Virginia or purchased or leased their Coastdown Cheating Vehicle in Virginia.

**Washington Subclass**

All members of the Nationwide Class who are residents of Washington or purchased or leased their Coastdown Cheating Vehicle in Washington.

**West Virginia Subclass**
All members of the Nationwide Class who are residents of West Virginia or purchased or leased their Coastdown Cheating Vehicle in West Virginia.

**Wisconsin Subclass**
All members of the Nationwide Class who are residents of Wisconsin or purchased or leased their Coastdown Cheating Vehicle in Wisconsin.

**Wyoming Subclass**
All members of the Nationwide Class who are residents of Wyoming or purchased or leased their Coastdown Cheating Vehicle in Wyoming.

482.   The class is likely to also include other vehicles, as well as other model year vehicles.   Plaintiffs reserve the right to amend the proposed class after additional information is received from Ford Motor Company in discovery.

483.   Excluded from the Class are individuals who have personal injury claims resulting from the high emissions in the Coastdown Cheating Vehicles. Also excluded from the Class are Ford and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; the Judge to whom this case is assigned and his/her immediate family; and Plaintiffs' counsel.

484.   Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

485. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide

basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

486.   This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

487.   <u>Numerosity</u>. Federal Rule of Civil Procedure 23(a)(1): The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. For purposes of this complaint, Plaintiffs allege that there are in excess of an estimated 1,000,000 or more vehicles in the Class. The precise number of Class members is unknown to Plaintiffs but may be ascertained from Ford's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

488.   <u>Commonality and Predominance</u>: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

    a)    Whether Ford engaged in the conduct alleged herein;

    b)    Whether Ford designed, advertised, marketed, distributed, leased, sold, or otherwise placed Coastdown Cheating Vehicles into the stream of commerce in the United States;

c)      Whether Ford provided false information to consumers regarding the fuel efficiency and emissions of the Coastdown Cheating Vehicles;

d)      Whether Ford provided false information to the EPA regarding the fuel efficiency and emissions of the Coastdown Cheating Vehicles;

e)      Whether Ford knew, and for how long, that the testing certifying the fuel efficiency and emissions of the Coastdown Cheating Vehicles was tainted by inaccurate information;

f)      Whether Ford intentionally designed, manufactured, marketed, and distributed Coastdown Cheating Vehicles with misleading fuel efficiency and emissions ratings;

g)      Whether Plaintiffs and the other Class members overpaid for their vehicles at the point of sale; and

h)      Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

489.   <u>Typicality</u>: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Ford's wrongful conduct as described above.

490.   <u>Adequacy</u>: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. Plaintiffs' counsel have

extensive experience in emissions cases. The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

491.   <u>Declaratory and Injunctive Relief:</u> Federal Rule of Civil Procedure 23(b)(2): Ford has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief with respect to the Class as a whole.

492.   <u>Superiority:</u> Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for the members of the Classes to individually seek redress for Ford's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.  CLASS ALLEGATIONS

**A.**     **Claims Brought on Behalf of the Alabama Subclass**

### COUNT 1

### VIOLATION OF THE ALABAMA
### DECEPTIVE TRADE PRACTICES ACT
### (ALA. CODE § 8-19-1 *et seq.*)

493.   Plaintiffs William Don Cook, Ronald J. Dismukes, and Jeffrey Foshee ("Alabama Plaintiffs") hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

494.   This claim is brought by the Alabama Plaintiffs on behalf of the Alabama Subclass.

495.   The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including: "engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." ALA. CODE § 8-19-5.

496.   Alabama Plaintiffs and the Alabama Subclass are "consumers" within the meaning of ALA. CODE. § 8-19-3(2).

497.   Alabama Plaintiffs, the Alabama Subclass, and Ford are "persons" within the meaning of ALA. CODE § 8-19-3(3).

498.   Ford was and is engaged in "trade or commerce" within the meaning of ALA. CODE § 8-19-3(8).

499.   In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

500.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

501.   Ford's unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including Alabama Plaintiffs and the Alabama Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

502.   Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Alabama Plaintiffs and the Alabama Subclass.

503.   Ford knew or should have known that its conduct violated the Alabama DTPA.

504.   Ford owed Alabama Plaintiffs and the Alabama Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

a.   Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

b.   Intentionally concealed the foregoing from Alabama Plaintiffs and the Alabama Subclass; and/or

c.   Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Alabama Plaintiffs and the Alabama Subclass that contradicted these representations.

505.   Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Alabama Plaintiffs and the Alabama Subclass.

506.   Alabama Plaintiffs and the Alabama Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Alabama Plaintiffs and the Alabama Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Alabama DTPA.

507.   Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Alabama DTPA.

508.   As a direct and proximate result of Ford's violations of the Alabama DTPA, Alabama Plaintiffs and the Alabama Subclass have suffered injury-in-fact and/or actual damage.

509.   Ford's violations present a continuing risk to Alabama Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

510.   Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

511.   Pursuant to ALA. CODE § 8-19-10, Alabama Plaintiffs seek monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each plaintiff.

512.   Alabama Plaintiffs also seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under ALA. CODE. § 8-19-1, *et seq*.

513.    Plaintiffs also seek punitive damages because Ford engaged in aggravated and outrageous conduct.

514.    On June 20, 2019, Plaintiffs sent a letter complying with ALA. CODE § 8-19-10(e) to Ford. Ford failed to remedy its unlawful conduct within the requisite period. Thus, Alabama Plaintiffs seek all damages and relief to which they are entitled.

## COUNT 2

## BREACH OF CONTRACT
## (BASED ON ALABAMA LAW)

515.    Alabama Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

516.    This claim is brought by Alabama Plaintiffs on behalf of the Alabama Subclass.

517.    Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Alabama Plaintiffs and the Alabama Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Alabama Plaintiffs and the Alabama Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did

- 153 -

not contain the reduced mileage. Accordingly, Alabama Plaintiffs and the Alabama Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

518.   Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Alabama Plaintiffs and the Alabama Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

519.   As a direct and proximate result of Ford's breach of contract, Alabama Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 3

### BREACH OF EXPRESS WARRANTY
### (ALA. CODE § 7-2-313)

520.   Alabama Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

521.   This claim is brought by Alabama Plaintiffs on behalf of the Alabama Subclass.

522.   Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to Ala. Code § 7-2-104.

523.   In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

524.   In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

525.   As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

526.   These affirmations and promises were part of the basis of the bargain that was reached when Alabama Plaintiffs and the other Alabama Subclass members purchased or leased the Coastdown Cheating Vehicles.

527.  Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

528.  Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

529.  Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Alabama Plaintiffs and the Alabama Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

530.  Accordingly, recovery by the Alabama Plaintiffs and the Alabama Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Alabama Plaintiffs, individually and on behalf of the other Alabama Subclass members, seek all remedies as allowed by law.

531.  Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently

concealed material facts regarding the Coastdown Cheating Vehicles. Alabama Plaintiffs and the Alabama Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

532. Finally, due to Ford's breach of warranty as set forth herein, Alabama Plaintiffs and the Alabama Subclass assert as an additional and/or alternative remedy, the revocation of acceptance of the goods, and the return to Alabama Plaintiffs and the Alabama Subclass members of the purchase price of all Coastdown Cheating Vehicles currently owned for such other incidental and consequential damages as allowed under Ala. Code § 7-2-114.

533. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

534. As a direct and proximate result of Ford's breach of express warranties, Alabama Plaintiffs and the Alabama Subclass have been damaged in an amount to be determined at trial.

## COUNT 4

## FRAUDULENT CONCEALMENT
## (BASED ON ALABAMA LAW)

535. Alabama Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

536.   This claim is brought by Alabama Plaintiffs on behalf of the Alabama Subclass.

537.   Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Alabama Plaintiffs and the Alabama Subclass information that is highly relevant and material to their purchasing decision.

538.   The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

539.   Ford further affirmatively misrepresented to Alabama Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

540.   Ford knew these representations were false when made.

541.   The Coastdown Cheating Vehicles purchased or leased by Alabama Plaintiffs and the Alabama Subclass were, in fact, defective, with reduced fuel efficiency.

542.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Alabama Plaintiffs and the Alabama Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

543.   As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

544.   The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Alabama Plaintiffs and the Alabama Subclass did not know of these facts and Ford actively concealed these facts from Alabama Plaintiffs and the Alabama Subclass.

545.   Alabama Plaintiffs and the Alabama Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Alabama Plaintiffs and the Alabama Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Alabama Plaintiffs and the Alabama Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

546.   Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Alabama Plaintiffs and the Alabama Subclass placed in its representations.

547.   Ford's false representations  and omissions were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Alabama Plaintiffs and the Alabama Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

548.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is

far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Alabama Plaintiffs and the Alabama Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Alabama Plaintiffs and the Alabama Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Alabama Plaintiffs and the Alabama Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Alabama Plaintiffs and the Alabama Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

549.   Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Alabama Plaintiffs and the Alabama Subclass.

550.   Ford has still not made full and adequate disclosures and continues to defraud Alabama Plaintiffs and the Alabama Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

551.   Alabama Plaintiffs and the Alabama Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Alabama Plaintiffs' and the Alabama Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Alabama Plaintiffs, or Alabama Subclass members.

552.   Because of the concealment and/or suppression of the facts, Alabama Plaintiffs and the Alabama Subclass have been injured and sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel

costs over what was represented by Ford. Had they been aware of the true facts, Alabama Plaintiffs and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

553.   Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Alabama Plaintiffs and the Alabama Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

554.   Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Alabama Plaintiffs' and the Alabama Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 5

### NEGLIGENT MISREPRESENTATION
### (BASED ON ALABAMA LAW)

555.   Alabama Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

556.   This claim is brought by the Alabama Plaintiffs on behalf of the Alabama Subclass.

557.   Defendant made fuel economy representations to Alabama Plaintiffs and members of the Class that were not true.

558.   Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Alabama Plaintiffs and Alabama Subclass members rely on these misrepresentations.

559.   Alabama Plaintiffs reasonably relied on Defendant's representations and as a result Alabama Plaintiffs and Alabama Subclass members were harmed.

## COUNT 6

### UNJUST ENRICHMENT
### (BASED ON ALABAMA LAW)

560.   Alabama Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

561.   This claim is brought by the Alabama Plaintiffs on behalf of the Alabama Subclass.

562.   Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Alabama Plaintiffs and the Alabama Subclass.

563.   Defendant enjoyed the benefit of increased financial gains, to the detriment of Alabama Plaintiffs and other Alabama Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

564.   Alabama Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Alabama Subclass.

**B.   Claims brought on behalf of the Alaska Subclass**

**COUNT 7**

**VIOLATION OF THE ALASKA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION ACT
(ALASKA STAT. ANN. § 45.50.471 *et seq.*)**

565.   Alaska Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

566.   This claim is brought by Alaska Plaintiffs on behalf of the Alaska Subclass.

567.   The Alaska Unfair Trade Practices and Consumer Protection Act (Alaska CPA) declared unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce unlawful, including "using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged." ALASKA STAT. ANN. § 45.50.471.

568.   In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

569.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

570.   Ford's unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including Alaska Plaintiffs and the Alaska Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

571.   Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Alaska Plaintiffs and the Alaska Subclass.

572.   Ford knew or should have known that its conduct violated the Alaska CPA.

573. Ford owed Alaska Plaintiffs and the Alaska Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

      a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

      b.    Intentionally concealed the foregoing from Alaska Plaintiffs and the Alaska Subclass; and/or

      c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Alaska Plaintiffs and the Alaska Subclass that contradicted these representations.

574. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Alaska Plaintiffs and the Alaska Subclass.

575. Alaska Plaintiffs and the Alaska Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Alaska Plaintiffs and the Alaska Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Alaska CPA.

576. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Alaska CPA.

577.   As a direct and proximate result of Ford's violations of the Alaska CPA, Alaska Plaintiffs and the Alaska Subclass have suffered injury-in-fact and/or actual damage.

578.   Ford's violations present a continuing risk to Alaska Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

579.   Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

580.   Pursuant to ALASKA STAT ANN. § 45.50.531, Plaintiffs seek monetary relief against Ford measured as the greater of (a) three times the actual damages in an amount to be determined at trial or (b) $500 for each plaintiff.

581.   Plaintiffs also seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices pursuant to ALASKA STAT. ANN. § 45.50.535(b)(1), attorneys' fees, and any other just and proper relief available under the Alaska CPA.

582.   Plaintiffs also seek punitive damages because Ford engaged in aggravated and outrageous conduct.

583.   Plaintiffs sent a letter on June 20, 2019 complying with ALASKA STAT. ANN. § 45.50.535(b)(1) to Ford.

## COUNT 8

## BREACH OF CONTRACT
## (BASED ON ALASKA LAW)

584.   Alaska Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

585.   This claim is brought by Alaska Plaintiffs on behalf of the Alaska Subclass.

586.   Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Alaska Plaintiffs and the Alaska Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Alaska Plaintiffs and the Alaska Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Alaska Plaintiffs and the Alaska Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

587.  Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Alaska Plaintiffs and the Alaska Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

588.  As a direct and proximate result of Ford's breach of contract, Alaska Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 9

### BREACH OF EXPRESS WARRANTY
### (AK. STAT. § 45.02.313)

589.  Alaska Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

590.  This claim is brought by Alaska Plaintiffs on behalf of the Alaska Subclass.

591.  Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to Ak. Stat. § 45.02.104.

592.    In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

593.    In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

594.    As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

595.    These affirmations and promises were part of the basis of the bargain that was reached when Alaska Plaintiffs and the other Alaska Subclass members purchased or leased the Coastdown Cheating Vehicles.

596.    Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is

unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

597.   Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

598.   Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Alaska Plaintiffs and the Alaska Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

599.   Accordingly, recovery by the Alaska Plaintiffs and the Alaska Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Alaska Plaintiffs, individually and on behalf of the other Alaska Subclass members, seek all remedies as allowed by law.

600.   Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Alaska Plaintiffs and the Alaska Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

601.   Finally, due to Ford's breach of warranty as set forth herein, Alaska Plaintiffs and the Alaska Subclass assert as an additional and/or alternative remedy, the revocation of acceptance of the goods, and the return to Alaska Plaintiffs and the Alaska Subclass members of the purchase price of all Coastdown Cheating Vehicles currently owned for such other incidental and consequential damages as allowed under Ak. Stat. § 45.02.714.

602.   Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

603.   As a direct and proximate result of Ford's breach of express warranties, Alaska Plaintiffs and the Alaska Subclass have been damaged in an amount to be determined at trial.

## COUNT 10

### FRAUDULENT CONCEALMENT
### (BASED ON ALASKA LAW)

604.   Alaska Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

605.   This claim is brought by Alaska Plaintiffs on behalf of the Alaska Subclass.

606.   Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Alaska Plaintiffs and the Alaska Subclass information that is highly relevant and material to their purchasing decision.

607.   The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

608.   Ford further affirmatively misrepresented to Alaska Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

609.   Ford knew these representations were false when made.

610.   The Coastdown Cheating Vehicles purchased or leased by Alaska Plaintiffs and the Alaska Subclass were, in fact, defective, with reduced fuel efficiency.

611.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Alaska Plaintiffs and the Alaska Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

612.   As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

613.   The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Alaska Plaintiffs and the Alaska Subclass did not know of these facts and Ford actively concealed these facts from Alaska Plaintiffs and the Alaska Subclass.

614.   Alaska Plaintiffs and the Alaska Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Alaska Plaintiffs and the Alaska Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended

to deceive Alaska Plaintiffs and the Alaska Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

615.   Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Alaska Plaintiffs and the Alaska Subclass placed in its representations.

616.   Ford's false representations and omissions were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Alaska Plaintiffs and the Alaska Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

617.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably

discoverable by Alaska Plaintiffs and the Alaska Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles. Having volunteered to provide information to Alaska Plaintiffs and the Alaska Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Alaska Plaintiffs and the Alaska Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Alaska Plaintiffs and the Alaska Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

618. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Alaska Plaintiffs and the Alaska Subclass.

619.   Ford has still not made full and adequate disclosures and continues to defraud Alaska Plaintiffs and the Alaska Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

620.   Alaska Plaintiffs and the Alaska Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Alaska Plaintiffs' and the Alaska Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Alaska Plaintiffs, or Alaska Subclass members.

621.   Because of the concealment and/or suppression of the facts, Alaska Plaintiffs and the Alaska Subclass have been injured and sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Alaska Plaintiffs and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

622.   Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Alaska Plaintiffs and the Alaska Subclass for damages in an amount to be

proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

623.    Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Alaska Plaintiffs' and the Alaska Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 11

## NEGLIGENT MISREPRESENTATION
## (BASED ON ALASKA LAW)

624.    Alaska Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

625.    This claim is brought by the Alaska Plaintiffs on behalf of the Alaska Subclass.

626.    Defendant made fuel economy representations to Alaska Plaintiffs and members of the Class that were not true.

627.    Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Alaska Plaintiffs and Alaska Subclass members rely on these misrepresentations.

- 179 -

628.   Alaska Plaintiffs reasonably relied on Defendant's representations and as a result Alaska Plaintiffs and Alaska Subclass members were harmed.

## COUNT 12

### UNJUST ENRICHMENT
### (BASED ON ALASKA LAW)

629.   Alaska Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

630.   This claim is brought by the Alaska Plaintiffs on behalf of the Alaska Subclass.

631.   Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Alaska Plaintiffs and the Alaska Subclass.

632.   Defendant enjoyed the benefit of increased financial gains, to the detriment of Alaska Plaintiffs and other Alaska Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

633.   Alaska Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Alaska Subclass.

**C.    Claims brought on behalf of the Arizona Subclass**

## COUNT 13

### VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT
### (ARIZONA REV. STAT. § 44-1521 *et seq.*)

634.   Plaintiff Ronald Ceremello ("Arizona Plaintiff") Arizona Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

635.   This claim is brought by Arizona Plaintiffs on behalf of the Arizona Subclass.

636.   Ford, Plaintiffs, and Arizona Class members are "persons" within the meaning of the Arizona CFA, ARIZ. REV. STAT. § 44-1521(6).

637.   Each Coastdown Cheating Vehicle at issue is "merchandise" within the meaning of ARIZ. REV. STAT. § 44-1521(5).

638.   The Arizona Consumer Fraud Act (Arizona CFA) provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud . . . , misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . . of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." ARIZ. REV. STAT. § 44-1522(A).

639.   In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

640.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

641.   Ford's unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including Arizona Plaintiffs and the Arizona Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

642.   Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Arizona Plaintiffs and the Arizona Subclass.

643.   Ford knew or should have known that its conduct violated the Arizona CFA.

644. Ford owed Arizona Plaintiffs and the Arizona Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

    a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

    b.    Intentionally concealed the foregoing from Arizona Plaintiffs and the Arizona Subclass; and/or

    c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Arizona Plaintiffs and the Arizona Subclass that contradicted these representations.

645. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Arizona Plaintiffs and the Arizona Subclass.

646. Arizona Plaintiffs and the Arizona Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Arizona Plaintiffs and the Arizona Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Arizona CFA.

647.   Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Arizona CFA.

648.   As a direct and proximate result of Ford's violations of the Arizona CFA, Arizona Plaintiffs and the Arizona Subclass have suffered injury-in-fact and/or actual damage.

649.   Ford's violations present a continuing risk to Arizona Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

650.   Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

651.   Arizona Plaintiffs seek monetary relief against Ford in an amount to be determined at trial. Arizona Plaintiffs and the Arizona Subclass also seek punitive damages because Ford engaged in aggravated and outrageous conduct with an evil mind.

652.   Arizona Plaintiffs and the Arizona Subclass also seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

## COUNT 14

## BREACH OF CONTRACT
## (BASED ON ARIZONA LAW)

653.   Arizona Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

654.   This claim is brought by Arizona Plaintiffs on behalf of the Arizona Subclass.

655.   Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Arizona Plaintiffs and the Arizona Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Arizona Plaintiffs and the Arizona Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Arizona Plaintiffs and the Arizona Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

656.   Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Arizona Plaintiffs and the Arizona Subclass

defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

657.   As a direct and proximate result of Ford's breach of contract, Arizona Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 15

## BREACH OF EXPRESS WARRANTY
## (ARIZ. REV. STAT. § 47-2313, *ET SEQ.*)

658.   Arizona Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

659.   This claim is brought by Arizona Plaintiffs on behalf of the Arizona Subclass.

660.   Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to Ariz. Rev. Stat. § 47-2104(A).

661.   In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover

"defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

662.   In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

663.   As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

664.   These affirmations and promises were part of the basis of the bargain that was reached when Arizona Plaintiffs and the other Arizona Subclass members purchased or leased the Coastdown Cheating Vehicles.

665.   Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

666.   Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

667.   Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Arizona Plaintiffs and the Arizona Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

668.   Accordingly, recovery by the Arizona Plaintiffs and the Arizona Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Arizona Plaintiffs, individually and on behalf of the other Arizona Subclass members, seek all remedies as allowed by law.

669.   Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Arizona Plaintiffs and the Arizona Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

670.   Finally, due to Ford's breach of warranty as set forth herein, Arizona Plaintiffs and the Arizona Subclass assert as an additional and/or alternative remedy, as set forth in Ariz. Rev. Stat. § 47-2711, the revocation of acceptance of the goods,

and the return to Arizona Plaintiffs and the Arizona Subclass members of the purchase price of all Coastdown Cheating Vehicles currently owned for such other incidental and consequential damages as allowed under Ariz. Rev. Stat. §§ 47-2711 and 47-2608.

671.   Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

672.   As a direct and proximate result of Ford's breach of express warranties, Arizona Plaintiffs and the Arizona Subclass have been damaged in an amount to be determined at trial.

## COUNT 16

### FRAUDULENT CONCEALMENT
### (BASED ON ARIZONA LAW)

673.   Arizona Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

674.   This claim is brought by Arizona Plaintiffs on behalf of the Arizona Subclass.

675.   Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these

vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Arizona Plaintiffs and the Arizona Subclass information that is highly relevant and material to their purchasing decision.

676. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

677. Ford further affirmatively misrepresented to Arizona Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

678. Ford knew these representations were false when made.

679. The Coastdown Cheating Vehicles purchased or leased by Arizona Plaintiffs and the Arizona Subclass were, in fact, defective, with reduced fuel efficiency.

680. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Arizona Plaintiffs and the

Arizona Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

681.   As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

682.   The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Arizona Plaintiffs and the Arizona Subclass did not know of these facts and Ford actively concealed these facts from Arizona Plaintiffs and the Arizona Subclass.

683.   Arizona Plaintiffs and the Arizona Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Arizona Plaintiffs and the Arizona Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Arizona Plaintiffs and the Arizona Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

684.   Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and

sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Arizona Plaintiffs and the Arizona Subclass placed in its representations.

685.   Ford's false representations  and omissions were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Arizona Plaintiffs and the Arizona Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

686.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Arizona Plaintiffs and the Arizona Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth

above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Arizona Plaintiffs and the Arizona Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Arizona Plaintiffs and the Arizona Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Arizona Plaintiffs and the Arizona Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

687.  Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Arizona Plaintiffs and the Arizona Subclass.

688.  Ford has still not made full and adequate disclosures and continues to defraud Arizona Plaintiffs and the Arizona Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

689.   Arizona Plaintiffs and the Arizona Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Arizona Plaintiffs' and the Arizona Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Arizona Plaintiffs, or Arizona Subclass members.

690.   Because of the concealment and/or suppression of the facts, Arizona Plaintiffs and the Arizona Subclass have been injured and sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Arizona Plaintiffs and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

691.   Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Arizona Plaintiffs and the Arizona Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

692. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Arizona Plaintiffs' and the Arizona Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 17

## NEGLIGENT MISREPRESENTATION
## (BASED ON ARIZONA LAW)

693. Arizona Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

694. This claim is brought by the Arizona Plaintiffs on behalf of the Arizona Subclass.

695. Defendant made fuel economy representations to Arizona Plaintiffs and members of the Class that were not true.

696. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Arizona Plaintiffs and Arizona Subclass members rely on these misrepresentations.

697. Arizona Plaintiffs reasonably relied on Defendant's representations and as a result Arizona Plaintiffs and Arizona Subclass members were harmed.

## COUNT 18

## UNJUST ENRICHMENT
## (BASED ON ARIZONA LAW)

698.   Arizona Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

699.   This claim is brought by the Arizona Plaintiffs on behalf of the Arizona Subclass.

700.   Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Arizona Plaintiffs and the Arizona Subclass.

701.   Defendant enjoyed the benefit of increased financial gains, to the detriment of Arizona Plaintiffs and other Arizona Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

702.   Arizona Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Arizona Subclass.

**D.     Claims brought on behalf of the Arkansas Subclass**

**COUNT 19**

**VIOLATION OF THE ARKANSAS
DECEPTIVE TRADE PRACTICES ACT
(ARK. CODE ANN. § 4-88-101 *et seq.*)**

703.   Arkansas Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

704.   This claim is brought by Arkansas Plaintiffs on behalf of the Arkansas Subclass.

705.   Ford, Plaintiffs, and the Arkansas Subclass are "persons" within the meaning of the Arkansas Deceptive Trade Practices Act ("Arkansas DTPA"), ARK. CODE. ANN. § 4-88-102(5).

706.   Each Coastdown Cheating Vehicle at issue constitutes "goods" within the meaning of ARK. CODE ANN. § 4-88-102(4).

707.   The Arkansas DTPA prohibits "[d]eceptive and unconscionable trade practices," which include but are not limited to "[e]ngaging in any . . . unconscionable false, or deceptive act or practice in business, commerce, or trade." ARK. CODE. ANN. § 4-88-107(a)(10). The Arkansas DTPA also prohibits, in connection with the sale or advertisement of any goods, "(1) the act, use, or employment by any person of any deception, fraud, or pretense; or (2) the

concealment, suppression, or omission of any material fact with intent that other rely upon the concealment, suppression, or omission." ARK CODE. ANN. § 4-88-108.

708.   In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

709.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

710.   Ford's unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including Arkansas Plaintiffs and the Arkansas Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

711.   Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Arkansas Plaintiffs and the Arkansas Subclass.

712.   Ford knew or should have known that its conduct violated the Arkansas DTPA.

713.   Ford owed Arkansas Plaintiffs and the Arkansas Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

     a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

     b.    Intentionally concealed the foregoing from Arkansas Plaintiffs and the Arkansas Subclass; and/or

     c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Arkansas Plaintiffs and the Arkansas Subclass that contradicted these representations.

714.   Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Arkansas Plaintiffs and the Arkansas Subclass.

715.   Arkansas Plaintiffs and the Arkansas Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Arkansas Plaintiffs and the Arkansas Subclass members who purchased the Coastdown Cheating Vehicles either would have paid

less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Arkansas DTPA.

716.   Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Arkansas DTPA.

717.   As a direct and proximate result of Ford's violations of the Arkansas DTPA, Arkansas Plaintiffs and the Arkansas Subclass have suffered injury-in-fact and/or actual damage.

718.   Ford's violations present a continuing risk to Arkansas Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

719.   Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

720.   Arkansas Plaintiffs seek monetary relief against Ford in an amount to be determined at trial. Arkansas Plaintiffs and the Arkansas Subclass also seek punitive damages because Ford acted wantonly in causing Arkansas Plaintiffs and the Arkansas Subclass members' injuries, or with such a conscious indifference to the consequences that malice may be inferred.

721.   Arkansas Plaintiffs and the Arkansas Subclass also seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arkansas DTPA.

## COUNT 20

## BREACH OF CONTRACT
## (BASED ON ARKANSAS LAW)

722.   Arkansas Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

723.   This claim is brought by Arkansas Plaintiffs on behalf of the Arkansas Subclass.

724.   Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Arkansas Plaintiffs and the Arkansas Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Arkansas Plaintiffs and the Arkansas Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Arkansas Plaintiffs and the Arkansas Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

725.   Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Arkansas Plaintiffs and the Arkansas Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

726.   As a direct and proximate result of Ford's breach of contract, Arkansas Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 21

### BREACH OF EXPRESS WARRANTY
### (ARK. CODE § 4-2-313)

727.   Arkansas Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

728.   This claim is brought by Arkansas Plaintiffs on behalf of the Arkansas Subclass.

729.   Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to Ark. Code § 4-2-104.

730.   In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

731.   In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

732.   As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

733.   These affirmations and promises were part of the basis of the bargain that was reached when Arkansas Plaintiffs and the other Arkansas Subclass members purchased or leased the Coastdown Cheating Vehicles.

734.   Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is

unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

735. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

736. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Arkansas Plaintiffs and the Arkansas Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

737. Accordingly, recovery by the Arkansas Plaintiffs and the Arkansas Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Arkansas Plaintiffs, individually and on behalf of the other Arkansas Subclass members, seek all remedies as allowed by law.

738. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Arkansas Plaintiffs and the Arkansas Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

739.   Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

740.   As a direct and proximate result of Ford's breach of express warranties, Arkansas Plaintiffs and the Arkansas Subclass have been damaged in an amount to be determined at trial.

## COUNT 22

## FRAUDULENT CONCEALMENT
## (BASED ON ARKANSAS LAW)

741.   Arkansas Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

742.   This claim is brought by Arkansas Plaintiffs on behalf of the Arkansas Subclass.

743.   Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Arkansas Plaintiffs and the Arkansas Subclass information that is highly relevant and material to their purchasing decision.

744. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

745. Ford further affirmatively misrepresented to Arkansas Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

746. Ford knew these representations were false when made.

747. The Coastdown Cheating Vehicles purchased or leased by Arkansas Plaintiffs and the Arkansas Subclass were, in fact, defective, with reduced fuel efficiency.

748. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Arkansas Plaintiffs and the Arkansas Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

749.    As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

750.    The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Arkansas Plaintiffs and the Arkansas Subclass did not know of these facts and Ford actively concealed these facts from Arkansas Plaintiffs and the Arkansas Subclass.

751.    Arkansas Plaintiffs and the Arkansas Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Arkansas Plaintiffs and the Arkansas Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Arkansas Plaintiffs and the Arkansas Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

752.    Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized

profits and sales above the trust that Arkansas Plaintiffs and the Arkansas Subclass placed in its representations.

753.   Ford's false representations  and omissions were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Arkansas Plaintiffs and the Arkansas Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

754.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Arkansas Plaintiffs and the Arkansas Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Arkansas Plaintiffs and the Arkansas Subclass members, Ford had

the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Arkansas Plaintiffs and the Arkansas Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Arkansas Plaintiffs and the Arkansas Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

755.   Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Arkansas Plaintiffs and the Arkansas Subclass.

756.   Ford has still not made full and adequate disclosures and continues to defraud Arkansas Plaintiffs and the Arkansas Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

757.   Arkansas Plaintiffs and the Arkansas Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not

have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Arkansas Plaintiffs' and the Arkansas Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Arkansas Plaintiffs, or Arkansas Subclass members.

758.   Because of the concealment and/or suppression of the facts, Arkansas Plaintiffs and the Arkansas Subclass have been injured and sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Arkansas Plaintiffs and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

759.   Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Arkansas Plaintiffs and the Arkansas Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

760.   Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Arkansas Plaintiffs' and the Arkansas Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages

in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 23

### NEGLIGENT MISREPRESENTATION
### (BASED ON ARKANSAS LAW)

761.   Arkansas Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

762.   This claim is brought by the Arkansas Plaintiffs on behalf of the Arkansas Subclass.

763.   Defendant made fuel economy representations to Arkansas Plaintiffs and members of the Class that were not true.

764.   Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Arkansas Plaintiffs and Arkansas Subclass members rely on these misrepresentations.

765.   Arkansas Plaintiffs reasonably relied on Defendant's representations and as a result Arkansas Plaintiffs and Arkansas Subclass members were harmed.

## COUNT 24

### UNJUST ENRICHMENT
### (BASED ON ARKANSAS LAW)

766.   Arkansas Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

767.    This claim is brought by the Arkansas Plaintiffs on behalf of the Arkansas Subclass.

768.    Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Arkansas Plaintiffs and the Arkansas Subclass.

769.    Defendant enjoyed the benefit of increased financial gains, to the detriment of Arkansas Plaintiffs and other Arkansas Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

770.    Arkansas Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Arkansas Subclass.

**E.**    **Claims Brought on Behalf of the California Subclass**

**COUNT 25**

**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**(CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*)**

771.    Plaintiffs Victor Perez and Harold Brower ("California Plaintiffs") incorporate by reference all paragraphs as though fully set forth herein.

772.    This claim is brought by the California Plaintiffs on behalf of the California Subclass.

773.    California's Unfair Competition Law (UCL), CAL. BUS. & PROF. CODE § 17200 *et seq.*, proscribes acts of unfair competition, including "any unlawful,

unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

774.  Ford's conduct, as described herein, was and is in violation of the UCL. Ford's conduct violates the UCL in at least the following ways:

i.  By failing to disclose that the Coastdown Cheating Vehicles do not achieve the MPGs listed on the Monroney sticker or Ford's advertising;

ii.  By knowingly and intentionally concealing from Plaintiffs and the other California Subclass members that the Coastdown Cheating Vehicles contain reported MPGs via a Coastdown Cheating process chat do not achieve the MPGs listed on the Monroney sticker, do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles;

iii.  By failing to disclose that fuel economy is achieved with manipulation of the computer trip meter;

iv.  By marketing the Coastdown Cheating Vehicles as fuel efficient vehicles; and

v.  By violating federal laws, including the Automobile Disclosure Act (15 U.S.C. §§ 1231-33) and 49 U.S.C. § 32908, and EPA CAFE standards by failing to disclose that the Coastdown Cheating Vehicles do not achieve the MPGs listed on the Monroney sticker

vi.  By violating other California laws, including California consumer protection laws.

vii.  By refusing or otherwise failing to repair and/or replace the Coastdown Cheating Vehicles.

775.    Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with an intent to mislead California Plaintiffs and the Class.

776.    In purchasing or leasing the Coastdown Cheating Vehicles, California Plaintiffs and the California Subclass were deceived by Ford's failure to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the representation made by Ford.

777.    California Plaintiffs and California Subclass reasonably relied upon Ford's false misrepresentations. They had no way of knowing that Ford's representations were false and gravely misleading. As alleged herein, Ford engaged in extremely sophisticated methods of deception. California Plaintiffs and California Subclass did not, and could not, unravel Ford's deception on their own.

778.    Ford knew or should have known that its conduct violated the UCL.

779.    Ford owed California Plaintiffs and the California Subclass a duty to disclose the truth about its fuel efficiency manipulation because Ford:

    a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

    b.    Intentionally concealed the foregoing from California Plaintiffs and the California Subclass; and/or

- 214 -

     c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from California Plaintiffs and the California Subclass that contradicted these representations.

780.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

781.   Ford's conduct proximately caused injuries to California Plaintiffs and the California Subclass.

782.   California Plaintiffs and the California Subclass were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Ford's conduct in that California Plaintiffs and the California Subclass members overpaid for the Coastdown Cheating Vehicles, and/or the Coastdown Cheating Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Ford's misrepresentations and omissions.

783.   Ford's violations present a continuing risk to California Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

784. Ford's misrepresentations and omissions alleged herein caused California Plaintiffs and the California Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, California Plaintiffs and the California Subclass would not have purchased or leased these vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced fuel economy of the Coastdown Cheating Vehicles.

785. Accordingly, California Plaintiffs and the California Subclass members have suffered injury in fact, including lost money or property, as a result of Ford's misrepresentations and omissions.

786. California Plaintiffs request that this Court enter such orders or judgments as may be necessary to restore to California Plaintiffs and the California Subclass any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in CAL. BUS. & PROF. CODE § 17203 and CAL. CIV. CODE § 3345; and for such other relief as may be appropriate.

787. Plaintiffs also seek punitive damages because Ford engaged in aggravated and outrageous conduct.

## COUNT 26

## VIOLATIONS OF THE CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT
## (CAL. BUS. & PROF. CODE § 1750 *ET SEQ.*)

788.   California Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

789.   This claim is brought by the California Plaintiffs on behalf of California Subclass.

790.   California's Consumers Legal Remedies Act ("CLRA"), CAL. CIV. CODE § 1750, et seq., proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

791.   The Coastdown Cheating Vehicles are "goods" as defined in CAL. CIV. CODE §§ 1751(a).

792.   California Plaintiffs and the California Subclass are "consumers" as defined in CAL. CIV. CODE § 1761(d), and Plaintiffs, the other Class members, and Ford are "person[s]" as defined in CAL. CIV. CODE § 1761(c).

793.   Ford's conduct, as described herein, was and is in violation of the CLRA. Ford's conduct violates at least the following enumerated CLRA provisions:

  i.   CAL. CIV. CODE § 1770(a)(2): Misrepresenting the approval or certification of goods;

ii.    CAL. CIV. CODE § 1770(a)(5): Representing that goods have sponsorship, approval, characteristics, uses, benefits, or quantities which they do not have;

iii.   CAL. CIV. CODE § 1770(a)(7): Representing that goods are of a particular standard, quality, or grade, if they are of another;

iv.    CAL. CIV. CODE § 1770(a)(9): Advertising goods with intent not to sell them as advertised; and

v.     CAL. CIV. CODE § 1770(a)(16): Representing that goods have been supplied in accordance with a previous representation when they have not.

794.   California Plaintiffs and the California Subclass have suffered injury in fact and actual damages resulting from Ford's material omissions and misrepresentations because they paid an inflated purchase or lease price for the Coastdown Cheating Vehicles.

795.   Because Ford fraudulently concealed that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the representation made by Ford, their value has diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

796.   Ford knew, should have known, or was reckless in not knowing that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised

and certified, and their mileage is far worse than a reasonable consumer would expect.

797.   California Plaintiffs and the California Subclass were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Ford's conduct in that Plaintiffs and the other California Class members overpaid for the Coastdown Cheating Vehicles, and/or the Coastdown Cheating Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Ford's misrepresentations and omissions.

798.   Ford's misrepresentations and omissions alleged herein caused California Plaintiffs and the California Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, California Plaintiffs and the California Subclass would not have purchased or leased these vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced fuel economy of the Coastdown Cheating Vehicles.

799.   In accordance with Civil Code § 1780 (a), California Plaintiffs and the California Subclass seek injunctive and equitable relief for Ford's violations of the CLRA, including an injunction to enjoin Ford from continuing its deceptive advertising and sales practices.

800.   California Plaintiffs have provided Ford with notice of its violations of the CLRA pursuant to CAL. CIV. CODE § 1782(a).  The notice was transmitted to Ford on June 20, 2019.

801.   California Plaintiffs and the California Subclass's injuries were proximately caused by Ford's fraudulent and deceptive business practices.

802.   Therefore, California Plaintiffs and the California Subclass are entitled to equitable and monetary relief under the CLRA.

## COUNT 27

### VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW (CAL. BUS. & PROF. CODE § 17500 *ET SEQ.*)

803.   California Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

804.   This claim is brought by the California Plaintiffs on behalf of the California Subclass.

805.   CAL. BUS. & PROF. CODE § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the

- 220 -

exercise of reasonable care should be known, to be untrue or misleading." Ford failed to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

806.   Ford caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Ford, to be untrue and misleading to consumers, including California Plaintiffs and the California Subclass.

807. Ford has violated § 17500 because the misrepresentations and omissions regarding the functionality and fuel efficiency of the Coastdown Cheating Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

808.   California Plaintiffs and the California Subclass have suffered an injury in fact, including the loss of money or property, as a result of Ford's unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Coastdown Cheating Vehicles, California Plaintiffs and the California Subclass relied on the misrepresentations and/or omissions of Ford with respect to the functionality and fuel economy of the Coastdown Cheating Vehicles.  Had California Plaintiffs and

the California Subclass known this, they would not have purchased or leased the Coastdown Cheating Vehicles and/or paid as much for them. Accordingly, Plaintiffs and the other California Class members overpaid for the Coastdown Cheating Vehicles.

809.   All wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Ford's business. Ford's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

810.   The facts concealed and omitted by Ford to California Plaintiffs and the California Subclass are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Coastdown Cheating Vehicles or pay a lower price. Had California Plaintiffs and the California Subclass known of the lower fuel economy at the time they purchased or leased the Coastdown Cheating Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

811.   California Plaintiffs, individually and on behalf of the California Subclass, request that this Court enter such orders or judgments as may be necessary to restore to California Plaintiffs and the California Subclass any money Ford acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief as may be appropriate.

## COUNT 28

## BREACH OF CONTRACT
## (BASED ON CALIFORNIA LAW)

812.    California Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

813.    This claim is brought by California Plaintiffs on behalf of the California Subclass.

814.    Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused California Plaintiffs and the California Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, California Plaintiffs and the California Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, California Plaintiffs and the California Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

815.    Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to California Plaintiffs and the California Subclass

defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

816.   As a direct and proximate result of Ford's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 29

### BREACH OF EXPRESS WARRANTY
### SONG-BEVERLY CONSUMER WARRANTY ACT (CAL. CIV. CODE §§ 1791.2 & 1793.2(d))

817.   California Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

818.   This claim is brought by California Plaintiffs on behalf of the California Subclass.

819.   California Plaintiffs and the California Subclass members who purchased or leased the Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

820.   The Coastdown Cheating Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

821.   Ford is a "manufacturer" of the Coastdown Cheating Vehicles within the meaning of Cal. Civ. Code § 1791(j).

822.   California Plaintiffs and the California Subclass members bought/leased new motor vehicles manufactured by Ford.

823.   Ford made express warranties to California Plaintiffs and the California Subclass members within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, as described above.

824.   In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

825.   In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

826.   As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

827.   These affirmations and promises were part of the basis of the bargain that was reached when California Plaintiffs and the other California Subclass members purchased or leased the Coastdown Cheating Vehicles.

828.   Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

829.   Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

830.   Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make California Plaintiffs and the California Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

831.   Accordingly, recovery by the California Plaintiffs and the California Subclass is not limited to the NVLW promising to repair and/or correct a

manufacturing defect, and California Plaintiffs, individually and on behalf of the other California Subclass members, seek all remedies as allowed by law.

832.   Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. California Plaintiffs and the California Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

833.   California Plaintiffs and other Class members delivered their Coastdown Cheating Vehicles to Ford or its authorized repair facility for repair and/or notified Ford in writing of the need for repair.

834.   Ford and its authorized repair facilities failed and continue to fail to repair the Coastdown Cheating Vehicles to match Ford's written warranties after a reasonable number of opportunities to do so.

835.   California Plaintiffs and the California Subclass members gave Ford or its authorized repair facilities at least two opportunities to fix the defect unless only one repair attempt was possible because the vehicle was later destroyed or because Ford or its authorized repair facility refused to attempt the repair.

836.   Ford did not promptly replace or buy back the Coastdown Cheating Vehicles of California Plaintiffs and the California Subclass members.

837.   As a result of Ford's breach of its express warranties, California Plaintiffs and the California Subclass members received goods whose defective condition substantially impairs their value to California Plaintiffs and the California Subclass members.  California Plaintiffs and the California Subclass members have been damaged as a result of the diminished value of Ford's products, the products' malfunctioning, and the nonuse of their Coastdown Cheating Vehicles.

838.   Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, California Plaintiffs and the California Subclass members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Coastdown Cheating Vehicles, or the overpayment or diminution in value of their Coastdown Cheating Vehicles.

839.   Pursuant to Cal. Civ. Code § 1794, California Plaintiffs and the California Subclass members are entitled to costs and attorneys' fees.

## COUNT 30

### FRAUDULENT CONCEALMENT
### (BASED ON CALIFORNIA LAW)

840.   California Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

841.   This claim is brought by California Plaintiffs on behalf of the California Subclass.

842.   Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied California Plaintiffs and the California Subclass information that is highly relevant to their purchasing decision.

843.   The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

844.   Ford further affirmatively misrepresented to California Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

845.   Ford knew these representations were false when made.

846.   The Coastdown Cheating Vehicles purchased or leased by California Plaintiffs and the California Subclass were, in fact, defective, with reduced fuel efficiency.

847. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because California Plaintiffs and the California Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

848. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

849. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; California Plaintiffs and the California Subclass did not know of these facts and Ford actively concealed these facts from California Plaintiffs and the California Subclass.

850. California Plaintiffs and the California Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, California Plaintiffs and the California Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford

intended to deceive California Plaintiffs and the California Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

851.   Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that California Plaintiffs and the California Subclass placed in its representations.

852.   Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including California Plaintiffs and the California Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

853.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably

discoverable by California Plaintiffs and the California Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles. Having volunteered to provide information to California Plaintiffs and the California Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by California Plaintiffs and the California Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to California Plaintiffs and the California Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

854. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of California Plaintiffs and the California Subclass.

855.   Ford has still not made full and adequate disclosures and continues to defraud California Plaintiffs and the California Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

856.   California Plaintiffs and the California Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. California Plaintiffs' and the California Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, California Plaintiffs, or California Subclass members.

857.   Because of the concealment and/or suppression of the facts, California Plaintiffs and the California Subclass have sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Plaintiff and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

858.   Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to California Plaintiffs and the California Subclass for damages in an amount

to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

859.   Ford's   acts   were   done   wantonly,   maliciously,   oppressively, deliberately, with intent to defraud, and in reckless disregard of California Plaintiffs' and the California Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 31

## NEGLIGENT MISREPRESENTATION
## (BASED ON CALIFORNIA LAW)

860.   California   Plaintiffs   reallege   and   incorporate   by   reference   all paragraphs alleged herein.

861.   This claim is brought by the California Plaintiffs on behalf of the California Subclass.

862.   Defendant made fuel economy representations to California Plaintiffs and members of the Class that were not true.

863.   Defendant   had   no   reasonable   grounds   for   believing   these representations were true when they made them, yet they intended that California Plaintiffs and California Subclass members rely on these misrepresentations.

864. California Plaintiffs reasonably relied on Defendant's representations and as a result California Plaintiffs and California Subclass members were harmed.

## COUNT 32

## UNJUST ENRICHMENT
## (BASED ON CALIFORNIA LAW)

865. California Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

866. This claim is brought by the California Plaintiffs on behalf of the California Subclass.

867. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to California Plaintiffs and the California Subclass.

868. Defendant enjoyed the benefit of increased financial gains, to the detriment of California Plaintiffs and other California Subclass members. It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

869. California Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the California Subclass.

**F.**     **Claims Brought on Behalf of the Colorado Subclass**

## COUNT 33

### VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT
### (COLO. REV. STAT. § 6-1-101 *et seq.*)

870.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

871.   This claim is brought by Colorado Plaintiffs on behalf of the Colorado Subclass.

872.   The Colorado Consumer Protection Act ("Colorado CPA") prohibits deceptive practices in the course of a person's business, including but not limited to "fail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction." COLO. REV. STAT. § 6-1-105.

873.   Ford is a "person" under COLO. REV. STAT. § 6-1-102(6).

874.   Colorado Plaintiffs and the Colorado Subclass members are "consumers" for purposes of COLO. REV. STAT § 6-1-113(1)(a).

875.   Ford's conduct, as set forth above, occurred in the conduct of trade or commerce.

876.   In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel

economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

877.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Colorado Plaintiffs and the Colorado Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

878.   Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Colorado Plaintiffs and the Colorado Subclass.

879.   Ford knew or should have known that its conduct violated the Colorado CPA.

880.   Ford owed Colorado Plaintiffs and the Colorado Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

    a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

    b.    Intentionally concealed the foregoing from Colorado Plaintiffs and the Colorado Subclass; and/or

    c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Colorado Plaintiffs and the Colorado Subclass that contradicted these representations.

881.   Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Colorado Plaintiffs and the Colorado Subclass.

882.   Colorado Plaintiffs and the Colorado Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Colorado Plaintiffs and the Colorado Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Colorado CPA.

883.   Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Colorado CPA. As a direct and proximate result of Ford's violations of the Colorado CPA, Colorado Plaintiffs and the Colorado Subclass have suffered injury-in-fact and/or actual damage.

884.   Ford's violations present a continuing risk to Colorado Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

885.   Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

886.   Pursuant to COLO. REV. STAT. § 6-1-113, Colorado Plaintiffs seek monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for each Colorado Plaintiffs and the Colorado Subclass member.

887.   Plaintiffs also seek punitive damages because Ford engaged in aggravated and outrageous conduct.

888.   Colorado Plaintiffs also seek an order enjoining Ford's unfair, unlawful, or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper remedy under the Colorado CPA.

## COUNT 34

## BREACH OF CONTRACT
## (BASED ON COLORADO LAW)

889.   Colorado Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

890.   This claim is brought by Colorado Plaintiffs on behalf of the Colorado Subclass.

891.   Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Colorado Plaintiffs and the Colorado Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Colorado Plaintiffs and the Colorado Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Colorado Plaintiffs and the Colorado Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

892.   Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Colorado Plaintiffs and the Colorado Subclass

defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

893.   As a direct and proximate result of Ford's breach of contract, Colorado Plaintiffs and the Colorado Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

### COUNT 35

### BREACH OF EXPRESS WARRANTY
### (COLO. REV. STAT. §§ 4-2-313 AND 4-2.5-210)

894.   Colorado Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

895.   This claim is brought by Colorado Plaintiffs on behalf of the Colorado Subclass.

896.   Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3); and is a "seller" of motor vehicles under Colo. Rev. Stat. § 4-2-103(1)(d).

897.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

898. The Coastdown Cheating Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. § 4-2.5-103(1)(h).

899. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

900. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

901. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

902. These affirmations and promises were part of the basis of the bargain that was reached when Colorado Plaintiffs and the other Colorado Subclass members purchased or leased the Coastdown Cheating Vehicles.

903. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that

produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

904. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

905. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Colorado Plaintiffs and the Colorado Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

906. Accordingly, recovery by the Colorado Plaintiffs and the Colorado Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Colorado Plaintiffs, individually and on behalf of the other Colorado Subclass members, seek all remedies as allowed by law.

907. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Colorado

Plaintiffs and the Colorado Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

908.    Moreover, many of the injuries flowing from the Coastdown Cheating Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein. Due to Ford's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Colorado Plaintiff and the Colorado Subclass members' remedies would be insufficient to make Plaintiff and the other Class members whole.

909.    Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

910.    As a direct and proximate result of Ford's breach of express warranties, Colorado Plaintiffs and the Colorado Subclass have been damaged in an amount to be determined at trial.

## COUNT 36

## FRAUDULENT CONCEALMENT
## (BASED ON COLORADO LAW)

911.    Colorado Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

912.   This claim is brought by Colorado Plaintiffs on behalf of the Colorado Subclass.

913.   Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Colorado Plaintiffs and the Colorado Subclass information that is highly relevant to their purchasing decision.

914.   The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

915.   Ford further affirmatively misrepresented to Colorado Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

916.   Ford knew these representations were false when made.

917.    The Coastdown Cheating Vehicles purchased or leased by Colorado Plaintiffs and the Colorado Subclass were, in fact, defective, with reduced fuel efficiency.

918.    Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Colorado Plaintiffs and the Colorado Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

919.    As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

920.    The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Colorado Plaintiffs and the Colorado Subclass did not know of these facts and Ford actively concealed these facts from Colorado Plaintiffs and the Colorado Subclass.

921.  Colorado Plaintiffs and the Colorado Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Colorado Plaintiffs and the Colorado Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Colorado Plaintiffs and the Colorado Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

922.  Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Colorado Plaintiffs and the Colorado Subclass placed in its representations.

923.  Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Colorado Plaintiffs and the Colorado Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

924.  Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is

far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Colorado Plaintiffs and the Colorado Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Colorado Plaintiffs and the Colorado Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Colorado Plaintiffs and the Colorado Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Colorado Plaintiffs and the Colorado Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

925.   Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Colorado Plaintiffs and the Colorado Subclass.

926.   Ford has still not made full and adequate disclosures and continues to defraud Colorado Plaintiffs and the Colorado Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

927.   Colorado Plaintiffs and the Colorado Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Colorado Plaintiffs' and the Colorado Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Colorado Plaintiffs, or, Colorado Subclass members.

928.   Because of the concealment and/or suppression of the facts, Colorado Plaintiffs and the Colorado Subclass have sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was

represented by Ford. Had they been aware of the true facts, Colorado Plaintiffs and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

929.   Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Colorado Plaintiffs and the Colorado Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

930.   Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Colorado Plaintiffs' and the Colorado Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 37

### NEGLIGENT MISREPRESENTATION
### (BASED ON COLORADO LAW)

931.   Colorado Plaintiffs realleges and incorporates by reference all paragraphs alleged herein.

932.   This claim is brought by the Colorado Plaintiffs on behalf of the Colorado Subclass.

933. Defendant made fuel economy representations to Colorado Plaintiffs and members of the Class that were not true.

934. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Colorado Plaintiffs and Colorado Subclass members rely on these misrepresentations.

935. Colorado Plaintiffs reasonably relied on Defendant's representations and as a result Colorado Plaintiffs and Colorado Subclass members were harmed.

## COUNT 38

## UNJUST ENRICHMENT
## (BASED ON COLORADO LAW)

936. Colorado Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

937. This claim is brought by the Colorado Plaintiffs on behalf of the Colorado Subclass.

938. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Colorado Plaintiffs and the Colorado Subclass.

939. Defendant enjoyed the benefit of increased financial gains, to the detriment of Colorado Plaintiffs and other Colorado Subclass members. It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

940.   Colorado Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Colorado Subclass.

## G.   Claims brought on behalf of the Connecticut Subclass

**COUNT 39**

**VIOLATION OF THE CONNECTICUT**
**UNFAIR TRADE PRACTICES ACT**
**(CONN. GEN. STAT. § 42-110A *et seq.*)**

941.   Connecticut Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

942.   This claim is brought by Connecticut Plaintiffs on behalf of the Connecticut Subclass.

943.   Connecticut Plaintiffs, Connecticut Subclass members, and Ford are each a "person" within the meaning of CONN. GEN. STAT. § 42-110a(3).

944.   Ford's challenged conduct occurred in "trade" or "commerce" within the meaning of CONN. GEN. STAT. § 42-110a(4).

945.   The Connecticut Unfair Trade Practices Act (Connecticut UTPA) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." CONN. GEN. STAT. § 42-110b(a).

946.   In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

947.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

948.   Ford's unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including Connecticut Plaintiffs and the Connecticut Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

949. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Connecticut Plaintiffs and the Connecticut Subclass.

950. Ford knew or should have known that its conduct violated the Connecticut UTPA.

- 253 -

951.   Ford owed Connecticut Plaintiffs and the Connecticut Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

b.    Intentionally concealed the foregoing from Connecticut Plaintiffs and the Connecticut Subclass; and/or

c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Connecticut Plaintiffs and the Connecticut Subclass that contradicted these representations.

952.   Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Connecticut Plaintiffs and the Connecticut Subclass.

953.   Connecticut Plaintiffs and the Connecticut Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Connecticut Plaintiffs and the Connecticut Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Connecticut UTPA.

954.   Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Connecticut UTPA.

955.   As a direct and proximate result of Ford's violations of the Connecticut UTPA, Connecticut Plaintiffs and the Connecticut Subclass have suffered injury-in-fact and/or actual damage.

956.   Ford's violations present a continuing risk to Connecticut Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

957.   Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

958.   Connecticut Plaintiffs and Connecticut Class members are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to CONN. GEN. STAT. § 42-110g.

959.   Ford acted with reckless indifference to another's rights, or wanton or intentional violation of another's rights, and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard for the rights of others. Therefore, punitive damages are warranted.

960.   Connecticut Plaintiffs and the Connecticut Subclass also seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Connecticut UTPA.

## COUNT 40

## BREACH OF CONTRACT
## (BASED ON CONNECTICUT LAW)

961.   Connecticut Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

962.   This claim is brought by Connecticut Plaintiffs on behalf of the Connecticut Subclass.

963.   Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Connecticut Plaintiffs and the Connecticut Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Connecticut Plaintiffs and the Connecticut Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Connecticut Plaintiffs and the Connecticut Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

964.    Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Connecticut Plaintiffs and the Connecticut Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

965.    As a direct and proximate result of Ford's breach of contract, Connecticut Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 41

### BREACH OF EXPRESS WARRANTY
### (CONN. GEN. STAT. §§ 42-179 & 42-186)

966.    Connecticut Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

967.    This claim is brought by Connecticut Plaintiff on behalf of the Connecticut Subclass.

968.    Ford is and was at all relevant times a manufacturer with respect to motor vehicles pursuant to Conn. Gen. Stat. § 14-1(52).

969.   In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

970.   In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

971.   As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

972.   These affirmations and promises were part of the basis of the bargain that was reached when Connecticut Plaintiffs and the other Connecticut Subclass members purchased or leased the Coastdown Cheating Vehicles.

973.   Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is

unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

974. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

975. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Connecticut Plaintiffs and the Connecticut Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

976. Accordingly, recovery by the Connecticut Plaintiffs and the Connecticut Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Connecticut Plaintiffs, individually and on behalf of the other Connecticut Subclass members, seek all remedies as allowed by law.

977. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Connecticut Plaintiffs and the Connecticut Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

978. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

979. As a direct and proximate result of Ford's breach of express warranties, Connecticut Plaintiffs and the Connecticut Subclass have been damaged in an amount to be determined at trial.

## COUNT 42

### FRAUDULENT CONCEALMENT
### (BASED ON CONNECTICUT LAW)

980. Connecticut Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

981. This claim is brought by Connecticut Plaintiffs on behalf of the Connecticut Subclass.

982. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Connecticut Plaintiffs and the Connecticut Subclass information that is highly relevant and material to their purchasing decision.

983.   The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

984.   Ford further affirmatively misrepresented to Connecticut Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

985.   Ford knew these representations were false when made.

986.   The Coastdown Cheating Vehicles purchased or leased by Connecticut Plaintiffs and the Connecticut Subclass were, in fact, defective, with reduced fuel efficiency.

987.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Connecticut Plaintiffs and the Connecticut Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

988.   As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

989.   The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Connecticut Plaintiffs and the Connecticut Subclass did not know of these facts and Ford actively concealed these facts from Connecticut Plaintiffs and the Connecticut Subclass.

990.   Connecticut Plaintiffs and the Connecticut Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Connecticut Plaintiffs and the Connecticut Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Connecticut Plaintiffs and the Connecticut Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

991.   Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized

profits and sales above the trust that Connecticut Plaintiffs and the Connecticut Subclass placed in its representations.

992.   Ford's false representations and omissions were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Connecticut Plaintiffs and the Connecticut Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

993.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Connecticut Plaintiffs and the Connecticut Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Connecticut Plaintiffs and the Connecticut Subclass members, Ford

had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Connecticut Plaintiffs and the Connecticut Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Connecticut Plaintiffs and the Connecticut Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

994.   Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Connecticut Plaintiffs and the Connecticut Subclass.

995.   Ford has still not made full and adequate disclosures and continues to defraud Connecticut Plaintiffs and the Connecticut Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

996.   Connecticut Plaintiffs and the Connecticut Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would

not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Connecticut Plaintiffs' and the Connecticut Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Connecticut Plaintiffs, or Connecticut Subclass members.

997. Because of the concealment and/or suppression of the facts, Connecticut Plaintiffs and the Connecticut Subclass have been injured and sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Connecticut Plaintiffs and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

998. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Connecticut Plaintiffs and the Connecticut Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

999. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Connecticut

Plaintiffs' and the Connecticut Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 43

### NEGLIGENT MISREPRESENTATION
### (BASED ON CONNECTICUT LAW)

1000. Connecticut Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1001. This claim is brought by the Connecticut Plaintiffs on behalf of the Connecticut Subclass.

1002. Defendant made fuel economy representations to Connecticut Plaintiffs and members of the Class that were not true.

1003. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Connecticut Plaintiffs and Connecticut Subclass members rely on these misrepresentations.

1004. Connecticut Plaintiffs reasonably relied on Defendant's representations and as a result Connecticut Plaintiffs and Connecticut Subclass members were harmed.

## COUNT 44

### UNJUST ENRICHMENT
### (BASED ON CONNECTICUT LAW)

1005. Connecticut Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1006. This claim is brought by the Connecticut Plaintiffs on behalf of the Connecticut Subclass.

1007. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Connecticut Plaintiffs and the Connecticut Subclass.

1008. Defendant enjoyed the benefit of increased financial gains, to the detriment of Connecticut Plaintiffs and other Connecticut Subclass members. It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

1009. Connecticut Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Connecticut Subclass.

**H.     Claims brought on behalf of the Delaware Subclass**

## COUNT 45

**VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT
(DEL. CODE TIT. 6, § 2513 *et seq.*)**

1010. Delaware Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

1011. This claim is brought by Delaware Plaintiffs on behalf of the Delaware Subclass.

1012. Ford is a "person" within the meaning of DEL. CODE TIT. 6, § 2511(7).

1013. Ford's actions, as set forth above, occurred in the conduct of trade or commerce.

1014. The Delaware Consumer Fraud Act (Delaware CFA) prohibits the "act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale, lease or advertisement of any merchandise, whether or nor any person has in fact been misled, deceived, or damaged thereby." DEL. CODE TIT. 6, § 2513(a).

1015. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel

economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

1016. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

1017. Ford's unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including Delaware Plaintiffs and the Delaware Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

1018. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Delaware Plaintiffs and the Delaware Subclass.

1019. Ford knew or should have known that its conduct violated the Delaware CFA.

1020. Ford owed Delaware Plaintiffs and the Delaware Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

    a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

    b.    Intentionally concealed the foregoing from Delaware Plaintiffs and the Delaware Subclass; and/or

    c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Delaware Plaintiffs and the Delaware Subclass that contradicted these representations.

1021. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Delaware Plaintiffs and the Delaware Subclass.

1022. Delaware Plaintiffs and the Delaware Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Delaware Plaintiffs and the Delaware Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Delaware CFA.

1023. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Delaware CFA.

1024. As a direct and proximate result of Ford's violations of the Delaware CFA, Delaware Plaintiffs and the Delaware Subclass have suffered injury-in-fact and/or actual damage.

1025. Ford's violations present a continuing risk to Delaware Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

1026. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

1027. Plaintiffs seeks damages under the Delaware CFA for injury resulting from the direct and natural consequences of Ford's unlawful conduct. *See, e.g.*, *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1980). Plaintiffs also seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

1028. Ford engaged in gross, oppressive, or aggravated conduct justifying the imposition of punitive damages.

## COUNT 46

## BREACH OF CONTRACT
## (BASED ON DELAWARE LAW)

1029. Delaware Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1030. This claim is brought by Delaware Plaintiffs on behalf of the Delaware Subclass.

1031. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Delaware Plaintiffs and the Delaware Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Delaware Plaintiffs and the Delaware Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Delaware Plaintiffs and the Delaware Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

1032. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Delaware Plaintiffs and the Delaware Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

1033. As a direct and proximate result of Ford's breach of contract, Delaware Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 47

### BREACH OF EXPRESS WARRANTY
### (5A DEL. C. 1953, §§ 2-313 & 2A-210)

1034. Delaware Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1035. This claim is brought by Delaware Plaintiffs on behalf of the Delaware Subclass.

1036. Ford is and was at all relevant times a merchant with respect to motor vehicles.

1037. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

1038. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

1039. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

1040. These affirmations and promises were part of the basis of the bargain that was reached when Delaware Plaintiffs and the other Delaware Subclass members purchased or leased the Coastdown Cheating Vehicles.

1041. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is

unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

1042. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

1043. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Delaware Plaintiffs and the Delaware Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1044. Accordingly, recovery by the Delaware Plaintiffs and the Delaware Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Delaware Plaintiffs, individually and on behalf of the other Delaware Subclass members, seek all remedies as allowed by law.

1045. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Delaware Plaintiffs and the Delaware Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

1046. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

1047. As a direct and proximate result of Ford's breach of express warranties, Delaware Plaintiffs and the Delaware Subclass have been damaged in an amount to be determined at trial.

## COUNT 48

## FRAUDULENT CONCEALMENT
## (BASED ON DELAWARE LAW)

1048. Delaware Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1049. This claim is brought by Delaware Plaintiffs on behalf of the Delaware Subclass.

1050. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Delaware Plaintiffs and the Delaware Subclass information that is highly relevant and material to their purchasing decision.

1051. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

1052. Ford further affirmatively misrepresented to Delaware Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

1053. Ford knew these representations were false when made.

1054. The Coastdown Cheating Vehicles purchased or leased by Delaware Plaintiffs and the Delaware Subclass were, in fact, defective, with reduced fuel efficiency.

1055. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Delaware Plaintiffs and the Delaware Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

1056. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

1057. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Delaware Plaintiffs and the Delaware Subclass did not know of these facts and Ford actively concealed these facts from Delaware Plaintiffs and the Delaware Subclass.

1058. Delaware Plaintiffs and the Delaware Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Delaware Plaintiffs and the Delaware Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Delaware Plaintiffs and the Delaware Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

1059. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized

profits and sales above the trust that Delaware Plaintiffs and the Delaware Subclass placed in its representations.

1060. Ford's false representations and omissions were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Delaware Plaintiffs and the Delaware Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

1061. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Delaware Plaintiffs and the Delaware Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles. Having volunteered to provide information to Delaware Plaintiffs and the Delaware Subclass members, Ford had

the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Delaware Plaintiffs and the Delaware Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Delaware Plaintiffs and the Delaware Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

1062. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Delaware Plaintiffs and the Delaware Subclass.

1063. Ford has still not made full and adequate disclosures and continues to defraud Delaware Plaintiffs and the Delaware Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

1064. Delaware Plaintiffs and the Delaware Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not

have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Delaware Plaintiffs' and the Delaware Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Delaware Plaintiffs, or Delaware Subclass members.

1065. Because of the concealment and/or suppression of the facts, Delaware Plaintiffs and the Delaware Subclass have been injured and sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Delaware Plaintiffs and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

1066. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Delaware Plaintiffs and the Delaware Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1067. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Delaware Plaintiffs' and the Delaware Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages

in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 49

### NEGLIGENT MISREPRESENTATION
### (BASED ON DELAWARE LAW)

1068.  Delaware Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1069. This claim is brought by the Delaware Plaintiffs on behalf of the Delaware Subclass.

1070. Defendant made fuel economy representations to Delaware Plaintiffs and members of the Class that were not true.

1071. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Delaware Plaintiffs and Delaware Subclass members rely on these misrepresentations.

1072. Delaware Plaintiffs reasonably relied on Defendant's representations and as a result Delaware Plaintiffs and Delaware Subclass members were harmed.

## COUNT 50

### UNJUST ENRICHMENT
### (BASED ON DELAWARE LAW)

1073.  Delaware Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1074. This claim is brought by the Delaware Plaintiffs on behalf of the Delaware Subclass.

1075. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Delaware Plaintiffs and the Delaware Subclass.

1076. Defendant enjoyed the benefit of increased financial gains, to the detriment of Delaware Plaintiffs and other Delaware Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

1077. Delaware Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Delaware Subclass.

**I.   Claims Brought on Behalf of the Florida Subclass**

### COUNT 51

### VIOLATIONS OF THE FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. § 501.201 *ET SEQ.*)

1078. Plaintiffs Steve Beavers, Dillion Drake, and Randall Maingot ("Florida Plaintiffs") incorporate by reference all preceding allegations as though fully set forth herein.

1079. Florida Plaintiffs bring this Count on behalf of the Florida Subclass.

1080. Florida Plaintiffs and the Florida Subclass members are "consumers" within the meaning of Florida Unfair and Deceptive Trade Practices Act ("Florida UDTPA"), FLA. STAT. § 501.203(7).

1081. Defendant engaged in "trade or commerce" within the meaning of FLA. STAT. § 501.203(8).

1082. Florida's Deceptive and Unfair Trade Practices Act prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.204(1). Defendant participated in unfair and deceptive trade practices that violated the Florida UDTPA as described herein. Defendant engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices as defined in FLA. STAT. § 501.204(1). Ford's conduct offends established public policy, is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and is likely to mislead consumers.

1083. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact

with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

1084. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Florida Plaintiffs and the Florida Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

1085. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Florida Plaintiffs and the Florida Subclass.

1086. Ford knew or should have known that its conduct violated the Florida UDTPA.

1087. Ford owed Florida Plaintiffs and the Florida Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

  a.  Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

  b.  Intentionally concealed the foregoing from Florida Plaintiffs and the Florida Subclass; and/or

- 285 -

      c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Florida Plaintiffs and the Florida Subclass that contradicted these representations.

1088. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Florida Plaintiffs and the Florida Subclass.

1089. Florida Plaintiffs and the Florida Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Florida Plaintiffs and the Florida Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Florida UDTPA.

1090. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Florida UDTPA. As a direct and proximate result of Ford's violations of the Florida UDTPA, Florida Plaintiffs and the Florida Subclass have suffered injury-in-fact and/or actual damage.

1091. Ford's violations present a continuing risk to Florida Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

1092. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

1093. Accordingly, the Defendant is liable to Florida Plaintiffs and the Florida Subclass for damages in an amount to be proven at trial.

1094. Plaintiffs also seek punitive damages because Ford engaged in aggravated and outrageous conduct.

## COUNT 52

## BREACH OF CONTRACT
## (BASED ON FLORIDA LAW)

1095. Florida Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1096. This claim is brought by Florida Plaintiffs on behalf of the Florida Subclass.

1097. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Florida Plaintiffs and the Florida Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Florida Plaintiffs and the Florida Subclass would

not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Florida Plaintiffs and the Florida Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

1098. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Florida Plaintiffs and the Florida Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

1099. As a direct and proximate result of Ford's breach of contract, Florida Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 53

## BREACH OF EXPRESS WARRANTY
## (FLA. STAT. § 672.313)

1100. Florida Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1101. This claim is brought by Florida Plaintiffs on behalf of the Florida Subclass.

1102. Ford is and was at all relevant times a merchant with respect to motor vehicles.

1103. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

1104. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

1105. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

1106. These affirmations and promises were part of the basis of the bargain that was reached when Florida Plaintiffs and the other Florida Subclass members purchased or leased the Coastdown Cheating Vehicles.

1107. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

1108. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

1109. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Florida Plaintiffs and the Florida Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1110. Accordingly, recovery by the Florida Plaintiffs and the Florida Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing

defect, and Florida Plaintiffs, individually and on behalf of the other Florida Subclass members, seek all remedies as allowed by law.

1111. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Florida Plaintiffs and the Florida Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

1112. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

1113. As a direct and proximate result of Ford's breach of express warranties, Florida Plaintiffs and the Florida Subclass have been damaged in an amount to be determined at trial.

## COUNT 54

## FRAUDULENT CONCEALMENT
## (BASED ON FLORIDA LAW)

1114. Florida Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1115. This claim is brought by Florida Plaintiffs on behalf of the Florida Subclass.

1116. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Florida Plaintiffs and the Florida Subclass information that is highly relevant to their purchasing decision.

1117. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

1118. Ford further affirmatively misrepresented to Florida Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

1119. Ford knew these representations were false when made.

1120. The Coastdown Cheating Vehicles purchased or leased by Florida Plaintiffs and the Florida Subclass were, in fact, defective, with reduced fuel efficiency.

1121. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Florida Plaintiffs and the Florida Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

1122. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

1123. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Florida Plaintiffs and the Florida Subclass did not know of these facts and Ford actively concealed these facts from Florida Plaintiffs and the Florida Subclass.

1124. Florida Plaintiffs and the Florida Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers Florida Plaintiffs and the Florida Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Florida Plaintiffs and the Florida Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

1125. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Florida Plaintiffs and the Florida Subclass placed in its representations.

1126. Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Florida Plaintiffs and the Florida Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

1127. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is

far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Florida Plaintiffs and the Florida Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Florida Plaintiffs and the Florida Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Florida Plaintiffs and the Florida Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Florida Plaintiffs and the Florida Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

1128. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Florida Plaintiffs and the Florida Subclass.

1129. Ford has still not made full and adequate disclosures and continues to defraud Florida Plaintiffs and the Florida Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

1130. Florida Plaintiffs and the Florida Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Florida Plaintiffs' and the Florida Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Florida Plaintiffs, or Florida Subclass members.

1131. Because of the concealment and/or suppression of the facts, Florida Plaintiffs and the Florida Subclass have sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was

represented by Ford. Had they been aware of the true facts, Florida Plaintiffs and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

1132. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Florida Plaintiffs and the Florida Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1133. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Florida Plaintiffs' and the Florida Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 55

### NEGLIGENT MISREPRESENTATION
### (BASED ON FLORIDA LAW)

1134. Florida Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1135. This claim is brought by the Florida Plaintiffs on behalf of the Florida Subclass.

1136. Defendant made fuel economy representations to Florida Plaintiffs and members of the Class that were not true.

1137. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Florida Plaintiffs and Florida Subclass members rely on these misrepresentations.

1138. Florida Plaintiffs reasonably relied on Defendant's representations and as a result Florida Plaintiffs and Florida Subclass members were harmed.

## COUNT 56

### UNJUST ENRICHMENT
### (BASED ON FLORIDA LAW)

1139. Florida Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1140. This claim is brought by the Florida Plaintiffs on behalf of the Florida Subclass.

1141. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Florida Plaintiffs and the Florida Subclass.

1142. Defendant enjoyed the benefit of increased financial gains, to the detriment of Florida Plaintiffs and other Florida Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

1143. Florida Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Florida Subclass.

**J.      Claims Brought on Behalf of the Georgia Subclass**

**COUNT 57**

**VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT
(GA. CODE ANN. § 10-1-390 *et seq.*)**

1144. Plaintiff Jamar Haynes ("Georgia Plaintiff") hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

1145. Georgia Plaintiffs bring this Count on behalf of the Georgia Subclass.

1146. The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, GA. CODE ANN. § 101-393(b), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another"; and "[a]dvertising goods or services with intent not to sell them as advertised and certified." GA. CODE ANN. § 10-1-393(b).

1147. Georgia Plaintiffs and Georgia Class members are "consumers" within the meaning of GA. CODE ANN. § 10-1-393(b).

1148. Ford engaged in "trade or commerce" within the meaning of GA. CODE ANN. § 10-1-393(b).

1149. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

1150. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Georgia Plaintiffs and the Georgia Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

1151. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Georgia Plaintiffs and the Georgia Subclass.

1152. Ford knew or should have known that its conduct violated the Georgia FBPA.

1153. Ford owed Georgia Plaintiffs and the Georgia Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

      a.      Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

      b.      Intentionally concealed the foregoing from Georgia Plaintiffs and the Georgia Subclass; and/or

      c.      Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Georgia Plaintiffs and the Georgia Subclass that contradicted these representations.

1154. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Georgia Plaintiffs and the Georgia Subclass.

1155. Georgia Plaintiffs and the Georgia Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Georgia Plaintiffs and the Georgia Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their

vehicles or would not have purchased or leased them at all but for Ford's violations of the Georgia FBPA.

1156. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Georgia FBPA. As a direct and proximate result of Ford's violations of the Georgia FBPA, Georgia Plaintiffs and the Georgia Subclass have suffered injury-in-fact and/or actual damage.

1157. Ford's violations present a continuing risk to Georgia Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

1158. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

1159. Georgia Plaintiffs and Georgia Class members are entitled to seek damages and exemplary damages (for intentional violations) per GA. CODE ANN. § 10-1-399(a).

1160. Georgia Plaintiffs and Georgia Class members will also seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, attorneys' fees, and

any other just and proper relief available under the Georgia FBPA per GA. CODE ANN. § 10-1-399.

1161. Plaintiffs also seek punitive damages because Ford engaged in aggravated and outrageous conduct.

1162. On June 20, 2019, certain Georgia Plaintiffs sent a letter complying with GA. CODE ANN. § 10-1-399(b) to Ford. Because Ford failed to remedy its unlawful conduct within the requisite time period, Georgia Plaintiffs seek all damages and relief to which Georgia Plaintiffs and the Georgia Subclass are entitled.

## COUNT 58

## VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT
## (GA. CODE ANN § 10-1-370 *et seq.*)

1163. Georgia Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

1164. This claim is brought by Georgia Plaintiffs on behalf of the Georgia Subclass.

1165. Georgia's Uniform Deceptive Trade Practices Act ("Georgia UDTPA") prohibits "deceptive trade practices," which include "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another"; and "[a]dvertising

goods or services with intent not to sell them as advertised and certified." GA. CODE ANN. § 10-1-393(b).

1166. Ford, Georgia Plaintiffs, and Georgia Subclass members are "persons" within the meaning of GA. CODE ANN. § 10-1-371(5).

1167. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

1168. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Georgia Plaintiffs and the Georgia Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

1169. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Georgia Plaintiffs and the Georgia Subclass.

1170. Ford knew or should have known that its conduct violated the Georgia UDTPA.

1171. Ford owed Georgia Plaintiffs and the Georgia Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

    a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

    b.    Intentionally concealed the foregoing from Georgia Plaintiffs and the Georgia Subclass; and/or

    c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Georgia Plaintiffs and the Georgia Subclass that contradicted these representations.

1172. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Georgia Plaintiffs and the Georgia Subclass.

1173. Georgia Plaintiffs and the Georgia Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose

material information. Georgia Plaintiffs and the Georgia Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Georgia UDTPA.

1174. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Georgia UDTPA. As a direct and proximate result of Ford's violations of the Georgia UDTPA, Georgia Plaintiffs and the Georgia Subclass have suffered injury-in-fact and/or actual damage.

1175. Ford's violations present a continuing risk to Georgia Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

1176. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

1177. Georgia Plaintiffs seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under GA. CODE ANN. § 10-1-373.

## COUNT 59

## BREACH OF CONTRACT
## (BASED ON GEORGIA LAW)

1178. Georgia Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1179. This claim is brought by the Georgia Plaintiffs on behalf of the Georgia Subclass.

1180. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Georgia Plaintiffs and the Georgia Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Georgia Plaintiffs and the Georgia Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Georgia Plaintiffs and the Georgia Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

1181. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Georgia Plaintiffs and the Georgia Subclass

defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

1182. As a direct and proximate result of Ford's breach of contract, Georgia Plaintiffs and the Georgia Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 60

### BREACH OF EXPRESS WARRANTY
### (GA. CODE ANN. § 11-2-313)

1183. Georgia Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1184. This claim is brought by Georgia Plaintiffs on behalf of the Georgia Subclass.

1185. Ford is and was at all relevant times a merchant with respect to motor vehicles.

1186. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover

"defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

1187. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

1188. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

1189. These affirmations and promises were part of the basis of the bargain that was reached when Georgia Plaintiffs and the other Georgia Subclass members purchased or leased the Coastdown Cheating Vehicles.

1190. Georgia Plaintiffs and the Georgia Subclass experienced defects within the warranty period. Despite the existence of warranties, Ford failed to inform Georgia Plaintiffs and the Georgia Subclass members that the Coastdown Cheating Vehicles were defectively designed, and failed to fix the defectively designed Coastdown Cheating Vehicles free of charge.

1191. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that

produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

1192. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

1193. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Georgia Plaintiffs and the Georgia Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1194. Accordingly, recovery by the Georgia Plaintiffs and the Georgia Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Georgia Plaintiffs, individually and on behalf of the other Georgia Subclass members, seek all remedies as allowed by law.

1195. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Georgia

Plaintiffs and the Georgia Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

1196. Moreover, many of the injuries flowing from the Coastdown Cheating Vehicles cannot be resolved through the limited remedy of "repairs or adjustments," as many incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein. Due to Ford's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Georgia Plaintiffs and the Georgia Subclass members' remedies would be insufficient to make Georgia Plaintiffs and the Georgia Subclass members whole.

1197. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

1198. As a direct and proximate result of Ford's breach of express warranties, Georgia Plaintiffs and the Georgia Subclass have been damaged in an amount to be determined at trial.

## COUNT 61

### FRAUDULENT CONCEALMENT
### (BASED ON GEORGIA LAW)

1199. Georgia Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1200. This claim is brought by the Georgia Plaintiffs on behalf of the Georgia Subclass.

1201. Ford intentionally concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Georgia Plaintiffs and the Georgia Subclass information that is highly relevant to their purchasing decision.

1202. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

1203. Ford further affirmatively misrepresented to Georgia Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

1204. Ford knew these representations were false when made.

1205. The Coastdown Cheating Vehicles purchased or leased by Georgia Plaintiffs and the Georgia Subclass were, in fact, defective, with reduced fuel efficiency.

1206. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Georgia Plaintiffs and the Georgia Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

1207. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

1208. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Georgia Plaintiffs and the Georgia Subclass did not know of these facts and Ford actively concealed these facts from Georgia Plaintiffs and the Georgia Subclass.

1209. Georgia Plaintiffs and the Georgia Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Georgia Plaintiffs and the Georgia Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Georgia Plaintiffs and the Georgia Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

1210. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Georgia Plaintiffs and the Georgia Subclass members placed in its representations.

1211. Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Georgia Plaintiffs and the Georgia Subclass, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

1212. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is

far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Georgia Plaintiffs and the Georgia Subclass. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Georgia Plaintiffs and the Georgia Subclass, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Georgia Plaintiffs and the Georgia Subclass. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Georgia Plaintiffs and the Georgia Subclass that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

1213. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its

vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Georgia Plaintiffs and the Georgia Subclass.

1214. Ford has still not made full and adequate disclosures and continues to defraud Georgia Plaintiffs and the Georgia Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

1215. Georgia Plaintiffs and the Georgia Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Georgia Plaintiffs' and the Georgia Subclass's actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Georgia Plaintiffs, or the Georgia Subclass.

1216. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Georgia Plaintiffs and the Georgia Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1217. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and

Georgia Class members' rights and the representations that Ford made to them were made in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 62

## NEGLIGENT MISREPRESENTATION
## (BASED ON GEORGIA LAW)

1218. Georgia Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1219. This claim is brought by the Georgia Plaintiffs on behalf of the Georgia Subclass.

1220. Defendant made fuel economy representations to Georgia Plaintiffs and members of the Class that were not true.

1221. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Georgia Plaintiffs and Georgia Subclass members rely on these misrepresentations.

1222. Georgia Plaintiffs reasonably relied on Defendant's representations and as a result Georgia Plaintiffs and Georgia Subclass members were harmed.

## COUNT 63

## UNJUST ENRICHMENT
## (BASED ON GEORGIA LAW)

1223. Georgia Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1224. This claim is brought by the Georgia Plaintiffs on behalf of the Georgia Subclass.

1225. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Georgia Plaintiffs and the Georgia Subclass.

1226. Defendant enjoyed the benefit of increased financial gains, to the detriment of Georgia Plaintiffs and other Georgia Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

1227. Georgia Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Georgia Subclass.

**K.**     **Claims brought on behalf of the Hawaii Subclass**

### COUNT 64

### VIOLATION OF THE HAWAII ACT § 480-2(A)
### (HAW. REV. STAT. § 480 *et seq.*)

1228. Plaintiff George Andrew Rayne ("Hawaii Plaintiff") hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

1229. This claim is brought by Hawaii Plaintiff on behalf of the Hawaii Subclass.

1230. HAWAII REV. STAT. § 480-2(a) prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

1231. Ford is a "person" under HAW. REV. STAT. § 480-1.

1232. Hawaii Plaintiff and Hawaii Class members are "consumer[s]" as defined by HAW. REV. STAT. § 480-1, who purchased or leased the Coastdown Cheating Vehicles at issue.

1233. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

1234. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

1235. Ford's unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including Hawaii Plaintiff and the Hawaii

Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

1236. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Hawaii Plaintiff and the Hawaii Subclass.

1237. Ford knew or should have known that its conduct violated the Hawaii UDA.

1238. Ford owed Hawaii Plaintiff and the Hawaii Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

> a. Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;
>
> b. Intentionally concealed the foregoing from Hawaii Plaintiff and the Hawaii Subclass; and/or
>
> c. Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Hawaii Plaintiff and the Hawaii Subclass that contradicted these representations.

1239. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Hawaii Plaintiff and the Hawaii Subclass.

1240. Hawaii Plaintiff and the Hawaii Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Hawaii Plaintiff and the Hawaii Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Hawaii UDA.

1241. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Hawaii UDA.

1242. As a direct and proximate result of Ford's violations of the Hawaii UDA, Hawaii Plaintiff and the Hawaii Subclass have suffered injury-in-fact and/or actual damage.

1243. Ford's violations present a continuing risk to Hawaii Plaintiff as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

1244. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles

has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

1245. Pursuant to HAW. REV. STAT. § 480-13, Hawaii Plaintiff and Hawaii Subclass members seek monetary relief against Ford measured as the greater of (a) $1,000 and (b) threefold actual damages in an amount to be determined at trial.

1246. Under HAW. REV. STAT. § 480-13.5, Hawaii Plaintiff and Hawaii Subclass members seek an additional award against Ford of up to $10,000 for each violation directed at a Hawaii elder. Ford knew or should have known that its conduct was directed to one or more Plaintiffs who are elders. Ford's conduct caused one or more of these elders to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the elder. Plaintiffs who are elders are substantially more vulnerable to Ford's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered a substantial physical, emotional, or economic damage resulting from Ford's conduct.

1247. Plaintiffs also seek punitive damages because Ford engaged in aggravated and outrageous conduct.

## COUNT 65

## BREACH OF CONTRACT
## (BASED ON HAWAII LAW)

1248. Hawaii Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1249. This claim is brought by Hawaii Plaintiff on behalf of the Hawaii Subclass.

1250. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Hawaii Plaintiff and the Hawaii Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Hawaii Plaintiff and the Hawaii Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Hawaii Plaintiff and the Hawaii Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

1251. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Hawaii Plaintiff and the Hawaii Subclass defective

Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

1252. As a direct and proximate result of Ford's breach of contract, Hawaii Plaintiff and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 66

## BREACH OF EXPRESS WARRANTY
## (HI REV. STAT. §§ 490:2-313 & 490:2A-519)

1253. Hawaii Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1254. This claim is brought by Hawaii Plaintiff on behalf of the Hawaii Subclass.

1255. Ford is and was at all relevant times a merchant with respect to motor vehicles.

1256. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover

"defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

1257. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

1258. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

1259. These affirmations and promises were part of the basis of the bargain that was reached when Hawaii Plaintiff and the other Hawaii Subclass members purchased or leased the Coastdown Cheating Vehicles.

1260. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

1261. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

1262. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Hawaii Plaintiff and the Hawaii Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1263. Accordingly, recovery by the Hawaii Plaintiff and the Hawaii Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Hawaii Plaintiff, individually and on behalf of the other Hawaii Subclass members, seek all remedies as allowed by law.

1264. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Hawaii Plaintiff and the Hawaii Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

1265. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this

litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

1266.  As a direct and proximate result of Ford's breach of express warranties, Hawaii Plaintiff and the Hawaii Subclass have been damaged in an amount to be determined at trial.

## COUNT 67

### FRAUDULENT CONCEALMENT
### (BASED ON HAWAII LAW)

1267. Hawaii Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1268. This claim is brought by Hawaii Plaintiff on behalf of the Hawaii Subclass.

1269. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Hawaii Plaintiff and the Hawaii Subclass information that is highly relevant and material to their purchasing decision.

1270. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to

provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

1271. Ford further affirmatively misrepresented to Hawaii Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

1272. Ford knew these representations were false when made.

1273. The Coastdown Cheating Vehicles purchased or leased by Hawaii Plaintiff and the Hawaii Subclass were, in fact, defective, with reduced fuel efficiency.

1274. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Hawaii Plaintiff and the Hawaii Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

1275. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed

to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

1276. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Hawaii Plaintiff and the Hawaii Subclass did not know of these facts and Ford actively concealed these facts from Hawaii Plaintiff and the Hawaii Subclass.

1277. Hawaii Plaintiff and the Hawaii Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Hawaii Plaintiff and the Hawaii Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Hawaii Plaintiff and the Hawaii Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

1278. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Hawaii Plaintiff and the Hawaii Subclass placed in its representations.

1279. Ford's false representations and omissions were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and

also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Hawaii Plaintiff and the Hawaii Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

1280. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Hawaii Plaintiff and the Hawaii Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Hawaii Plaintiff and the Hawaii Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Hawaii Plaintiff and the Hawaii Subclass members. Whether an automobile is fuel efficient and whether it accurately

measures its own gasoline consumption are material concerns to a consumer. Ford represented to Hawaii Plaintiff and the Hawaii Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

1281. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Hawaii Plaintiff and the Hawaii Subclass.

1282. Ford has still not made full and adequate disclosures and continues to defraud Hawaii Plaintiff and the Hawaii Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

1283. Hawaii Plaintiff and the Hawaii Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Hawaii Plaintiff's and the Hawaii Subclass members' actions were justified. Ford

was in exclusive control of the material facts, and such facts were not generally known to the public, Hawaii Plaintiff, or Hawaii Subclass members.

1284. Because of the concealment and/or suppression of the facts, Hawaii Plaintiff and the Hawaii Subclass have been injured and sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Hawaii Plaintiff and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

1285. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Hawaii Plaintiff and the Hawaii Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1286. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Hawaii Plaintiff's and the Hawaii Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 68

## NEGLIGENT MISREPRESENTATION
## (BASED ON HAWAII LAW)

1287. Hawaii Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1288. This claim is brought by the Hawaii Plaintiff on behalf of the Hawaii Subclass.

1289. Defendant made fuel economy representations to Hawaii Plaintiff and members of the Class that were not true.

1290. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Hawaii Plaintiff and Hawaii Subclass members rely on these misrepresentations.

1291. Hawaii Plaintiff reasonably relied on Defendant's representations and as a result Hawaii Plaintiff and Hawaii Subclass members were harmed.

## COUNT 69

## UNJUST ENRICHMENT
## (BASED ON HAWAII LAW)

1292. Hawaii Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1293. This claim is brought by the Hawaii Plaintiff on behalf of the Hawaii Subclass.

1294. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Hawaii Plaintiff and the Hawaii Subclass.

1295. Defendant enjoyed the benefit of increased financial gains, to the detriment of Hawaii Plaintiff and other Hawaii Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

1296. Hawaii Plaintiff, therefore, seeks any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Hawaii Subclass.

**L.    Claims Brought on Behalf of the Idaho Subclass**

**COUNT 70**

**VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT
(IDAHO CODE ANN. § 48-601 *et seq.*)**

1297. Idaho Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

1298. This claim is brought by Idaho Plaintiff on behalf of the Idaho Subclass.

1299. The Idaho Consumer Protection Act ("Idaho CPA") prohibits deceptive business practices, including but not limited to (1) representing that the Coastdown Cheating Vehicles have characteristics, uses, and benefits which they do not have; (2) representing that the Coastdown Cheating Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Coastdown Cheating

Vehicles with the intent not to sell them as advertised and certified; (4) engaging in acts or practices which are otherwise misleading, false, or deceptive to the consumer; and (5) engaging in any unconscionable method, act or practice in the conduct of trade or commerce. *See* IDAHO CODE ANN. § 48-603.

1300. Idaho Plaintiff, the Idaho Subclass, and Ford are each "persons" under IDAHO CODE ANN. § 48-602(1).

1301. Ford's acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under IDAHO CODE ANN. § 48-602(2).

1302. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

1303. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Idaho Plaintiff and the Idaho Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy,

the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

1304. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Idaho Plaintiff and the Idaho Subclass.

1305. Ford knew or should have known that its conduct violated the Idaho CPA.

1306. Ford owed Idaho Plaintiff and the Idaho Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

      a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

      b.    Intentionally concealed the foregoing from Idaho Plaintiff and the Idaho Subclass; and/or

      c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Idaho Plaintiff and the Idaho Subclass that contradicted these representations.

1307. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Idaho Plaintiff and the Idaho Subclass.

1308. Idaho Plaintiff and the Idaho Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Idaho Plaintiff and the Idaho Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Idaho CPA.

1309. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Idaho CPA. As a direct and proximate result of Ford's violations of the Idaho CPA, Idaho Plaintiff and the Idaho Subclass have suffered injury-in-fact and/or actual damage.

1310. Ford's violations present a continuing risk to Idaho Plaintiff as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

1311. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

1312. Pursuant to IDAHO CODE ANN. § 48-608, Idaho Plaintiff seeks monetary relief against Ford measured as the greater of (a) actual damages in an amount to be

determined at trial and (b) statutory damages in the amount of $1,000 for each plaintiff.

1313. Idaho Plaintiff also seeks an order enjoining Ford's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Idaho CPA.

1314. Idaho Plaintiff also seeks punitive damages against Ford because its conduct evidences an extreme deviation from reasonable standards. Ford's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT 71

## BREACH OF CONTRACT
## (BASED ON IDAHO LAW)

1315. Idaho Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1316. This claim is brought by Idaho Plaintiff on behalf of the Idaho Subclass.

1317. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Idaho Plaintiff and the Idaho Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Idaho Plaintiff and the Idaho Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or

would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Idaho Plaintiff and the Idaho Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

1318. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Idaho Plaintiff and the Idaho Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

1319. As a direct and proximate result of Ford's breach of contract, Idaho Plaintiff and the Idaho Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1320. Plaintiffs also seek punitive damages because Ford engaged in aggravated and outrageous conduct.

## COUNT 72

## BREACH OF EXPRESS WARRANTY
## (I.C. § 28-2-316)

1321. Idaho Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1322. This claim is brought by Idaho Plaintiff on behalf of the Idaho Subclass.

1323. Ford is and was at all relevant times a merchant with respect to motor vehicles.

1324. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

1325. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

1326. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

1327. These affirmations and promises were part of the basis of the bargain that was reached when Idaho Plaintiff and the other Idaho Subclass members purchased or leased the Coastdown Cheating Vehicles.

1328. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

1329. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

1330. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Idaho Plaintiff and the Idaho Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1331. Accordingly, recovery by the Idaho Plaintiff and the Idaho Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Idaho Plaintiff, individually and on behalf of the other Idaho Subclass members, seek all remedies as allowed by law.

1332. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Idaho Plaintiff and the Idaho Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

1333. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

1334. As a direct and proximate result of Ford's breach of express warranties, Idaho Plaintiff and the Idaho Subclass have been damaged in an amount to be determined at trial.

## COUNT 73

## FRAUDULENT CONCEALMENT
## (BASED ON IDAHO LAW)

1335. Idaho Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1336. This claim is brought by Idaho Plaintiff on behalf of the Idaho Subclass.

1337. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far

worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Idaho Plaintiff and the Idaho Subclass information that is highly relevant to their purchasing decision.

1338. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

1339. Ford further affirmatively misrepresented to Idaho Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

1340. Ford knew these representations were false when made.

1341. The Coastdown Cheating Vehicles purchased or leased by Idaho Plaintiff and the Idaho Subclass were, in fact, defective, with reduced fuel efficiency.

1342. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Idaho Plaintiff and the Idaho

Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

1343. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

1344. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Idaho Plaintiff and the Idaho Subclass did not know of these facts and Ford actively concealed these facts from Idaho Plaintiff and the Idaho Subclass.

1345. Idaho Plaintiff and the Idaho Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Idaho Plaintiff and the Idaho Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Idaho Plaintiff and the Idaho Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

1346. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and

sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Idaho Plaintiff and the Idaho Subclass placed in its representations.

1347. Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Idaho Plaintiff and the Idaho Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

1348. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Idaho Plaintiff and the Idaho Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth

above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Idaho Plaintiff and the Idaho Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Idaho Plaintiff and the Idaho Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Idaho Plaintiff and the Idaho Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

1349. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Idaho Plaintiff and the Idaho Subclass.

1350. Ford has still not made full and adequate disclosures and continues to defraud Idaho Plaintiff and the Idaho Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

1351. Idaho Plaintiff and the Idaho Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Idaho Plaintiff's and the Idaho Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Idaho Plaintiff, or, Idaho Subclass members.

1352. Because of the concealment and/or suppression of the facts, Idaho Plaintiff and the Idaho Subclass have sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Idaho Plaintiff and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

1353. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Idaho Plaintiff and the Idaho Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1354. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Idaho Plaintiff's and the Idaho Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 74

## NEGLIGENT MISREPRESENTATION
## (BASED ON IDAHO LAW)

1355. Idaho Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1356. This claim is brought by the Idaho Plaintiff on behalf of the Idaho Subclass.

1357. Defendant made fuel economy representations to Idaho Plaintiff and members of the Class that were not true.

1358. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Idaho Plaintiff and Idaho Subclass members rely on these misrepresentations.

1359. Idaho Plaintiff reasonably relied on Defendant's representations and as a result Idaho Plaintiff and Idaho Subclass members were harmed.

## COUNT 75

## UNJUST ENRICHMENT
## (BASED ON IDAHO LAW)

1360. Idaho Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1361. This claim is brought by the Idaho Plaintiff on behalf of the Idaho Subclass.

1362. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Idaho Plaintiff and the Idaho Subclass.

1363. Defendant enjoyed the benefit of increased financial gains, to the detriment of Idaho Plaintiff and other Idaho Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

1364. Idaho Plaintiff, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Idaho Subclass.

**M.    Claims Brought on Behalf of the Illinois Subclass**

### COUNT 76

### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1, *ET SEQ.* AND 720 ILCS 295/1A)

1365. Plaintiffs Cassandra Morrison and Ryan Hubert ("Illinois Plaintiffs") incorporate by reference all paragraphs as though fully set forth herein.

1366. Illinois Plaintiffs bring this claim on behalf of the Illinois Subclass.

1367. Ford is a "person" as that term is defined in 815 ILCS 505/1(c).

1368. Illinois Plaintiffs and the Illinois Subclass members are "consumers" as that term is defined in 815 ILCS 505/1(e).

1369. The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

1370. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy were far worse than a reasonable consumer would expect given the

premium paid for these vehicles over a comparable vehicle. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

1371. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Illinois Plaintiffs and the Illinois Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

1372. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Illinois Plaintiffs and the Illinois Subclass.

1373. Ford knew or should have known that its conduct violated the Illinois CFA.

1374. Ford owed Illinois Plaintiffs and the Illinois Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

a.  Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

b.  Intentionally concealed the foregoing from Illinois Plaintiffs and the Illinois Subclass; and/or

c.  Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Illinois Plaintiffs and the Illinois Subclass that contradicted these representations.

1375. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Illinois Plaintiffs and the Illinois Subclass.

1376. Illinois Plaintiffs and the Illinois Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Illinois Plaintiffs and the Illinois Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Illinois CFA.

1377. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Illinois CFA. As a direct and proximate result of Ford's violations of the Illinois CFA, Illinois Plaintiffs and the Illinois Subclass have suffered injury-in-fact and/or actual damage.

1378. Ford's violations present a continuing risk to Illinois Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

1379. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

1380. Pursuant to 815 ILCS 505/10a(a), Illinois Plaintiffs and the Illinois Subclass seek monetary relief against Ford in the amount of actual damages, as well as punitive damages because Ford acted with fraud and/or malice and/or was grossly negligent.

1381. Illinois Plaintiffs also seeks punitive damages, attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1, *et seq*.

1382. On July 22, 2019, a copy of the complaint, *Brewer, et. al. v. Ford Motor Company*, No. 19-12135-SJM-RSW, (E.D. Mich. Jul. 22, 2019), now transferred into this MDL, was mailed to the Attorney General of the State of Illinois in accordance with 815 ILCS 505/10a(d).

## COUNT 77

## BREACH OF CONTRACT
## (BASED ON ILLINOIS LAW)

1383. Illinois Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1384. This claim is brought by the Illinois Plaintiffs on behalf of Illinois Subclass.

1385. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Illinois Plaintiffs and the Illinois Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Illinois Plaintiffs and the Illinois Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Illinois Plaintiffs and the Illinois Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

1386. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Illinois Plaintiffs and the Illinois Subclass defective

Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

1387. As a direct and proximate result of Ford's breach of contract, Illinois Plaintiffs and the Illinois Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 78

## BREACH OF EXPRESS WARRANTY
## (810 ILCS 5/2-313)

1388. Illinois Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1389. This claim is brought by Illinois Plaintiffs on behalf of the Illinois Subclass.

1390. Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to 810 ILCS 5/2-104.

1391. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover

"defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

1392. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

1393. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

1394. These affirmations and promises were part of the basis of the bargain that was reached when Illinois Plaintiffs and the other Illinois Subclass members purchased or leased the Coastdown Cheating Vehicles.

1395. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

1396. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

1397. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Illinois Plaintiffs and the Illinois Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1398. Accordingly, recovery by the Illinois Plaintiffs and the Illinois Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Illinois Plaintiffs, individually and on behalf of the other Illinois Subclass members, seek all remedies as allowed by law.

1399. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Illinois Plaintiffs and the Illinois Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

1400. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this

litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

1401.  As a direct and proximate result of Ford's breach of express warranties, Illinois Plaintiffs and the Illinois Subclass have been damaged in an amount to be determined at trial.

## COUNT 79

## FRAUDULENT CONCEALMENT
## (BASED ON ILLINOIS LAW)

1402.  Illinois Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1403.  This claim is brought by Illinois Plaintiffs on behalf of Illinois Subclass.

1404.  Ford intentionally concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Illinois Plaintiffs and the Illinois Subclass information that is highly relevant to their purchasing decision.

1405.  The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to

provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

1406. Ford further affirmatively misrepresented to Illinois Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

1407. Ford knew these representations were false when made.

1408. The Coastdown Cheating Vehicles purchased or leased by Illinois Plaintiffs and the Illinois Subclass were, in fact, defective, with reduced fuel efficiency.

1409. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Illinois Plaintiffs and the Illinois Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

1410. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed

to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

1411. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Illinois Plaintiffs and the Illinois Subclass did not know of these facts and Ford actively concealed these facts from Illinois Plaintiffs and the Illinois Subclass.

1412. Illinois Plaintiffs and the Illinois Subclass members reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Illinois Plaintiffs and the Illinois Subclass members did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Illinois Plaintiffs and the Illinois Subclass members by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

1413. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Illinois Plaintiffs and the Illinois Subclass members placed in its representations.

1414. Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Illinois Plaintiffs and the Illinois Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

1415. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Illinois Plaintiffs and the Illinois Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles. Having volunteered to provide information to Illinois Plaintiffs and the Illinois Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the

Coastdown Cheating Vehicles purchased or leased by Illinois Plaintiffs and the Illinois Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Illinois Plaintiffs and the Illinois Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

1416. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Illinois Plaintiffs and the Illinois Subclass members.

1417. Ford has still not made full and adequate disclosures and continues to defraud Illinois Plaintiffs and the Illinois Subclass members by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

1418. Illinois Plaintiffs and the Illinois Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from

them. Illinois Plaintiffs' and the Illinois Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Illinois Plaintiffs, or Illinois Subclass members.

1419. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Illinois Plaintiffs and the Illinois Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1420. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Illinois Plaintiffs' and the Illinois Subclass's rights and the representations that Ford made to them were made in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 80

### NEGLIGENT MISREPRESENTATION
### (BASED ON ILLINOIS LAW)

1421. Illinois Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1422. This claim is brought by the Illinois Plaintiffs on behalf of the Illinois Subclass.

1423. Defendant made fuel economy representations to Illinois Plaintiffs and members of the Class that were not true.

1424. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Illinois Plaintiffs and Illinois Subclass members rely on these misrepresentations.

1425. Illinois Plaintiffs reasonably relied on Defendant's representations and as a result Illinois Plaintiffs and Illinois Subclass members were harmed.

## COUNT 81

### UNJUST ENRICHMENT
### (BASED ON ILLINOIS LAW)

1426. Illinois Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1427. This claim is brought by the Illinois Plaintiffs on behalf of the Illinois Subclass.

1428. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Illinois Plaintiffs and the Illinois Subclass.

1429. Defendant enjoyed the benefit of increased financial gains, to the detriment of Illinois Plaintiffs and other Illinois Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

1430. Illinois Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Illinois Subclass.

**N.     Claims brought on behalf of the Indiana Subclass**

**COUNT 82**

**VIOLATION OF THE INDIANA
DECEPTIVE CONSUMER SALES ACT
(IND. CODE § 24-5-0.5-3)**

1431. Indiana Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

1432. This claim is brought by Indiana Plaintiffs on behalf of the Indiana Subclass.

1433. Ford is a "person" within the meaning of IND. CODE § 25-5-0.5-2(a)(2) and a "supplier" within the meaning of IND. CODE § 24-5-0.5-2(a)(3).

1434. Plaintiffs' vehicle purchases are "consumer transactions" within the meaning of IND. CODE § 24-5-0.5-2(a)(3).

1435. Indiana's Deceptive Consumer Sales Act (Indiana DCSA) prohibits a person from engaging in a "deceptive business practice[s]" or acts, including but not limited to "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection

it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; . . . (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; . . . (b) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false."

1436. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

1437. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

1438. Ford's unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including Indiana Plaintiffs and the Indiana Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

1439. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Indiana Plaintiffs and the Indiana Subclass.

1440. Ford knew or should have known that its conduct violated the Indiana DCSA.

1441. Ford owed Indiana Plaintiffs and the Indiana Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

    a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

    b.    Intentionally concealed the foregoing from Indiana Plaintiffs and the Indiana Subclass; and/or

    c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Indiana Plaintiffs and the

> Indiana    Subclass    that    contradicted    these
> representations.

1442. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Indiana Plaintiffs and the Indiana Subclass.

1443. Indiana Plaintiff and the Indiana Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Indiana Plaintiffs and the Indiana Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Indiana DCSA.

1444. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Indiana DCSA.

1445. As a direct and proximate result of Ford's violations of the Indiana DCSA, Indiana Plaintiffs and the Indiana Subclass have suffered injury-in-fact and/or actual damage.

1446. Ford's violations present a continuing risk to Indiana Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

1447. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the

defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

1448. Pursuant to IND. CODE § 24-5-0.5-4, Indiana Plaintiffs seek monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each plaintiff, including treble damages up to $1,000 for Ford's willfully deceptive acts.

1449. Indiana Plaintiffs seek punitive damages based on the outrageousness and recklessness of Ford's conduct.

1450. On June 20, 2019, Plaintiffs sent a letter complying with IND. CODE § 24-5-0.5-5(a) to Ford.

## COUNT 83

### BREACH OF CONTRACT
### (BASED ON INDIANA LAW)

1451. Indiana Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1452. This claim is brought by Indiana Plaintiffs on behalf of the Indiana Subclass.

1453. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Indiana Plaintiffs and the Indiana Subclass to

make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Indiana Plaintiffs and the Indiana Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Indiana Plaintiffs and the Indiana Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

1454. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Indiana Plaintiffs and the Indiana Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

1455. As a direct and proximate result of Ford's breach of contract, Indiana Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 84

## BREACH OF EXPRESS WARRANTY
## (IC 26-1-2-316)

1456. Indiana Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1457. This claim is brought by Indiana Plaintiffs on behalf of the Indiana Subclass.

1458. Ford is and was at all relevant times a merchant with respect to motor vehicles.

1459. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

1460. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

1461. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

1462. These affirmations and promises were part of the basis of the bargain that was reached when Indiana Plaintiffs and the other Indiana Subclass members purchased or leased the Coastdown Cheating Vehicles.

1463. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

1464. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

1465. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Indiana Plaintiffs and the Indiana Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1466. Accordingly, recovery by the Indiana Plaintiffs and the Indiana Subclass is not limited to the NVLW promising to repair and/or correct a

manufacturing defect, and Indiana Plaintiffs, individually and on behalf of the other Indiana Subclass members, seek all remedies as allowed by law.

1467. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Indiana Plaintiffs and the Indiana Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

1468. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

1469. As a direct and proximate result of Ford's breach of express warranties, Indiana Plaintiffs and the Indiana Subclass have been damaged in an amount to be determined at trial.

## COUNT 85

## FRAUDULENT CONCEALMENT
## (BASED ON INDIANA LAW)

1470. Indiana Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1471. This claim is brought by Indiana Plaintiffs on behalf of the Indiana Subclass.

1472. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Indiana Plaintiffs and the Indiana Subclass information that is highly relevant and material to their purchasing decision.

1473. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

1474. Ford further affirmatively misrepresented to Indiana Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

1475. Ford knew these representations were false when made.

1476. The Coastdown Cheating Vehicles purchased or leased by Indiana Plaintiffs and the Indiana Subclass were, in fact, defective, with reduced fuel efficiency.

1477. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Indiana Plaintiffs and the Indiana Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

1478. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

1479. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Indiana Plaintiffs and the Indiana Subclass did not know of these facts and Ford actively concealed these facts from Indiana Plaintiffs and the Indiana Subclass.

1480. Indiana Plaintiffs and the Indiana Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Indiana Plaintiffs and the Indiana Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Indiana Plaintiffs and the Indiana Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

1481. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Indiana Plaintiffs and the Indiana Subclass placed in its representations.

1482. Ford's false representations and omissions were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Indiana Plaintiffs and the Indiana Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

1483. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is

far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Indiana Plaintiffs and the Indiana Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Indiana Plaintiffs and the Indiana Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Indiana Plaintiffs and the Indiana Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Indiana Plaintiffs and the Indiana Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

1484. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Indiana Plaintiffs and the Indiana Subclass.

1485. Ford has still not made full and adequate disclosures and continues to defraud Indiana Plaintiffs and the Indiana Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

1486. Indiana Plaintiffs and the Indiana Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Indiana Plaintiffs' and the Indiana Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Indiana Plaintiffs, or Indiana Subclass members.

1487. Because of the concealment and/or suppression of the facts, Indiana Plaintiffs and the Indiana Subclass have been injured and sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over

what was represented by Ford. Had they been aware of the true facts, Indiana Plaintiffs and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

1488. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Indiana Plaintiffs and the Indiana Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1489. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Indiana Plaintiffs' and the Indiana Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 86

### NEGLIGENT MISREPRESENTATION
### (BASED ON INDIANA LAW)

1490. Indiana Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1491. This claim is brought by the Indiana Plaintiffs on behalf of the Indiana Subclass.

1492. Defendant made fuel economy representations to Indiana Plaintiffs and members of the Class that were not true.

1493. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Indiana Plaintiffs and Indiana Subclass members rely on these misrepresentations.

1494. Indiana Plaintiffs reasonably relied on Defendant's representations and as a result Indiana Plaintiffs and Indiana Subclass members were harmed.

## COUNT 87

### UNJUST ENRICHMENT
### (BASED ON INDIANA LAW)

1495. Indiana Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1496. This claim is brought by the Indiana Plaintiffs on behalf of the Indiana Subclass.

1497. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Indiana Plaintiffs and the Indiana Subclass.

1498. Defendant enjoyed the benefit of increased financial gains, to the detriment of Indiana Plaintiffs and other Indiana Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

1499. Indiana Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Indiana Subclass.

**O.    Claims brought on behalf of the Iowa Subclass**

**COUNT 88**

**VIOLATION OF THE IOWA PRIVATE RIGHT
OF ACTION FOR CONSUMER FRAUDS ACT
(IOWA CODE § 714h.1 *et seq.*)**

1500. Iowa Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

1501. This claim is brought by Iowa Plaintiffs on behalf of the Iowa Subclass.

1502. Ford is a "person" under IOWA CODE § 714H.2(7).

1503. Iowa Plaintiffs and Iowa Class members are "consumers" as defined by IOWA CODE § 714H.2(3) who purchased or leased one or more Coastdown Cheating Vehicles.

1504. The Iowa Private Right of Action for Consumer Frauds Act (Iowa CFA) prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression or omission in connection

- 381 -

with the advertisement, sale, or lease of consumer merchandise." IOWA CODE § 714H.3.

1505. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

1506. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

1507. Ford's unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including Iowa Plaintiffs and the Iowa Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

1508. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Iowa Plaintiffs and the Iowa Subclass.

1509. Ford knew or should have known that its conduct violated the Iowa CFA.

1510. Ford owed Indiana Plaintiffs and the Iowa Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

    a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

    b.    Intentionally concealed the foregoing from Iowa Plaintiffs and the Iowa Subclass; and/or

    c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Iowa Plaintiffs and the Iowa Subclass that contradicted these representations.

1511. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Iowa Plaintiffs and the Iowa Subclass.

1512. Iowa Plaintiffs and the Iowa Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Iowa Plaintiffs and the Iowa Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Iowa CFA.

1513. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Iowa CFA.

1514. As a direct and proximate result of Ford's violations of the Iowa CFA, Iowa Plaintiffs and the Iowa Subclass have suffered injury-in-fact and/or actual damage.

1515. Ford's violations present a continuing risk to Iowa Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

1516. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

1517. Pursuant to IOWA CODE § 714H.5, Plaintiffs seek an order enjoining Ford's unfair and/or deceptive acts or practices, actual damages, statutory damages up to three times the amount of actual damages awarded as a result of Ford's willful and wanton disregard for the rights of others, attorneys' fees, and other such equitable relief as the court deems necessary to protect the public from further violations of the Iowa CFA.

1518. Iowa Plaintiffs seek punitive damages based on the outrageousness and recklessness of Ford's conduct.

## COUNT 89

## BREACH OF CONTRACT
## (BASED ON IOWA LAW)

1519. Iowa Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1520. This claim is brought by Iowa Plaintiffs on behalf of the Iowa Subclass.

1521. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Iowa Plaintiffs and the Iowa Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Iowa Plaintiffs and the Iowa Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Iowa Plaintiffs and the Iowa Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

1522. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these

contracts by selling or leasing to Iowa Plaintiffs and the Iowa Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

1523. As a direct and proximate result of Ford's breach of contract, Iowa Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 90

## BREACH OF EXPRESS WARRANTY
## (IOWA CODE § 554.2313 AND 554.13210)

1524. Iowa Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1525. This claim is brought by Iowa Plaintiffs on behalf of the Iowa Subclass.

1526. Ford is and was at all relevant times a merchant with respect to motor vehicles under Iowa Code § 554.2104.

1527. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Iowa Code § 554.13103(1)(p).

1528. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

1529. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

1530. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

1531. These affirmations and promises were part of the basis of the bargain that was reached when Iowa Plaintiffs and the other Iowa Subclass members purchased or leased the Coastdown Cheating Vehicles.

1532. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is

unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

1533. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

1534. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Iowa Plaintiffs and the Iowa Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1535. Accordingly, recovery by the Iowa Plaintiffs and the Iowa Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Iowa Plaintiffs, individually and on behalf of the other Iowa Subclass members, seek all remedies as allowed by law.

1536. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Iowa Plaintiffs and the Iowa Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

1537. Moreover, many of the injuries flowing from the Coastdown Cheating Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as many incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Iowa Plaintiffs' and the other Iowa Subclass members' remedies would be insufficient to make Iowa Plaintiff and the other Iowa Subclass members whole.

1538. Finally, due to Ford's breach of warranty as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy, as set forth in Iowa Code § 554.2608, for a revocation of acceptance of the goods, and for a return to Iowa Plaintiffs and the Iowa Subclass members of the purchase price of all Coastdown Cheating Vehicles currently owned and for such other incidental and consequential damages as allowed under Iowa Code §§ 554.2711 and 554.2608.

1539. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

1540. As a direct and proximate result of Ford's breach of express warranties, Iowa Plaintiffs and the Iowa Subclass have been damaged in an amount to be determined at trial.

## COUNT 91

## FRAUDULENT CONCEALMENT
## (BASED ON IOWA LAW)

1541. Iowa Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1542. This claim is brought by Iowa Plaintiffs on behalf of the Iowa Subclass.

1543. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Iowa Plaintiffs and the Iowa Subclass information that is highly relevant and material to their purchasing decision.

1544. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

1545. Ford further affirmatively misrepresented to Iowa Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

1546. Ford knew these representations were false when made.

1547. The Coastdown Cheating Vehicles purchased or leased by Iowa Plaintiffs and the Iowa Subclass were, in fact, defective, with reduced fuel efficiency.

1548. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Iowa Plaintiffs and the Iowa Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

1549. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

1550. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Iowa Plaintiffs and the Iowa Subclass did not know of these facts and Ford actively concealed these facts from Iowa Plaintiffs and the Iowa Subclass.

1551. Iowa Plaintiffs and the Iowa Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Iowa Plaintiffs and the Iowa Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Iowa Plaintiffs and the Iowa Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

1552. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Iowa Plaintiffs and the Iowa Subclass placed in its representations.

1553. Ford's false representations  and omissions were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Iowa Plaintiffs and the Iowa Subclass

members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

1554. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Iowa Plaintiffs and the Iowa Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Iowa Plaintiffs and the Iowa Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Iowa Plaintiffs and the Iowa Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Iowa Plaintiffs and the Iowa Subclass members that they were

purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

1555. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Iowa Plaintiffs and the Iowa Subclass.

1556. Ford has still not made full and adequate disclosures and continues to defraud Iowa Plaintiffs and the Iowa Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

1557. Iowa Plaintiffs and the Iowa Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Iowa Plaintiffs' and the Iowa Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Iowa Plaintiffs, or Iowa Subclass members.

1558. Because of the concealment and/or suppression of the facts, Iowa Plaintiffs and the Iowa Subclass have been injured and sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Iowa Plaintiffs and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

1559. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Iowa Plaintiffs and the Iowa Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1560. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Iowa Plaintiffs' and the Iowa Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 92

## NEGLIGENT MISREPRESENTATION
## (BASED ON IOWA LAW)

1561. Iowa Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1562. This claim is brought by the Iowa Plaintiffs on behalf of the Iowa Subclass.

1563. Defendant made fuel economy representations to Iowa Plaintiffs and members of the Class that were not true.

1564. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Iowa Plaintiffs and Iowa Subclass members rely on these misrepresentations.

1565. Iowa Plaintiffs reasonably relied on Defendant's representations and as a result Iowa Plaintiffs and Iowa Subclass members were harmed.

## COUNT 93

### UNJUST ENRICHMENT
### (BASED ON IOWA LAW)

1566. Iowa Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1567. This claim is brought by the Iowa Plaintiffs on behalf of the Iowa Subclass.

1568. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Iowa Plaintiffs and the Iowa Subclass.

1569. Defendant enjoyed the benefit of increased financial gains, to the detriment of Iowa Plaintiffs and other Iowa Subclass members. It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

1570. Iowa Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Iowa Subclass.

## P.    Claims brought on behalf of the Kansas Subclass

### COUNT 94

### VIOLATION OF THE KANSAS CONSUMER PROTECTION ACT (KAN. STAT. ANN. § 50-623 *et seq.*)

1571. Kansas Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

1572. This claim is brought by Kansas Plaintiffs on behalf of the Kansas Subclass.

1573. Plaintiffs and Kansas Class members are "consumers" within the meaning of KAN. STAT. ANN. § 50-624(b) who purchased or leased one or more Coastdown Cheating Vehicles.

1574. Each sale or lease of a Coastdown Cheating Vehicle to Plaintiffs was a "consumer transaction" within the meaning of KAN. STAT. ANN. § 50-624(c).

1575. The Kansas Consumer Protection Act (Kansas CPA) states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer

transaction." KAN. STAT. ANN. § 50-626(a). Deceptive acts or practices include but are not limited to "the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact" and "the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact." KAN. STAT. ANN. § 50-626.

1576. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

1577. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

1578. Ford's unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including Kansas Plaintiffs and the Kansas Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

1579. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Kansas Plaintiffs and the Kansas Subclass.

1580. Ford knew or should have known that its conduct violated the Kansas CPA.

1581. Ford owed Kansas Plaintiffs and the Kansas Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

      a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

      b.    Intentionally concealed the foregoing from Kansas Plaintiffs and the Kansas Subclass; and/or

      c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Kansas Plaintiffs and the Kansas Subclass that contradicted these representations.

1582. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Kansas Plaintiffs and the Kansas Subclass.

1583. Kansas Plaintiffs and the Kansas Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Kansas Plaintiffs and the Kansas Subclass members who

purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Kansas CPA.

1584. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Kansas CPA.

1585. As a direct and proximate result of Ford's violations of the Kansas CPA, Kansas Plaintiffs and the Kansas Subclass have suffered injury-in-fact and/or actual damage.

1586. Ford's violations present a continuing risk to Kansas Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

1587. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

1588. Pursuant to KAN. STAT. ANN. § 50-634, Plaintiffs seek monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each plaintiff.

1589. Plaintiffs also seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under KAN. STAT. ANN. § 50-623 *et seq.*

1590. Kansas Plaintiffs seek punitive damages based on the outrageousness and recklessness of Ford's conduct.

**COUNT 95**

**BREACH OF CONTRACT
(BASED ON KANSAS LAW)**

1591. Kansas Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1592. This claim is brought by Kansas Plaintiffs on behalf of the Kansas Subclass.

1593. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Kansas Plaintiffs and the Kansas Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Kansas Plaintiffs and the Kansas Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Kansas Plaintiffs and the Kansas

Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

1594. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Kansas Plaintiffs and the Kansas Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

1595. As a direct and proximate result of Ford's breach of contract, Kansas Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 96

## BREACH OF EXPRESS WARRANTY
### (K.S.A. § 50-645)

1596. Kansas Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1597. This claim is brought by Kansas Plaintiffs on behalf of the Kansas Subclass.

1598. Ford is and was at all relevant times a merchant with respect to motor vehicles.

1599. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

1600. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

1601. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

1602. These affirmations and promises were part of the basis of the bargain that was reached when Kansas Plaintiffs and the other Kansas Subclass members purchased or leased the Coastdown Cheating Vehicles.

1603. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that

produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

1604. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

1605. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Kansas Plaintiffs and the Kansas Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1606. Accordingly, recovery by the Kansas Plaintiffs and the Kansas Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Kansas Plaintiffs, individually and on behalf of the other Kansas Subclass members, seek all remedies as allowed by law.

1607. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Kansas

Plaintiffs and the Kansas Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

1608. Moreover, many of the injuries flowing from the Coastdown Cheating Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as many incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Kansas Plaintiffs' and the other Kansas Subclass members' remedies would be insufficient to make Kansas Plaintiff and the other Kansas Subclass members whole.

1609. Finally, due to Ford's breach of warranty as set forth herein, Kansas Plaintiffs and the other Class members assert as an additional and/or alternative remedy, as set forth in Kansas Code § 554.2608, for a revocation of acceptance of the goods, and for a return to Kansas Plaintiffs and the Kansas Subclass members of the purchase price of all Coastdown Cheating Vehicles currently owned and for such other incidental and consequential damages as allowed under Kansas Code §§ 554.2711 and 554.2608.

1610. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this

- 405 -

litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

1611. As a direct and proximate result of Ford's breach of express warranties, Kansas Plaintiffs and the Kansas Subclass have been damaged in an amount to be determined at trial.

## COUNT 97

## FRAUDULENT CONCEALMENT
## (BASED ON KANSAS LAW)

1612. Kansas Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1613. This claim is brought by Kansas Plaintiffs on behalf of the Kansas Subclass.

1614. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Kansas Plaintiffs and the Kansas Subclass information that is highly relevant and material to their purchasing decision.

1615. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to

provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

1616. Ford further affirmatively misrepresented to Kansas Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

1617. Ford knew these representations were false when made.

1618. The Coastdown Cheating Vehicles purchased or leased by Kansas Plaintiffs and the Kansas Subclass were, in fact, defective, with reduced fuel efficiency.

1619. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Kansas Plaintiffs and the Kansas Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

1620. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed

to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

1621. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Kansas Plaintiffs and the Kansas Subclass did not know of these facts and Ford actively concealed these facts from Kansas Plaintiffs and the Kansas Subclass.

1622. Kansas Plaintiffs and the Kansas Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Kansas Plaintiffs and the Kansas Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Kansas Plaintiffs and the Kansas Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

1623. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Kansas Plaintiffs and the Kansas Subclass placed in its representations.

1624. Ford's false representations and omissions were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and

also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Kansas Plaintiffs and the Kansas Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

1625. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Kansas Plaintiffs and the Kansas Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Kansas Plaintiffs and the Kansas Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Kansas Plaintiffs and the Kansas Subclass members. Whether an automobile is fuel efficient and whether it

accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Kansas Plaintiffs and the Kansas Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

1626. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Kansas Plaintiffs and the Kansas Subclass.

1627. Ford has still not made full and adequate disclosures and continues to defraud Kansas Plaintiffs and the Kansas Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

1628. Kansas Plaintiffs and the Kansas Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Kansas Plaintiffs' and the Kansas Subclass members' actions were justified. Ford

was in exclusive control of the material facts, and such facts were not generally known to the public, Kansas Plaintiffs, or Kansas Subclass members.

1629. Because of the concealment and/or suppression of the facts, Kansas Plaintiffs and the Kansas Subclass have been injured and sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Kansas Plaintiffs and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

1630. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Kansas Plaintiffs and the Kansas Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1631. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Kansas Plaintiffs' and the Kansas Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 98

## NEGLIGENT MISREPRESENTATION
## (BASED ON KANSAS LAW)

1632. Kansas Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1633. This claim is brought by the Kansas Plaintiffs on behalf of the Kansas Subclass.

1634. Defendant made fuel economy representations to Kansas Plaintiffs and members of the Class that were not true.

1635. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Kansas Plaintiffs and Kansas Subclass members rely on these misrepresentations.

1636. Kansas Plaintiffs reasonably relied on Defendant's representations and as a result Kansas Plaintiffs and Kansas Subclass members were harmed.

## COUNT 99

## UNJUST ENRICHMENT
## (BASED ON KANSAS LAW)

1637. Kansas Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1638. This claim is brought by the Kansas Plaintiffs on behalf of the Kansas Subclass.

1639. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Kansas Plaintiffs and the Kansas Subclass.

1640. Defendant enjoyed the benefit of increased financial gains, to the detriment of Kansas Plaintiffs and other Kansas Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

1641. Kansas Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Kansas Subclass.

**Q.**    **Claims brought on behalf of the Kentucky Subclass**

**COUNT 100**

**VIOLATIONS OF THE KENTUCKY CONSUMER PROTECTION ACT
(KY. REV. STAT. § 367.110 *ET SEQ.*).**

1642. Kentucky Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

1643. This claim is brought by Kentucky Plaintiffs on behalf of the Kentucky Subclass.

1644. Ford and Kentucky Class members are "persons" within the meaning of the KY. REV. STAT. § 367.110(1).

1645. Ford engaged in "trade" or "commerce" within the meaning of KY. REV. STAT. § 367.110(2).

1646. The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce …." KY. REV. STAT. § 367.170(1).

1647. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

1648. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

1649. Ford's unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including Kentucky Plaintiffs and the Kentucky Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

1650. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Kentucky Plaintiffs and the Kentucky Subclass.

1651. Ford knew or should have known that its conduct violated the Kentucky CPA.

1652. Ford owed Kentucky Plaintiffs and the Kentucky Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

      a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

      b.    Intentionally concealed the foregoing from Kentucky Plaintiffs and the Kentucky Subclass; and/or

      c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Kentucky Plaintiffs and the Kentucky Subclass that contradicted these representations.

1653. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Kentucky Plaintiffs and the Kentucky Subclass.

1654. Kentucky Plaintiffs and the Kentucky Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to

disclose material information. Kentucky Plaintiffs and the Kentucky Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Kentucky CPA.

1655. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Kentucky CPA.

1656. As a direct and proximate result of Ford's violations of the Kentucky CPA, Kentucky Plaintiffs and the Kentucky Subclass have suffered injury-in-fact and/or actual damage.

1657. Ford's violations present a continuing risk to Kentucky Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

1658. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

1659. Pursuant to KY. REV. STAT. ANN. § 367.220, Kentucky Plaintiffs and the Kentucky Subclass seek to recover actual damages in an amount to be determined

at trial; declaratory relief; attorneys' fees; and any other just and proper relief available under KY. REV. STAT. ANN. § 367.220.

1660. Kentucky Plaintiffs seek punitive damages based on the outrageousness and recklessness of Ford's conduct.

## COUNT 101

### BREACH OF CONTRACT
### (BASED ON KENTUCKY LAW)

1661. Kentucky Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1662. This claim is brought by Kentucky Plaintiffs on behalf of the Kentucky Subclass.

1663. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Kentucky Plaintiffs and the Kentucky Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Kentucky Plaintiffs and the Kentucky Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Kentucky Plaintiffs and the Kentucky

Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

1664. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Kentucky Plaintiffs and the Kentucky Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

1665. As a direct and proximate result of Ford's breach of contract, Kentucky Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 102

## BREACH OF EXPRESS WARRANTY
## (KY. REV. STAT. § 355.2-313)

1666. Kentucky Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1667. This claim is brought by Kentucky Plaintiffs on behalf of the Kentucky Subclass.

1668. Ford is and was at all relevant times a merchant with respect to motor vehicles.

1669. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

1670. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

1671. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

1672. These affirmations and promises were part of the basis of the bargain that was reached when Kentucky Plaintiffs and the other Kentucky Subclass members purchased or leased the Coastdown Cheating Vehicles.

1673. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that

produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

1674. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

1675. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Kentucky Plaintiffs and the Kentucky Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1676. Accordingly, recovery by the Kentucky Plaintiffs and the Kentucky Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Kentucky Plaintiffs, individually and on behalf of the other Kentucky Subclass members, seek all remedies as allowed by law.

1677. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Kentucky

Plaintiffs and the Kentucky Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

1678. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

1679. As a direct and proximate result of Ford's breach of express warranties, Kentucky Plaintiffs and the Kentucky Subclass have been damaged in an amount to be determined at trial.

## COUNT 103

## FRAUDULENT CONCEALMENT
## (BASED ON KENTUCKY LAW)

1680. Kentucky Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1681. This claim is brought by Kentucky Plaintiffs on behalf of the Kentucky Subclass.

1682. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard

for the truth and denied Kentucky Plaintiffs and the Kentucky Subclass information that is highly relevant and material to their purchasing decision.

1683. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

1684. Ford further affirmatively misrepresented to Kentucky Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

1685. Ford knew these representations were false when made.

1686. The Coastdown Cheating Vehicles purchased or leased by Kentucky Plaintiffs and the Kentucky Subclass were, in fact, defective, with reduced fuel efficiency.

1687. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Kentucky Plaintiffs and the Kentucky Subclass relied on Ford's material representations or omissions of fact that

the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

1688. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

1689. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Kentucky Plaintiffs and the Kentucky Subclass did not know of these facts and Ford actively concealed these facts from Kentucky Plaintiffs and the Kentucky Subclass.

1690. Kentucky Plaintiffs and the Kentucky Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Kentucky Plaintiffs and the Kentucky Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Kentucky Plaintiffs and the Kentucky Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

1691. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions

regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Kentucky Plaintiffs and the Kentucky Subclass placed in its representations.

1692. Ford's false representations and omissions were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Kentucky Plaintiffs and the Kentucky Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

1693. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Kentucky Plaintiffs and the Kentucky Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles. Having volunteered to provide

information to Kentucky Plaintiffs and the Kentucky Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Kentucky Plaintiffs and the Kentucky Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Kentucky Plaintiffs and the Kentucky Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

1694. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Kentucky Plaintiffs and the Kentucky Subclass.

1695. Ford has still not made full and adequate disclosures and continues to defraud Kentucky Plaintiffs and the Kentucky Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

1696. Kentucky Plaintiffs and the Kentucky Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did

if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Kentucky Plaintiffs' and the Kentucky Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Kentucky Plaintiffs, or Kentucky Subclass members.

1697. Because of the concealment and/or suppression of the facts, Kentucky Plaintiffs and the Kentucky Subclass have been injured and sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Kentucky Plaintiffs and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

1698. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Kentucky Plaintiffs and the Kentucky Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1699. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Kentucky Plaintiffs' and the Kentucky Subclass's rights and the representations that Ford made to them

in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 104

## NEGLIGENT MISREPRESENTATION
## (BASED ON KENTUCKY LAW)

1700. Kentucky Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1701. This claim is brought by the Kentucky Plaintiffs on behalf of the Kentucky Subclass.

1702. Defendant made fuel economy representations to Kentucky Plaintiffs and members of the Class that were not true.

1703. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Kentucky Plaintiffs and Kentucky Subclass members rely on these misrepresentations.

1704. Kentucky Plaintiffs reasonably relied on Defendant's representations and as a result Kentucky Plaintiffs and Kentucky Subclass members were harmed.

## COUNT 105

## UNJUST ENRICHMENT
## (BASED ON KENTUCKY LAW)

1705. Kentucky Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1706. This claim is brought by the Kentucky Plaintiffs on behalf of the Kentucky Subclass.

1707. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Kentucky Plaintiffs and the Kentucky Subclass.

1708. Defendant enjoyed the benefit of increased financial gains, to the detriment of Kentucky Plaintiffs and other Kentucky Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

1709. Kentucky Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Kentucky Subclass.

**R.    Claims Brought on Behalf of the Louisiana Subclass**

### COUNT 106

### VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### (LA. REV. STAT. § 51:1401 *et seq.*)

1710. Plaintiffs Evan Allen and Benjamin Bischoff ("Louisiana Plaintiffs") reallege and incorporate by reference all paragraphs as though fully set forth herein.

1711. This claim is brought by Louisiana Plaintiffs on behalf of Louisiana purchasers or lessees who are members of the Class.

1712. Ford, Louisiana Plaintiffs, and the Louisiana Subclass are "persons" within the meaning of LA. REV. STAT. § 51:1402(8).

1713. Louisiana Plaintiffs and the Louisiana Subclass are "consumers" within the meaning of LA. REV. STAT. § 51:1402(1).

1714. Ford engaged in "trade" or "commerce" within the meaning of LA. REV. STAT. § 51:1402(9).

1715. The Louisiana Unfair Trade Practices and Consumer Protection Law (Louisiana CPL) makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." LA. REV. STAT. § 51:1405(A). Ford participated in misleading, false, or deceptive acts that violated the Louisiana CPL including failing to disclose the actual fuel economy of the Coastdown Cheating Vehicles.

1716. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Coastdown Cheating Vehicles.

1717. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1718. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Louisiana Plaintiffs and the Louisiana Subclass.

1719. Ford knew or should have known that its conduct violated the Louisiana CPL.

1720. Ford owed Louisiana Plaintiffs and the Louisiana Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

      a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

      b.    Intentionally concealed the foregoing from Louisiana Plaintiffs and the Louisiana Subclass; and/or

      c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Louisiana Plaintiffs and the Louisiana Subclass that contradicted these representations.

1721. Louisiana Plaintiffs and the Louisiana Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information.

1722. As a direct and proximate result of Ford's violations of the Louisiana CPL, Louisiana Plaintiffs and the Louisiana Subclass have suffered injury-in-fact and/or actual damage.

1723. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

1724. Pursuant to LA. REV. STAT. § 51:1409, Louisiana Plaintiffs and the Louisiana Subclass seek to recover actual damages in an amount to be determined at trial; treble damages for Ford's knowing violations of the Louisiana CPL; an order enjoining Ford's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under LA. REV. STAT. § 51:1409.

1725. Plaintiffs also seek punitive damages because Ford engaged in aggravated and outrageous conduct.

1726. On July 22, 2019, a copy of the complaint, *Brewer, et. al. v. Ford Motor Company*, No. 19-12135-SJM-RSW, (E.D. Mich. Jul. 22, 2019), now transferred into this MDL, was mailed to the Attorney General of the State of Louisiana in accordance with LA. REV. STAT. § 51:1409.

## COUNT 107

## BREACH OF CONTRACT
## (BASED ON LOUISIANA LAW)

1727. Louisiana Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1728. This claim is brought by the Louisiana Plaintiffs on behalf of the Louisiana Subclass.

1729. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Louisiana Plaintiffs and the Louisiana Subclass members to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Louisiana Plaintiffs and the Louisiana Subclass members would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Louisiana Plaintiffs and the Louisiana Subclass members overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

1730. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Louisiana Plaintiffs and the Louisiana Subclass

members defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

1731. As a direct and proximate result of Ford's breach of contract, Louisiana Plaintiffs and the Louisiana Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 108

### BREACH OF WARRANTY AGAINST REDHIBITORY DEFECTS
### (LA. CIV. CODE 2520)

1732. Louisiana Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1733. This claim is brought by Louisiana Plaintiffs on behalf of the Louisiana Subclass.

1734. Ford is and was at all relevant times a merchant with respect to motor vehicles.

1735. In a transaction, a seller warrants the buyer against redhibitory defects, or vices, in the thing sold.

1736. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

1737. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

1738. As a direct and proximate result of Ford's breach of express warranties, Louisiana Plaintiffs and the Louisiana Subclass have been damaged in an amount to be determined at trial.

## COUNT 109

## FRAUDULENT CONCEALMENT
## (BASED ON LOUISIANA LAW)

1739. Louisiana Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1740. This claim is brought by Louisiana Plaintiffs on behalf of the Louisiana Subclass.

1741. Ford intentionally concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Louisiana Plaintiffs and the Louisiana Subclass members information that is highly relevant to their purchasing decision.

1742. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

1743. Ford further affirmatively misrepresented to Louisiana Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

1744. Ford knew these representations were false when made.

1745. The Coastdown Cheating Vehicles purchased or leased by Louisiana Plaintiffs and the Louisiana Subclass were, in fact, defective, with reduced fuel efficiency.

1746. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Louisiana Plaintiffs and the Louisiana Subclass members relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

1747. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

1748. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Louisiana Plaintiffs and the Louisiana Subclass members did not know of these facts and Ford actively concealed these facts from Louisiana Plaintiffs and the Louisiana Subclass members.

1749. Louisiana Plaintiffs and the Louisiana Subclass members reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Louisiana Plaintiffs and the Louisiana Subclass did not, and could not, unravel Ford's deception on their

own. Rather, Ford intended to deceive Louisiana Plaintiffs and the Louisiana Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

1750. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Louisiana Plaintiffs and the Louisiana Subclass members placed in its representations.

1751. Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Louisiana Plaintiffs and the Louisiana Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

1752. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to

such facts, and because Ford knew these facts were not known to or reasonably discoverable by Louisiana Plaintiffs or the Louisiana Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Louisiana Plaintiffs and the Louisiana Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Louisiana Plaintiffs and the Louisiana Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Louisiana Plaintiffs and the Louisiana Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

1753. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the

brand's image and cost Ford money, and it did so at the expense of Louisiana Plaintiffs and the Louisiana Subclass members.

1754. Ford has still not made full and adequate disclosures and continues to defraud Louisiana Plaintiffs and the Louisiana Subclass members by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

1755. Louisiana Plaintiffs and the Louisiana Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Louisiana Plaintiffs' and the Louisiana Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Louisiana Plaintiffs, or the Louisiana Subclass members.

1756. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Louisiana Plaintiffs and the Louisiana Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1757. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Louisiana Plaintiffs' and the Louisiana Subclass members' rights and the representations that Ford made to them were made in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 110

## NEGLIGENT MISREPRESENTATION
## (BASED ON LOUISIANA LAW)

1758. Louisiana Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1759. This claim is brought by the Louisiana Plaintiffs on behalf of the Louisiana Subclass.

1760. Defendant made fuel economy representations to Louisiana Plaintiffs and members of the Class that were not true.

1761. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Louisiana Plaintiffs and Louisiana Subclass members rely on these misrepresentations.

1762. Louisiana Plaintiffs reasonably relied on Defendant's representations and as a result Louisiana Plaintiffs and Louisiana Subclass members were harmed.

## COUNT 111

## UNJUST ENRICHMENT
## (BASED ON LOUISIANA LAW)

1763. Louisiana Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1764. This claim is brought by the Louisiana Plaintiffs on behalf of the Louisiana Subclass.

1765. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Louisiana Plaintiffs and the Louisiana Subclass.

1766. Defendant enjoyed the benefit of increased financial gains, to the detriment of Louisiana Plaintiffs and other Louisiana Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

1767. Louisiana Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Louisiana Subclass.

**S.      Claims brought on behalf of the Maine Subclass**

## COUNT 112

### VIOLATION OF THE MAINE UNFAIR TRADE PRACTICES ACT
### (ME. REV. STAT. ANN. TIT. 5, § 205-A *et seq.*)

1768. Maine Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

1769. This claim is brought by Maine Plaintiffs on behalf of the Maine Subclass.

1770. Ford, Plaintiffs, and Maine Class members are "persons" within the meaning of ME. REV. STAT. ANN. TIT. § 5, 206(2).

1771. Ford is engaged in "trade" or "commerce" within the meaning of ME. REV. STAT. ANN. TIT. § 5, 206(3).

1772. The Maine Unfair Trade Practices Act (Maine UTPA) makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." ME. REV. STAT. ANN. TIT. 5, § 207.

1773. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

1774. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression,

or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

1775. Ford's unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including Maine Plaintiffs and the Maine Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

1776. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Maine Plaintiffs and the Maine Subclass.

1777. Ford knew or should have known that its conduct violated the Maine UTPA.

1778. Ford owed Maine Plaintiffs and the Maine Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

a. Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

b. Intentionally concealed the foregoing from Maine Plaintiffs and the Maine Subclass; and/or

- 443 -

      c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Maine Plaintiffs and the Maine Subclass that contradicted these representations.

1779. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Maine Plaintiffs and the Maine Subclass.

1780. Maine Plaintiffs and the Maine Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Maine Plaintiffs and the Maine Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Maine UTPA.

1781. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Maine UTPA.

1782. As a direct and proximate result of Ford's violations of the Maine UTPA, Maine Plaintiffs and the Maine Subclass have suffered injury-in-fact and/or actual damage.

1783. Ford's violations present a continuing risk to Maine Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

1784. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

1785. Pursuant to ME. REV. STAT. ANN. TIT. 5, § 213, Plaintiffs seeks an order enjoining Ford's unfair and/or deceptive acts or practices.

1786. Maine Plaintiffs seek punitive damages based on the outrageousness and recklessness of Ford's conduct.

1787. On June 20, 2019, Plaintiffs sent a letter complying with ME. REV. STAT. ANN. TIT. 5, § 213(1-A) to Ford. Because Ford failed to remedy its unlawful conduct within the requisite time period, Maine Plaintiffs seek all damages and relief to which they and the Maine Subclass are entitled.

## COUNT 113

### BREACH OF CONTRACT
### (BASED ON MAINE LAW)

1788. Maine Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1789. This claim is brought by Maine Plaintiffs on behalf of the Maine Subclass.

1790. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Maine Plaintiffs and the Maine Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Maine Plaintiffs and the Maine Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Maine Plaintiffs and the Maine Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

1791. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Maine Plaintiffs and the Maine Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

1792. As a direct and proximate result of Ford's breach of contract, Maine Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 114

### BREACH OF EXPRESS WARRANTY
### (ME. REV. STAT. ANN. § 2-313)

1793. Maine Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1794. This claim is brought by Maine Plaintiffs on behalf of the Maine Subclass.

1795. Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to Me. Rev. Stat. Ann. § 2-104.

1796. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

1797. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

1798. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

1799. These affirmations and promises were part of the basis of the bargain that was reached when Maine Plaintiffs and the other Maine Subclass members purchased or leased the Coastdown Cheating Vehicles.

1800. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

1801. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

1802. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Maine Plaintiffs and the Maine Subclass whole, and because

Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1803. Accordingly, recovery by the Maine Plaintiffs and the Maine Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Maine Plaintiffs, individually and on behalf of the other Maine Subclass members, seek all remedies as allowed by law.

1804. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Maine Plaintiffs and the Maine Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

1805. Finally, due to Ford's breach of warranty as set forth herein, Maine Plaintiffs and the Maine Subclass assert as an additional and/or alternative remedy, the revocation of acceptance of the goods, and the return to Maine Plaintiffs and the Maine Subclass members of the purchase price of all Coastdown Cheating Vehicles currently owned for such other incidental and consequential damages.

1806. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this

litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

1807.  As a direct and proximate result of Ford's breach of express warranties, Maine Plaintiffs and the Maine Subclass have been damaged in an amount to be determined at trial.

**COUNT 115**

**FRAUDULENT CONCEALMENT**
**(BASED ON MAINE LAW)**

1808.  Maine Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1809.  This claim is brought by Maine Plaintiffs on behalf of the Maine Subclass.

1810.  Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Maine Plaintiffs and the Maine Subclass information that is highly relevant and material to their purchasing decision.

1811.  The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to

provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

1812. Ford further affirmatively misrepresented to Maine Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

1813. Ford knew these representations were false when made.

1814. The Coastdown Cheating Vehicles purchased or leased by Maine Plaintiffs and the Maine Subclass were, in fact, defective, with reduced fuel efficiency.

1815. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Maine Plaintiffs and the Maine Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

1816. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed

to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

1817. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Maine Plaintiffs and the Maine Subclass did not know of these facts and Ford actively concealed these facts from Maine Plaintiffs and the Maine Subclass.

1818. Maine Plaintiffs and the Maine Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Maine Plaintiffs and the Maine Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Maine Plaintiffs and the Maine Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

1819. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Maine Plaintiffs and the Maine Subclass placed in its representations.

1820. Ford's false representations  and omissions were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and

also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Maine Plaintiffs and the Maine Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

1821. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Maine Plaintiffs and the Maine Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Maine Plaintiffs and the Maine Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Maine Plaintiffs and the Maine Subclass members. Whether an automobile is fuel efficient and whether it accurately

measures its own gasoline consumption are material concerns to a consumer. Ford represented to Maine Plaintiffs and the Maine Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

1822. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Maine Plaintiffs and the Maine Subclass.

1823. Ford has still not made full and adequate disclosures and continues to defraud Maine Plaintiffs and the Maine Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

1824. Maine Plaintiffs and the Maine Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Maine Plaintiffs' and the Maine Subclass members' actions were justified. Ford was

in exclusive control of the material facts, and such facts were not generally known to the public, Maine Plaintiffs, or Maine Subclass members.

1825. Because of the concealment and/or suppression of the facts, Maine Plaintiffs and the Maine Subclass have been injured and sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Maine Plaintiffs and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

1826. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Maine Plaintiffs and the Maine Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1827. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Maine Plaintiffs' and the Maine Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 116

## NEGLIGENT MISREPRESENTATION
### (BASED ON MAINE LAW)

1828. Maine Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1829. This claim is brought by the Maine Plaintiffs on behalf of the Maine Subclass.

1830. Defendant made fuel economy representations to Maine Plaintiffs and members of the Class that were not true.

1831. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Maine Plaintiffs and Maine Subclass members rely on these misrepresentations.

1832. Maine Plaintiffs reasonably relied on Defendant's representations and as a result Maine Plaintiffs and Maine Subclass members were harmed.

## COUNT 117

## UNJUST ENRICHMENT
### (BASED ON MAINE LAW)

1833. Maine Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

1834. This claim is brought by the Maine Plaintiffs on behalf of the Maine Subclass.

1835. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Maine Plaintiffs and the Maine Subclass.

1836. Defendant enjoyed the benefit of increased financial gains, to the detriment of Maine Plaintiffs and other Maine Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

1837. Maine Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Maine Subclass.

**T.    Claims Brought on Behalf of the Maryland Subclass**

**COUNT 118**

**VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT
(MD. CODE ANN., COM. LAW § 13-101 *et seq.*)**

1838. Plaintiff Randy Transue ("Maryland Plaintiff") hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

1839. This claim is brought by Maryland Plaintiff on behalf of the Maryland Subclass.

1840. The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale or lease of any consumer good, including "failure to state a material fact if the failure deceives or tends to deceive" and "[d]eception, fraud, false pretense, false premise,

misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same," MD. CODE ANN., COM. LAW § 13-301, regardless of whether the consumer is actually deceived or damaged, MD. CODE ANN., COM. LAW § 13-302.

1841. Ford, Maryland Plaintiff, and the Maryland Subclass members are "persons" within the meaning of MD. CODE ANN., COM. LAW § 13-101(h).

1842. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

1843. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Maryland Plaintiff and the Maryland Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

1844. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Maryland Plaintiff and the Maryland Subclass.

1845. Ford knew or should have known that its conduct violated the Maryland CPA.

1846. Ford owed Maryland Plaintiff and the Maryland Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

      a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

      b.    Intentionally concealed the foregoing from Maryland Plaintiff and the Maryland Subclass; and/or

      c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Maryland Plaintiff and the Maryland Subclass that contradicted these representations.

1847. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Maryland Plaintiff and the Maryland Subclass.

1848. Maryland Plaintiff and the Maryland Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to

disclose material information. Maryland Plaintiff and the Maryland Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Maryland CPA.

1849. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Maryland CPA. As a direct and proximate result of Ford's violations of the Maryland CPA, Maryland Plaintiff and the Maryland Subclass have suffered injury-in-fact and/or actual damage.

1850. Ford's violations present a continuing risk to Maryland Plaintiff as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

1851. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

1852. Pursuant to MD. CODE ANN., COM. LAW § 13-408, Maryland Plaintiff seeks actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

1853. Plaintiffs also seek punitive damages because Ford engaged in aggravated and outrageous conduct.

## COUNT 119

## BREACH OF CONTRACT
## (BASED ON MARYLAND LAW)

1854. Maryland Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1855. This claim is brought by Maryland Plaintiff on behalf of the Maryland Subclass.

1856. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Maryland Plaintiff and the Maryland Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Maryland Plaintiff and the Maryland Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Maryland Plaintiff and the Maryland Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

1857. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Maryland Plaintiff and the Maryland Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

1858. As a direct and proximate result of Ford's breach of contract, Maryland Plaintiff and the Maryland Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 120

### BREACH OF EXPRESS WARRANTY
### (MD. CODE COM. LAW § 2-313)

1859. Maryland Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1860. This claim is brought by Maryland Plaintiff on behalf of the Maryland Subclass.

1861. Ford is and was at all relevant times a merchant with respect to motor vehicles.

1862. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

1863. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

1864. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

1865. These affirmations and promises were part of the basis of the bargain that was reached when Maryland Plaintiff and the other Maryland Subclass members purchased or leased the Coastdown Cheating Vehicles.

1866. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is

unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

1867. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

1868. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Maryland Plaintiff and the Maryland Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1869. Accordingly, recovery by the Maryland Plaintiff and the Maryland Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Maryland Plaintiff, individually and on behalf of the other Maryland Subclass members, seek all remedies as allowed by law.

1870. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Maryland Plaintiff and the Maryland Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

1871. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

1872. As a direct and proximate result of Ford's breach of express warranties, Maryland Plaintiff and the Maryland Subclass have been damaged in an amount to be determined at trial.

**COUNT 121**

**FRAUDULENT CONCEALMENT**
**(BASED ON MARYLAND LAW)**

1873. Maryland Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1874. This claim is brought by Maryland Plaintiff on behalf of the Maryland Subclass.

1875. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Maryland Plaintiff and the Maryland Subclass information that is highly relevant to their purchasing decision.

1876. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

1877. Ford further affirmatively misrepresented to Maryland Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

1878. Ford knew these representations were false when made.

1879. The Coastdown Cheating Vehicles purchased or leased by Maryland Plaintiff and the Maryland Subclass were, in fact, defective, with reduced fuel efficiency.

1880. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Maryland Plaintiff and the Maryland Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

1881. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

1882. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Maryland Plaintiffs and the Maryland Subclass did not know of these facts and Ford actively concealed these facts from Maryland Plaintiff and the Maryland Subclass.

1883. Maryland Plaintiff and the Maryland Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Maryland Plaintiff and the Maryland Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Maryland Plaintiff and the Maryland Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

1884. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized

profits and sales above the trust that Maryland Plaintiff and the Maryland Subclass placed in its representations.

1885. Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Maryland Plaintiff and the Maryland Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

1886. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Maryland Plaintiff and the Maryland Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Maryland Plaintiff and the Maryland Subclass members, Ford had the

duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Maryland Plaintiff and the Maryland Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Maryland Plaintiff and the Maryland Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

1887. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Maryland Plaintiff and the Maryland Subclass.

1888. Ford has still not made full and adequate disclosures and continues to defraud Maryland Plaintiff and the Maryland Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

1889. Maryland Plaintiff and the Maryland Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not

have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Maryland Plaintiff's and the Maryland Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Maryland Plaintiff, or, Maryland Subclass members.

1890. Because of the concealment and/or suppression of the facts, Maryland Plaintiff and the Maryland Subclass have sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Maryland Plaintiff and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

1891. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Maryland Plaintiff and the Maryland Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1892. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Maryland Plaintiff's and the Maryland Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages

in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 122

### NEGLIGENT MISREPRESENTATION
### (BASED ON MARYLAND LAW)

1893. Maryland Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1894. This claim is brought by the Maryland Plaintiff on behalf of the Maryland Subclass.

1895. Defendant made fuel economy representations to Maryland Plaintiff and members of the Class that were not true.

1896. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Maryland Plaintiff and Maryland Subclass members rely on these misrepresentations.

1897. Maryland Plaintiff reasonably relied on Defendant's representations and as a result Maryland Plaintiff and Maryland Subclass members were harmed.

## COUNT 123

### UNJUST ENRICHMENT
### (BASED ON MARYLAND LAW)

1898. Maryland Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1899. This claim is brought by the Maryland Plaintiff on behalf of the Maryland Subclass.

1900. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Maryland Plaintiff and the Maryland Subclass.

1901. Defendant enjoyed the benefit of increased financial gains, to the detriment of Maryland Plaintiff and other Maryland Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

1902. Maryland Plaintiff, therefore, seeks any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Maryland Subclass.

## U.     Claims brought on behalf of the Massachusetts Subclass

### COUNT 124

### VIOLATION OF THE MASSACHUSETTS GENERAL LAW CHAPTER 93(A) (MASS. GEN. LAWS CH. 93A, § 1, *et seq.*)

1903. Plaintiff Robert Lovell ("Massachusetts Plaintiff") hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

1904. This claim is brought by Massachusetts Plaintiff on behalf of the Massachusetts Subclass.

1905. Defendant is a "person" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

1906.. Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."   Mass. Gen. Laws ch. 93A, § 2.  Ford participated in misleading, false, or deceptive acts that violated the Massachusetts Act.

1907. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

1908. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

1909. Ford's unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including Massachusetts Plaintiffs and the Massachusetts Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to

its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

1910. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Massachusetts Plaintiffs and the Massachusetts Subclass.

1911. Ford knew or should have known that its conduct violated the Massachusetts Act.

1912. Ford owed Massachusetts Plaintiffs and the Massachusetts Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

   a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

   b.    Intentionally concealed the foregoing from Massachusetts Plaintiffs and the Massachusetts Subclass; and/or

   c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Massachusetts Plaintiffs and the Massachusetts Subclass that contradicted these representations.

1913. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Massachusetts Plaintiffs and the Massachusetts Subclass.

1914. Massachusetts Plaintiffs and the Massachusetts Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Massachusetts Plaintiffs and the Massachusetts Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Massachusetts Act.

1915. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Massachusetts Act.

1916. As a direct and proximate result of Ford's violations of the Massachusetts Act, Massachusetts Plaintiffs and the Massachusetts Subclass have suffered injury-in-fact and/or actual damage.

1917. Ford's violations present a continuing risk to Massachusetts Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

1918. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

1919. Pursuant to Mass. Gen. Laws ch. 93A, § 9, Massachusetts Plaintiffs and the Massachusetts Subclass seek monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff and each Massachusetts Subclass member. Because Ford's conduct was committed willfully and knowingly, Massachusetts Plaintiffs are entitled to recover, for each Plaintiff and each Massachusetts Subclass member, up to three times actual damages, but no less than two times actual damages.

1920. Massachusetts Plaintiffs also seek an order enjoining Ford's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees costs, and any other just and proper relief available under the Massachusetts Act.

1921. Massachusetts Plaintiffs seek punitive damages based on the outrageousness and recklessness of Ford's conduct

1922. On June 20, 2019, Plaintiffs sent a letter complying with MASS. GEN. LAWS CH. 93A, § 9(3) to Ford.

## COUNT 125

## BREACH OF CONTRACT
## (BASED ON MASSACHUSETTS LAW)

1923. Massachusetts Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1924. This claim is brought by Massachusetts Plaintiff on behalf of the Massachusetts Subclass.

1925. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Massachusetts Plaintiff and the Massachusetts Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Massachusetts Plaintiff and the Massachusetts Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Massachusetts Plaintiff and the Massachusetts Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

1926. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Massachusetts Plaintiff and the Massachusetts Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable

consumer would expect given the premium paid for these vehicles and the representation made by Ford.

1927. As a direct and proximate result of Ford's breach of contract, Massachusetts Plaintiff and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 126

### BREACH OF EXPRESS WARRANTY
### (MASS. GEN. LAWS CH. 106, § 2-313)

1928. Massachusetts Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1929. This claim is brought by Massachusetts Plaintiff on behalf of the Massachusetts Subclass.

1930. Ford is and was at all relevant times a merchant with respect to motor vehicles.

1931. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the

shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

1932. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

1933. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

1934. These affirmations and promises were part of the basis of the bargain that was reached when Massachusetts Plaintiff and the other Massachusetts Subclass members purchased or leased the Coastdown Cheating Vehicles.

1935. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

1936. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

1937. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Massachusetts Plaintiff and the Massachusetts Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1938. Accordingly, recovery by the Massachusetts Plaintiff and the Massachusetts Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Massachusetts Plaintiff, individually and on behalf of the other Massachusetts Subclass members, seek all remedies as allowed by law.

1939. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Massachusetts Plaintiff and the Massachusetts Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

1940. Moreover, many of the injuries flowing from the Coastdown Cheating Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as many incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein, and due to its failure

and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Massachusetts Plaintiff's and the other Massachusetts Subclass members' remedies would be insufficient to make Massachusetts Plaintiff and the other Massachusetts Subclass members whole.

1941. Finally, due to Ford's breach of warranty as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy, as set forth in Mass. Gen. Laws Ch. 106, § 2-608, for a revocation of acceptance of the goods, and for a return to Massachusetts Plaintiff and the Massachusetts Subclass members of the purchase price of all Coastdown Cheating Vehicles currently owned and for such other incidental and consequential damages as allowed under Mass. Gen. Laws Ch. 106, §§ 2-711 and 2-608.

1942. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

1943. As a direct and proximate result of Ford's breach of express warranties, Massachusetts Plaintiff and the Massachusetts Subclass have been damaged in an amount to be determined at trial.

## COUNT 127

## FRAUDULENT CONCEALMENT
## (BASED ON MASSACHUSETTS LAW)

1944. Massachusetts Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1945. This claim is brought by Massachusetts Plaintiff on behalf of the Massachusetts Subclass.

1946. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Massachusetts Plaintiff and the Massachusetts Subclass information that is highly relevant and material to their purchasing decision.

1947. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

1948. Ford further affirmatively misrepresented to Massachusetts Plaintiff in advertising and other forms of communication, including standard and uniform

- 482 -

material provided with each car, that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

1949. Ford knew these representations were false when made.

1950. The Coastdown Cheating Vehicles purchased or leased by Massachusetts Plaintiff and the Massachusetts Subclass were, in fact, defective, with reduced fuel efficiency.

1951. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Massachusetts Plaintiff and the Massachusetts Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

1952. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

1953. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Massachusetts Plaintiff and the

Massachusetts Subclass did not know of these facts and Ford actively concealed these facts from Massachusetts Plaintiff and the Massachusetts Subclass.

1954. Massachusetts Plaintiff and the Massachusetts Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Massachusetts Plaintiff and the Massachusetts Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Massachusetts Plaintiff and the Massachusetts Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

1955. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Massachusetts Plaintiff and the Massachusetts Subclass placed in its representations.

1956. Ford's false representations and omissions were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Massachusetts Plaintiff and the

Massachusetts Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

1957. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Massachusetts Plaintiff and the Massachusetts Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Massachusetts Plaintiff and the Massachusetts Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Massachusetts Plaintiff and the Massachusetts Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Massachusetts Plaintiff and the

Massachusetts Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

1958. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Massachusetts Plaintiff and the Massachusetts Subclass.

1959. Ford has still not made full and adequate disclosures and continues to defraud Massachusetts Plaintiff and the Massachusetts Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

1960. Massachusetts Plaintiff and the Massachusetts Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Massachusetts Plaintiff's and the Massachusetts Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such

facts were not generally known to the public, Massachusetts Plaintiff, or Massachusetts Subclass members.

1961. Because of the concealment and/or suppression of the facts, Massachusetts Plaintiff and the Massachusetts Subclass have been injured and sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Massachusetts Plaintiff and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

1962. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Massachusetts Plaintiff and the Massachusetts Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

1963. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Massachusetts Plaintiff's and the Massachusetts Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 128

## NEGLIGENT MISREPRESENTATION
## (BASED ON MASSACHUSETTS LAW)

1964. Massachusetts Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

1965. This claim is brought by the Massachusetts Plaintiff on behalf of the Massachusetts Subclass.

1966. Defendant made fuel economy representations to Massachusetts Plaintiff and members of the Class that were not true.

1967. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Massachusetts Plaintiff and Massachusetts Subclass members rely on these misrepresentations.

1968. Massachusetts Plaintiff reasonably relied on Defendant's representations and as a result Massachusetts Plaintiff and Massachusetts Subclass members were harmed.

## COUNT 129

## UNJUST ENRICHMENT
## (BASED ON MASSACHUSETTS LAW)

1969. Massachusetts Plaintiff realleges and incorporate by reference all paragraphs alleged herein.

1970. This claim is brought by the Massachusetts Plaintiff on behalf of the Massachusetts Subclass.

1971. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Massachusetts Plaintiff and the Massachusetts Subclass.

1972. Defendant enjoyed the benefit of increased financial gains, to the detriment of Massachusetts Plaintiff and other Massachusetts Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

1973. Massachusetts Plaintiff, therefore, seeks any and all available equitable relief, including but not limited to disgorgement and/or restitution to him and other members of the Massachusetts Subclass.

## V.   Claims Brought on Behalf of the Michigan Subclass

### COUNT 130

### VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT (MICH. COMP. LAWS § 445.903 *et seq.*)

1974. Plaintiffs Mark Hill, Brian Leja, Nicholas Leonardi, and Jeffrey Kaloustian ("Michigan Plaintiffs") hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

1975. This claim is brought by Michigan Plaintiffs on behalf of the Michigan Subclass.

1976. The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer"; "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is"; or "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." MICH. COMP. LAWS § 445.903(1).

1977. Michigan Plaintiffs and the Michigan Subclass members are "person[s]" within the meaning of the MICH. COMP. LAWS § 445.902(1)(d).

1978. Ford is a "person" engaged in "trade or commerce" within the meaning of the MICH. COMP. LAWS § 445.902(1)(d) and (g).

1979. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact

with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

1980. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Michigan Plaintiffs and the Michigan Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

1981. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Michigan Plaintiffs and the Michigan Subclass.

1982. Ford knew or should have known that its conduct violated the Michigan CPA.

1983. Ford owed Michigan Plaintiffs and the Michigan Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

> a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;
>
> b.    Intentionally concealed the foregoing from Michigan Plaintiffs and the Michigan Subclass; and/or

> c. Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Michigan Plaintiffs and the Michigan Subclass that contradicted these representations.

1984. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Michigan Plaintiffs and the Michigan Subclass.

1985. Michigan Plaintiffs and the Michigan Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Michigan Plaintiffs and the Michigan Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Michigan CPA.

1986. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Michigan CPA. As a direct and proximate result of Ford's violations of the Michigan CPA, Michigan Plaintiffs and the Michigan Subclass have suffered injury-in-fact and/or actual damage.

1987. Ford's violations present a continuing risk to Michigan Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

1988. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

1989. Michigan Plaintiffs seek injunctive relief to enjoin Ford from continuing their unfair and deceptive acts; monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for each plaintiff; reasonable attorneys' fees; and any other just and proper relief available under MICH. COMP. LAWS § 445.911.

1990. Michigan Plaintiffs also seek punitive damages because Ford carried out despicable conduct with willful and conscious disregard of the rights of others. Ford's conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT 131

### BREACH OF CONTRACT
### (BASED ON MICHIGAN LAW)

1991. Michigan Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1992. This claim is brought by Michigan Plaintiffs on behalf of the Michigan Subclass.

1993. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Michigan Plaintiffs and the Michigan Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Michigan Plaintiffs and the Michigan Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Michigan Plaintiffs and the Michigan Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

1994. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Michigan Plaintiffs and the Michigan Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer

would expect given the premium paid for these vehicles and the representation made by Ford.

1995.  As a direct and proximate result of Ford's breach of contract, Michigan Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 132

### BREACH OF EXPRESS WARRANTY
### (MICH. COMP. LAWS ANN. 440.2313 AND 440.2860)

1996.  Michigan Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1997.  This claim is brought by Michigan Plaintiffs on behalf of the Michigan Subclass.

1998.  Ford is and was at all relevant times a merchant with respect to motor vehicles under Mich. Comp. Laws Ann. § 440.2104(1) and a "seller" of motor vehicles under § 440.2313(1).

1999.  With respect to leases, Ford is and was at all relevant times a "lessor" with respect to motor vehicles under Mich. Comp. Laws Ann. 440.2803(1)(p), and 440.2860.

2000. The Coastdown Cheating Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws Ann. 440.2105(1) and 440.2803(1)(h).

2001. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

2002. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

2003. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

2004. These affirmations and promises were part of the basis of the bargain that was reached when Michigan Plaintiffs and the other Michigan Subclass members purchased or leased the Coastdown Cheating Vehicles.

2005. Ford breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Ford. Ford has not repaired or adjusted, and has been unable to repair or adjust, the Coastdown Cheating Vehicles' materials and workmanship defects.

2006. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

2007. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Michigan Plaintiffs and the Michigan Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

2008. Accordingly, recovery by the Michigan Plaintiffs and the Michigan Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Michigan Plaintiffs, individually and on behalf of the other Michigan Subclass members, seek all remedies as allowed by law.

2009. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Michigan

Plaintiffs and the Michigan Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

2010. Moreover, many of the injuries flowing from the Coastdown Cheating Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as many incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Michigan Plaintiffs' and the other Michigan Subclass members' remedies would be insufficient to make Michigan Plaintiff and the other Michigan Subclass members whole.

2011. Finally, due to Ford's breach of warranty as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy, for a revocation of acceptance of the goods, and for a return to Michigan Plaintiffs and the Michigan Subclass members of the purchase price of all Coastdown Cheating Vehicles currently owned and for such other incidental and consequential damages as allowed.

2012. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

2013. As a direct and proximate result of Ford's breach of express warranties, Michigan Plaintiffs and the Michigan Subclass have been damaged in an amount to be determined at trial.

## COUNT 133

### FRAUDULENT CONCEALMENT
### (BASED ON MICHIGAN LAW)

2014. Michigan Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2015. This claim is brought by Michigan Plaintiffs on behalf of the Michigan Subclass.

2016. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Michigan Plaintiffs and the Michigan Subclass information that is highly relevant to their purchasing decision.

2017. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

2018. Ford further affirmatively misrepresented to Michigan Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

2019. Ford knew these representations were false when made.

2020. The Coastdown Cheating Vehicles purchased or leased by Michigan Plaintiffs and the Michigan Subclass were, in fact, defective, with reduced fuel efficiency.

2021. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Michigan Plaintiffs and the Michigan Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

2022. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

2023. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Michigan Plaintiffs and the Michigan Subclass did not know of these facts and Ford actively concealed these facts from Michigan Plaintiffs and the Michigan Subclass.

2024. Michigan Plaintiffs and the Michigan Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Michigan Plaintiffs and the Michigan Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Michigan Plaintiffs and the Michigan Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

2025. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Michigan Plaintiffs and the Michigan Subclass placed in its representations.

2026. Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Michigan Plaintiffs and the Michigan Subclass

members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

2027. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Michigan Plaintiffs and the Michigan Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Michigan Plaintiffs and the Michigan Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Michigan Plaintiffs and the Michigan Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Michigan Plaintiffs and the Michigan Subclass

members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

2028. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Michigan Plaintiffs and the Michigan Subclass.

2029. Ford has still not made full and adequate disclosures and continues to defraud Michigan Plaintiffs and the Michigan Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

2030. Michigan Plaintiffs and the Michigan Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Michigan Plaintiffs' and the Michigan Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Michigan Plaintiffs, or Michigan Subclass members.

2031. Because of the concealment and/or suppression of the facts, Michigan Plaintiffs and the Michigan Subclass have sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Michigan Plaintiffs and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

2032. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Michigan Plaintiffs and the Michigan Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2033. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Michigan Plaintiffs' and the Michigan Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 134

### NEGLIGENT MISREPRESENTATION
### (BASED ON MICHIGAN LAW)

2034. Michigan Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2035. This claim is brought by the Michigan Plaintiffs on behalf of the Michigan Subclass.

2036. Defendant made fuel economy representations to Michigan Plaintiffs and members of the Class that were not true.

2037. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Michigan Plaintiffs and Michigan Subclass members rely on these misrepresentations.

2038. Michigan Plaintiffs reasonably relied on Defendant's representations and as a result Michigan Plaintiffs and Michigan Subclass members were harmed.

## COUNT 135

### UNJUST ENRICHMENT
### (BASED ON MICHIGAN LAW)

2039. Michigan Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2040. This claim is brought by the Michigan Plaintiffs on behalf of the Michigan Subclass.

2041. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Michigan Plaintiffs and the Michigan Subclass.

2042. Defendant enjoyed the benefit of increased financial gains, to the detriment of Michigan Plaintiffs and other Michigan Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

2043. Michigan Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Michigan Subclass.

## W.    Claims Brought on Behalf of the Minnesota Subclass

### COUNT 136

### VIOLATION OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT (MINN. STAT. § 325F.68 *et seq.*)

2044. Plaintiff Mark Arendt ("Minnesota Plaintiff") hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

2045. This claim is brought by Minnesota Plaintiff on behalf of the Minnesota Subclass.

2046. The Coastdown Cheating Vehicles constitute "merchandise" within the meaning of MINN. STAT. § 325F.68(2).

2047. The Minnesota Prevention of Consumer Fraud Act (Minnesota CFA) prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise,

whether or not any person has in fact been misled, deceived, or damaged thereby." MINN. STAT. § 325F.69(1).

2048. Ford's actions as set forth herein occurred in the conduct of trade or commerce.

2049. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

2050. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Minnesota Plaintiff and the Minnesota Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

2051. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Minnesota Plaintiff and the Minnesota Subclass.

2052. Ford knew or should have known that its conduct violated the Minnesota CFA.

2053. Ford owed Minnesota Plaintiff and the Minnesota Subclass members a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

   a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

   b.    Intentionally concealed the foregoing from Minnesota Plaintiff and the Minnesota Subclass; and/or

   c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of in the Coastdown Cheating Vehicles, while purposefully withholding material facts from Minnesota Plaintiff and the Minnesota Subclass that contradicted these representations.

2054. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Minnesota Plaintiff and the Minnesota Subclass.

2055. Minnesota Plaintiff and the Minnesota Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to

disclose material information. Minnesota Plaintiff and the Minnesota Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Minnesota CFA.

2056. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Minnesota CFA. As a direct and proximate result of Ford's violations of the Minnesota CFA, Minnesota Plaintiff and the Minnesota Subclass have suffered injury-in-fact and/or actual damage.

2057. Ford's violations present a continuing risk to Minnesota Plaintiff as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

2058. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

2059. Pursuant to MINN. STAT. § 8.31(3a), Minnesota Plaintiff seeks actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

2060. Minnesota Plaintiff also seeks punitive damages under MINN. STAT. § 549.20(1)(a) given the clear and convincing evidence that Ford's acts show deliberate disregard for the rights of others.

### COUNT 137

### VIOLATION OF THE MINNESOTA DECEPTIVE TRADE PRACTICES ACT (MINN. STAT. § 325D.43-48 *ET SEQ.*)

2061. Minnesota Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

2062. This claim is brought by Minnesota Plaintiff on behalf of the Minnesota Subclass.

2063. The Minnesota Deceptive Trade Practices Act (Minnesota DTPA) prohibits deceptive trade practices, which include "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." MINN. STAT. § 325F.69(1).

2064. Ford's actions as set forth herein occurred in the conduct of trade or commerce.

2065. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel

economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

2066. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Minnesota Plaintiff and the Minnesota Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

2067. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Minnesota Plaintiff and the Minnesota Subclass.

2068. Ford knew or should have known that its conduct violated the Minnesota DTPA.

2069. Ford owed Minnesota Plaintiff and the Minnesota Subclass members a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

a.   Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

b.   Intentionally concealed the foregoing from Minnesota Plaintiff and the Minnesota Subclass; and/or

c.   Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Minnesota Plaintiff and the Minnesota Subclass that contradicted these representations.

2070. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Minnesota Plaintiff and the Minnesota Subclass.

2071. Minnesota Plaintiff and the Minnesota Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Minnesota Plaintiff and the Minnesota Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Minnesota DTPA.

2072. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Minnesota DTPA. As a direct and proximate result of Ford's violations of the Minnesota DTPA, Minnesota Plaintiff and the Minnesota Subclass have suffered injury-in-fact and/or actual damage.

2073. Ford's violations present a continuing risk to Minnesota Plaintiff as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

2074. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

2075. Pursuant to MINN. STAT. § 8.31(3a), Minnesota Plaintiff seeks actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota DTPA.

2076. Minnesota Plaintiff also seeks punitive damages under MINN. STAT. § 549.20(1)(a) given the clear and convincing evidence that Ford's acts show deliberate disregard for the rights of others.

## COUNT 138

## BREACH OF CONTRACT
## (BASED ON MINNESOTA LAW)

2077. Minnesota Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2078. This claim is brought by Minnesota Plaintiff on behalf of the Minnesota Subclass.

2079. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Minnesota Plaintiff and the Minnesota Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Minnesota Plaintiff and the Minnesota Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Minnesota Plaintiff and the Minnesota Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

2080. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Minnesota Plaintiff and the Minnesota Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

2081.  As a direct and proximate result of Ford's breach of contract, Minnesota Plaintiff and the Minnesota Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 139

### BREACH OF EXPRESS WARRANTY
### (MINN. STAT. § 336.2-313, AND § 336.2A-210)

2082. Minnesota Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2083.  This claim is brought by Minnesota Plaintiff on behalf of the Minnesota Subclass.

2084. Ford is and was at all relevant times a merchant with respect to motor vehicles under Minn. Stat. § 336.2-104(1) and a "seller" of motor vehicles under § 336.2-313(1).

2085. With respect to leases, Ford is and was at all relevant times a "lessor" with respect to motor vehicles under Minn. Stat. § 336.2A-1031(1)(p) and § 336.2A-210.

2086. The Coastdown Cheating Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. § 336.2-105 and Minn. Stat. § 336.2A-103(1)(h).

2087. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

2088. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

2089. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

2090. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

2091. These affirmations and promises were part of the basis of the bargain that was reached when Minnesota Plaintiff and the other Minnesota Subclass members purchased or leased the Coastdown Cheating Vehicles.

2092. Ford breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by Ford. Ford has not repaired or adjusted, and has been unable to repair or adjust, the Coastdown Cheating Vehicles' materials and workmanship defects.

2093. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

2094. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Minnesota Plaintiff and the Minnesota Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

2095. Accordingly, recovery by the Minnesota Plaintiff and the Minnesota Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Minnesota Plaintiff, individually and on behalf of the other Minnesota Subclass members, seek all remedies as allowed by law.

2096. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Minnesota

Plaintiff and the Minnesota Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

2097. Moreover, many of the injuries flowing from the Coastdown Cheating Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as many incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Minnesota Plaintiff's and the other Minnesota Subclass members' remedies would be insufficient to make Minnesota Plaintiff and the other Minnesota Subclass members whole.

2098. Finally, due to Ford's breach of warranty as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy, for a revocation of acceptance of the goods, and for a return to Minnesota Plaintiff and the Minnesota Subclass members of the purchase price of all Coastdown Cheating Vehicles currently owned and for such other incidental and consequential damages as allowed.

2099. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

2100. As a direct and proximate result of Ford's breach of express warranties, Minnesota Plaintiff and the Minnesota Subclass have been damaged in an amount to be determined at trial.

## COUNT 140

## FRAUDULENT CONCEALMENT
## (BASED ON MINNESOTA LAW)

2101. Minnesota Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2102. This claim is brought by Minnesota Plaintiff on behalf of the Minnesota Subclass.

2103. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Minnesota Plaintiff and the Minnesota Subclass information that is highly relevant to their purchasing decision.

2104. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

2105. Ford further affirmatively misrepresented to Minnesota Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

2106. Ford knew these representations were false when made.

2107. The Coastdown Cheating Vehicles purchased or leased by Minnesota Plaintiff and the Minnesota Subclass were, in fact, defective, with reduced fuel efficiency.

2108. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Minnesota Plaintiff and the Minnesota Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

2109. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

2110. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Minnesota Plaintiffs and the Minnesota Subclass did not know of these facts and Ford actively concealed these facts from Minnesota Plaintiff and the Minnesota Subclass.

2111. Minnesota Plaintiff and the Minnesota Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Minnesota Plaintiff and the Minnesota Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Minnesota Plaintiff and the Minnesota Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

2112. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Minnesota Plaintiff and the Minnesota Subclass placed in its representations.

2113. Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Minnesota Plaintiff and the Minnesota Subclass

members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

2114. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Minnesota Plaintiff and the Minnesota Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Minnesota Plaintiff and the Minnesota Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Minnesota Plaintiff and the Minnesota Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Minnesota Plaintiff and the Minnesota Subclass

members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

2115. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Minnesota Plaintiff and the Minnesota Subclass.

2116. Ford has still not made full and adequate disclosures and continues to defraud Minnesota Plaintiff and the Minnesota Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

2117. Minnesota Plaintiff and the Minnesota Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Minnesota Plaintiff's and the Minnesota Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Minnesota Plaintiff, or, Minnesota Subclass members.

2118. Because of the concealment and/or suppression of the facts, Minnesota Plaintiff and the Minnesota Subclass have sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Minnesota Plaintiff and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

2119. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Minnesota Plaintiff and the Minnesota Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2120. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Minnesota Plaintiff's and the Minnesota Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 141

## NEGLIGENT MISREPRESENTATION
### (BASED ON MINNESOTA LAW)

2121. Minnesota Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

2122. This claim is brought by the Minnesota Plaintiff on behalf of the Minnesota Subclass.

2123. Defendant made fuel economy representations to Minnesota Plaintiff and members of the Class that were not true.

2124. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Minnesota Plaintiff and Minnesota Subclass members rely on these misrepresentations.

2125. Minnesota Plaintiff reasonably relied on Defendant's representations and as a result Minnesota Plaintiff and Minnesota Subclass members were harmed.

## COUNT 142

### UNJUST ENRICHMENT
### (BASED ON MINNESOTA LAW)

2126. Minnesota Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

2127. This claim is brought by the Minnesota Plaintiff on behalf of the Minnesota Subclass.

2128. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Minnesota Plaintiff and the Minnesota Subclass.

2129. Defendant enjoyed the benefit of increased financial gains, to the detriment of Minnesota Plaintiff and other Minnesota Subclass members. It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

2130. Minnesota Plaintiff, therefore, seeks any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Minnesota Subclass.

## X. Claims brought on behalf of the Mississippi Subclass

### COUNT 143

### VIOLATION OF THE MISSISSIPPI CONSUMER PROTECTION ACT (MISS. CODE. ANN. § 75-24-1 *ET SEQ.*)

2131. Mississippi Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

2132. This claim is brought by Mississippi Plaintiffs on behalf of the Mississippi Subclass.

2133. The Mississippi Consumer Protection Act (Mississippi CPA) prohibits "unfair or deceptive trade practices in or affecting commerce." MISS. CODE ANN. § 75-24-5(1). Unfair or deceptive practices include but are not limited to "(e) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have"; "(g) Representing that goods or services are of a particular standard, quality, or grade, or

- 526 -

that goods are of a particular style or model, if they are of another"; and "(i) Advertising goods or services with intent not to sell them as advertised and certified." Miss. Code Ann. § 75-24-5(2).

2134. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

2135. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

2136. Ford's unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including Mississippi Plaintiffs and the Mississippi Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

2137. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Mississippi Plaintiffs and the Mississippi Subclass.

2138. Ford knew or should have known that its conduct violated the Mississippi CPA.

2139. Ford owed Mississippi Plaintiffs and the Mississippi Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

<blockquote>

a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

b.    Intentionally concealed the foregoing from Mississippi Plaintiffs and the Mississippi Subclass; and/or

c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Mississippi Plaintiffs and the Mississippi Subclass that contradicted these representations.

</blockquote>

2140. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Mississippi Plaintiffs and the Mississippi Subclass.

2141. Mississippi Plaintiffs and the Mississippi Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and

failure to disclose material information. Mississippi Plaintiffs and the Mississippi Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Mississippi CPA.

2142. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Mississippi CPA.

2143. As a direct and proximate result of Ford's violations of the Mississippi CPA, Mississippi Plaintiffs and the Mississippi Subclass have suffered injury-in-fact and/or actual damage.

2144. Ford's violations present a continuing risk to Mississippi Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

2145. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

2146. Mississippi Plaintiffs seek actual damages in an amount to be determined at trial and any other just and proper relief available under the Mississippi CPA.

2147. Mississippi Plaintiffs seek punitive damages based on the outrageousness and recklessness of Ford's conduct.

2148. Mississippi Plaintiffs have provided Ford with pre-suit notice.

### COUNT 144

### BREACH OF CONTRACT
### (BASED ON MISSISSIPPI LAW)

2149. Mississippi Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2150. This claim is brought by Mississippi Plaintiffs on behalf of the Mississippi Subclass.

2151. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Mississippi Plaintiffs and the Mississippi Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Mississippi Plaintiffs and the Mississippi Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Mississippi Plaintiffs and the Mississippi Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

2152. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Mississippi Plaintiffs and the Mississippi Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

2153. As a direct and proximate result of Ford's breach of contract, Mississippi Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 145

### BREACH OF EXPRESS WARRANTY
### (MISS. CODE § 75-2-313 AND MISS. CODE § 75-2A-210)

2154. Mississippi Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2155. This claim is brought by Mississippi Plaintiffs on behalf of the Mississippi Subclass.

2156. Ford is and was at all relevant times a merchant with respect to motor vehicles.

2157. With respect to leases, Ford is and was at all relevant times a "lessor" with respect to motor vehicles.

2158. The Coastdown Cheating Vehicles are and were at all relevant times "goods."

2159. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

2160. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

2161. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

2162. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles

achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

2163. These affirmations and promises were part of the basis of the bargain that was reached when Mississippi Plaintiffs and the other Mississippi Subclass members purchased or leased the Coastdown Cheating Vehicles.

2164. Mississippi Plaintiffs and the Mississippi Subclass members experienced defects within the warranty period.  Despite the existence of warranties, Ford failed to inform Mississippi Plaintiffs and the Mississippi Subclass members that the Coastdown Cheating Vehicles were defectively designed, and failed to fix the defectively designed Coastdown Cheating Vehicles free of charge.

2165. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings.  Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

2166. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

2167. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is

insufficient to make Mississippi Plaintiffs and the Mississippi Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

2168. Accordingly, recovery by the Mississippi Plaintiffs and the Mississippi Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Mississippi Plaintiffs, individually and on behalf of the other Mississippi Subclass members, seek all remedies as allowed by law.

2169. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Mississippi Plaintiffs and the Mississippi Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

2170. Moreover, many of the injuries flowing from the Coastdown Cheating Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as many incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Mississippi Plaintiffs' and the other Mississippi Subclass

members' remedies would be insufficient to make Mississippi Plaintiff and the other

Mississippi Subclass members whole.

2171. Plaintiffs provided notice of Ford's breach via certified mail as early as

May 6, 2019. Furthermore, Ford has been provided notice of this breach through this

litigation and other complaints filed against it, as well as its internal knowledge of

the inaccurate coastdown testing.

2172. As a direct and proximate result of Ford's breach of express warranties,

Mississippi Plaintiffs and the Mississippi Subclass have been damaged in an amount

to be determined at trial.

## COUNT 146

### FRAUDULENT CONCEALMENT
### (BASED ON MISSISSIPPI LAW)

2173. Mississippi Plaintiffs incorporate by reference all paragraphs as though

fully set forth herein.

2174. This claim is brought by Mississippi Plaintiffs on behalf of the

Mississippi Subclass.

2175. Ford concealed the fact that the Coastdown Cheating Vehicles do not

provide the fuel efficiency that was advertised and certified, and their mileage is far

worse than a reasonable consumer would expect given the premium paid for these

vehicles and the representation made by Ford, and Ford acted with reckless disregard

for the truth and denied Mississippi Plaintiffs and the Mississippi Subclass information that is highly relevant and material to their purchasing decision.

2176. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

2177. Ford further affirmatively misrepresented to Mississippi Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

2178. Ford knew these representations were false when made.

2179. The Coastdown Cheating Vehicles purchased or leased by Mississippi Plaintiffs and the Mississippi Subclass were, in fact, defective, with reduced fuel efficiency.

2180. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Mississippi Plaintiffs and the Mississippi Subclass relied on Ford's material representations or omissions of fact

that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

2181. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

2182. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Mississippi Plaintiffs and the Mississippi Subclass did not know of these facts and Ford actively concealed these facts from Mississippi Plaintiffs and the Mississippi Subclass.

2183. Mississippi Plaintiffs and the Mississippi Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Mississippi Plaintiffs and the Mississippi Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Mississippi Plaintiffs and the Mississippi Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

2184. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and

sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Mississippi Plaintiffs and the Mississippi Subclass placed in its representations.

2185. Ford's false representations and omissions were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Mississippi Plaintiffs and the Mississippi Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

2186. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Mississippi Plaintiffs and the Mississippi Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth

above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Mississippi Plaintiffs and the Mississippi Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Mississippi Plaintiffs and the Mississippi Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Mississippi Plaintiffs and the Mississippi Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

2187. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Mississippi Plaintiffs and the Mississippi Subclass.

2188. Ford has still not made full and adequate disclosures and continues to defraud Mississippi Plaintiffs and the Mississippi Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

2189. Mississippi Plaintiffs and the Mississippi Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Mississippi Plaintiffs' and the Mississippi Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Mississippi Plaintiffs, or Mississippi Subclass members.

2190. Because of the concealment and/or suppression of the facts, Mississippi Plaintiffs and the Mississippi Subclass have been injured and sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Mississippi Plaintiffs and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

2191. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Mississippi Plaintiffs and the Mississippi Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all

compensatory damages, incidental and consequential damages, and other damages allowed by law.

2192. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Mississippi Plaintiffs' and the Mississippi Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 147

### NEGLIGENT MISREPRESENTATION
### (BASED ON MISSISSIPPI LAW)

2193. Mississippi Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2194. This claim is brought by the Mississippi Plaintiffs on behalf of the Mississippi Subclass.

2195. Defendant made fuel economy representations to Mississippi Plaintiffs and members of the Class that were not true.

2196. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Mississippi Plaintiffs and Mississippi Subclass members rely on these misrepresentations.

2197. Mississippi Plaintiffs reasonably relied on Defendant's representations and as a result Mississippi Plaintiffs and Mississippi Subclass members were harmed.

## COUNT 148

## UNJUST ENRICHMENT
## (BASED ON MISSISSIPPI LAW)

2198. Mississippi Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2199. This claim is brought by the Mississippi Plaintiffs on behalf of the Mississippi Subclass.

2200. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Mississippi Plaintiffs and the Mississippi Subclass.

2201. Defendant enjoyed the benefit of increased financial gains, to the detriment of Mississippi Plaintiffs and other Mississippi Subclass members. It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

2202. Mississippi Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Mississippi Subclass.

**Y.    Claims Brought on Behalf of the Missouri Subclass**

### COUNT 149

### VIOLATION OF THE MISSOURI
### MERCHANDISING PRACTICES ACT
### (MO. REV. STAT. § 407.010, *ET SEQ.*)

2203. Plaintiffs Josh Brumbaugh and Darren Honeycutt ("Missouri Plaintiffs") incorporate by reference all paragraphs as though fully set forth herein.

2204. This claim is brought by the Missouri Plaintiffs on behalf of the Missouri Subclass.

2205. Ford, Missouri Plaintiffs and the Missouri Subclass are "persons" within the meaning of MO. REV. STAT. § 407.010(5).

2206. Ford engaged in "trade" or "commerce" in the State of Missouri within the meaning of MO. REV. STAT. § 407.010(7).

2207. The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." MO. REV. STAT. § 407.020.

2208. In the course of Ford's business, it willfully failed to disclose and actively concealed the true mileage of the Coastdown Cheating Vehicles, which is less than a reasonable consumer would expect in light of Ford's advertising

campaign. Accordingly, Ford used or employed deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce, in violation of the Missouri MPA. Ford's conduct offends public policy; is unethical, oppressive, or unscrupulous; and presents a risk of, or causes, substantial injury to consumers.

2209. In the course of business, Ford willfully failed to disclose and actively concealed the conduct discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, and/or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Coastdown Cheating Vehicles.

2210. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Missouri Plaintiffs and the Missouri Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

2211. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Missouri Plaintiffs and the Missouri Subclass.

2212. Ford knew or should have known that their conduct violated the Missouri MPA.

2213. Ford owed Missouri Plaintiffs and the Missouri Subclass members a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

  a.   Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

  b.   Intentionally concealed the foregoing from Missouri Plaintiffs and the Missouri Subclass; and/or

  c.   Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Missouri Plaintiffs and the Missouri Subclass that contradicted these representations.

2214. Because Ford fraudulently concealed the lower mileage of the Coastdown Cheating Vehicles, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to the Coastdown Cheating Vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

2215. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Plaintiffs and the Missouri Class.

2216. Missouri Plaintiffs and the Missouri Subclass suffered ascertainable loss caused by Ford's misrepresentations and their concealment of and failure to disclose material information. Class members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Missouri MPA.

2217. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Missouri MPA. All owners of Coastdown Cheating Vehicles suffered ascertainable loss in the form of the diminished value of their vehicle as a result of Ford's deceptive and unfair acts and practices made in the course of Ford's business.

2218. Ford's violations present a continuing risk to Missouri Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

2219. As a direct and proximate result of Ford's violations of the Missouri MPA, Missouri Plaintiffs and the Missouri Subclass have suffered injury-in-fact and/or actual damage.

2220. Ford is liable to Missouri Plaintiffs and the Missouri Subclass for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining FCA's unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

2221. Plaintiffs also seek punitive damages because Ford engaged in aggravated and outrageous conduct.

2222. On July 22, 2019, a copy of the complaint, *Brewer, et. al. v. Ford Motor Company*, No. 19-12135-SJM-RSW, (E.D. Mich. Jul. 22, 2019), now transferred into this MDL, was mailed to the Attorney General of the State of Missouri in accordance with Mo. Ann. Stat. § 407.010, *et seq*.

## COUNT 150

## BREACH OF CONTRACT
## (BASED ON MISSOURI LAW)

2223. Missouri Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2224. This claim is brought by Missouri Plaintiffs on behalf of the Missouri Subclass.

2225. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Missouri Plaintiffs and the Missouri Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those

misrepresentations and omissions, Missouri Plaintiffs and the Missouri Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Missouri Plaintiffs and the Missouri Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

2226. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Missouri Plaintiffs and the Missouri Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

2227. As a direct and proximate result of Ford's breach of contract, Missouri Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 151

## BREACH OF EXPRESS WARRANTY
## (MO. STAT. § 400.2-313, AND § 400.2A-210)

2228. Missouri Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2229. This claim is brought by Missouri Plaintiffs on behalf of the Missouri Subclass.

2230. Ford is and was at all relevant times a merchant with respect to motor vehicles under Mo. Stat. § 400.2-104(1) and a "seller" of motor vehicles under § 400.2-313.

2231. With respect to leases, Ford is and was at all relevant times a "lessor" with respect to motor vehicles under Mo. Stat. § 400.2A-103(1)(p) and § 400.2A-210.

2232. The Coastdown Cheating Vehicles are and were at all relevant times "goods" within the meaning of Mo. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

2233. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the

shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

2234. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

2235. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

2236. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

2237. These affirmations and promises were part of the basis of the bargain that was reached when Missouri Plaintiffs and the other Missouri Subclass members purchased or leased the Coastdown Cheating Vehicles.

2238. Missouri Plaintiffs and the Missouri Subclass members experienced defects within the warranty period. Despite the existence of warranties, Ford failed to inform Missouri Plaintiffs and the Missouri Subclass members that the Coastdown Cheating Vehicles were defectively designed, and failed to fix the defectively designed Coastdown Cheating Vehicles free of charge.

2239. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

2240. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

2241. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Missouri Plaintiffs and the Missouri Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

2242. Accordingly, recovery by the Missouri Plaintiffs and the Missouri Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Missouri Plaintiffs, individually and on behalf of the other Missouri Subclass members, seek all remedies as allowed by law.

2243. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently

concealed material facts regarding the Coastdown Cheating Vehicles. Missouri Plaintiffs and the Missouri Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

2244. Moreover, many of the injuries flowing from the Coastdown Cheating Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as many incidental and consequential damages have already been suffered due to Ford's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Missouri Plaintiffs' and the other Missouri Subclass members' remedies would be insufficient to make Missouri Plaintiff and the other Missouri Subclass members whole.

2245. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

2246. As a direct and proximate result of Ford's breach of express warranties, Missouri Plaintiffs and the Missouri Subclass have been damaged in an amount to be determined at trial.

## COUNT 152

## FRAUDULENT CONCEALMENT
## (BASED ON MISSOURI LAW)

2247. Missouri Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2248. This claim is brought by Missouri Plaintiffs on behalf of the Missouri Subclass.

2249. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Missouri Plaintiffs and the Missouri Subclass information that is highly relevant to their purchasing decision.

2250. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

2251. Ford further affirmatively misrepresented to Missouri Plaintiffs in advertising and other forms of communication, including standard and uniform

material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

2252. Ford knew these representations were false when made.

2253. The Coastdown Cheating Vehicles purchased or leased by Missouri Plaintiffs and the Missouri Subclass were, in fact, defective, with reduced fuel efficiency.

2254. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Missouri Plaintiffs and the Missouri Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

2255. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

2256. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Missouri Plaintiffs and the Missouri Subclass

did not know of these facts and Ford actively concealed these facts from Missouri Plaintiffs and the Missouri Subclass.

2257. Missouri Plaintiffs and the Missouri Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Missouri Plaintiffs and the Missouri Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Missouri Plaintiffs and the Missouri Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

2258. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Missouri Plaintiffs and the Missouri Subclass placed in its representations.

2259. Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Missouri Plaintiffs and the Missouri Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

2260. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Missouri Plaintiffs and the Missouri Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles. Having volunteered to provide information to Missouri Plaintiffs and the Missouri Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Missouri Plaintiffs and the Missouri Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Missouri Plaintiffs and the Missouri Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact

the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

2261. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Missouri Plaintiffs and the Missouri Subclass.

2262. Ford has still not made full and adequate disclosures and continues to defraud Missouri Plaintiffs and the Missouri Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

2263. Missouri Plaintiffs and the Missouri Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Missouri Plaintiffs' and the Missouri Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Missouri Plaintiffs, or, Missouri Subclass members.

2264. Because of the concealment and/or suppression of the facts, Missouri Plaintiffs and the Missouri Subclass have sustained damage because they overpaid

for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Missouri Plaintiffs and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

2265. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Missouri Plaintiffs and the Missouri Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2266. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Missouri Plaintiffs' and the Missouri Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 153

## NEGLIGENT MISREPRESENTATION
## (BASED ON MISSOURI LAW)

2267. Missouri Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2268. This claim is brought by the Missouri Plaintiffs on behalf of the Missouri Subclass.

2269. Defendant made fuel economy representations to Missouri Plaintiffs and members of the Class that were not true.

2270. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Missouri Plaintiffs and Missouri Subclass members rely on these misrepresentations.

2271. Missouri Plaintiffs reasonably relied on Defendant's representations and as a result Missouri Plaintiffs and Missouri Subclass members were harmed.

## COUNT 154

### UNJUST ENRICHMENT
### (BASED ON MISSOURI LAW)

2272. Missouri Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2273. This claim is brought by the Missouri Plaintiffs on behalf of the Missouri Subclass.

2274. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Missouri Plaintiffs and the Missouri Subclass.

2275. Defendant enjoyed the benefit of increased financial gains, to the detriment of Missouri Plaintiffs and other Missouri Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

2276. Missouri Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Missouri Subclass.

## Z.    Claims Brought on Behalf of the Montana Subclass

### COUNT 155

### VIOLATION OF THE MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT OF 1973 (MONT. CODE ANN. § 30-14-101 *et seq.*)

2277. Montana Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

2278. This claim is brought by Montana Plaintiff on behalf of the Montana Subclass.

2279. The Montana Unfair Trade Practices and Consumer Protection Act ("Montana CPA") makes unlawful any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." MONT. CODE ANN. § 30-14-103.

2280. Ford, Montana Plaintiff, and Montana Subclass members are "persons" within the meaning of MONT. CODE ANN. § 30-14-102(6).

2281. Montana Plaintiff and Montana Subclass members are "consumer[s]" under MONT. CODE ANN. § 30-14-102(1).

2282. The sale or lease of each Coastdown Cheating Vehicle at issue occurred within "trade and commerce" within the meaning of MONT. CODE ANN. § 30-14-102(8), and Ford committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

2283. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

2284. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Montana Plaintiff and the Montana Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

2285. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Montana Plaintiff and the Montana Subclass.

2286. Ford knew or should have known that its conduct violated the Montana CPA.

2287. Ford owed Montana Plaintiff and the Montana Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

- a. Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

- b. Intentionally concealed the foregoing from Montana Plaintiff and the Montana Subclass; and/or

- c. Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Montana Plaintiff and the Montana Subclass that contradicted these representations.

2288. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Montana Plaintiff and the Montana Subclass.

2289. Montana Plaintiff and the Montana Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose

material information. Montana Plaintiff and the Montana Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Montana CPA.

2290. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Montana CPA. As a direct and proximate result of Ford's violations of the Montana CPA, Montana Plaintiff and the Montana Subclass have suffered injury-in-fact and/or actual damage.

2291. Ford's violations present a continuing risk to Montana Plaintiff as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

2292. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

2293. Plaintiffs additionally seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, and any other relief the Court considers necessary or proper, under MONT. CODE ANN. § 30-14-133.

2294. Plaintiffs also seek punitive damages because Ford engaged in aggravated and outrageous conduct.

## COUNT 156

## BREACH OF CONTRACT
## (BASED ON MONTANA LAW)

2295. Montana Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2296. This claim is brought by Montana Plaintiff on behalf of the Montana Subclass.

2297. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Montana Plaintiff and the Montana Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Montana Plaintiff and the Montana Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Montana Plaintiff and the Montana Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

2298. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Montana Plaintiff and the Montana Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

2299. As a direct and proximate result of Ford's breach of contract, Montana Plaintiff and the Montana Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 157

### BREACH OF EXPRESS WARRANTY
### (MONT. CODE ANN. § 30-2-313)

2300. Montana Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2301. This claim is brought by Montana Plaintiff on behalf of the Montana Subclass.

2302. Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to Mont. Code Ann. § 30-2-104.

2303. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

2304. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

2305. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

2306. These affirmations and promises were part of the basis of the bargain that was reached when Montana Plaintiff and the other Montana Subclass members purchased or leased the Coastdown Cheating Vehicles.

2307. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is

unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

2308. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

2309. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Montana Plaintiff and the Montana Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

2310. Accordingly, recovery by the Montana Plaintiff and the Montana Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Montana Plaintiff, individually and on behalf of the other Montana Subclass members, seek all remedies as allowed by law.

2311. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Montana Plaintiff and the Montana Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

2312. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

2313. As a direct and proximate result of Ford's breach of express warranties, Montana Plaintiff and the Montana Subclass have been damaged in an amount to be determined at trial.

## COUNT 158

## FRAUDULENT CONCEALMENT
## (BASED ON MONTANA LAW)

2314. Montana Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2315. This claim is brought by Montana Plaintiff on behalf of the Montana Subclass.

2316. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Montana Plaintiff and the Montana Subclass information that is highly relevant to their purchasing decision.

2317. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

2318. Ford further affirmatively misrepresented to Montana Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

2319. Ford knew these representations were false when made.

2320. The Coastdown Cheating Vehicles purchased or leased by Montana Plaintiff and the Montana Subclass were, in fact, defective, with reduced fuel efficiency.

2321. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Montana Plaintiff and the Montana Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

2322. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

2323. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Montana Plaintiffs and the Montana Subclass did not know of these facts and Ford actively concealed these facts from Montana Plaintiff and the Montana Subclass.

2324. Montana Plaintiff and the Montana Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Montana Plaintiff and the Montana Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Montana Plaintiff and the Montana Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

2325. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized

profits and sales above the trust that Montana Plaintiff and the Montana Subclass placed in its representations.

2326. Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Montana Plaintiff and the Montana Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

2327. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Montana Plaintiff and the Montana Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Montana Plaintiff and the Montana Subclass members, Ford had the

duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Montana Plaintiff and the Montana Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Montana Plaintiff and the Montana Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

2328. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Montana Plaintiff and the Montana Subclass.

2329. Ford has still not made full and adequate disclosures and continues to defraud Montana Plaintiff and the Montana Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

2330. Montana Plaintiff and the Montana Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not

have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Montana Plaintiff's and the Montana Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Montana Plaintiff, or, Montana Subclass members.

2331. Because of the concealment and/or suppression of the facts, Montana Plaintiff and the Montana Subclass have sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Montana Plaintiff and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

2332. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Montana Plaintiff and the Montana Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2333. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Montana Plaintiff's and the Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an

amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 159

### NEGLIGENT MISREPRESENTATION
### (BASED ON MONTANA LAW)

2334. Montana Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

2335. This claim is brought by the Montana Plaintiff on behalf of the Montana Subclass.

2336. Defendant made fuel economy representations to Montana Plaintiff and members of the Class that were not true.

2337. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Montana Plaintiff and Montana Subclass members rely on these misrepresentations.

2338. Montana Plaintiff reasonably relied on Defendant's representations and as a result Montana Plaintiff and Montana Subclass members were harmed.

## COUNT 160

### UNJUST ENRICHMENT
### (BASED ON MONTANA LAW)

2339. Montana Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

2340. This claim is brought by the Montana Plaintiff on behalf of the Montana Subclass.

2341. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Montana Plaintiff and the Montana Subclass.

2342. Defendant enjoyed the benefit of increased financial gains, to the detriment of Montana Plaintiff and other Montana Subclass members. It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

2343. Montana Plaintiff, therefore, seeks any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Montana Subclass.

## AA. Claims Brought on Behalf of the Nebraska Subclass

### COUNT 161

### VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT (NEB. REV. STAT. § 59-1601 *et seq.*)

2344. Plaintiff Scott Whitehill ("Nebraska Plaintiff") hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

2345. This claim is brought by Nebraska Plaintiff on behalf of the Nebraska Subclass.

2346. The Nebraska Consumer Protection Act ("Nebraska CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." NEB. REV. STAT. § 59-1602.

2347. Ford, Nebraska Plaintiff, and Nebraska Subclass members are "person[s]" under NEB. REV. STAT. § 59-1601(1).

2348. Ford's actions as set forth herein occurred in the conduct of trade or commerce as defined under NEB. REV. STAT. § 59-1601(2).

2349. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

2350. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Nebraska Plaintiff and the Nebraska Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel

economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

2351. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Nebraska Plaintiff and the Nebraska Subclass.

2352. Ford knew or should have known that its conduct violated the Nebraska CPA.

2353. Ford owed Nebraska Plaintiff and the Nebraska Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

> a. Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

> b. Intentionally concealed the foregoing from Nebraska Plaintiff and the Nebraska Subclass; and/or

> c. Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Nebraska Plaintiff and the Nebraska Subclass that contradicted these representations.

2354. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Nebraska Plaintiff and the Nebraska Subclass.

2355. Nebraska Plaintiff and the Nebraska Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Nebraska Plaintiff and the Nebraska Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Nebraska CPA.

2356. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Nebraska CPA. As a direct and proximate result of Ford's violations of the Nebraska CPA, Nebraska Plaintiff and the Nebraska Subclass have suffered injury-in-fact and/or actual damage.

2357. Ford's violations present a continuing risk to Nebraska Plaintiff as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

2358. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

2359. Because Ford's conduct caused injury to Nebraska Plaintiff's property through violations of the Nebraska CPA, Nebraska Plaintiff seeks recovery of actual

damages as well as enhanced damages up to $1,000, an order enjoining Ford's unfair or deceptive acts and practices, costs of Court, reasonable attorneys' fees, and any other just and proper relief available under NEB. REV. STAT. § 59-1609.

2360. Plaintiffs also seek punitive damages because Ford engaged in aggravated and outrageous conduct.

## COUNT 162

## BREACH OF CONTRACT
## (BASED ON NEBRASKA LAW)

2361. Nebraska Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2362. This claim is brought by the Nebraska Plaintiff on behalf of Nebraska purchasers who are members of the Class.

2363. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Nebraska Plaintiff and the Nebraska Subclass members to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Nebraska Plaintiff and the Nebraska Subclass members would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Nebraska

Plaintiff and the Nebraska Subclass members overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

2364. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Nebraska Plaintiff and the Nebraska Subclass Class members defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

2365. As a direct and proximate result of Ford's breach of contract Nebraska Plaintiff and the Nebraska Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 163

### BREACH OF EXPRESS WARRANTY
### (NEB. REV. STAT. (U.C.C.) § 2-313)

2366. Nebraska Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2367. This claim is brought by Nebraska Plaintiff on behalf of the Nebraska Subclass.

2368. Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to Neb. Rev. Stat. (U.C.C.) § 2-104.

2369. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

2370. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

2371. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

2372. These affirmations and promises were part of the basis of the bargain that was reached when Nebraska Plaintiff and the other Nebraska Subclass members purchased or leased the Coastdown Cheating Vehicles.

2373. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that

produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

2374. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

2375. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Nebraska Plaintiff and the Nebraska Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

2376. Accordingly, recovery by the Nebraska Plaintiff and the Nebraska Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Nebraska Plaintiff, individually and on behalf of the other Nebraska Subclass members, seek all remedies as allowed by law.

2377. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Nebraska

Plaintiff and the Nebraska Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

2378. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

2379. As a direct and proximate result of Ford's breach of express warranties, Nebraska Plaintiff and the Nebraska Subclass have been damaged in an amount to be determined at trial.

## COUNT 164

## FRAUDULENT CONCEALMENT
## (BASED ON NEBRASKA LAW)

2380. Nebraska Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

2381. This claim is brought by Nebraska Plaintiff on behalf of the Nebraska Subclass.

2382. Ford intentionally concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted

with reckless disregard for the truth and denied Nebraska Plaintiff and the Nebraska Subclass members information that is highly relevant to their purchasing decision.

2383. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

2384. Ford further affirmatively misrepresented to Nebraska Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

2385. Ford knew these representations were false when made.

2386. The Coastdown Cheating Vehicles purchased or leased by Nebraska Plaintiff and the Nebraska Subclass were, in fact, defective, with reduced fuel efficiency.

2387. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Nebraska Plaintiff and the Nebraska Subclass members relied on Ford's material representations or omissions

of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

2388. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

2389. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Nebraska Plaintiff and the Nebraska Subclass members did not know of these facts and Ford actively concealed these facts from Nebraska Plaintiff and the Nebraska Subclass members.

2390. Nebraska Plaintiff and the Nebraska Subclass members reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Nebraska Plaintiff and the Nebraska Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Nebraska Plaintiff and the Nebraska Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

2391. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and

sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Nebraska Plaintiff and the Nebraska Subclass members placed in its representations.

2392. Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Nebraska Plaintiff and the Nebraska Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

2393. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Nebraska Plaintiff or the Nebraska Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth

above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Nebraska Plaintiff and the Nebraska Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Nebraska Plaintiff and the Nebraska Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Nebraska Plaintiff and the Nebraska Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

2394. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Nebraska Plaintiff and the Nebraska Subclass members.

2395. Ford has still not made full and adequate disclosures and continues to defraud Nebraska Plaintiff and the Nebraska Subclass members by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

2396. Nebraska Plaintiff and the Nebraska Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Nebraska Plaintiff's and the Nebraska Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Nebraska Plaintiff, or the Nebraska Subclass members.

2397. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Nebraska Plaintiff and the Nebraska Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2398. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Nebraska Plaintiff's and the Nebraska Subclass members' rights and the representations that Ford made to them were made in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 165

## NEGLIGENT MISREPRESENTATION
## (BASED ON NEBRASKA LAW)

2399. Nebraska Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

2400. This claim is brought by the Nebraska Plaintiff on behalf of the Nebraska Subclass.

2401. Defendant made fuel economy representations to Nebraska Plaintiff and members of the Class that were not true.

2402. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Nebraska Plaintiff and Nebraska Subclass members rely on these misrepresentations.

2403. Nebraska Plaintiff reasonably relied on Defendant's representations and as a result Nebraska Plaintiff and Nebraska Subclass members were harmed.

## COUNT 166

## UNJUST ENRICHMENT
## (BASED ON NEBRASKA LAW)

2404. Nebraska Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

2405. This claim is brought by the Nebraska Plaintiff on behalf of the Nebraska Subclass.

2406. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Nebraska Plaintiff and the Nebraska Subclass.

2407. Defendant enjoyed the benefit of increased financial gains, to the detriment of Nebraska Plaintiff and other Nebraska Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

2408. Nebraska Plaintiff, therefore, seeks any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Nebraska Subclass.

**BB.   Claims Brought on Behalf of the Nevada Subclass**

**COUNT 167**

**VIOLATION OF THE NEVADA
DECEPTIVE TRADE PRACTICES ACT
(NEV. REV. STAT. § 598.0903 *et seq.*)**

2409. Nevada Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

2410. This claim is brought by Nevada Plaintiff on behalf of the Nevada Subclass.

2411. The Nevada Deceptive Trade Practices Act ("Nevada DTPA") prohibits deceptive trade practices. NEV. REV. STAT. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or

occupation, the person "[k]nowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; "[r]epresents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model"; "[a]dvertises goods or services with intent not to sell or lease them as advertised and certified"; or "[k]nowingly makes any other false representation in a transaction." Nev. Rev. Stat. §§ 598.0915–598.0925.

2412. Ford engaged in deceptive trade practices that violated the Nevada DTPA when Ford knowingly failed to disclose that the Coastdown Cheating Vehicles did not have the advertised and certified fuel economy and that the fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

2413. Ford's actions as set forth above occurred in the conduct of trade or commerce.

2414. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy were far worse than a reasonable consumer would expect given the

premium paid for these vehicles over a comparable vehicle. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

2415. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Nevada Plaintiff and the Nevada Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

2416. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Nevada Plaintiff and the Nevada Subclass.

2417. Ford knew or should have known that its conduct violated the Nevada DTPA.

2418. Ford owed Nevada Plaintiff and the Nevada Subclass members a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

a.      Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

b.      Intentionally concealed the foregoing from Nevada Plaintiffs and the Nevada Subclass; and/or

c.      Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Nevada Plaintiff and the Nevada Subclass that contradicted these representations.

2419. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Nevada Plaintiff and the Nevada Subclass.

2420. Nevada Plaintiff and the Nevada Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Nevada Plaintiff and the Nevada Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Nevada DTPA.

2421. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Nevada DTPA. As a direct and proximate result of Ford's violations of the Nevada DTPA, Nevada Plaintiff and the Nevada Subclass have suffered injury-in-fact and/or actual damage.

2422. Ford's violations present a continuing risk to Nevada Plaintiff as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

2423. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

2424. Accordingly, Plaintiffs seek their actual damages, punitive damages, an order enjoining Ford's deceptive acts or practices, costs of Court, attorney's fees, and all other appropriate and available remedies under the Nevada DTPA. NEV. REV. STAT. § 41.600.

## COUNT 168

## BREACH OF CONTRACT
## (BASED ON NEVADA LAW)

2425. Nevada Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2426. This claim is brought by Nevada Plaintiff on behalf of the Nevada Subclass.

2427. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy

than advertised and certified, caused Nevada Plaintiff and the Nevada Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Nevada Plaintiff and the Nevada Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Nevada Plaintiff and the Nevada Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

2428. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Nevada Plaintiff and the Nevada Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

2429. As a direct and proximate result of Ford's breach of contract, Nevada Plaintiff and the Nevada Subclass have been damaged in an amount to be proven at

trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 169

### BREACH OF EXPRESS WARRANTY
### (NEV. REV. STAT. § 104.2313)

2430. Nevada Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2431. This claim is brought by Nevada Plaintiff on behalf of the Nevada Subclass.

2432. Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to Nev. Rev. Stat. § 104.2104.

2433. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

2434. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles

achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

2435. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

2436. These affirmations and promises were part of the basis of the bargain that was reached when Nevada Plaintiff and the other Nevada Subclass members purchased or leased the Coastdown Cheating Vehicles.

2437. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

2438. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

2439. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Nevada Plaintiff and the Nevada Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

2440.  Accordingly, recovery by the Nevada Plaintiff and the Nevada Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Nevada Plaintiff, individually and on behalf of the other Nevada Subclass members, seek all remedies as allowed by law.

2441. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Nevada Plaintiff and the Nevada Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

2442.  Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

2443.  As a direct and proximate result of Ford's breach of express warranties, Nevada Plaintiff and the Nevada Subclass have been damaged in an amount to be determined at trial.

## COUNT 170

## FRAUDULENT CONCEALMENT
## (BASED ON NEVADA LAW)

2444. Nevada Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2445. This claim is brought by Nevada Plaintiff on behalf of the Nevada Subclass.

2446. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Nevada Plaintiff and the Nevada Subclass information that is highly relevant to their purchasing decision.

2447. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

2448. Ford further affirmatively misrepresented to Nevada Plaintiff in advertising and other forms of communication, including standard and uniform

material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

2449. Ford knew these representations were false when made.

2450. The Coastdown Cheating Vehicles purchased or leased by Nevada Plaintiff and the Nevada Subclass were, in fact, defective, with reduced fuel efficiency.

2451. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Nevada Plaintiff and the Nevada Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

2452. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

2453. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Nevada Plaintiffs and the Nevada Subclass

did not know of these facts and Ford actively concealed these facts from Nevada Plaintiff and the Nevada Subclass.

2454. Nevada Plaintiff and the Nevada Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Nevada Plaintiff and the Nevada Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Nevada Plaintiff and the Nevada Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

2455. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Nevada Plaintiff and the Nevada Subclass placed in its representations.

2456. Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Nevada Plaintiff and the Nevada Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

2457. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Nevada Plaintiff and the Nevada Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Nevada Plaintiff and the Nevada Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Nevada Plaintiff and the Nevada Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Nevada Plaintiff and the Nevada Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the

Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

2458. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Nevada Plaintiff and the Nevada Subclass.

2459. Ford has still not made full and adequate disclosures and continues to defraud Nevada Plaintiff and the Nevada Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

2460. Nevada Plaintiff and the Nevada Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Nevada Plaintiff's and the Nevada Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Nevada Plaintiff, or, Nevada Subclass members.

2461. Because of the concealment and/or suppression of the facts, Nevada Plaintiff and the Nevada Subclass have sustained damage because they overpaid for

their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Nevada Plaintiff and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

2462. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Nevada Plaintiff and the Nevada Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2463. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Nevada Plaintiff's and the Nevada Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 171

### NEGLIGENT MISREPRESENTATION
### (BASED ON NEVADA LAW)

2464. Nevada Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

2465. This claim is brought by the Nevada Plaintiff on behalf of the Nevada Subclass.

2466. Defendant made fuel economy representations to Nevada Plaintiff and members of the Class that were not true.

2467. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Nevada Plaintiff and Nevada Subclass members rely on these misrepresentations.

2468. Nevada Plaintiff reasonably relied on Defendant's representations and as a result Nevada Plaintiff and Nevada Subclass members were harmed.

## COUNT 172

## UNJUST ENRICHMENT
## (BASED ON NEVADA LAW)

2469. Nevada Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

2470. This claim is brought by the Nevada Plaintiff on behalf of the Nevada Subclass.

2471. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Nevada Plaintiff and the Nevada Subclass.

2472. Defendant enjoyed the benefit of increased financial gains, to the detriment of Nevada Plaintiff and other Nevada Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

2473. Nevada Plaintiff, therefore, seeks any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Nevada Subclass.

## CC.   Claims brought on behalf of the New Hampshire Subclass

### COUNT 173

### VIOLATION OF THE NEW HAMPSHIRE CONSUMER PROTECTION ACT (N.H. REV. STAT. ANN. § 358-A:1 *et seq.*)

2474. New Hampshire Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

2475. This claim is brought by New Hampshire Plaintiffs on behalf of the New Hampshire Subclass.

2476. Ford, New Hampshire Plaintiffs, and New Hampshire Subclass members are "persons" under N.H. REV. STAT. ANN. § 358-A:1.

2477. Ford's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. REV. STAT. ANN. § 358-A:1.

2478. The New Hampshire Consumer Protection Act (New Hampshire CPA) prohibits a person, in the conduct of any trade or commerce, from "using any unfair

or deceptive act or practice," including "but . . . not limited to, the following: . . . [r]epresenting that goods or services have . . . characteristics, . . . uses, benefits, or quantities that they do not have"; "[r]epresenting that goods or services are of a particular standard, quality, or grade, . . . if they are of another"; and "[a]dvertising goods or services with intent not to sell them as advertised and certified." N.H. REV. STAT. § 358-A:2.

2479. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

2480. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

2481. Ford's unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including New Hampshire Plaintiffs and the New Hampshire Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to

its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

2482. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead New Hampshire Plaintiffs and the New Hampshire Subclass.

2483. Ford knew or should have known that its conduct violated the New Hampshire CPA.

2484. Ford owed New Hampshire Plaintiffs and the New Hampshire Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

      a.     Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

      b.     Intentionally concealed the foregoing from New Hampshire Plaintiffs and the New Hampshire Subclass; and/or

      c.     Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from New Hampshire Plaintiffs and the New Hampshire Subclass that contradicted these representations.

2485. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to New Hampshire Plaintiffs and the New Hampshire Subclass.

2486. New Hampshire Plaintiffs and the New Hampshire Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. New Hampshire Plaintiffs and the New Hampshire Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the New Hampshire CPA.

2487. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the New Hampshire CPA.

2488. As a direct and proximate result of Ford's violations of the New Hampshire CPA, New Hampshire Plaintiffs and the New Hampshire Subclass have suffered injury-in-fact and/or actual damage.

2489. Ford's violations present a continuing risk to New Hampshire Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

2490. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

2491. Because Ford's willful conduct caused injury to Plaintiffs' property through violations of the New Hampshire CPA, Plaintiff seeks recovery of actual damages or $1,000, whichever is greater; treble damages; costs and reasonable attorneys' fees; an order enjoining Ford's unfair and/or deceptive acts and practices; and any other just and proper relief under N.H. REV. STAT. ANN. § 358-A:10.

2492. New Hampshire Plaintiffs seek punitive damages based on the outrageousness and recklessness of Ford's conduct.

## COUNT 174

### BREACH OF CONTRACT
### (BASED ON NEW HAMPSHIRE LAW)

2493. New Hampshire Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2494. This claim is brought by New Hampshire Plaintiffs on behalf of the New Hampshire Subclass.

2495. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused New Hampshire Plaintiffs and the New Hampshire Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, New Hampshire Plaintiffs and the New Hampshire Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown

Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, New Hampshire Plaintiffs and the New Hampshire Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

2496. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to New Hampshire Plaintiffs and the New Hampshire Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

2497. As a direct and proximate result of Ford's breach of contract, New Hampshire Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 175

### BREACH OF EXPRESS WARRANTY
### (N.H. REV. STAT. ANN. 382-A:2-313)

2498. New Hampshire Plaintiffs incorporates by reference all paragraphs as though fully set forth herein.

2499. This claim is brought by New Hampshire Plaintiffs on behalf of the New Hampshire Subclass.

2500. Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to N.H. Rev. Stat. Ann. 382-A:2-104.

2501. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

2502. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

2503. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

2504. These affirmations and promises were part of the basis of the bargain that was reached when New Hampshire Plaintiffs and the other New Hampshire Subclass members purchased or leased the Coastdown Cheating Vehicles.

2505. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

2506. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

2507. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make New Hampshire Plaintiffs and the New Hampshire Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

2508. Accordingly, recovery by the New Hampshire Plaintiffs and the New Hampshire Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and New Hampshire Plaintiffs, individually and on behalf of the other New Hampshire Subclass members, seek all remedies as allowed by law.

2509. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating

Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Nevada Plaintiffs and the Nevada Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

2510. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

2511. As a direct and proximate result of Ford's breach of express warranties, New Hampshire Plaintiffs and the New Hampshire Subclass have been damaged in an amount to be determined at trial.

**COUNT 176**

**FRAUDULENT CONCEALMENT
(BASED ON NEW HAMPSHIRE LAW)**

2512. New Hampshire Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2513. This claim is brought by New Hampshire Plaintiffs on behalf of the New Hampshire Subclass.

2514. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these

vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied New Hampshire Plaintiffs and the New Hampshire Subclass information that is highly relevant and material to their purchasing decision.

2515. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

2516. Ford further affirmatively misrepresented to New Hampshire Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

2517. Ford knew these representations were false when made.

2518. The Coastdown Cheating Vehicles purchased or leased by New Hampshire Plaintiffs and the New Hampshire Subclass were, in fact, defective, with reduced fuel efficiency.

2519. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because New Hampshire Plaintiffs

and the New Hampshire Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

2520. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

2521. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; New Hampshire Plaintiffs and the New Hampshire Subclass did not know of these facts and Ford actively concealed these facts from New Hampshire Plaintiffs and the New Hampshire Subclass.

2522. New Hampshire Plaintiffs and the New Hampshire Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, New Hampshire Plaintiffs and the New Hampshire Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive New Hampshire Plaintiffs and the New Hampshire Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

2523. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that New Hampshire Plaintiffs and the New Hampshire Subclass placed in its representations.

2524. Ford's false representations and omissions were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including New Hampshire Plaintiffs and the New Hampshire Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

2525. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by New Hampshire Plaintiffs and the New Hampshire Subclass members. Ford also had a duty to disclose because it made general affirmative

representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles. Having volunteered to provide information to New Hampshire Plaintiffs and the New Hampshire Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by New Hampshire Plaintiffs and the New Hampshire Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to New Hampshire Plaintiffs and the New Hampshire Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

2526. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of New Hampshire Plaintiffs and the New Hampshire Subclass.

2527. Ford has still not made full and adequate disclosures and continues to defraud New Hampshire Plaintiffs and the New Hampshire Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

2528. New Hampshire Plaintiffs and the New Hampshire Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. New Hampshire Plaintiffs' and the New Hampshire Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, New Hampshire Plaintiffs, or New Hampshire Subclass members.

2529. Because of the concealment and/or suppression of the facts, New Hampshire Plaintiffs and the New Hampshire Subclass have been injured and sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, New Hampshire Plaintiffs and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

2530. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to New Hampshire Plaintiffs and the New Hampshire Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2531. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of New Hampshire Plaintiffs' and the New Hampshire Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 177

## NEGLIGENT MISREPRESENTATION
## (BASED ON NEW HAMPSHIRE LAW)

2532. New Hampshire Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2533. This claim is brought by the New Hampshire Plaintiffs on behalf of the New Hampshire Subclass.

2534. Defendant made fuel economy representations to New Hampshire Plaintiffs and members of the Class that were not true.

2535. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that New Hampshire Plaintiffs and New Hampshire Subclass members rely on these misrepresentations.

2536. New Hampshire Plaintiffs reasonably relied on Defendant's representations and as a result New Hampshire Plaintiffs and New Hampshire Subclass members were harmed.

## COUNT 178

### UNJUST ENRICHMENT
### (BASED ON NEW HAMPSHIRE LAW)

2537. New Hampshire Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2538. This claim is brought by the New Hampshire Plaintiffs on behalf of the New Hampshire Subclass.

2539. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to New Hampshire Plaintiffs and the New Hampshire Subclass.

2540. Defendant enjoyed the benefit of increased financial gains, to the detriment of New Hampshire Plaintiffs and other New Hampshire Subclass members. It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

2541. New Hampshire Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the New Hampshire Subclass.

## DD. Claims Brought on Behalf of the New Jersey Subclass

### COUNT 179

### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
### (N.J. STAT. ANN. § 56:8-1 *ET SEQ.*)

2542. Plaintiffs Dean Kriner, Keith Fencl, and Tracey Travis ("New Jersey Plaintiffs") hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

2543. This claim is brought by New Jersey Plaintiffs on behalf of the New Jersey Subclass.

2544. The New Jersey Consumer Fraud Act (New Jersey CFA) makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J. STAT. ANN. § 56:8-2.

2545. Ford, Plaintiffs, and New Jersey Class members are "persons" within the meaning of N.J. STAT. ANN. § 56:8-1(d).

2546. Ford engaged in "sales" of "merchandise" within the meaning of N.J. STAT. ANN. § 56:8-1(c), (e). Ford's actions as set forth herein occurred in the conduct of trade or commerce.

2547. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

2548. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including New Jersey Plaintiffs and the New Jersey Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

2549. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead New Jersey Plaintiffs and the New Jersey Subclass.

2550. Ford knew or should have known that its conduct violated the New Jersey CFA.

2551. Ford owed New Jersey Plaintiffs and the New Jersey Subclass members a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

> a. Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;
>
> b. Intentionally concealed the foregoing from New Jersey Plaintiffs and the New Jersey Subclass; and/or
>
> c. Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from New Jersey Plaintiffs and the New Jersey Subclass that contradicted these representations.

2552. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to New Jersey Plaintiffs and the New Jersey Subclass.

2553. New Jersey Plaintiffs and the New Jersey Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and

failure to disclose material information. New Jersey Plaintiffs and the New Jersey Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the New Jersey CFA.

2554. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the New Jersey CFA. As a direct and proximate result of Ford's violations of the New Jersey CFA, New Jersey Plaintiffs and the New Jersey Subclass have suffered injury-in-fact and/or actual damage.

2555. Ford's violations present a continuing risk to New Jersey Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

2556. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

2557. New Jersey Plaintiffs are entitled to recover legal and/or equitable relief, including an order enjoining Ford's unlawful conduct, treble damages, costs, and reasonable attorneys' fees pursuant to N.J. STAT. ANN. § 56:8-19, and any other just and appropriate relief.

2558. Plaintiffs also seek punitive damages because Ford engaged in aggravated and outrageous conduct.

2559. On July 22, 2019, a copy of the complaint, *Brewer, et. al. v. Ford Motor Company*, No. 19-12135-SJM-RSW, (E.D. Mich. Jul. 22, 2019), now transferred into this MDL, was mailed to the Attorney General of the State of New Jersey in accordance with N.J.S.A. § 56:8-20.

## COUNT 180

## BREACH OF CONTRACT
### (BASED ON NEW JERSEY LAW)

2560. New Jersey Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2561. This claim is brought by New Jersey Plaintiffs on behalf of the New Jersey Subclass.

2562. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused New Jersey Plaintiffs and the New Jersey Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, New Jersey Plaintiffs and the New Jersey Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive

alternative vehicles that did not contain the reduced mileage. Accordingly, New Jersey Plaintiffs and the New Jersey Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

2563. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to New Jersey Plaintiffs and the New Jersey Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

2564. As a direct and proximate result of Ford's breach of contract, New Jersey Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 181

## BREACH OF EXPRESS WARRANTY
### (N.J. STAT. § 12A:2-313)

2565. New Jersey Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2566. This claim is brought by New Jersey Plaintiffs on behalf of the New Jersey Subclass.

2567. Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to N.J. Stat. § 12A:2-104.

2568. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

2569. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

2570. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

2571. These affirmations and promises were part of the basis of the bargain that was reached when New Jersey Plaintiffs and the other New Jersey Subclass members purchased or leased the Coastdown Cheating Vehicles.

2572. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

2573. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

2574. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make New Jersey Plaintiffs and the New Jersey Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

2575. Accordingly, recovery by the New Jersey Plaintiffs and the New Jersey Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and New Jersey Plaintiffs, individually and on behalf of the other New Jersey Subclass members, seek all remedies as allowed by law.

2576. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently

concealed material facts regarding the Coastdown Cheating Vehicles. New Jersey Plaintiffs and the New Jersey Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

2577.  Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

2578.  As a direct and proximate result of Ford's breach of express warranties, New Jersey Plaintiffs and the New Jersey Subclass have been damaged in an amount to be determined at trial.

**COUNT 182**

**FRAUDULENT CONCEALMENT
(BASED ON NEW JERSEY LAW)**

2579.  New Jersey Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2580.  New Jersey Plaintiffs bring this claim on behalf of the New Jersey Subclass.

2581.  Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because New Jersey Plaintiffs and the

New Jersey Subclass members relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

2582. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

2583. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

2584. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; New Jersey Plaintiffs and the New Jersey Subclass members did not know of these facts and Ford actively concealed these facts from New Jersey Plaintiffs and the New Jersey Subclass members.

2585. New Jersey Plaintiffs and the New Jersey Subclass members reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, New Jersey Plaintiffs

and the New Jersey Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive New Jersey Plaintiffs and the New Jersey Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

2586. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that New Jersey Plaintiffs and the New Jersey Subclass members placed in its representations.

2587. Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including New Jersey Plaintiffs and the New Jersey Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

2588. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were

known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by New Jersey Plaintiffs or the New Jersey Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to New Jersey Plaintiffs and the New Jersey Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by New Jersey Plaintiffs and the New Jersey Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to New Jersey Plaintiffs and the New Jersey Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

2589. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the

brand's image and cost Ford money, and it did so at the expense of New Jersey Plaintiffs and the New Jersey Subclass members.

2590. Ford has still not made full and adequate disclosures and continues to defraud New Jersey Plaintiffs and the New Jersey Subclass members by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

2591. New Jersey Plaintiffs and the New Jersey Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. New Jersey Plaintiffs' and the New Jersey Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, New Jersey Plaintiffs, or the New Jersey Subclass members.

2592. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to New Jersey Plaintiffs and the New Jersey Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2593. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of New Jersey Plaintiffs' and the New Jersey Subclass members' rights and the representations that Ford made to them were made in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 183

## NEGLIGENT MISREPRESENTATION
### (BASED ON NEW JERSEY LAW)

2594. New Jersey Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2595. This claim is brought by the New Jersey Plaintiffs on behalf of the New Jersey Subclass.

2596. Defendant made fuel economy representations to New Jersey Plaintiffs and members of the Class that were not true.

2597. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that New Jersey Plaintiffs and New Jersey Subclass members rely on these misrepresentations.

2598. New Jersey Plaintiffs reasonably relied on Defendant's representations and as a result New Jersey Plaintiffs and New Jersey Subclass members were harmed.

## COUNT 184

## UNJUST ENRICHMENT
## (BASED ON NEW JERSEY LAW)

2599. New Jersey Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2600. This claim is brought by the New Jersey Plaintiffs on behalf of the New Jersey Subclass.

2601. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to New Jersey Plaintiffs and the New Jersey Subclass.

2602. Defendant enjoyed the benefit of increased financial gains, to the detriment of New Jersey Plaintiffs and other New Jersey Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

2603. New Jersey Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the New Jersey Subclass.

**EE.   Claims brought on behalf of the New Mexico Subclass**

**COUNT 185**

**VIOLATION OF THE NEW MEXICO**
**UNFAIR TRADE PRACTICES ACT**
**(N.M. STAT. ANN. § 57-12-1 *et seq.*)**

2604. New Mexico Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

2605. This claim is brought by New Mexico Plaintiffs on behalf of the New Mexico Subclass.

2606. Ford, New Mexico Plaintiffs, and the New Mexico Subclass members are "person[s]" under N.M. STAT. ANN. § 57-12-2.

2607. Ford's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. STAT. ANN. § 57-12-2.

2608. The New Mexico Unfair Trade Practices Act (New Mexico UTPA) makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services . . . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive." N.M. STAT. ANN. § 57-12-2(D).

2609. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

2610. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

2611. Ford's unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including New Mexico Plaintiffs and the New Mexico Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

2612. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead New Mexico Plaintiffs and the New Mexico Subclass.

2613. Ford knew or should have known that its conduct violated the New Mexico UTPA.

2614. Ford owed New Mexico Plaintiffs and the New Mexico Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

    a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

    b.    Intentionally concealed the foregoing from New Mexico Plaintiffs and the New Mexico Subclass; and/or

    c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from New Mexico Plaintiffs and the New Mexico Subclass that contradicted these representations.

2615. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to New Mexico Plaintiffs and the New Mexico Subclass.

2616. New Mexico Plaintiffs and the New Mexico Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. New Mexico Plaintiffs and the New Mexico Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the New Mexico UTPA.

2617. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the New Mexico UTPA.

2618. As a direct and proximate result of Ford's violations of the New Mexico UTPA, New Mexico Plaintiffs and the New Mexico Subclass have suffered injury-in-fact and/or actual damage.

2619. Ford's violations present a continuing risk to New Mexico Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

2620. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

2621. Because Ford's unconscionable, willful conduct caused actual harm to New Mexico Plaintiffs, New Mexico Plaintiffs seek recovery of actual damages or $100, whichever is greater; discretionary treble damages; punitive damages; and reasonable attorneys' fees and costs, as well as all other proper and just relief available under N.M. STAT. ANN. § 57-12-10.

2622. New Hampshire Plaintiffs seek punitive damages based on the outrageousness and recklessness of Ford's conduct.

## COUNT 186

## BREACH OF CONTRACT
## (BASED ON NEW MEXICO LAW)

2623. New Mexico Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2624. This claim is brought by New Mexico Plaintiffs on behalf of the New Mexico Subclass.

2625. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused New Mexico Plaintiffs and the New Mexico Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, New Mexico Plaintiffs and the New Mexico Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, New Mexico Plaintiffs and the New Mexico Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

2626. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to New Mexico Plaintiffs and the New Mexico

Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

2627. As a direct and proximate result of Ford's breach of contract, New Mexico Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 187

## BREACH OF EXPRESS WARRANTY
## (N.M. STAT. ANN. § 55-2-313)

2628. New Mexico Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2629. This claim is brought by New Mexico Plaintiffs on behalf of the New Mexico Subclass.

2630. Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to N.M. Stat. Ann. § 55-2-104.

2631. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover

"defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

2632. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

2633. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

2634. These affirmations and promises were part of the basis of the bargain that was reached when New Mexico Plaintiffs and the other New Mexico Subclass members purchased or leased the Coastdown Cheating Vehicles.

2635. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

2636. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

2637. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make New Mexico Plaintiffs and the New Mexico Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

2638. Accordingly, recovery by the New Mexico Plaintiffs and the New Mexico Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and New Mexico Plaintiffs, individually and on behalf of the other New Mexico Subclass members, seek all remedies as allowed by law.

2639. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. New Mexico Plaintiffs and the New Mexico Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

2640. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this

litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

2641. As a direct and proximate result of Ford's breach of express warranties, New Mexico Plaintiffs and the New Mexico Subclass have been damaged in an amount to be determined at trial.

**COUNT 188**

**FRAUDULENT CONCEALMENT
(BASED ON NEW MEXICO LAW)**

2642. New Mexico Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2643. This claim is brought by New Mexico Plaintiffs on behalf of the New Mexico Subclass.

2644. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied New Mexico Plaintiffs and the New Mexico Subclass information that is highly relevant and material to their purchasing decision.

2645. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to

provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

2646. Ford further affirmatively misrepresented to New Mexico Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

2647. Ford knew these representations were false when made.

2648. The Coastdown Cheating Vehicles purchased or leased by New Mexico Plaintiffs and the New Mexico Subclass were, in fact, defective, with reduced fuel efficiency.

2649. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because New Mexico Plaintiffs and the New Mexico Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

2650. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed

to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

2651. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; New Mexico Plaintiffs and the New Mexico Subclass did not know of these facts and Ford actively concealed these facts from New Mexico Plaintiffs and the New Mexico Subclass.

2652. New Mexico Plaintiffs and the New Mexico Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, New Mexico Plaintiffs and the New Mexico Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive New Mexico Plaintiffs and the New Mexico Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

2653. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that New Mexico Plaintiffs and the New Mexico Subclass placed in its representations.

2654. Ford's false representations and omissions were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including New Mexico Plaintiffs and the New Mexico Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

2655. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by New Mexico Plaintiffs and the New Mexico Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles. Having volunteered to provide information to New Mexico Plaintiffs and the New Mexico Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the

value of the Coastdown Cheating Vehicles purchased or leased by New Mexico Plaintiffs and the New Mexico Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to New Mexico Plaintiffs and the New Mexico Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

2656. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of New Mexico Plaintiffs and the New Mexico Subclass.

2657. Ford has still not made full and adequate disclosures and continues to defraud New Mexico Plaintiffs and the New Mexico Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

2658. New Mexico Plaintiffs and the New Mexico Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or

would have taken other affirmative steps in light of the information concealed from them. New Mexico Plaintiffs' and the New Mexico Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, New Mexico Plaintiffs, or New Mexico Subclass members.

2659. Because of the concealment and/or suppression of the facts, New Mexico Plaintiffs and the New Mexico Subclass have been injured and sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, New Mexico Plaintiffs and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

2660. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to New Mexico Plaintiffs and the New Mexico Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2661. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of New Mexico Plaintiffs' and the New Mexico Subclass's rights and the representations that Ford

made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 189

## NEGLIGENT MISREPRESENTATION
## (BASED ON NEW MEXICO LAW)

2662. New Mexico Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2663. This claim is brought by the New Mexico Plaintiffs on behalf of the New Mexico Subclass.

2664. Defendant made fuel economy representations to New Mexico Plaintiffs and members of the Class that were not true.

2665. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that New Mexico Plaintiffs and New Mexico Subclass members rely on these misrepresentations.

2666. New Mexico Plaintiffs reasonably relied on Defendant's representations and as a result New Mexico Plaintiffs and New Mexico Subclass members were harmed.

## COUNT 190

## UNJUST ENRICHMENT
## (BASED ON NEW MEXICO LAW)

2667. New Mexico Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2668. This claim is brought by the New Mexico Plaintiffs on behalf of the New Mexico Subclass.

2669. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to New Mexico Plaintiffs and the New Mexico Subclass.

2670. Defendant enjoyed the benefit of increased financial gains, to the detriment of New Mexico Plaintiffs and other New Mexico Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

2671. New Mexico Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the New Mexico Subclass.

**FF.   Claims Brought on Behalf of the New York Subclass**

### COUNT 191

### VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW
### (N.Y. GEN. BUS. LAW § 349)

2672. Plaintiff Cody Smith ("New York Plaintiff") hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

2673. This claim is brought by New York Plaintiff on behalf of the New York Subclass.

2674. The New York General Business Law (New York GBL) makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. GEN. BUS. LAW § 349.

2675. New York Plaintiff and the New York Subclass members are "persons" within the meaning of N.Y. GEN. BUS. LAW § 349(h).

2676. Ford is a "person," "firm," "corporation," or "association" within the meaning of N.Y. GEN. BUS. LAW § 349.

2677. In the course of Ford's business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle. Ford's deceptive acts and practices, which were intended to mislead consumers who purchased or leased a Coastdown Cheating Vehicle, was conduct directed at consumers. Accordingly, Ford engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices as defined in N.Y. Gen. Bus. Law § 349, including engaging in conduct likely to deceive.

2678. Ford's actions as set forth above occurred in the conduct of trade or commerce.

2679. Because Ford's deception takes place in the context of public health, its deception affects the public interest. Further, Ford's unlawful conduct constitutes

unfair acts or practices that have the capacity to deceive consumers, and that have a broad impact on consumers at large.

2680. Ford's conduct proximately caused injuries to New York Plaintiff and the New York Subclass.

2681. Because Ford's willful and knowing conduct caused injury to Plaintiffs, Plaintiffs seek recovery of actual damages or $50, whichever is greater; discretionary treble damages up to $1,000; punitive damages; reasonable attorneys' fees and costs; an order enjoining Ford's deceptive conduct; and any other just and proper relief available under N.Y. GEN. BUS. LAW § 349.

2682. Plaintiffs also seek punitive damages because Ford engaged in aggravated and outrageous conduct.

## COUNT 192

## VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW
### (N.Y. GEN. BUS. LAW § 350)

2683. New York Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

2684. This claim is brought by New York Plaintiff on behalf of the New York Subclass.

2685. The New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising, including labeling, of a commodity ... if such advertising is

misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of … representations [made] with respect to the commodity…." N.Y. Gen. Bus. Law § 350-a.

2686. Ford caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Ford, to be untrue and misleading to consumers, including New York Plaintiff and New York Subclass members.

2687. Ford has violated N.Y. Gen. Bus. Law § 350 because the omissions regarding the fuel economy certifications in Coastdown Cheating Vehicles as described above, were material and likely to deceive a reasonable consumer.

2688. New York Plaintiff and New York Subclass members have suffered injury, including the loss of money or property, as a result of Ford's false advertising. In purchasing or leasing their Coastdown Cheating Vehicles, New York Plaintiff and New York Subclass members relied on the representations and/or omissions of Ford with respect to the fuel economy certifications of the Coastdown Cheating Vehicles. Ford's representations turned out to be untrue because the Coastdown Cheating Vehicles' fuel economy certifications are untrue. Had New York Plaintiff and the New York Subclass members known this, they would not have purchased or leased their Coastdown Cheating Vehicles and/or paid as much for them.

2689. Accordingly, New York Plaintiff and the New York Subclass overpaid for their Coastdown Cheating Vehicles and did not receive the benefit of the bargain for their Coastdown Cheating Vehicles, which have also suffered diminution in value.

2690. Because Ford fraudulently concealed that the fuel economy certifications are untrue, resulting in a raft of negative publicity once the true fuel economy finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth less than they otherwise would be.

2691. New York Plaintiff, individually and on behalf of New York Subclass members, request that this Court enter such orders or judgments as may be necessary to enjoin Ford from continuing its unfair, unlawful and/or deceptive practices. New York Plaintiff and the New York Subclass members are also entitled to recover their actual damages or $500, whichever is greater. Because Ford acted willfully or knowingly, New York Plaintiff and the New York Subclass members are entitled to recover three times actual damages, up to $10,000.

## COUNT 193

### BREACH OF CONTRACT
### (BASED ON NEW YORK LAW)

2692. New York Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2693. This claim is brought by New York Plaintiff on behalf of the New York Subclass.

2694. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused New York Plaintiff and the New York Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, New York Plaintiff and the New York Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, New York Plaintiff and the New York Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

2695. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to New York Plaintiff and the New York Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer

would expect given the premium paid for these vehicles and the representation made by Ford.

2696.  As a direct and proximate result of Ford's breach of contract, New York Plaintiff and the New York Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COUNT 194**

**BREACH OF EXPRESS WARRANTY**
**(N.Y.U.C.C. § 2-313)**

2697.  New York Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2698.  This claim is brought by New York Plaintiff on behalf of the New York Subclass.

2699.  Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to N.Y.U.C.C. § 2-104.

2700.  In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the

shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

2701. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

2702. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

2703. These affirmations and promises were part of the basis of the bargain that was reached when New York Plaintiff and the other New York Subclass members purchased or leased the Coastdown Cheating Vehicles.

2704. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

2705. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

2706. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make New York Plaintiff and the New York Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

2707. Accordingly, recovery by the New York Plaintiff and the New York Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and New York Plaintiff, individually and on behalf of the other New York Subclass members, seek all remedies as allowed by law.

2708. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. New York Plaintiff and the New York Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

2709. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

2710. As a direct and proximate result of Ford's breach of express warranties, New York Plaintiff and the New York Subclass have been damaged in an amount to be determined at trial.

## COUNT 195

## FRAUDULENT CONCEALMENT
## (BASED ON NEW YORK LAW)

2711. New York Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2712. This claim is brought by New York Plaintiff on behalf of the New York Subclass.

2713. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied New York Plaintiff and the New York Subclass information that is highly relevant to their purchasing decision.

2714. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

2715. Ford further affirmatively misrepresented to New York Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

2716. Ford knew these representations were false when made.

2717. The Coastdown Cheating Vehicles purchased or leased by New York Plaintiff and the New York Subclass were, in fact, defective, with reduced fuel efficiency.

2718. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because New York Plaintiff and the New York Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

2719. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

2720. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; New York Plaintiffs and the New York Subclass did not know of these facts and Ford actively concealed these facts from New York Plaintiff and the New York Subclass.

2721. New York Plaintiff and the New York Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, New York Plaintiff and the New York Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive New York Plaintiff and the New York Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

2722. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that New York Plaintiff and the New York Subclass placed in its representations.

2723. Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including New York Plaintiff and the New York Subclass

members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

2724. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by New York Plaintiff and the New York Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles. Having volunteered to provide information to New York Plaintiff and the New York Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by New York Plaintiff and the New York Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to New York Plaintiff and the New York Subclass

members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

2725. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of New York Plaintiff and the New York Subclass.

2726. Ford has still not made full and adequate disclosures and continues to defraud New York Plaintiff and the New York Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

2727. New York Plaintiff and the New York Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. New York Plaintiff's and the New York Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, New York Plaintiff, or, New York Subclass members.

2728. Because of the concealment and/or suppression of the facts, New York Plaintiff and the New York Subclass have sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, New York Plaintiff and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

2729. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to New York Plaintiff and the New York Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2730. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of New York Plaintiff's and the New York Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 196

## NEGLIGENT MISREPRESENTATION
## (BASED ON NEW YORK LAW)

2731. New York Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

2732. This claim is brought by the New York Plaintiff on behalf of the New York Subclass.

2733. Defendant made fuel economy representations to New York Plaintiff and members of the Class that were not true.

2734. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that New York Plaintiff and New York Subclass members rely on these misrepresentations.

2735. New York Plaintiff reasonably relied on Defendant's representations and as a result New York Plaintiff and New York Subclass members were harmed.

## COUNT 197

### UNJUST ENRICHMENT
### (BASED ON NEW YORK LAW)

2736. New York Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

2737. This claim is brought by the New York Plaintiff on behalf of the New York Subclass.

2738. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to New York Plaintiff and the New York Subclass.

2739. Defendant enjoyed the benefit of increased financial gains, to the detriment of New York Plaintiff and other New York Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

2740. New York Plaintiff, therefore, seeks any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the New York Subclass.

**GG.  Claims Brought on Behalf of the North Carolina Subclass**

**COUNT 198**

**VIOLATION OF THE NORTH CAROLINA UNFAIR
AND DECEPTIVE ACTS AND PRACTICES ACT
(N.C. GEN. STAT. § 75-1.1 *et seq.*)**

2741. North Carolina Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

2742. This claim is brought by North Carolina Plaintiff on behalf of North Carolina Subclass.

2743. North Carolina's Unfair and Deceptive Acts and Practices Act (the North Carolina Act) broadly prohibits a person from engaging in "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" N.C. GEN. STAT. § 75-1.1(a). The North Carolina Act provides a private right of action for any person injured "by reason of any act or

thing done by any other person, firm or corporation in violation of" the North Carolina Act. N.C. GEN. STAT. § 75-16.

2744. Ford's acts and practices complained of herein were performed in the course of Ford's trade or business and thus occurred in or affected "commerce" within the meaning of N.C. GEN. STAT. § 75-1.1(b).

2745. Ford engaged in deceptive trade practices that violated the North Carolina ACT when Ford knowingly failed to disclose that the Coastdown Cheating Vehicles did not have the advertised and certified fuel economy and that the fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

2746. Ford's actions as set forth above occurred in the conduct of trade or commerce.

2747. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

2748. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including North Carolina Plaintiff and the North Carolina Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

2749. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead North Carolina Plaintiff and the North Carolina Subclass.

2750. Ford knew or should have known that its conduct violated the North Carolina ACT.

2751. Ford owed North Carolina Plaintiff and the North Carolina Subclass members a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

   a.   Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

   b.   Intentionally concealed the foregoing from North Carolina Plaintiff and the North Carolina Subclass; and/or

   c.   Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding

- 670 -

> material facts from North Carolina Plaintiff and the
> North Carolina Subclass that contradicted these
> representations.

2752. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to North Carolina Plaintiff and the North Carolina Subclass.

2753. North Carolina Plaintiff and the North Carolina Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. North Carolina Plaintiff and the North Carolina Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the North Carolina ACT.

2754. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the North Carolina ACT. As a direct and proximate result of Ford's violations of the North Carolina ACT, North Carolina Plaintiff and the North Carolina Subclass have suffered injury-in-fact and/or actual damage.

2755. Ford's violations present a continuing risk to North Carolina Plaintiff as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

2756. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the

defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

2757. Ford acted with willful and conscious disregard of the rights and safety of others, subjecting North Carolina Plaintiff and the North Carolina Subclass to cruel and unjust hardship as a result, such than an award of punitive damages is appropriate.

2758. North Carolina Plaintiff, individually and on behalf of the North Carolina Subclass, seeks an order for treble his actual damages, an order enjoining Ford's unlawful acts, punitive damages costs of Court, attorney's fees, and any other just and proper relief available under the North Carolina Act, N.C. GEN. STAT. § 75-16.

## COUNT 199

## BREACH OF CONTRACT
## (BASED ON NORTH CAROLINA LAW)

2759. North Carolina Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2760. This claim is brought by North Carolina Plaintiff on behalf of the North Carolina Subclass.

2761. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy

than advertised and certified, caused North Carolina Plaintiff and the North Carolina Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, North Carolina Plaintiff and the North Carolina Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, North Carolina Plaintiff and the North Carolina Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

2762. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to North Carolina Plaintiff and the North Carolina Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

2763. As a direct and proximate result of Ford's breach of contract, North Carolina Plaintiff and the North Carolina Subclass have been damaged in an amount

to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 200

### BREACH OF EXPRESS WARRANTY
### (N.C. GEN. STAT. § 25-2-313)

2764. North Carolina Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2765. This claim is brought by North Carolina Plaintiff on behalf of the North Carolina Subclass.

2766. Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to N.C. Gen. Stat. § 25-2-104.

2767. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

2768. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles

achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

2769. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

2770. These affirmations and promises were part of the basis of the bargain that was reached when North Carolina Plaintiff and the other North Carolina Subclass members purchased or leased the Coastdown Cheating Vehicles.

2771. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

2772. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

2773. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make North Carolina Plaintiff and the North Carolina Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

2774. Accordingly, recovery by the North Carolina Plaintiff and the North Carolina Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and North Carolina Plaintiff, individually and on behalf of the other North Carolina Subclass members, seek all remedies as allowed by law.

2775. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. North Carolina Plaintiff and the North Carolina Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

2776. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

2777. As a direct and proximate result of Ford's breach of express warranties, North Carolina Plaintiff and the North Carolina Subclass have been damaged in an amount to be determined at trial.

## COUNT 201

## FRAUDULENT CONCEALMENT
## (BASED ON NORTH CAROLINA LAW)

2778. North Carolina Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2779. This claim is brought by North Carolina Plaintiff on behalf of the North Carolina Subclass.

2780. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied North Carolina Plaintiff and the North Carolina Subclass information that is highly relevant to their purchasing decision.

2781. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

2782. Ford further affirmatively misrepresented to North Carolina Plaintiff in advertising and other forms of communication, including standard and uniform

material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

2783. Ford knew these representations were false when made.

2784. The Coastdown Cheating Vehicles purchased or leased by North Carolina Plaintiff and the North Carolina Subclass were, in fact, defective, with reduced fuel efficiency.

2785. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because North Carolina Plaintiff and the North Carolina Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

2786. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

2787. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; North Carolina Plaintiffs and the North

Carolina Subclass did not know of these facts and Ford actively concealed these facts from North Carolina Plaintiff and the North Carolina Subclass.

2788. North Carolina Plaintiff and the North Carolina Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, North Carolina Plaintiff and the North Carolina Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive North Carolina Plaintiff and the North Carolina Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

2789. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that North Carolina Plaintiff and the North Carolina Subclass placed in its representations.

2790. Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including North Carolina Plaintiff and the North Carolina

Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

2791. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by North Carolina Plaintiff and the North Carolina Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to North Carolina Plaintiff and the North Carolina Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by North Carolina Plaintiff and the North Carolina Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to North Carolina Plaintiff and

the North Carolina Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

2792. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of North Carolina Plaintiff and the North Carolina Subclass.

2793. Ford has still not made full and adequate disclosures and continues to defraud North Carolina Plaintiff and the North Carolina Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

2794. North Carolina Plaintiff and the North Carolina Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. North Carolina Plaintiff's and the North Carolina Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such

facts were not generally known to the public, North Carolina Plaintiff, or, North Carolina Subclass members.

2795. Because of the concealment and/or suppression of the facts, North Carolina Plaintiff and the North Carolina Subclass have sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, North Carolina Plaintiff and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less. Because of the concealment and/or suppression of the facts, North Carolina Plaintiff and the North Carolina Subclass sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, North Carolina Plaintiff and the North Carolina Subclass members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

2796. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to North Carolina Plaintiff and the North Carolina Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all

compensatory damages, incidental and consequential damages, and other damages allowed by law.

2797. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of North Carolina Plaintiff's and the North Carolina Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT 202**

**NEGLIGENT MISREPRESENTATION**
**(BASED ON NORTH CAROLINA LAW)**

2798. North Carolina Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

2799. This claim is brought by the North Carolina Plaintiff on behalf of the North Carolina Subclass.

2800. Defendant made fuel economy representations to North Carolina Plaintiff and members of the Class that were not true.

2801. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that North Carolina Plaintiff and North Carolina Subclass members rely on these misrepresentations.

2802. North Carolina Plaintiff reasonably relied on Defendant's representations and as a result North Carolina Plaintiff and North Carolina Subclass members were harmed.

## COUNT 203

### UNJUST ENRICHMENT
### (BASED ON NORTH CAROLINA LAW)

2803. North Carolina Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

2804. This claim is brought by the North Carolina Plaintiff on behalf of the North Carolina Subclass.

2805. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to North Carolina Plaintiff and the North Carolina Subclass.

2806. Defendant enjoyed the benefit of increased financial gains, to the detriment of North Carolina Plaintiff and other North Carolina Subclass members. It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

2807. North Carolina Plaintiff, therefore, seeks any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the North Carolina Subclass.

## HH.  Claims brought on behalf of the North Dakota Subclass

## COUNT 204

## VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD ACT
## (N.D. CENT. CODE § 51-15-02)

2808.  North Dakota Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

2809.  This claim is brought by North Dakota Plaintiffs on behalf of the North Dakota Subclass.

2810.  Ford, North Dakota Plaintiffs, and North Dakota Subclass members are "persons" within the meaning of N.D. CENT. CODE § 51-15-02(4).

2811.  Ford engaged in the "sale" of "merchandise" within the meaning of N.D. CENT. CODE § 51-15-02(3), (5).

2812.  The North Dakota Consumer Fraud Act (North Dakota CFA) makes unlawful "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise." N.D. CENT. CODE § 51-15-02.

2813.  In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

2814. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

2815. Ford's unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including North Dakota Plaintiffs and the North Dakota Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

2816. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead North Dakota Plaintiffs and the North Dakota Subclass.

2817. Ford knew or should have known that its conduct violated the North Dakota CFA.

2818. Ford owed North Dakota Plaintiffs and the North Dakota Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

a. Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

b. Intentionally concealed the foregoing from North Dakota Plaintiffs and the North Dakota Subclass; and/or

c. Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from North Dakota Plaintiffs and the North Dakota Subclass that contradicted these representations.

2819. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to North Dakota Plaintiffs and the North Dakota Subclass.

2820. North Dakota Plaintiffs and the North Dakota Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. North Dakota Plaintiffs and the North Dakota Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the North Dakota CFA.

2821. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the North Dakota CFA.

2822. As a direct and proximate result of Ford's violations of the North Dakota CFA, North Dakota Plaintiffs and the North Dakota Subclass have suffered injury-in-fact and/or actual damage.

2823. Ford's violations present a continuing risk to North Dakota Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

2824. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

2825. Ford knowingly committed the conduct described above and therefore, under N.D. CENT. CODE § 51-15-09, Ford is liable to Plaintiffs for treble damages in amounts to be proven at trial, as well as attorneys' fees, costs, and disbursements. Plaintiffs further seek an order enjoining Ford's unfair and/or deceptive acts or practices, and other just and proper available relief under the North Dakota CFA.

2826. North Dakota Plaintiffs seek punitive damages based on the outrageousness and recklessness of Ford's conduct.

## COUNT 205

## BREACH OF CONTRACT
## (BASED ON NORTH DAKOTA LAW)

2827. North Dakota Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2828. This claim is brought by North Dakota Plaintiffs on behalf of the North Dakota Subclass.

2829. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused North Dakota Plaintiffs and the North Dakota Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, North Dakota Plaintiffs and the North Dakota Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, North Dakota Plaintiffs and the North Dakota Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

2830. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to North Dakota Plaintiffs and the North Dakota

Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

2831. As a direct and proximate result of Ford's breach of contract, North Dakota Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 206

## BREACH OF EXPRESS WARRANTY
## (N.D. CENT. CODE § 41-02-30)

2832. North Dakota Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2833. This claim is brought by North Dakota Plaintiffs on behalf of the North Dakota Subclass.

2834. Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to N.D. Cent. Code § 41-02-04.

2835. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover

"defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

2836. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

2837. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

2838. These affirmations and promises were part of the basis of the bargain that was reached when North Dakota Plaintiffs and the other North Dakota Subclass members purchased or leased the Coastdown Cheating Vehicles.

2839. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

2840. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

2841. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make North Dakota Plaintiffs and the North Dakota Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

2842. Accordingly, recovery by the North Dakota Plaintiffs and the North Dakota Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and North Dakota Plaintiffs, individually and on behalf of the other North Dakota Subclass members, seek all remedies as allowed by law.

2843. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. North Dakota Plaintiffs and the North Dakota Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

2844. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this

litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

2845. As a direct and proximate result of Ford's breach of express warranties, North Dakota Plaintiffs and the North Dakota Subclass have been damaged in an amount to be determined at trial.

## COUNT 207

## FRAUDULENT CONCEALMENT
## (BASED ON NORTH DAKOTA LAW)

2846. North Dakota Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2847. This claim is brought by North Dakota Plaintiffs on behalf of the North Dakota Subclass.

2848. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied North Dakota Plaintiffs and the North Dakota Subclass information that is highly relevant and material to their purchasing decision.

2849. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to

provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

2850. Ford further affirmatively misrepresented to North Dakota Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

2851. Ford knew these representations were false when made.

2852. The Coastdown Cheating Vehicles purchased or leased by North Dakota Plaintiffs and the North Dakota Subclass were, in fact, defective, with reduced fuel efficiency.

2853. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because North Dakota Plaintiffs and the North Dakota Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

2854. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed

to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

2855. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; North Dakota Plaintiffs and the North Dakota Subclass did not know of these facts and Ford actively concealed these facts from North Dakota Plaintiffs and the North Dakota Subclass.

2856. North Dakota Plaintiffs and the North Dakota Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, North Dakota Plaintiffs and the North Dakota Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive North Dakota Plaintiffs and the North Dakota Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

2857. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that North Dakota Plaintiffs and the North Dakota Subclass placed in its representations.

2858. Ford's false representations and omissions were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including North Dakota Plaintiffs and the North Dakota Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

2859. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by North Dakota Plaintiffs and the North Dakota Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles. Having volunteered to provide information to North Dakota Plaintiffs and the North Dakota Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the

value of the Coastdown Cheating Vehicles purchased or leased by North Dakota Plaintiffs and the North Dakota Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to North Dakota Plaintiffs and the North Dakota Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

2860. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of North Dakota Plaintiffs and the North Dakota Subclass.

2861. Ford has still not made full and adequate disclosures and continues to defraud North Dakota Plaintiffs and the North Dakota Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

2862. North Dakota Plaintiffs and the North Dakota Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford,

and/or would have taken other affirmative steps in light of the information concealed from them. North Dakota Plaintiffs' and the North Dakota Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, North Dakota Plaintiffs, or North Dakota Subclass members.

2863. Because of the concealment and/or suppression of the facts, North Dakota Plaintiffs and the North Dakota Subclass have been injured and sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, North Dakota Plaintiffs and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

2864. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to North Dakota Plaintiffs and the North Dakota Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2865. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of North Dakota Plaintiffs' and the North Dakota Subclass's rights and the representations that Ford

made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 208

## NEGLIGENT MISREPRESENTATION
## (BASED ON NORTH DAKOTA LAW)

2866. North Dakota Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2867. This claim is brought by the North Dakota Plaintiffs on behalf of the North Dakota Subclass.

2868. Defendant made fuel economy representations to North Dakota Plaintiffs and members of the Class that were not true.

2869. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that North Dakota Plaintiffs and North Dakota Subclass members rely on these misrepresentations.

2870. North Dakota Plaintiffs reasonably relied on Defendant's representations and as a result North Dakota Plaintiffs and North Dakota Subclass members were harmed.

## COUNT 209

## UNJUST ENRICHMENT
## (BASED ON NORTH DAKOTA LAW)

2871. North Dakota Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

2872. This claim is brought by the North Dakota Plaintiffs on behalf of the North Dakota Subclass.

2873. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to North Dakota Plaintiffs and the North Dakota Subclass.

2874. Defendant enjoyed the benefit of increased financial gains, to the detriment of North Dakota Plaintiffs and other North Dakota Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

2875. North Dakota Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the North Dakota Subclass.

## II.    Claims Brought on Behalf of the Ohio Subclass

### COUNT 210

### VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT (OHIO REV. CODE ANN. § 1345.01 *ET SEQ.*)

2876. Plaintiff David Polley ("Ohio Plaintiff") hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

2877. This claim is brought by Ohio Plaintiff on behalf of the Ohio Subclass.

2878. Ohio Consumer Sales Practices Act ("Ohio CSPA"), OHIO REV. CODE ANN. § 1345.02, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Specifically, and without limitation of the broad prohibition, the Act prohibits (1) representing that Coastdown Cheating Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that Coastdown Cheating Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising Coastdown Cheating Vehicles with the intent not to sell them as advertised and certified, and (4) engaging in acts or practices which are otherwise unfair, misleading, false, or deceptive to the consumer. OHIO REV. CODE ANN. § 1345.02. Ford participated in misleading, false, or deceptive acts that violated the Ohio CSPA.

2879. Ford is a "supplier" as that term is defined in OHIO REV. CODE ANN. § 1345.01(C).

2880. Ohio Plaintiff and the Ohio Subclass members are "consumers" as that term is defined in OHIO REV. CODE ANN. § 1345.01(D), and their purchase or lease of one or more Coastdown Cheating Vehicles is a "consumer transaction" within the meaning of OHIO REV. CODE ANN. § 1345.01(A).

2881. Ford engaged in deceptive trade practices that violated the Ohio CSPA when Ford knowingly failed to disclose that the Coastdown Cheating Vehicles did not have the advertised and certified fuel economy and that the fuel economy was

far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

2882. Ford's actions as set forth above occurred in the conduct of trade or commerce.

2883. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

2884. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Ohio Plaintiff and the Ohio Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

2885. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Ohio Plaintiff and the Ohio Subclass.

2886. Ford knew or should have known that its conduct violated the Ohio CSPA.

2887. Ford owed Ohio Plaintiff and the Ohio Subclass members a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

a.   Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

b.   Intentionally concealed the foregoing from Ohio Plaintiff and the Ohio Subclass; and/or

c.   Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Ohio Plaintiff and the Ohio Subclass that contradicted these representations.

2888. The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the acts and omissions of Ford in this Complaint, including but not limited to the failure to honor both implied warranties and express warranties, the making and distribution of false, deceptive, and/or misleading representations, and the concealment and/or non-disclosure of a

dangerous defect, constitute deceptive sales practices in violation of the OCSPA.

These cases include, but are not limited to, the following:

    a.    *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

    b.    *State ex rel. Betty D. Montgomery v. Volkswagen Motor Co.* (OPIF #10002123);

    c.    *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025);

    d.    *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

    e.    *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

    f.    *State ex rel. Jim Petro v. Craftmatic Org., Inc.* (OPIF #10002347);

    g.    *Mark J. Craw Volkswagen, et al. v. Joseph Airport Toyota, Inc.* (OPIF #10001586);

    h.    *State ex rel. William J. Brown v. Harold Lyons, et al.* (OPIF #10000304);

    i.    *Brinkman v. Mazda Motor of Am., Inc.* (OPIF #10001427);

    j.    *Khouri v. Don Lewis* (OPIF #100001995);

    k.    *Mosley v. Performance Mitsubishi aka Automanage* (OPIF #10001326);

    l.    *Walls v. Harry Williams dba Butch's Auto Sales* (OPIF #10001524); and

    m.    *Brown v. Spears* (OPIF #10000403).

2889. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Ohio Plaintiff and the Ohio Subclass.

2890. Ohio Plaintiff and the Ohio Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Ohio Plaintiff and the Ohio Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Ohio CSPA.

2891. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Ohio CSPA. As a direct and proximate result of Ford's violations of the Ohio CSPA, Ohio Plaintiff and the Ohio Subclass have suffered injury-in-fact and/or actual damage.

2892. Ford's violations present a continuing risk to Ohio Plaintiff as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

2893. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

2894. As a result of the foregoing wrongful conduct, Plaintiffs have been damaged in an amount to be proven at trial and seek all just and proper remedies, including but not limited to actual and statutory damages, an order enjoining Ford's deceptive and unfair conduct, treble damages, court costs, and reasonable attorneys' fees, pursuant to OHIO REV. CODE ANN. § 1345.09 *et seq.*

2895. Plaintiffs also seek punitive damages because Ford engaged in aggravated and outrageous conduct.

## COUNT 211

## BREACH OF CONTRACT
## (BASED ON OHIO LAW)

2896. Ohio Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2897. This claim is brought by the Ohio Plaintiff on behalf of Ohio Subclass.

2898. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Ohio Plaintiff and the Ohio Subclass members to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Ohio Plaintiff and the Ohio Subclass members would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did

not contain the reduced mileage. Accordingly, Ohio Plaintiff and the Ohio Subclass members overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

2899. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Ohio Plaintiff and the Ohio Subclass members defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

2900. As a direct and proximate result of Ford's breach of contract, Ohio Plaintiff and the Ohio Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 212

## BREACH OF EXPRESS WARRANTY
## (OHIO REV. CODE ANN. § 1302.26)

2901. Ohio Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2902. This claim is brought by Ohio Plaintiff on behalf of the Ohio Subclass.

2903. Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to Ohio Rev. Code Ann. § 1302.01.

2904. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

2905. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

2906. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

2907. These affirmations and promises were part of the basis of the bargain that was reached when Ohio Plaintiff and the other Ohio Subclass members purchased or leased the Coastdown Cheating Vehicles.

2908. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that

produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

2909. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

2910. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Ohio Plaintiff and the Ohio Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

2911. Accordingly, recovery by the Ohio Plaintiff and the Ohio Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Ohio Plaintiff, individually and on behalf of the other Ohio Subclass members, seek all remedies as allowed by law.

2912. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Ohio Plaintiff

and the Ohio Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

2913. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

2914. As a direct and proximate result of Ford's breach of express warranties, Ohio Plaintiff and the Ohio Subclass have been damaged in an amount to be determined at trial.

## COUNT 213

## FRAUDULENT CONCEALMENT
## (BASED ON OHIO LAW)

2915. Ohio Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2916. This claim is brought by the Ohio Plaintiff on behalf of Ohio purchasers who are members of the Class.

2917. Ford intentionally concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted

with reckless disregard for the truth and denied Ohio Plaintiff and the Ohio Subclass members information that is highly relevant to their purchasing decision.

2918. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

2919. Ford further affirmatively misrepresented to Ohio Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

2920. Ford knew these representations were false when made.

2921. The Coastdown Cheating Vehicles purchased or leased by Ohio Plaintiff and the Ohio Subclass members were, in fact, defective, with reduced fuel efficiency.

2922. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Ohio Plaintiff and the Ohio Subclass members relied on Ford's material representations or omissions of fact that

the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

2923.  As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

2924.  The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Ohio Plaintiff and the Ohio Subclass members did not know of these facts and Ford actively concealed these facts from Ohio Plaintiff and the Ohio Subclass members.

2925. Ohio Plaintiff and the Ohio Subclass members reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Ohio Plaintiff and the Ohio Subclass members did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Ohio Plaintiff and the Ohio Subclass members by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

2926. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions

regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Ohio Plaintiff and the Ohio Subclass members placed in its representations.

2927. Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Ohio Plaintiff and the Ohio Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

2928. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Ohio Plaintiff and the Ohio Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to

Ohio Plaintiff and the Ohio Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Ohio Plaintiff and the Ohio Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Ohio Plaintiff and the Ohio Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

2929. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Ohio Plaintiff and the Ohio Subclass members.

2930. Ford has still not made full and adequate disclosures and continues to defraud Ohio Plaintiff and the Ohio Subclass members by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

2931. Ohio Plaintiff and the Ohio Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not

have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Ohio Plaintiff's and the Ohio Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Ohio Plaintiff, or Ohio Subclass members.

2932. Accordingly, Ford is liable to Ohio Plaintiff and the Ohio Subclass members for damages in an amount to be proven at trial.

2933. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Ohio Plaintiff and the Ohio Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2934. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Ohio Plaintiff's and Ohio Subclass members' rights and the representations that Ford made to them were made in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 214

## NEGLIGENT MISREPRESENTATION
## (BASED ON OHIO LAW)

2935. Ohio Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

2936. This claim is brought by the Ohio Plaintiff on behalf of the Ohio Subclass.

2937. Defendant made fuel economy representations to Ohio Plaintiff and members of the Class that were not true.

2938. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Ohio Plaintiff and Ohio Subclass members rely on these misrepresentations.

2939. Ohio Plaintiff reasonably relied on Defendant's representations and as a result Ohio Plaintiff and Ohio Subclass members were harmed.

## COUNT 215

### UNJUST ENRICHMENT
### (BASED ON OHIO LAW)

2940. Ohio Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

2941. This claim is brought by the Ohio Plaintiff on behalf of the Ohio Subclass.

2942. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Ohio Plaintiff and the Ohio Subclass.

2943. Defendant enjoyed the benefit of increased financial gains, to the detriment of Ohio Plaintiff and other Ohio Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

2944. Ohio Plaintiff, therefore, seeks any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Ohio Subclass.

## JJ.   Claims Brought on Behalf of the Oklahoma Subclass

### COUNT 216

### VIOLATION OF THE OKLAHOMA CONSUMER PROTECTION ACT (OKLA. STAT. TIT. 15, § 751 *et seq.*)

2945. Plaintiff Ahmed Abdi ("Oklahoma Plaintiff") hereby incorporatesS by reference the allegations contained in the preceding paragraphs of this complaint.

2946. This claim is brought by Oklahoma Plaintiff on behalf of the Oklahoma Subclass.

2947. The Oklahoma Consumer Protection Act ("Oklahoma CPA") declares unlawful, *inter alia*, the following acts or practices when committed in the course of business: making a "misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person" and "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." OKLA. STAT. TIT. 15, §§ 752–753.

2948. Oklahoma Plaintiff and the Oklahoma Subclass members are "persons" under OKLA. STAT. TIT. 15, § 752.

2949. Ford is a "person," "corporation," or "association" within the meaning of OKLA. STAT. TIT. 15, § 15-751(1).

2950. The sale or lease of a Coastdown Cheating Vehicle to Plaintiff was a "consumer transaction" within the meaning of OKLA. STAT. TIT. 15, § 752 and Ford's actions as set forth herein occurred in the conduct of trade or commerce.

2951. Ford's acts were made knowingly, intentionally, and with malice. Ford demonstrated a complete lack of care and acted in reckless disregard of the rights of Oklahoma Plaintiff and the Oklahoma Subclass. Oklahoma Plaintiff and the Oklahoma Subclass and the other Class members are therefore entitled to an award of punitive damages to the extent permitted under applicable law.

2952. Ford's conduct as alleged herein was unconscionable because (1) Ford, knowingly or had reason to know, took advantage of consumers reasonably unable to protect their interests because of their ignorance of Ford's fraudulent omissions and representations; (2) at the time the consumer transaction was entered into, Ford knew or had reason to know that the price the consumers were charged grossly exceeded the price at which they would have paid if they had known of Ford's scheme, and (3) Ford knew or had reason to know that the transaction it induced the consumers to enter into was excessively one-sided in favor of Ford.

2953. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Oklahoma Plaintiff and the Oklahoma Subclass.

2954. Oklahoma Plaintiff and the Oklahoma Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Oklahoma Plaintiff and the Oklahoma Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Oklahoma CPA.

2955. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Oklahoma CPA. As a direct and proximate result of Ford's violations of the Oklahoma CPA, Oklahoma Plaintiff and the Oklahoma Subclass have suffered injury-in-fact and/or actual damage.

2956. Ford's violations present a continuing risk to Oklahoma Plaintiff as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

2957. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles

has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

2958. Because Ford's unconscionable conduct caused injury to Oklahoma Plaintiff, Oklahoma Plaintiff seeks recovery of actual damages, discretionary penalties up to $2,000 per violation, and reasonable attorneys' fees, under OKLA. STAT. TIT. 15, § 761.1. Plaintiffs further seek an order enjoining Ford's unfair and/or deceptive acts or practices, and any other just and proper relief available under the Oklahoma CPA.

2959. Plaintiffs also seek punitive damages because Ford engaged in aggravated and outrageous conduct.

## COUNT 217

### BREACH OF CONTRACT
### (BASED ON OKLAHOMA LAW)

2960. Oklahoma Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2961. This claim is brought by Oklahoma Plaintiff on behalf of the Oklahoma Subclass.

2962. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Oklahoma Plaintiff and the Oklahoma Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those

- 720 -

misrepresentations and omissions, Oklahoma Plaintiff and the Oklahoma Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Oklahoma Plaintiff and the Oklahoma Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

2963. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Oklahoma Plaintiff and the Oklahoma Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

2964. As a direct and proximate result of Ford's breach of contract, Oklahoma Plaintiff and the Oklahoma Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 218

## BREACH OF EXPRESS WARRANTY
## (12A OKA. STAT. § 2-313)

2965. Oklahoma Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2966. This claim is brought by Oklahoma Plaintiff on behalf of the Oklahoma Subclass.

2967. Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to 12A Okla. Stat. § 2-104.

2968. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

2969. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

2970. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

2971. These affirmations and promises were part of the basis of the bargain that was reached when Oklahoma Plaintiff and the other Oklahoma Subclass members purchased or leased the Coastdown Cheating Vehicles.

2972. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

2973. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

2974. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Oklahoma Plaintiff and the Oklahoma Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

2975. Accordingly, recovery by the Oklahoma Plaintiffs and the Oklahoma Subclass is not limited to the NVLW promising to repair and/or correct a

manufacturing defect, and Oklahoma Plaintiffs, individually and on behalf of the other Oklahoma Subclass members, seek all remedies as allowed by law.

2976. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Oklahoma Plaintiff and the Oklahoma Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

2977. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

2978. As a direct and proximate result of Ford's breach of express warranties, Oklahoma Plaintiff and the Oklahoma Subclass have been damaged in an amount to be determined at trial.

## COUNT 219

## FRAUDULENT CONCEALMENT
## (BASED ON OKLAHOMA LAW)

2979. Oklahoma Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

2980. This claim is brought by Oklahoma Plaintiff on behalf of the Oklahoma Subclass.

2981. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Oklahoma Plaintiff and the Oklahoma Subclass information that is highly relevant to their purchasing decision.

2982. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

2983. Ford further affirmatively misrepresented to Oklahoma Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

2984. Ford knew these representations were false when made.

- 725 -

2985. The Coastdown Cheating Vehicles purchased or leased by Oklahoma Plaintiff and the Oklahoma Subclass were, in fact, defective, with reduced fuel efficiency.

2986. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Oklahoma Plaintiff and the Oklahoma Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

2987. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

2988. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Oklahoma Plaintiffs and the Oklahoma Subclass did not know of these facts and Ford actively concealed these facts from Oklahoma Plaintiff and the Oklahoma Subclass.

2989. Oklahoma Plaintiff and the Oklahoma Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Oklahoma Plaintiff and the Oklahoma Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Oklahoma Plaintiff and the Oklahoma Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

2990. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Oklahoma Plaintiff and the Oklahoma Subclass placed in its representations.

2991. Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Oklahoma Plaintiff and the Oklahoma Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

2992. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is

far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Oklahoma Plaintiff and the Oklahoma Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Oklahoma Plaintiff and the Oklahoma Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Oklahoma Plaintiff and the Oklahoma Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Oklahoma Plaintiff and the Oklahoma Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

2993. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Oklahoma Plaintiff and the Oklahoma Subclass.

2994. Ford has still not made full and adequate disclosures and continues to defraud Oklahoma Plaintiff and the Oklahoma Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

2995. Oklahoma Plaintiff and the Oklahoma Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Oklahoma Plaintiff's and the Oklahoma Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Oklahoma Plaintiff, or, Oklahoma Subclass members.

2996. Because of the concealment and/or suppression of the facts, Oklahoma Plaintiff and the Oklahoma Subclass have sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was

represented by Ford. Had they been aware of the true facts, Oklahoma Plaintiff and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

2997. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Oklahoma Plaintiff and the Oklahoma Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

2998. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Oklahoma Plaintiff's and the Oklahoma Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 220

### NEGLIGENT MISREPRESENTATION
### (BASED ON OKLAHOMA LAW)

2999. Oklahoma Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

3000. This claim is brought by the Oklahoma Plaintiff on behalf of the Oklahoma Subclass.

3001. Defendant made fuel economy representations to Oklahoma Plaintiff and members of the Class that were not true.

3002. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Oklahoma Plaintiff and Oklahoma Subclass members rely on these misrepresentations.

3003. Oklahoma Plaintiff reasonably relied on Defendant's representations and as a result Oklahoma Plaintiff and Oklahoma Subclass members were harmed.

## COUNT 221

### UNJUST ENRICHMENT
### (BASED ON OKLAHOMA LAW)

3004. Oklahoma Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

3005. This claim is brought by the Oklahoma Plaintiff on behalf of the Oklahoma Subclass.

3006. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Oklahoma Plaintiff and the Oklahoma Subclass.

3007. Defendant enjoyed the benefit of increased financial gains, to the detriment of Oklahoma Plaintiff and other Oklahoma Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

3008. Oklahoma Plaintiff, therefore, seeks any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Oklahoma Subclass.

## KK. Claims Brought on Behalf of the Oregon Subclass

### COUNT 222

### VIOLATION OF THE OREGON
### UNLAWFUL TRADE PRACTICES ACT
### (OR. REV. STAT. § 646.605 *et seq.*)

3009. Plaintiff Samuel Huffman ("Oregon Plaintiff") hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

3010. This claim is brought by Oregon Plaintiff on behalf of the Oregon Subclass.

3011. The Oregon Unlawful Trade Practices Act ("Oregon UTPA") prohibits a person from, in the course of the person's business, doing any of the following: representing that goods have characteristics uses, benefits, or qualities that they do not have; representing that goods are of a particular standard or quality if they are of another; advertising goods or services with intent not to provide them as advertised and certified; and engaging in any other unfair or deceptive conduct in trade or commerce. OR. REV. STAT. § 646.608(1).

3012. Ford is a person within the meaning of OR. REV. STAT. § 646.605(4).

3013. Each Coastdown Cheating Vehicle is a "good" obtained primarily for personal family or household purposes within the meaning of OR. REV. STAT. § 646.605(6).

3014. Ford engaged in unlawful trade practices that violated the Oregon UTPA when Ford knowingly failed to disclose that the Coastdown Cheating Vehicles did not have the advertised and certified fuel economy and that the fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

3015. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

3016. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Oregon Plaintiff and the Oregon Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy,

the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

3017. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Oregon Plaintiff and the Oregon Subclass.

3018. Ford knew or should have known that its conduct violated the Oregon UTPA.

3019. Ford owed Oregon Plaintiff and the Oregon Subclass members a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

    a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

    b.    Intentionally concealed the foregoing from Oregon Plaintiff and the Oregon Subclass; and/or

    c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Oregon Plaintiff and the Oregon Subclass that contradicted these representations.

3020. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Oregon Plaintiff and the Oregon Subclass.

3021. Oregon Plaintiff and the Oregon Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Oregon Plaintiff and the Oregon Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Oregon UTPA.

3022. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Oregon UTPA. As a direct and proximate result of Ford's violations of the Oregon UTPA, Oregon Plaintiff and the Oregon Subclass have suffered injury-in-fact and/or actual damage.

3023. Ford's violations present a continuing risk to Oregon Plaintiff as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

3024. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

3025. Oregon Plaintiff and the Oregon Subclass are entitled to recover the greater of actual damages or $200 pursuant to OR. REV. STAT. § 646.638(1). Oregon

Plaintiff and the Oregon Subclass are also entitled to punitive damages because Ford engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

3026. On July 22, 2019, a copy of the complaint, *Brewer, et. al. v. Ford Motor Company*, No. 19-12135-SJM-RSW, (E.D. Mich. Jul. 22, 2019), now transferred into this MDL, was mailed to the Attorney General of the State of Oregon in accordance with OR. REV. STAT. § 646.638(2).

## COUNT 223

## BREACH OF CONTRACT
## (BASED ON OREGON LAW)

3027. Oregon Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3028. This claim is brought by Oregon Plaintiff on behalf of the Oregon Subclass.

3029. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Oregon Plaintiff and the Oregon Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Oregon Plaintiff and the Oregon Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or

- 736 -

would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Oregon Plaintiff and the Oregon Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

3030. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Oregon Plaintiff and the Oregon Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

3031. As a direct and proximate result of Ford's breach of contract, Oregon Plaintiff and the Oregon Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 224

## BREACH OF EXPRESS WARRANTY
## (OR. REV. STAT. § 72.3130)

3032. Oregon Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3033. This claim is brought by Oregon Plaintiff on behalf of the Oregon Subclass.

3034. Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to Or. Rev. Stat. § 72.1040.

3035. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

3036. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

3037. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

3038. These affirmations and promises were part of the basis of the bargain that was reached when Oregon Plaintiff and the other Oregon Subclass members purchased or leased the Coastdown Cheating Vehicles.

3039. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

3040. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

3041. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Oregon Plaintiff and the Oregon Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

3042. Accordingly, recovery by the Oregon Plaintiff and the Oregon Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Oregon Plaintiff, individually and on behalf of the other Oregon Subclass members, seek all remedies as allowed by law.

3043. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently

concealed material facts regarding the Coastdown Cheating Vehicles. Oregon Plaintiff and the Oregon Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

3044. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

3045. As a direct and proximate result of Ford's breach of express warranties, Oregon Plaintiff and the Oregon Subclass have been damaged in an amount to be determined at trial.

## COUNT 225

## FRAUDULENT CONCEALMENT
## (BASED ON OREGON LAW)

3046. Oregon Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3047. This claim is brought by Oregon Plaintiff on behalf of the Oregon Subclass.

3048. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard

for the truth and denied Oregon Plaintiff and the Oregon Subclass information that is highly relevant to their purchasing decision.

3049. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

3050. Ford further affirmatively misrepresented to Oregon Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

3051. Ford knew these representations were false when made.

3052. The Coastdown Cheating Vehicles purchased or leased by Oregon Plaintiff and the Oregon Subclass were, in fact, defective, with reduced fuel efficiency.

3053. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Oregon Plaintiff and the Oregon Subclass relied on Ford's material representations or omissions of fact that

the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

3054. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

3055. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Oregon Plaintiffs and the Oregon Subclass did not know of these facts and Ford actively concealed these facts from Oregon Plaintiff and the Oregon Subclass.

3056. Oregon Plaintiff and the Oregon Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Oregon Plaintiff and the Oregon Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Oregon Plaintiff and the Oregon Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

3057. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions

regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Oregon Plaintiff and the Oregon Subclass placed in its representations.

3058. Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Oregon Plaintiff and the Oregon Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

3059. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Oregon Plaintiff and the Oregon Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide

- 743 -

information to Oregon Plaintiff and the Oregon Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Oregon Plaintiff and the Oregon Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Oregon Plaintiff and the Oregon Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

3060. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Oregon Plaintiff and the Oregon Subclass.

3061. Ford has still not made full and adequate disclosures and continues to defraud Oregon Plaintiff and the Oregon Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

3062. Oregon Plaintiff and the Oregon Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they

had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Oregon Plaintiff's and the Oregon Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Oregon Plaintiff, or, Oregon Subclass members.

3063. Because of the concealment and/or suppression of the facts, Oregon Plaintiff and the Oregon Subclass have sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Oregon Plaintiff and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

3064. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Oregon Plaintiff and the Oregon Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

3065. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Oregon Plaintiff's and the Oregon Subclass's rights and the representations that Ford made to them in

order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 226

## NEGLIGENT MISREPRESENTATION
## (BASED ON OREGON LAW)

3066. Oregon Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

3067. This claim is brought by the Oregon Plaintiff on behalf of the Oregon Subclass.

3068. Defendant made fuel economy representations to Oregon Plaintiff and members of the Class that were not true.

3069. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Oregon Plaintiff and Oregon Subclass members rely on these misrepresentations.

3070. Oregon Plaintiff reasonably relied on Defendant's representations and as a result Oregon Plaintiff and Oregon Subclass members were harmed.

## COUNT 227

## UNJUST ENRICHMENT
## (BASED ON OREGON LAW)

3071. Oregon Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

3072. This claim is brought by the Oregon Plaintiff on behalf of the Oregon Subclass.

3073. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Oregon Plaintiff and the Oregon Subclass.

3074. Defendant enjoyed the benefit of increased financial gains, to the detriment of Oregon Plaintiff and other Oregon Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

3075. Oregon Plaintiff, therefore, seeks any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Oregon Subclass.

**LL.   Claims Brought on Behalf of the Pennsylvania Subclass**

**COUNT 228**

**VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 PA. CONS. STAT. § 201-1 *ET SEQ.*)**

3076. Plaintiff Steven Hull ("Pennsylvania Plaintiff") hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

3077. This claim is brought by Pennsylvania Plaintiff on behalf of the Pennsylvania Subclass.

3078. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including representing that goods or services have characteristics, benefits or qualities that they do not have; representing that goods or services are of a particular standard, quality or grade if they are of another; advertising goods or services with intent not to sell them as advertised and certified; and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding. 73 PA. CONS. STAT. § 201-2(4).

3079. Ford, Pennsylvania Plaintiff, and Pennsylvania Class members are "persons" within the meaning of 73 PA. CONS. STAT. § 201-2(2).

3080. Pennsylvania Plaintiff purchased a Coastdown Cheating Vehicle primarily for personal, family, or household purposes within the meaning of 73 PA. CONS. STAT. § 201-9.2.

3081. All of the acts complained of herein were perpetrated by Ford in the course of trade or commerce within the meaning of 73 PA. CONS. STAT. § 201-2(3).

3082. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel

economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

3083. Ford also willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

3084. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Pennsylvania Plaintiff and the Pennsylvania Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

3085. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Pennsylvania Plaintiff and the Pennsylvania Subclass.

3086. Ford knew or should have known that its conduct violated the Pennsylvania CPL.

3087. Ford owed Pennsylvania Plaintiff and the Pennsylvania Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

 a. Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

 b. Intentionally concealed the foregoing from Pennsylvania Plaintiff and the Pennsylvania Subclass; and/or

 c. Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Pennsylvania Plaintiff and the Pennsylvania Subclass that contradicted these representations.

3088. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Pennsylvania Plaintiff and the Pennsylvania Subclass.

3089. Pennsylvania Plaintiff and the Pennsylvania Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Pennsylvania Plaintiff and the Pennsylvania Subclass members who purchased the Coastdown Cheating Vehicles either would

have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Pennsylvania CPL.

3090. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Pennsylvania CPL. As a direct and proximate result of Ford's violations of the Pennsylvania CPL, Pennsylvania Plaintiff and the Pennsylvania Subclass have suffered injury-in-fact and/or actual damage.

3091. Ford's violations present a continuing risk to Pennsylvania Plaintiff as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

3092. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

3093. Ford is liable to Plaintiffs and the Pennsylvania Subclass for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 PA. CONS. STAT. § 201-9.2(a). Plaintiffs and the Pennsylvania Subclass are also entitled to an award of punitive damages given that Ford's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## COUNT 229

## BREACH OF CONTRACT
## (BASED ON PENNSYLVANIA LAW)

3094. Pennsylvania Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3095. This claim is brought by Pennsylvania Plaintiff on behalf of the Pennsylvania Subclass.

3096. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Pennsylvania Plaintiff and the Pennsylvania Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Pennsylvania Plaintiff and the Pennsylvania Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Pennsylvania Plaintiff and the Pennsylvania Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

3097. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Pennsylvania Plaintiff and the Pennsylvania

Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

3098. As a direct and proximate result of Ford's breach of contract, Pennsylvania Plaintiff and the Pennsylvania Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 230

## BREACH OF EXPRESS WARRANTY
## (13 PA. STAT. ANN. § 2313)

3099. Pennsylvania Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3100. This claim is brought by Pennsylvania Plaintiff on behalf of the Pennsylvania Subclass.

3101. Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to 13 Pa. Stat. Ann. § 2104.

3102. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of

three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

3103. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

3104. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

3105. These affirmations and promises were part of the basis of the bargain that was reached when Pennsylvania Plaintiff and the other Pennsylvania Subclass members purchased or leased the Coastdown Cheating Vehicles.

3106. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

3107. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

3108. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Pennsylvania Plaintiff and the Pennsylvania Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

3109. Accordingly, recovery by the Pennsylvania Plaintiff and the Pennsylvania Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Pennsylvania Plaintiff, individually and on behalf of the other Pennsylvania Subclass members, seek all remedies as allowed by law.

3110. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Pennsylvania Plaintiff and the Pennsylvania Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

3111. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this

litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

3112. As a direct and proximate result of Ford's breach of express warranties, Pennsylvania Plaintiff and the Pennsylvania Subclass have been damaged in an amount to be determined at trial.

## COUNT 231

### FRAUDULENT CONCEALMENT
### (BASED ON PENNSYLVANIA LAW)

3113. Pennsylvania Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3114. This claim is brought by Pennsylvania Plaintiff on behalf of the Pennsylvania Subclass.

3115. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Pennsylvania Plaintiff and the Pennsylvania Subclass information that is highly relevant to their purchasing decision.

3116. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to

provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

3117. Ford further affirmatively misrepresented to Pennsylvania Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

3118. Ford knew these representations were false when made.

3119. The Coastdown Cheating Vehicles purchased or leased by Pennsylvania Plaintiff and the Pennsylvania Subclass were, in fact, defective, with reduced fuel efficiency.

3120. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Pennsylvania Plaintiff and the Pennsylvania Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

3121. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed

to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

3122. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Pennsylvania Plaintiff and the Pennsylvania Subclass did not know of these facts and Ford actively concealed these facts from Pennsylvania Plaintiff and the Pennsylvania Subclass.

3123. Pennsylvania Plaintiff and the Pennsylvania Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Pennsylvania Plaintiff and the Pennsylvania Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Pennsylvania Plaintiff and the Pennsylvania Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

3124. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Pennsylvania Plaintiff and the Pennsylvania Subclass placed in its representations.

3125. Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Pennsylvania Plaintiff and the Pennsylvania Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

3126. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Pennsylvania Plaintiff and the Pennsylvania Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles. Having volunteered to provide information to Pennsylvania Plaintiff and the Pennsylvania Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the

value of the Coastdown Cheating Vehicles purchased or leased by Pennsylvania Plaintiff and the Pennsylvania Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Pennsylvania Plaintiff and the Pennsylvania Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

3127. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Pennsylvania Plaintiff and the Pennsylvania Subclass.

3128. Ford has still not made full and adequate disclosures and continues to defraud Pennsylvania Plaintiff and the Pennsylvania Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

3129. Pennsylvania Plaintiff and the Pennsylvania Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or

would have taken other affirmative steps in light of the information concealed from them. Pennsylvania Plaintiff's and the Pennsylvania Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Pennsylvania Plaintiff, or, Pennsylvania Subclass members.

3130. Because of the concealment and/or suppression of the facts, Pennsylvania Plaintiff and the Pennsylvania Subclass have sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Pennsylvania Plaintiff and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

3131. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Pennsylvania Plaintiff and the Pennsylvania Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

3132. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Pennsylvania Plaintiff's and the Pennsylvania Subclass's rights and the representations that Ford

made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 232

### NEGLIGENT MISREPRESENTATION
### (BASED ON PENNSYLVANIA LAW)

3133. Pennsylvania Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

3134. This claim is brought by the Pennsylvania Plaintiff on behalf of the Pennsylvania Subclass.

3135. Defendant made fuel economy representations to Pennsylvania Plaintiff and members of the Class that were not true.

3136. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Pennsylvania Plaintiff and Pennsylvania Subclass members rely on these misrepresentations.

3137. Pennsylvania Plaintiff reasonably relied on Defendant's representations and as a result Pennsylvania Plaintiff and Pennsylvania Subclass members were harmed.

## COUNT 233

### UNJUST ENRICHMENT
### (BASED ON PENNSYLVANIA LAW)

3138. Pennsylvania Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

3139. This claim is brought by the Pennsylvania Plaintiff on behalf of the Pennsylvania Subclass.

3140. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Pennsylvania Plaintiff and the Pennsylvania Subclass.

3141. Defendant enjoyed the benefit of increased financial gains, to the detriment of Pennsylvania Plaintiff and other Pennsylvania Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

3142. Pennsylvania Plaintiff, therefore, seeks any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Pennsylvania Subclass.

**MM.  Claims brought on behalf of the Rhode Island Subclass**

**COUNT 234**

**VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT (R.I. GEN. LAWS § 6-13.1 *et seq.*)**

3143. Rhode Island Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

3144. This claim is brought by Rhode Island Plaintiffs on behalf of the Rhode Island Subclass.

3145. Ford, Rhode Island Plaintiffs, and Rhode Island Subclass members are "persons" within the meaning of R.I. GEN. LAWS § 6-13.1-1(3).

3146. Ford was engaged in "trade" and "commerce" within the meaning of R.I. GEN. LAWS § 6-13.1-1(5).

3147. Rhode Island Plaintiffs purchased or leased Coastdown Cheating Vehicles primarily for personal, family, or household purposes within the meaning of R.I. GEN. LAWS § 6-13.1-5.2(a).

3148. Rhode Island's Unfair Trade Practices and Consumer Protection Act (Rhode Island CPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce," including "[e]ngaging in any act or practice that is unfair or deceptive to the consumer" and "[u]sing any other methods, acts or practices which mislead or deceive members of the public in a material respect." R.I. GEN. LAWS § 6-13.1-1(6).

3149. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

3150. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

3151. Ford's unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including Rhode Island Plaintiffs and the Rhode Island Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

3152. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Rhode Island Plaintiffs and the Rhode Island Subclass.

3153. Ford knew or should have known that its conduct violated the Rhode Island CPA.

3154. Ford owed Rhode Island Plaintiffs and the Rhode Island Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

a.      Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

b.      Intentionally concealed the foregoing from Rhode Island Plaintiffs and the Rhode Island Subclass; and/or

c.      Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Rhode Island Plaintiffs and the Rhode Island Subclass that contradicted these representations.

3155. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Rhode Island Plaintiffs and the Rhode Island Subclass.

3156. Rhode Island Plaintiffs and the Rhode Island Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Rhode Island Plaintiffs and the Rhode Island Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Rhode Island CPA.

3157. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Rhode Island CPA.

3158. As a direct and proximate result of Ford's violations of the Rhode Island CPA, Rhode Island Plaintiffs and the Rhode Island Subclass have suffered injury-in-fact and/or actual damage.

3159. Ford's violations present a continuing risk to Rhode Island Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

3160. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

3161. Rhode Island Plaintiffs are entitled to recover the greater of actual damages or $200 pursuant to R.I. GEN. LAWS § 6-13.1-5.2(a).

3162. Rhode Island Plaintiffs seek punitive damages based on the outrageousness and recklessness of Ford's conduct.

## COUNT 235

## BREACH OF CONTRACT
## (BASED ON RHODE ISLAND LAW)

3163. Rhode Island Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3164. This claim is brought by Rhode Island Plaintiffs on behalf of the Rhode Island Subclass.

3165. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Rhode Island Plaintiffs and the Rhode Island Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Rhode Island Plaintiffs and the Rhode Island Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Rhode Island Plaintiffs and the Rhode Island Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

3166. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Rhode Island Plaintiffs and the Rhode Island Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable

consumer would expect given the premium paid for these vehicles and the representation made by Ford.

3167. As a direct and proximate result of Ford's breach of contract, Rhode Island Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COUNT 236**

**BREACH OF EXPRESS WARRANTY**
**(R.I. GEN. LAWS § 6A-2-313)**

3168. Rhode Island Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3169. This claim is brought by Rhode Island Plaintiffs on behalf of the Rhode Island Subclass.

3170. Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to R.I. Gen. Laws § 6A-2-104.

3171. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the

shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

3172. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

3173. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

3174. These affirmations and promises were part of the basis of the bargain that was reached when Rhode Island Plaintiffs and the other Rhode Island Subclass members purchased or leased the Coastdown Cheating Vehicles.

3175. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

3176. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

3177. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Rhode Island Plaintiffs and the Rhode Island Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

3178. Accordingly, recovery by the Rhode Island Plaintiffs and the Rhode Island Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Rhode Island Plaintiffs, individually and on behalf of the other Rhode Island Subclass members, seek all remedies as allowed by law.

3179. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Rhode Island Plaintiffs and the Rhode Island Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

3180. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

3181. As a direct and proximate result of Ford's breach of express warranties, Rhode Island Plaintiffs and the Rhode Island Subclass have been damaged in an amount to be determined at trial.

**COUNT 237**

**FRAUDULENT CONCEALMENT**
**(BASED ON RHODE ISLAND LAW)**

3182. Rhode Island Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3183. This claim is brought by Rhode Island Plaintiffs on behalf of the Rhode Island Subclass.

3184. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Rhode Island Plaintiffs and the Rhode Island Subclass information that is highly relevant and material to their purchasing decision.

3185. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

3186. Ford further affirmatively misrepresented to Rhode Island Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

3187. Ford knew these representations were false when made.

3188. The Coastdown Cheating Vehicles purchased or leased by Rhode Island Plaintiffs and the Rhode Island Subclass were, in fact, defective, with reduced fuel efficiency.

3189. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Rhode Island Plaintiffs and the Rhode Island Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

3190. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

3191. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Rhode Island Plaintiffs and the Rhode Island Subclass did not know of these facts and Ford actively concealed these facts from Rhode Island Plaintiffs and the Rhode Island Subclass.

3192. Rhode Island Plaintiffs and the Rhode Island Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Rhode Island Plaintiffs and the Rhode Island Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Rhode Island Plaintiffs and the Rhode Island Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

3193. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Rhode Island Plaintiffs and the Rhode Island Subclass placed in its representations.

3194. Ford's false representations and omissions were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles.

As Ford well knew, its customers, including Rhode Island Plaintiffs and the Rhode Island Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

3195. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Rhode Island Plaintiffs and the Rhode Island Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Rhode Island Plaintiffs and the Rhode Island Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Rhode Island Plaintiffs and the Rhode Island Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are

material concerns to a consumer. Ford represented to Rhode Island Plaintiffs and the Rhode Island Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

3196. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Rhode Island Plaintiffs and the Rhode Island Subclass.

3197. Ford has still not made full and adequate disclosures and continues to defraud Rhode Island Plaintiffs and the Rhode Island Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

3198. Rhode Island Plaintiffs and the Rhode Island Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Rhode Island Plaintiffs' and the Rhode Island Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not

generally known to the public, Rhode Island Plaintiffs, or Rhode Island Subclass members.

3199. Because of the concealment and/or suppression of the facts, Rhode Island Plaintiffs and the Rhode Island Subclass have been injured and sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Rhode Island Plaintiffs and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

3200. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Rhode Island Plaintiffs and the Rhode Island Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

3201. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Rhode Island Plaintiffs' and the Rhode Island Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 238

### NEGLIGENT MISREPRESENTATION
### (BASED ON RHODE ISLAND LAW)

3202. Rhode Island Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3203. This claim is brought by the Rhode Island Plaintiffs on behalf of the Rhode Island Subclass.

3204. Defendant made fuel economy representations to Rhode Island Plaintiffs and members of the Class that were not true.

3205. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Rhode Island Plaintiffs and Rhode Island Subclass members rely on these misrepresentations.

3206. Rhode Island Plaintiffs reasonably relied on Defendant's representations and as a result Rhode Island Plaintiffs and Rhode Island Subclass members were harmed.

## COUNT 239

### UNJUST ENRICHMENT
### (BASED ON RHODE ISLAND LAW)

3207. Rhode Island Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3208. This claim is brought by the Rhode Island Plaintiffs on behalf of the Rhode Island Subclass.

3209. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Rhode Island Plaintiffs and the Rhode Island Subclass.

3210. Defendant enjoyed the benefit of increased financial gains, to the detriment of Rhode Island Plaintiffs and other Rhode Island Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

3211. Rhode Island Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Rhode Island Subclass.

**NN.**   **Claims Brought on Behalf of the South Carolina Subclass**

**COUNT 240**

**VIOLATION OF THE SOUTH CAROLINA**
**UNFAIR TRADE PRACTICES ACT**
**(S.C. CODE ANN. § 39-5-10 *et seq.*)**

3212. Plaintiff Matthew Brownlee ("South Carolina Plaintiff") hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

3213. This claim is brought by South Carolina Plaintiff on behalf of the South Carolina Subclass.

3214. The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. CODE ANN. § 39-5-20(a).

3215. Ford is a "person" under S.C. CODE ANN. § 39-5-10.

3216. In the course of its business, Ford also willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

3217. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including South Carolina Plaintiff and the South Carolina Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

3218. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead South Carolina Plaintiff and the South Carolina Subclass.

3219. Ford knew or should have known that its conduct violated the South Carolina UTPA.

3220. Ford owed South Carolina Plaintiff and the South Carolina Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

    a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

    b.    Intentionally concealed the foregoing from South Carolina Plaintiff and the South Carolina Subclass; and/or

    c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from South Carolina Plaintiff and the South Carolina Subclass that contradicted these representations.

3221. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to South Carolina Plaintiff and the South Carolina Subclass.

3222. South Carolina Plaintiff and the South Carolina Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and

failure to disclose material information. South Carolina Plaintiff and the South Carolina Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the South Carolina UTPA.

3223. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the South Carolina UTPA. As a direct and proximate result of Ford's violations of the South Carolina UTPA, South Carolina Plaintiff and the South Carolina Subclass have suffered injury-in-fact and/or actual damage.

3224. Ford's violations present a continuing risk to South Carolina Plaintiff as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

3225. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

3226. Pursuant to S.C. CODE ANN. § 39-5-140(a), Plaintiff seeks monetary relief to recover their economic losses. Because Ford's actions were willful and knowing, Plaintiffs' damages should be trebled.

3227. Plaintiff further alleges that Ford's malicious and deliberate conduct warrants an assessment of punitive damages because it carried out despicable conduct with willful and conscious disregard of the rights of others. Ford's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

3228. Plaintiff further seeks an order enjoining each Ford's unfair or deceptive acts or practices.

**COUNT 241**

**VIOLATION OF THE SOUTH CAROLINA
REGULATION OF MANUFACTURERS, DISTRIBUTORS, AND
DEALERS ACT
(S.C. CODE ANN. § 56-15-10 *et seq.*)**

3229. South Carolina Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

3230. This claim is brought by South Carolina Plaintiff on behalf of the South Carolina Subclass.

3231. Ford is a "manufacturer" under S.C. CODE ANN. § 56-15-10.

3232. Ford participated in unfair or deceptive acts or practices that violated the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act ("Dealers Act") by willfully failing to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that the fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

3233. Ford's bad faith and unconscionable actions include, but are not limited to:

a.  Representing that the Coastdown Cheating Vehicles have characteristics, uses, benefits, and qualities that they do not have;

b.  Representing that the Coastdown Cheating Vehicles are of a particular standard, quality, and grade when they are not;

c.  Advertising the Coastdown Cheating vehicles are of a particular standard, quality, and grade when they are not;

d.  Representing that a transaction involving the Coastdown Cheating Vehicles confers or involves rights, remedies, and obligations that it does not; and/or

e.  Representing that the subject of a transaction involving the Coastdown Cheating Vehicles has been supplied in accordance with a previous representation when it has not.

3234. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to South Carolina Plaintiff and the South Carolina Subclass.

3235. South Carolina Plaintiff and the South Carolina Subclass suffered ascertainable loss caused by Ford's unfair or deceptive acts or practices. South Carolina Plaintiff and the South Carolina Subclass would not have purchased the vehicle or would have paid less for it but for Ford's violations of the Dealers Act.

South Carolina Plaintiff and the South Carolina Subclass has suffered an ascertainable loss as a result of Ford's violations of the Dealers Act.

3236. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Dealers Act. As a direct and proximate result of Ford's violations of the Dealers Act, South Carolina Plaintiff and the South Carolina Subclass have suffered injury-in-fact and/or actual damage.

3237. Ford's violations present a continuing risk to South Carolina Plaintiff as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

3238. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

3239. Pursuant to S.C. CODE ANN. § 56-15-110, Plaintiff seeks monetary relief to recover their economic losses. Because Ford's actions were willful and knowing, Plaintiffs' damages should be trebled.

3240. Plaintiff further alleges that Ford's malicious and deliberate conduct warrants an assessment of punitive damages because it carried out despicable

conduct with willful and conscious disregard of the rights of others. Ford's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

3241. Plaintiff further seeks an order enjoining each Ford's unfair or deceptive acts or practices.

## COUNT 242

## BREACH OF CONTRACT
## (BASED ON SOUTH CAROLINA LAW)

3242. South Carolina Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3243. This claim is brought by the South Carolina Plaintiff on behalf of South Carolina Subclass.

3244. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused South Carolina Plaintiff and the South Carolina Subclass members to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, South Carolina Plaintiff and the South Carolina Subclass members would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, South Carolina Plaintiff and the South Carolina Subclass members

overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

3245. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to South Carolina Plaintiff and the South Carolina Subclass members defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

3246. As a direct and proximate result of Ford's breach of contract, South Carolina Plaintiff and the South Carolina Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 243

## BREACH OF EXPRESS WARRANTY
### (S.C. CODE ANN. § 36-2-313)

3247. South Carolina Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3248. This claim is brought by South Carolina Plaintiff on behalf of the South Carolina Subclass.

3249. Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to S.C. Code Ann. § 36-2-104.

3250. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

3251. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

3252. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

3253. These affirmations and promises were part of the basis of the bargain that was reached when South Carolina Plaintiff and the other South Carolina Subclass members purchased or leased the Coastdown Cheating Vehicles.

3254. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that

produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

3255. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

3256. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make South Carolina Plaintiff and the South Carolina Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

3257. Accordingly, recovery by the South Carolina Plaintiff and the South Carolina Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and South Carolina Plaintiff, individually and on behalf of the other South Carolina Subclass members, seek all remedies as allowed by law.

3258. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. South Carolina Plaintiff and the South Carolina Subclass were therefore induced to

purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

3259. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

3260. As a direct and proximate result of Ford's breach of express warranties, South Carolina Plaintiff and the South Carolina Subclass have been damaged in an amount to be determined at trial.

## COUNT 244

## FRAUDULENT CONCEALMENT
## (BASED ON SOUTH CAROLINA LAW)

3261. South Carolina Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3262. This claim is brought by the South Carolina Plaintiff on behalf of the South Carolina Subclass.

3263. Ford intentionally concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied South Carolina Plaintiff and the

South Carolina Subclass members information that is highly relevant to their purchasing decision.

3264. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

3265. Ford further affirmatively misrepresented to South Carolina Plaintiff and the South Carolina Subclass in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

3266. Ford knew these representations were false when made.

3267. The Coastdown Cheating Vehicles purchased or leased by South Carolina Plaintiff and the South Carolina Subclass members were, in fact, defective, with reduced fuel efficiency.

3268. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because South Carolina Plaintiff and

the South Carolina Subclass members relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

3269. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

3270. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; South Carolina Plaintiff and the South Carolina Subclass members did not know of these facts and Ford actively concealed these facts from South Carolina Plaintiff and the South Carolina Subclass members.

3271. South Carolina Plaintiff and the South Carolina Subclass members reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, South Carolina Plaintiff and the South Carolina Subclass members did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive South Carolina Plaintiff and the South Carolina Subclass members by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

3272. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that South Carolina Plaintiff and the South Carolina Subclass members placed in its representations.

3273. Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including South Carolina Plaintiff and the South Carolina Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

3274. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by South Carolina Plaintiff and the South Carolina Subclass members. Ford also had a duty to disclose because it made general affirmative representations

about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to South Carolina Plaintiff and the South Carolina Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by South Carolina Plaintiff and the South Carolina Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to South Carolina Plaintiff and the South Carolina Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

3275. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of South Carolina Plaintiff and the South Carolina Subclass members.

3276. Ford has still not made full and adequate disclosures and continues to defraud South Carolina Plaintiff and the South Carolina Subclass members by

concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

3277. South Carolina Plaintiff and the South Carolina Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. South Carolina Plaintiff's and the South Carolina Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, South Carolina Plaintiff, or the South Carolina Subclass members.

3278. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to South Carolina Plaintiff and the South Carolina Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

3279. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of South Carolina Plaintiff's and South Carolina Subclass members' rights and the representations that Ford made to them were made in order to enrich Ford. Ford's conduct warrants an

assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 245

### NEGLIGENT MISREPRESENTATION
### (BASED ON SOUTH CAROLINA LAW)

3280. South Carolina Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

3281. This claim is brought by the South Carolina Plaintiff on behalf of the South Carolina Subclass.

3282. Defendant made fuel economy representations to South Carolina Plaintiff and members of the Class that were not true.

3283. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that South Carolina Plaintiff and South Carolina Subclass members rely on these misrepresentations.

3284. South Carolina Plaintiff reasonably relied on Defendant's representations and as a result South Carolina Plaintiff and South Carolina Subclass members were harmed.

## COUNT 246

### UNJUST ENRICHMENT
### (BASED ON SOUTH CAROLINA LAW)

3285. South Carolina Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

3286. This claim is brought by the South Carolina Plaintiff on behalf of the South Carolina Subclass.

3287. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to South Carolina Plaintiff and the South Carolina Subclass.

3288. Defendant enjoyed the benefit of increased financial gains, to the detriment of South Carolina Plaintiff and other South Carolina Subclass members. It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

3289. South Carolina Plaintiff, therefore, seeks any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the South Carolina Subclass.

## OO.   Claims Brought on Behalf of the South Dakota Subclass

### COUNT 247

### VIOLATION OF THE SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAW (S.D. CODIFIED LAWS § 37-24-6)

3290. Plaintiff Robert Raney ("South Dakota Plaintiff") hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

3291. This claim is brought by South Dakota Plaintiff on behalf of the South Dakota Subclass.

3292. The South Dakota Deceptive Trade Practices and Consumer Protection Law ("South Dakota CPL") prohibits deceptive acts or practices, which include "[k]nowingly act[ing], us[ing], or employ[ing] any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby." S.D. CODIFIED LAWS §§ 37-24-6(1), 37-24-31.

3293. All of the acts complained of herein were perpetrated by Ford in the course of trade or commerce.

3294. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

3295. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

3296. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including South Dakota Plaintiff and the South Dakota Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

3297. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead South Dakota Plaintiff and the South Dakota Subclass.

3298. Ford knew or should have known that its conduct violated the South Dakota CPL.

3299. Ford owed South Dakota Plaintiff and the South Dakota Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

    a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

    b.    Intentionally concealed the foregoing from South Dakota Plaintiff and the South Dakota Subclass; and/or

    c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding

material facts from South Dakota Plaintiff and the South Dakota Subclass that contradicted these representations.

3300. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to South Dakota Plaintiff and the South Dakota Subclass.

3301. South Dakota Plaintiff and the South Dakota Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. South Dakota Plaintiff and the South Dakota Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the South Dakota CPL.

3302. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the South Dakota CPL. As a direct and proximate result of Ford's violations of the South Dakota CPL, South Dakota Plaintiff and the South Dakota Subclass have suffered injury-in-fact and/or actual damage.

3303. Ford's violations present a continuing risk to South Dakota Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

3304. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the

defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

3305. Under S.D. CODIFIED LAWS § 37-24-31, Plaintiffs are entitled to a recovery of their actual damages suffered as a result of Ford's acts and practices.

3306. Plaintiffs also seek punitive damages because Ford engaged in aggravated and outrageous conduct.

## COUNT 248

## BREACH OF CONTRACT
## (BASED ON SOUTH DAKOTA LAW)

3307. South Dakota Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3308. This claim is brought by the South Dakota Plaintiff on behalf of South Dakota Subclass.

3309. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused South Dakota Plaintiff and the South Dakota Subclass members to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, South Dakota Plaintiff and the South Dakota Subclass members would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown

Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, South Dakota Plaintiff and the South Dakota Subclass members overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

3310. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to South Dakota Plaintiff and the South Dakota Subclass Class members defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

3311. As a direct and proximate result of Ford's breach of contract, South Dakota Plaintiff and the South Dakota Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 249

## BREACH OF EXPRESS WARRANTY
## (S.D. CODIFIED LAWS § 57A-2-313)

3312. South Dakota Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3313. This claim is brought by South Dakota Plaintiff on behalf of the South Dakota Subclass.

3314. Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to S.D. Codified Laws § 57A-2-104.

3315. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

3316. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

3317. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

3318. These affirmations and promises were part of the basis of the bargain that was reached when South Dakota Plaintiff and the other South Dakota Subclass members purchased or leased the Coastdown Cheating Vehicles.

3319. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

3320. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

3321. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make South Dakota Plaintiff and the South Dakota Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

3322. Accordingly, recovery by the South Dakota Plaintiff and the South Dakota Subclass is not limited to the NVLW promising to repair and/or correct a

manufacturing defect, and South Dakota Plaintiff, individually and on behalf of the other South Dakota Subclass members, seek all remedies as allowed by law.

3323. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. South Dakota Plaintiff and the South Dakota Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

3324. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

3325. As a direct and proximate result of Ford's breach of express warranties, South Dakota Plaintiff and the South Dakota Subclass have been damaged in an amount to be determined at trial.

## COUNT 250

## FRAUDULENT CONCEALMENT
## (BASED ON SOUTH DAKOTA LAW)

3326. South Dakota Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3327. This claim is brought by the South Dakota Plaintiff on behalf of the South Dakota Subclass.

3328. Ford intentionally concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied South Dakota Plaintiff and the South Dakota Subclass members information that is highly relevant to their purchasing decision.

3329. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

3330. Ford further affirmatively misrepresented to South Dakota Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

3331. Ford knew these representations were false when made.

3332. The Coastdown Cheating Vehicles purchased or leased by South Dakota Plaintiff and the South Dakota Subclass members were, in fact, defective, with reduced fuel efficiency.

3333. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because South Dakota Plaintiff and the South Dakota Subclass members relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

3334. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

3335. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; South Dakota Plaintiff and the South Dakota Subclass members did not know of these facts and Ford actively concealed these facts from South Dakota Plaintiff and the South Dakota Subclass members.

3336. South Dakota Plaintiff and the South Dakota Subclass members reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, South Dakota Plaintiff and the South Dakota Subclass members did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive South Dakota Plaintiff and the South Dakota Subclass members by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

3337. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that South Dakota Plaintiff and the South Dakota Subclass members placed in its representations.

3338. Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including South Dakota Plaintiff and the South Dakota Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

3339. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by South Dakota Plaintiff and the South Dakota Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles. Having volunteered to provide information to South Dakota Plaintiff and the South Dakota Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by South Dakota Plaintiff and the South Dakota Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to South Dakota Plaintiff and the South Dakota Subclass members that they were purchasing or leasing fuel efficient

vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

3340. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of South Dakota Plaintiff and the South Dakota Subclass members.

3341. Ford has still not made full and adequate disclosures and continues to defraud South Dakota Plaintiff and the South Dakota Subclass members by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

3342. South Dakota Plaintiff and the South Dakota Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. South Dakota Plaintiff's and the South Dakota Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, South Dakota Plaintiff, or South Dakota Subclass members.

3343. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to South Dakota Plaintiff and the South Dakota Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

3344. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of South Dakota Plaintiff's and South Dakota Subclass members' rights and the representations that Ford made to them were made in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 251

## NEGLIGENT MISREPRESENTATION
## (BASED ON SOUTH DAKOTA LAW)

3345. South Dakota Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

3346. This claim is brought by the South Dakota Plaintiff on behalf of the South Dakota Subclass.

3347. Defendant made fuel economy representations to South Dakota Plaintiff and members of the Class that were not true.

3348. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that South Dakota Plaintiff and South Dakota Subclass members rely on these misrepresentations.

3349. South Dakota Plaintiff reasonably relied on Defendant's representations and as a result South Dakota Plaintiff and South Dakota Subclass members were harmed.

## COUNT 252

## UNJUST ENRICHMENT
## (BASED ON SOUTH DAKOTA LAW)

3350. South Dakota Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

3351. This claim is brought by the South Dakota Plaintiff on behalf of the South Dakota Subclass.

3352. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to South Dakota Plaintiff and the South Dakota Subclass.

3353. Defendant enjoyed the benefit of increased financial gains, to the detriment of South Dakota Plaintiff and other South Dakota Subclass members. It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

3354. South Dakota Plaintiff, therefore, seeks any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the South Dakota Subclass.

**PP.   Claims Brought on Behalf of the Tennessee Subclass**

### COUNT 253

### VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT
(TENN. CODE § 47-18-101, *et seq.*)

3355. Plaintiff James Williams ("Tennessee Plaintiff") incorporates by reference all paragraphs alleged herein.

3356. This claim is brought by Tennessee Plaintiff on behalf of the Tennessee Subclass.

3357. Tennessee Plaintiff and the Tennessee Subclass are "natural persons" and "consumers" within the meaning of TENN. CODE § 47-18-103(2).

3358. Ford is a "person" within the meaning of TENN. CODE § 47-18-103(2).

3359. Ford's conduct complained of herein affected "trade," "commerce" or "consumer transactions" within the meaning of TENN. CODE § 47-18-103(19).

3360. The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including but not limited to: "Representing that goods or services have . . . characteristics, [or] . . . benefits . . . that they do not have . . . ."; "Representing that goods or services are of a particular standard, quality or grade . . . if they are of

another"; and "Advertising goods or services with intent not to sell them as advertised." TENN. CODE § 47-18-104. Ford violated the Tennessee CPA by engaging in unfair or deceptive acts, including representing that Coastdown Cheating Vehicles have characteristics or benefits that they did not have; representing that Coastdown Cheating Vehicles are of a particular standard, quality, or grade when they are of another; and advertising Coastdown Cheating Vehicles with intent not to sell them as advertised.

3361. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

3362. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

3363. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Tennessee Plaintiff and the Tennessee Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel

economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

3364. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Tennessee Plaintiff and the Tennessee Subclass.

3365. Ford knew or should have known that its conduct violated the Tennessee CPA.

3366. Ford owed Tennessee Plaintiff and the Tennessee Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

   a.   Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

   b.   Intentionally concealed the foregoing from Tennessee Plaintiff and the Tennessee Subclass; and/or

   c.   Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Tennessee Plaintiff and the Tennessee Subclass that contradicted these representations.

3367. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Tennessee Plaintiff and the Tennessee Subclass.

3368. Tennessee Plaintiff and the Tennessee Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Tennessee Plaintiff and the Tennessee Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Tennessee CPA.

3369. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Tennessee CPA. As a direct and proximate result of Ford's violations of the Tennessee CPA, Tennessee Plaintiff and the Tennessee Subclass have suffered injury-in-fact and/or actual damage.

3370. Ford's violations present a continuing risk to Tennessee Plaintiff as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

3371. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

3372. Pursuant to TENN. CODE § 47-18-109(a), Tennessee Plaintiff, individually and on behalf of the Tennessee Subclass members, seeks monetary

relief against Ford measured as actual damages in an amount to be determined at trial, treble damages as a result of Ford's willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

3373. Plaintiffs also seek punitive damages because Ford engaged in aggravated and outrageous conduct.

## COUNT 254

## BREACH OF CONTRACT
## (BASED ON TENNESSEE LAW)

3374. Tennessee Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3375. This claim is brought by Tennessee Plaintiff on behalf of the Tennessee Subclass.

3376. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Tennessee Plaintiff and the Tennessee Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Tennessee Plaintiff and the Tennessee Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Tennessee Plaintiff and the Tennessee

Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

3377. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Tennessee Plaintiff and the Tennessee Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

3378. As a direct and proximate result of Ford's breach of contract, Tennessee Plaintiff and the Tennessee Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 255

## BREACH OF EXPRESS WARRANTY
### (TENN. CODE ANN. § 47-2-313)

3379. Tennessee Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3380. This claim is brought by Tennessee Plaintiff on behalf of the Tennessee Subclass.

3381. Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to Tenn. Code Ann. § 47-2-104.

3382. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

3383. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

3384. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

3385. These affirmations and promises were part of the basis of the bargain that was reached when Tennessee Plaintiff and the other Tennessee Subclass members purchased or leased the Coastdown Cheating Vehicles.

3386. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that

produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

3387. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

3388. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Tennessee Plaintiff and the Tennessee Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

3389. Accordingly, recovery by the Tennessee Plaintiff and the Tennessee Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Tennessee Plaintiff, individually and on behalf of the other Tennessee Subclass members, seek all remedies as allowed by law.

3390. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Tennessee

Plaintiff and the Tennessee Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

3391. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

3392. As a direct and proximate result of Ford's breach of express warranties, Tennessee Plaintiff and the Tennessee Subclass have been damaged in an amount to be determined at trial.

## COUNT 256

## FRAUDULENT CONCEALMENT
## (BASED ON TENNESSEE LAW)

3393. Tennessee Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3394. This claim is brought by Tennessee Plaintiff on behalf of the Tennessee Subclass.

3395. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard

for the truth and denied Tennessee Plaintiff and the Tennessee Subclass information that is highly relevant to their purchasing decision.

3396. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

3397. Ford further affirmatively misrepresented to Tennessee Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

3398. Ford knew these representations were false when made.

3399. The Coastdown Cheating Vehicles purchased or leased by Tennessee Plaintiff and the Tennessee Subclass were, in fact, defective, with reduced fuel efficiency.

3400. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Tennessee Plaintiff and the Tennessee Subclass relied on Ford's material representations or omissions of fact

that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

3401. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

3402. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Tennessee Plaintiff and the Tennessee Subclass did not know of these facts and Ford actively concealed these facts from Tennessee Plaintiff and the Tennessee Subclass.

3403. Tennessee Plaintiff and the Tennessee Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Tennessee Plaintiff and the Tennessee Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Tennessee Plaintiff and the Tennessee Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

3404. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions

regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Tennessee Plaintiff and the Tennessee Subclass placed in its representations.

3405. Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Tennessee Plaintiff and the Tennessee Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

3406. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Tennessee Plaintiff and the Tennessee Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles. Having volunteered to provide

information to Tennessee Plaintiff and the Tennessee Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Tennessee Plaintiff and the Tennessee Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Tennessee Plaintiff and the Tennessee Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

3407. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Tennessee Plaintiff and the Tennessee Subclass.

3408. Ford has still not made full and adequate disclosures and continues to defraud Tennessee Plaintiff and the Tennessee Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

3409. Tennessee Plaintiff and the Tennessee Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did

if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Tennessee Plaintiff's and the Tennessee Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Tennessee Plaintiff, or, Tennessee Subclass members.

3410. Because of the concealment and/or suppression of the facts, Tennessee Plaintiff and the Tennessee Subclass have sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Tennessee Plaintiff and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

3411. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Tennessee Plaintiff and the Tennessee Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

3412. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Tennessee Plaintiff's and the Tennessee Subclass's rights and the representations that Ford made to them

in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 257

## NEGLIGENT MISREPRESENTATION
## (BASED ON TENNESSEE LAW)

3413. Tennessee Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

3414. This claim is brought by the Tennessee Plaintiff on behalf of the Tennessee Subclass.

3415. Defendant made fuel economy representations to Tennessee Plaintiff and members of the Class that were not true.

3416. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Tennessee Plaintiff and Tennessee Subclass members rely on these misrepresentations.

3417. Tennessee Plaintiff reasonably relied on Defendant's representations and as a result Tennessee Plaintiff and Tennessee Subclass members were harmed.

## COUNT 258

## UNJUST ENRICHMENT
## (BASED ON TENNESSEE LAW)

3418. Tennessee Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

3419. This claim is brought by the Tennessee Plaintiff on behalf of the Tennessee Subclass.

3420. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Tennessee Plaintiff and the Tennessee Subclass.

3421. Defendant enjoyed the benefit of increased financial gains, to the detriment of Tennessee Plaintiff and other Tennessee Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

3422. Tennessee Plaintiff, therefore, seeks any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Tennessee Subclass.

## QQ.  Claims Brought on Behalf of the Texas Subclass

### COUNT 259

### VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT (TEX. BUS. & COM. CODE § 17.4 *ET SEQ.*)

3423. Plaintiffs David Brewer, Rosalynda Garza, Marshall B. Lloyd, and Michael Smith ("Texas Plaintiffs") incorporate by reference all paragraphs alleged herein.

3424. This claim is brought by Texas Plaintiffs on behalf of the Texas Subclass.

3425. Texas Plaintiffs and the Texas Subclass members are individuals with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets). *See* TEX. BUS. & COM. CODE § 17.41.

3426. The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") provides a private right of action to a consumer where the consumer suffers economic damage as the result of either (i) the use of false, misleading, or deceptive act or practice specifically enumerated in TEX. BUS. & COM. CODE § 17.46(b); or (ii) "an unconscionable action or course of action by any person." TEX. BUS. & COM. CODE § 17.50(a)(2) & (3). The Texas DTPA declares several specific actions to be unlawful, including: "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have"; "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another"; and "(9) advertising goods or services with intent not to sell them as advertised." An "unconscionable action or course of action" means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." TEX. BUS. & COM. CODE § 17.45(5). As detailed herein, Ford has engaged

in an unconscionable action or course of action and thereby caused economic damages to the Texas Class.

3427. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

3428. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

3429. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Texas Plaintiffs and the Texas Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

3430. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Texas Plaintiffs and the Texas Subclass.

3431. Ford knew or should have known that its conduct violated the Texas DTPA.

3432. Ford owed Texas Plaintiffs and the Texas Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

    a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

    b.    Intentionally concealed the foregoing from Texas Plaintiffs and the Texas Subclass; and/or

    c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Texas Plaintiffs and the Texas Subclass that contradicted these representations.

3433. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Texas Plaintiffs and the Texas Subclass.

3434. Texas Plaintiffs and the Texas Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Texas Plaintiffs and the Texas Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Texas DTPA.

3435. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Texas DTPA. As a direct and proximate result of Ford's violations of the Texas DTPA, Texas Plaintiffs and the Texas Subclass have suffered injury-in-fact and/or actual damage.

3436. Ford's violations present a continuing risk to Texas Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

3437. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

3438. On June 20, 2019, Plaintiffs sent a letter complying with TEX. BUS. & COM. CODE Ann. § 17.505 to Ford.

3439. On July 22, 2019, a copy of the complaint, *Brewer, et. al. v. Ford Motor Company*, No. 19-12135-SJM-RSW, (E.D. Mich. Jul. 22, 2019), now transferred into this MDL, was mailed to the Attorney General of the State of Texas in accordance with TEX. BUS. & COM. CODE Ann. § 17:501.

3440. Texas Plaintiffs seek monetary relief against Ford measured as actual damages in an amount to be determined at trial, treble damages for Ford's knowing

violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA.

3441. Alternatively, or additionally, pursuant to TEX. BUS. & COM. CODE § 17.50(b)(3) & (4), Texas Plaintiffs are also entitled to disgorgement or to rescission or to any other relief necessary to restore any money or property that was acquired from Texas Plaintiffs based on violations of the Texas DTPA or which the Court deems proper. Plaintiffs also seek an award of punitive damages due to Ford's aggravated and outrageous conduct.

3442. On July 22, 2019, a copy of the complaint, *Brewer, et. al. v. Ford Motor Company*, No. 19-12135-SJM-RSW, (E.D. Mich. Jul. 22, 2019), now transferred into this MDL, was mailed to the Attorney General of the State of Texas in accordance with Tex. Bis. & Com. Code § 17:501.

3443. Texas Plaintiffs have also provided Ford with pre-suit notice.

## COUNT 260

## BREACH OF CONTRACT
## (BASED ON TEXAS LAW)

3444. Texas Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3445. This claim is brought by Texas Plaintiffs on behalf of the Texas Subclass.

- 833 -

3446. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Texas Plaintiffs and the Texas Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Texas Plaintiffs and the Texas Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Texas Plaintiffs and the Texas Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

3447. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Texas Plaintiffs and the Texas Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

3448. As a direct and proximate result of Ford's breach of contract, Texas Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 261

## BREACH OF EXPRESS WARRANTY
## (TEX. BUS. & COM. CODE § 2.313)

3449. Texas Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3450. This claim is brought by Texas Plaintiffs on behalf of the Texas Subclass.

3451. Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to Tex. Bus. & Com. Code § 2.104.

3452. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

3453. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

3454. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

3455. These affirmations and promises were part of the basis of the bargain that was reached when Texas Plaintiffs and the other Texas Subclass members purchased or leased the Coastdown Cheating Vehicles.

3456. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

3457. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

3458. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Texas Plaintiffs and the Texas Subclass whole, and because

Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

3459. Accordingly, recovery by the Texas Plaintiffs and the Texas Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Texas Plaintiffs, individually and on behalf of the other Texas Subclass members, seek all remedies as allowed by law.

3460. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Texas Plaintiffs and the Texas Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

3461. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

3462. As a direct and proximate result of Ford's breach of express warranties, Texas Plaintiffs and the Texas Subclass have been damaged in an amount to be determined at trial.

## COUNT 262

## FRAUDULENT CONCEALMENT
## (BASED ON TEXAS LAW)

3463. Texas Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3464. This claim is brought by Texas Plaintiffs on behalf of the Texas Subclass.

3465. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Texas Plaintiffs and the Texas Subclass information that is highly relevant to their purchasing decision.

3466. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

3467. Ford further affirmatively misrepresented to Texas Plaintiffs in advertising and other forms of communication, including standard and uniform

material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

3468. Ford knew these representations were false when made.

3469. The Coastdown Cheating Vehicles purchased or leased by Texas Plaintiffs and the Texas Subclass were, in fact, defective, with reduced fuel efficiency.

3470. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Texas Plaintiffs and the Texas Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

3471. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

3472. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Texas Plaintiffs and the Texas Subclass did

not know of these facts and Ford actively concealed these facts from Texas Plaintiffs and the Texas Subclass.

3473. Texas Plaintiffs and the Texas Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Texas Plaintiffs and the Texas Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Texas Plaintiffs and the Texas Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

3474. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Texas Plaintiffs and the Texas Subclass placed in its representations.

3475. Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Texas Plaintiffs and the Texas Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

3476. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Texas Plaintiffs and the Texas Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Texas Plaintiffs and the Texas Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Texas Plaintiffs and the Texas Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Texas Plaintiffs and the Texas Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating

Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

3477. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Texas Plaintiffs and the Texas Subclass.

3478. Ford has still not made full and adequate disclosures and continues to defraud Texas Plaintiffs and the Texas Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

3479. Texas Plaintiffs and the Texas Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Texas Plaintiffs' and the Texas Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Texas Plaintiffs, or Texas Subclass members.

3480. Because of the concealment and/or suppression of the facts, Texas Plaintiffs and the Texas Subclass have sustained damage because they overpaid for

their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Texas Plaintiff and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

3481. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Texas Plaintiffs and the Texas Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

3482. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Texas Plaintiffs' and the Texas Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 263

## NEGLIGENT MISREPRESENTATION
### (BASED ON TEXAS LAW)

3483. Texas Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3484. This claim is brought by the Texas Plaintiffs on behalf of the Texas Subclass.

3485. Defendant made fuel economy representations to Texas Plaintiffs and members of the Class that were not true.

3486. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Texas Plaintiffs and Texas Subclass members rely on these misrepresentations.

3487. Texas Plaintiffs reasonably relied on Defendant's representations and as a result Texas Plaintiffs and Texas Subclass members were harmed.

## COUNT 264

## UNJUST ENRICHMENT
## (BASED ON TEXAS LAW)

3488. Texas Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3489. This claim is brought by the Texas Plaintiffs on behalf of the Texas Subclass.

3490. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Texas Plaintiffs and the Texas Subclass.

3491. Defendant enjoyed the benefit of increased financial gains, to the detriment of Texas Plaintiffs and other Texas Subclass members. It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

3492. Texas Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Texas Subclass.

## RR. Claims Brought on Behalf of the Utah Subclass

### COUNT 265

### VIOLATION OF THE UTAH CONSUMER SALE PRACTICES ACT (UTAH CODE ANN. § 13-11-1 *ET SEQ.*)

3493. Plaintiff Al Balls ("Utah Plaintiff") hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

3494. This claim is brought by Utah Plaintiff on behalf of the Utah Subclass.

3495. The Utah Consumer Sales Practices Act ("Utah CSPA") makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction," including but not limited to indicating that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not; indicating that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not; and "indicat[ing] that a specific price advantage exists, if it does not." UTAH CODE ANN. § 13-11-4.

3496. Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

3497. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

3498. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Utah Plaintiff and the Utah Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

3499. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Utah Plaintiff and the Utah Subclass.

3500. Ford knew or should have known that its conduct violated the Utah CSPA.

3501. Ford owed Utah Plaintiff and the Utah Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

      a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

      b.    Intentionally concealed the foregoing from Utah Plaintiff and the Utah Subclass; and/or

      c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Utah Plaintiff and the Utah Subclass that contradicted these representations.

3502. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Utah Plaintiff and the Utah Subclass.

3503. Utah Plaintiff and the Utah Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Utah Plaintiff and the Utah Subclass members who purchased the

Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Utah CSPA.

3504. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Utah CSPA. As a direct and proximate result of Ford's violations of the Utah CSPA, Utah Plaintiff and the Utah Subclass have suffered injury-in-fact and/or actual damage.

3505. Ford's violations present a continuing risk to Utah Plaintiff as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

3506. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

3507. Ford knew, or had reason to know, that consumers would rely on their failure to disclose the defects in its emissions system. Ford therefore engaged in an unconscionable act within the meaning of UTAH CODE ANN. § 13-11-5.

3508. Pursuant to UTAH CODE ANN. § 13-11-4, Utah Plaintiff seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $2,000 for each Plaintiff;

reasonable attorneys' fees; and any other just and proper relief available under the Utah CSPA. Plaintiffs also seek an award of punitive damages due to Ford's aggravated and outrageous conduct.

3509. On July 22, 2019, a copy of the complaint, *Brewer, et. al. v. Ford Motor Company*, No. 19-12135-SJM-RSW, (E.D. Mich. Jul. 22, 2019), now transferred into this MDL, was mailed to the Attorney General of the State of Utah in accordance with UTAH CODE ANN. § 13-11-4, *et seq*.

## COUNT 266

## BREACH OF CONTRACT
## (BASED ON UTAH LAW)

3510. Utah Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3511. This claim is brought by Utah Plaintiff on behalf of the Utah Subclass.

3512. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Utah Plaintiff and the Utah Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Utah Plaintiff and the Utah Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not

contain the reduced mileage. Accordingly, Utah Plaintiff and the Utah Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

3513. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Utah Plaintiff and the Utah Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

3514. As a direct and proximate result of Ford's breach of contract, Utah Plaintiff and the Utah Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 267

## BREACH OF EXPRESS WARRANTY
## (UTAH CODE ANN. § 70A-2-313)

3515. Utah Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3516. This claim is brought by Utah Plaintiff on behalf of the Utah Subclass.

3517. Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to Utah Code Ann. § 70A-2-104.

3518. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

3519. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

3520. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

3521. These affirmations and promises were part of the basis of the bargain that was reached when Utah Plaintiff and the other Utah Subclass members purchased or leased the Coastdown Cheating Vehicles.

3522. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that

produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

3523. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

3524. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Utah Plaintiff and the Utah Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

3525. Accordingly, recovery by the Utah Plaintiff and the Utah Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Utah Plaintiff, individually and on behalf of the other Utah Subclass members, seek all remedies as allowed by law.

3526. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Utah Plaintiff

and the Utah Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

3527. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

3528. As a direct and proximate result of Ford's breach of express warranties, Utah Plaintiff and the Utah Subclass have been damaged in an amount to be determined at trial.

## COUNT 268

## FRAUDULENT CONCEALMENT
## (BASED ON UTAH LAW)

3529. Utah Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3530. This claim is brought by Utah Plaintiff on behalf of the Utah Subclass.

3531. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Utah Plaintiff and the Utah Subclass information that is highly relevant to their purchasing decision.

3532. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

3533. Ford further affirmatively misrepresented to Utah Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

3534. Ford knew these representations were false when made.

3535. The Coastdown Cheating Vehicles purchased or leased by Utah Plaintiff and the Utah Subclass were, in fact, defective, with reduced fuel efficiency.

3536. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Utah Plaintiff and the Utah Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

3537. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

3538. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Utah Plaintiff and the Utah Subclass did not know of these facts and Ford actively concealed these facts from Utah Plaintiff and the Utah Subclass.

3539. Utah Plaintiff and the Utah Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Utah Plaintiff and the Utah Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Utah Plaintiff and the Utah Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

3540. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized

profits and sales above the trust that Utah Plaintiff and the Utah Subclass placed in its representations.

3541. Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Utah Plaintiff and the Utah Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

3542. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Utah Plaintiff and the Utah Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Utah Plaintiff and the Utah Subclass members, Ford had the duty to disclose not just

the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Utah Plaintiff and the Utah Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Utah Plaintiff and the Utah Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

3543. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Utah Plaintiff and the Utah Subclass.

3544. Ford has still not made full and adequate disclosures and continues to defraud Utah Plaintiff and the Utah Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

3545. Utah Plaintiff and the Utah Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would

have taken other affirmative steps in light of the information concealed from them. Utah Plaintiff's and the Utah Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Utah Plaintiff, or, Utah Subclass members.

3546. Because of the concealment and/or suppression of the facts, Utah Plaintiff and the Utah Subclass have sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Utah Plaintiff and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

3547. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Utah Plaintiff and the Utah Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

3548. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Utah Plaintiff's and the Utah Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an

amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 269

## NEGLIGENT MISREPRESENTATION
## (BASED ON UTAH LAW)

3549. Utah Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

3550. This claim is brought by the Utah Plaintiff on behalf of the Utah Subclass.

3551. Defendant made fuel economy representations to Utah Plaintiff and members of the Class that were not true.

3552. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Utah Plaintiff and Utah Subclass members rely on these misrepresentations.

3553. Utah Plaintiff reasonably relied on Defendant's representations and as a result Utah Plaintiff and Utah Subclass members were harmed.

## COUNT 270

## UNJUST ENRICHMENT
## (BASED ON UTAH LAW)

3554. Utah Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

3555. This claim is brought by the Utah Plaintiff on behalf of the Utah Subclass.

3556. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Utah Plaintiff and the Utah Subclass.

3557. Defendant enjoyed the benefit of increased financial gains, to the detriment of Utah Plaintiff and other Utah Subclass members. It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

3558. Utah Plaintiff, therefore, seeks any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Utah Subclass.

**SS. Claims brought on behalf of the Vermont Subclass**

**COUNT 271**

**VIOLATION OF THE VERMONT CONSUMER FRAUD ACT
(VT. STAT. ANN. TIT. 9, § 2451 *ET SEQ.*)**

3559. Vermont Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

3560. This claim is brought by Vermont Plaintiffs on behalf of the Vermont Subclass.

3561. Ford was a seller within the meaning of VT. STAT. ANN. TIT. 9, § 2451(a)(c).

3562. The Vermont Consumer Fraud Act (Vermont CFA) makes unlawful "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce." VT. STAT. ANN. TIT. 9, § 2453(a).

3563. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

3564. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

3565. Ford's unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including Vermont Plaintiffs and the Vermont Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

3566. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Vermont Plaintiffs and the Vermont Subclass.

3567. Ford knew or should have known that its conduct violated the Vermont CFA.

3568. Ford owed Vermont Plaintiffs and the Vermont Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

> a.   Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;
>
> b.   Intentionally concealed the foregoing from Vermont Plaintiffs and the Vermont Subclass; and/or
>
> c.   Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Vermont Plaintiffs and the Vermont Subclass that contradicted these representations.

3569. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Vermont Plaintiffs and the Vermont Subclass.

3570. Vermont Plaintiffs and the Vermont Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to

disclose material information. Vermont Plaintiffs and the Vermont Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Vermont CFA.

3571. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Vermont CFA.

3572. As a direct and proximate result of Ford's violations of the Vermont CFA, Vermont Plaintiffs and the Vermont Subclass have suffered injury-in-fact and/or actual damage.

3573. Ford's violations present a continuing risk to Vermont Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

3574. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

3575. Vermont Plaintiffs are entitled to recover "appropriate equitable relief" and "the amount of [their] damages, or the consideration or the value of the consideration given by [them], reasonable attorney's fees, and exemplary damages

not exceeding three times the value of the consideration given by [them]," pursuant to VT. STAT. ANN. TIT. 9, § 2461(b).

3576. Vermont Plaintiffs seek punitive damages based on the outrageousness and recklessness of Ford's conduct.

## COUNT 272

### BREACH OF CONTRACT
### (BASED ON VERMONT LAW)

3577. Vermont Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3578. This claim is brought by Vermont Plaintiffs on behalf of the Vermont Subclass.

3579. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Vermont Plaintiffs and the Vermont Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Vermont Plaintiffs and the Vermont Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Vermont Plaintiffs and the Vermont

Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

3580. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Vermont Plaintiffs and the Vermont Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

3581. As a direct and proximate result of Ford's breach of contract, Vermont Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 273

## BREACH OF EXPRESS WARRANTY
## (9A VT. STAT. ANN. § 2-313)

3582. Vermont Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3583. This claim is brought by Vermont Plaintiffs on behalf of the Vermont Subclass.

3584. Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to 9A Vt. Stat. Ann. § 2-104.

3585. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

3586. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

3587. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

3588. These affirmations and promises were part of the basis of the bargain that was reached when Vermont Plaintiffs and the other Vermont Subclass members purchased or leased the Coastdown Cheating Vehicles.

3589. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that

produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

3590. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

3591. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Vermont Plaintiffs and the Vermont Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

3592. Accordingly, recovery by the Vermont Plaintiffs and the Vermont Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Vermont Plaintiffs, individually and on behalf of the other Vermont Subclass members, seek all remedies as allowed by law.

3593. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Vermont

Plaintiffs and the Vermont Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

3594. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

3595. As a direct and proximate result of Ford's breach of express warranties, Vermont Plaintiffs and the Vermont Subclass have been damaged in an amount to be determined at trial.

### COUNT 274

### FRAUDULENT CONCEALMENT
### (BASED ON VERMONT LAW)

3596. Vermont Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3597. This claim is brought by Vermont Plaintiffs on behalf of the Vermont Subclass.

3598. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard

for the truth and denied Vermont Plaintiffs and the Vermont Subclass information that is highly relevant and material to their purchasing decision.

3599. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

3600. Ford further affirmatively misrepresented to Vermont Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

3601. Ford knew these representations were false when made.

3602. The Coastdown Cheating Vehicles purchased or leased by Vermont Plaintiffs and the Vermont Subclass were, in fact, defective, with reduced fuel efficiency.

3603. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Vermont Plaintiffs and the Vermont Subclass relied on Ford's material representations or omissions of fact that

the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

3604. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

3605. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Vermont Plaintiffs and the Vermont Subclass did not know of these facts and Ford actively concealed these facts from Vermont Plaintiffs and the Vermont Subclass.

3606. Vermont Plaintiffs and the Vermont Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Vermont Plaintiffs and the Vermont Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Vermont Plaintiffs and the Vermont Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

3607. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions

regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Vermont Plaintiffs and the Vermont Subclass placed in its representations.

3608. Ford's false representations and omissions were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Vermont Plaintiffs and the Vermont Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

3609. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Vermont Plaintiffs and the Vermont Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles. Having volunteered to provide

information to Vermont Plaintiffs and the Vermont Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Vermont Plaintiffs and the Vermont Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Vermont Plaintiffs and the Vermont Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

3610. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Vermont Plaintiffs and the Vermont Subclass.

3611. Ford has still not made full and adequate disclosures and continues to defraud Vermont Plaintiffs and the Vermont Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

3612. Vermont Plaintiffs and the Vermont Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did

if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Vermont Plaintiffs' and the Vermont Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Vermont Plaintiffs, or Vermont Subclass members.

3613. Because of the concealment and/or suppression of the facts, Vermont Plaintiffs and the Vermont Subclass have been injured and sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Vermont Plaintiffs and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

3614. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Vermont Plaintiffs and the Vermont Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

3615. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Vermont Plaintiffs' and the Vermont Subclass's rights and the representations that Ford made to them

- 873 -

in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COUNT 275

### NEGLIGENT MISREPRESENTATION
### (BASED ON VERMONT LAW)

3616. Vermont Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3617. This claim is brought by the Vermont Plaintiffs on behalf of the Vermont Subclass.

3618. Defendant made fuel economy representations to Vermont Plaintiffs and members of the Class that were not true.

3619. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Vermont Plaintiffs and Vermont Subclass members rely on these misrepresentations.

3620. Vermont Plaintiffs reasonably relied on Defendant's representations and as a result Vermont Plaintiffs and Vermont Subclass members were harmed.

### COUNT 276

### UNJUST ENRICHMENT
### (BASED ON VERMONT LAW)

3621. Vermont Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3622. This claim is brought by the Vermont Plaintiffs on behalf of the Vermont Subclass.

3623. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Vermont Plaintiffs and the Vermont Subclass.

3624. Defendant enjoyed the benefit of increased financial gains, to the detriment of Vermont Plaintiffs and other Vermont Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

3625. Vermont Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Vermont Subclass.

**TT.   Claims Brought on Behalf of the Virginia Subclass**

## COUNT 277

**VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT
(VA. CODE ANN. § 59.1-196 *et seq.*)**

3626. Plaintiff Kenneth Bernard ("Virginia Plaintiff") hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

3627. This claim is brought by Virginia Plaintiff on behalf of the Virginia Subclass.

3628. The Virginia Consumer Protection Act ("Virginia CPA") lists prohibited "practices," which include "[u]sing any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." VA. CODE ANN. § 59.1-200.

3629. Ford is a "supplier" under VA. CODE ANN. § 59.1-198.

3630. Each sale and lease of a Coastdown Cheating Vehicle was a "consumer transaction" within the meaning of VA. CODE ANN. § 59.1-198.

3631. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

3632. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Virginia Plaintiff and the Virginia Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy,

the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

3633. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Virginia Plaintiff and the Virginia Subclass.

3634. Ford knew or should have known that its conduct violated the Virginia CPA.

3635. Ford owed Virginia Plaintiff and the Virginia Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

    a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

    b.    Intentionally concealed the foregoing from Virginia Plaintiff and the Virginia Subclass; and/or

    c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Virginia Plaintiff and the Virginia Subclass that contradicted these representations.

3636. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Virginia Plaintiff and the Virginia Subclass.

3637. Virginia Plaintiff and the Virginia Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Virginia Plaintiff and the Virginia Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Virginia CPA.

3638. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Virginia CPA. As a direct and proximate result of Ford's violations of the Virginia CPA, Virginia Plaintiff and the Virginia Subclass have suffered injury-in-fact and/or actual damage.

3639. Ford's violations present a continuing risk to Virginia Plaintiff as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

3640. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

3641. Pursuant to VA. CODE ANN. § 59.1-204, Virginia Plaintiff seek monetary relief against Ford measured as the greater of (a) actual damages in an

amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff. Because Ford's conduct was committed willfully and knowingly, Virginia Plaintiff is entitled to recover, for each plaintiff, the greater of (a) three times actual damages or (b) $1,000. Plaintiffs also seek an award of punitive damages due to Ford's aggravated and outrageous conduct.

3642. Virginia Plaintiff also seeks an order enjoining Ford's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under VA. CODE ANN. § 59.1-204 *et seq.*

## COUNT 278

## BREACH OF CONTRACT
## (BASED ON VIRGINIA LAW)

3643. Virginia Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3644. This claim is brought by Virginia Plaintiff on behalf of the Virginia Subclass.

3645. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Virginia Plaintiff and the Virginia Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Virginia Plaintiff and the Virginia Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not

have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Virginia Plaintiff and the Virginia Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

3646. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Virginia Plaintiff and the Virginia Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

3647. As a direct and proximate result of Ford's breach of contract, Virginia Plaintiff and the Virginia Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 279

## BREACH OF EXPRESS WARRANTY
## (VA. CODE ANN. § 8.2-313)

3648. Virginia Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3649. This claim is brought by Virginia Plaintiff on behalf of the Virginia Subclass.

3650. Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to Va. Code Ann. § 8.2-104.

3651. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

3652. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

- 881 -

3653. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

3654. These affirmations and promises were part of the basis of the bargain that was reached when Virginia Plaintiff and the other Virginia Subclass members purchased or leased the Coastdown Cheating Vehicles.

3655. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

3656. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

3657. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Virginia Plaintiff and the Virginia Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

3658. Accordingly, recovery by the Virginia Plaintiff and the Virginia Subclass is not limited to the NVLW promising to repair and/or correct a

manufacturing defect, and Virginia Plaintiff, individually and on behalf of the other Virginia Subclass members, seek all remedies as allowed by law.

3659. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Virginia Plaintiff and the Virginia Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

3660. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

3661. As a direct and proximate result of Ford's breach of express warranties, Virginia Plaintiff and the Virginia Subclass have been damaged in an amount to be determined at trial.

## COUNT 280

## FRAUDULENT CONCEALMENT
## (BASED ON VIRGINIA LAW)

3662. Virginia Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3663. This claim is brought by Virginia Plaintiff on behalf of the Virginia Subclass.

3664. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Virginia Plaintiff and the Virginia Subclass information that is highly relevant to their purchasing decision.

3665. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

3666. Ford further affirmatively misrepresented to Virginia Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

3667. Ford knew these representations were false when made.

3668. The Coastdown Cheating Vehicles purchased or leased by Virginia Plaintiff and the Virginia Subclass were, in fact, defective, with reduced fuel efficiency.

3669. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Virginia Plaintiff and the Virginia Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

3670. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

3671. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Virginia Plaintiff and the Virginia Subclass did not know of these facts and Ford actively concealed these facts from Virginia Plaintiff and the Virginia Subclass.

3672. Virginia Plaintiff and the Virginia Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Virginia Plaintiff and the Virginia Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Virginia Plaintiff and the Virginia Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

3673. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Virginia Plaintiff and the Virginia Subclass placed in its representations.

3674. Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Virginia Plaintiff and the Virginia Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

3675. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is

far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Virginia Plaintiff and the Virginia Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Virginia Plaintiff and the Virginia Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Virginia Plaintiff and the Virginia Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Virginia Plaintiff and the Virginia Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

3676. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Virginia Plaintiff and the Virginia Subclass.

3677. Ford has still not made full and adequate disclosures and continues to defraud Virginia Plaintiff and the Virginia Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

3678. Virginia Plaintiff and the Virginia Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Virginia Plaintiff's and the Virginia Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Virginia Plaintiff, or, Virginia Subclass members.

3679. Because of the concealment and/or suppression of the facts, Virginia Plaintiff and the Virginia Subclass have sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was

represented by Ford. Had they been aware of the true facts, Virginia Plaintiff and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

3680. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Virginia Plaintiff and the Virginia Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

3681. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Virginia Plaintiff's and the Virginia Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 281

## NEGLIGENT MISREPRESENTATION
## (BASED ON VIRGINIA LAW)

3682. Virginia Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

3683. This claim is brought by the Virginia Plaintiff on behalf of the Virginia Subclass.

3684. Defendant made fuel economy representations to Virginia Plaintiff and members of the Class that were not true.

3685. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Virginia Plaintiff and Virginia Subclass members rely on these misrepresentations.

3686. Virginia Plaintiff reasonably relied on Defendant's representations and as a result Virginia Plaintiff and Virginia Subclass members were harmed.

## COUNT 282

### UNJUST ENRICHMENT
### (BASED ON VIRGINIA LAW)

3687. Virginia Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

3688. This claim is brought by the Virginia Plaintiff on behalf of the Virginia Subclass.

3689. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Virginia Plaintiff and the Virginia Subclass.

3690. Defendant enjoyed the benefit of increased financial gains, to the detriment of Virginia Plaintiff and other Virginia Subclass members. It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

3691. Virginia Plaintiff, therefore, seeks any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Utah Subclass.

**UU.   Claims Brought on Behalf of the Washington Subclass**

### COUNT 283

### VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT (WASH. REV. CODE ANN. § 19.86.010 *et seq.*)

3692. Plaintiffs John Jung, Jeffrey Quizhpi, and Rick Shurtliff ("Washington Plaintiffs") hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

3693. This claim is brought by Washington Plaintiffs on behalf of the Washington Subclass.

3694. The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." WASH. REV. CODE ANN. § 19.96.010.

3695. Ford committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of WASH. REV. CODE ANN. § 19.96.010.

3696. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel

economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

3697. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Washington Plaintiffs and the Washington Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

3698. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Washington Plaintiffs and the Washington Subclass.

3699. Ford knew or should have known that its conduct violated the Washington CPA.

3700. Ford owed Washington Plaintiffs and the Washington Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

  a.  Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

  b.  Intentionally concealed the foregoing from Washington Plaintiffs and the Washington Subclass; and/or

  c.  Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Washington Plaintiffs and the Washington Subclass that contradicted these representations.

3701. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Washington Plaintiffs and the Washington Subclass.

3702. Washington Plaintiffs and the Washington Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Washington Plaintiffs and the Washington Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Washington CPA.

3703. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Washington CPA. As a direct and proximate result of Ford's violations of the Washington CPA, Washington Plaintiffs and the Washington Subclass have suffered injury-in-fact and/or actual damage.

3704. Ford's violations present a continuing risk to Washington Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

3705. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

3706. Ford is liable to Plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under WASH. REV. CODE ANN. § 19.86.090. Plaintiffs also seek an award of punitive damages due to Ford's aggravated and outrageous conduct.

3707. On July 22, 2019, a copy of the complaint, *Brewer, et. al. v. Ford Motor Company*, No. 19-12135-SJM-RSW, (E.D. Mich. Jul. 22, 2019), now transferred into this MDL, was mailed to the Attorney General of the State of Washington in accordance with WASH. REV. CODE ANN. § 19.86.095.

## COUNT 284

## BREACH OF CONTRACT
## (BASED ON WASHINGTON LAW)

3708. Washington Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3709. This claim is brought by Washington Plaintiffs on behalf of the Washington Subclass.

3710. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Washington Plaintiffs and the Washington Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Washington Plaintiffs and the Washington Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Washington Plaintiffs and the Washington Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

3711. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Washington Plaintiffs and the Washington Subclass

defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

3712. As a direct and proximate result of Ford's breach of contract, Washington Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 285

### BREACH OF EXPRESS WARRANTY
### (WASH. REV. CODE § 62A.2-313)

3713. Washington Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3714. This claim is brought by Washington Plaintiffs on behalf of the Washington Subclass.

3715. Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to Wash. Rev. Code § 62A.2-104.

3716. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover

"defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

3717. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

3718. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

3719. These affirmations and promises were part of the basis of the bargain that was reached when Washington Plaintiffs and the other Washington Subclass members purchased or leased the Coastdown Cheating Vehicles.

3720. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

3721. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

3722. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Washington Plaintiffs and the Washington Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

3723. Accordingly, recovery by the Washington Plaintiffs and the Washington Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Washington Plaintiffs, individually and on behalf of the other Washington Subclass members, seek all remedies as allowed by law.

3724. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Washington Plaintiffs and the Washington Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

3725. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this

litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

3726. As a direct and proximate result of Ford's breach of express warranties, Washington Plaintiffs and the Washington Subclass have been damaged in an amount to be determined at trial.

## COUNT 286

## FRAUDULENT CONCEALMENT
## (BASED ON WASHINGTON LAW)

3727. Washington Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3728. This claim is brought by Washington Plaintiffs on behalf of the Washington Subclass.

3729. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Washington Plaintiffs and the Washington Subclass information that is highly relevant to their purchasing decision.

3730. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to

provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

3731. Ford further affirmatively misrepresented to Washington Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

3732. Ford knew these representations were false when made.

3733. The Coastdown Cheating Vehicles purchased or leased by Washington Plaintiffs and the Washington Subclass were, in fact, defective, with reduced fuel efficiency.

3734. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Washington Plaintiffs and the Washington Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

3735. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed

to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

3736. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Washington Plaintiffs and the Washington Subclass did not know of these facts and Ford actively concealed these facts from Washington Plaintiffs and the Washington Subclass.

3737. Washington Plaintiffs and the Washington Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Washington Plaintiffs and the Washington Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Washington Plaintiffs and the Washington Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

3738. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Washington Plaintiffs and the Washington Subclass placed in its representations.

3739. Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Washington Plaintiffs and the Washington Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

3740. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Washington Plaintiffs and the Washington Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Washington Plaintiffs and the Washington Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the

Coastdown Cheating Vehicles purchased or leased by Washington Plaintiffs and the Washington Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Washington Plaintiffs and the Washington Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

3741. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Washington Plaintiffs and the Washington Subclass.

3742. Ford has still not made full and adequate disclosures and continues to defraud Washington Plaintiffs and the Washington Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

3743. Washington Plaintiffs and the Washington Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from

them. Washington Plaintiffs' and the Washington Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Washington Plaintiffs, or Washington Subclass members.

3744. Because of the concealment and/or suppression of the facts, Washington Plaintiffs and the Washington Subclass have sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Washington Plaintiffs and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

3745. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Washington Plaintiffs and the Washington Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

3746. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Washington Plaintiffs' and the Washington Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of

punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 287

### NEGLIGENT MISREPRESENTATION
### (BASED ON WASHINGTON LAW)

3747. Washington Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3748. This claim is brought by the Washington Plaintiffs on behalf of the Washington Subclass.

3749. Defendant made fuel economy representations to Washington Plaintiffs and members of the Class that were not true.

3750. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Washington Plaintiffs and Washington Subclass members rely on these misrepresentations.

3751. Washington Plaintiffs reasonably relied on Defendant's representations and as a result Washington Plaintiffs and Washington Subclass members were harmed.

## COUNT 288

### UNJUST ENRICHMENT
### (BASED ON WASHINGTON LAW)

3752. Washington Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3753. This claim is brought by the Washington Plaintiffs on behalf of the Washington Subclass.

3754. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Washington Plaintiffs and the Washington Subclass.

3755. Defendant enjoyed the benefit of increased financial gains, to the detriment of Washington Plaintiffs and other Washington Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

3756. Washington Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Washington Subclass.

**VV. Claims brought on behalf of the West Virginia Subclass**

**COUNT 289**

**VIOLATION OF THE WEST VIRGINIA
CONSUMER CREDIT AND PROTECTION ACT
(W. VA. CODE § 46A-1-101 *et seq.*)**

3757. West Virginia Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

3758. This claim is brought by West Virginia Plaintiffs on behalf of the West Virginia Subclass.

3759. Ford is a "person" under W. VA. CODE § 46A-1-102(31).

3760. West Virginia Plaintiffs and West Virginia Class members are "consumers" as defined by W. VA. CODE §§ 46A-1-102(12) and 46A-6-102(2), who purchased or leased one or more Coastdown Cheating Vehicles.

3761. Ford engaged in trade or commerce as defined by W. VA. CODE § 46A-6-102(6).

3762. The West Virginia Consumer Credit and Protection Act (West Virginia CCPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." W. VA. CODE § 46A-6-104. Without limitation, "unfair or deceptive" acts or practices include:

> (I) Advertising goods or services with intent not to sell them as advertised and certified; . . .
>
> (L) Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding;
>
> (M) The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby; [and]
>
> (N) Advertising, printing, displaying, publishing, distributing or broadcasting, or causing to be advertised and certified, printed, displayed, published, distributed or broadcast in any manner, any statement or representation

> with regard to the sale of goods or the extension of consumer credit including the rates, terms or conditions for the sale of such goods or the extension of such credit, which is false, misleading or deceptive or which omits to state material information which is necessary to make the statements therein not false, misleading or deceptive.

W. VA. CODE § 46A-6-102(7).

3763. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

3764. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

3765. Ford's unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including West Virginia Plaintiffs and the West Virginia Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

3766. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead West Virginia Plaintiffs and the West Virginia Subclass.

3767. Ford knew or should have known that its conduct violated the West Virginia CCPA.

3768. Ford owed West Virginia Plaintiffs and the West Virginia Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

    a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

    b.    Intentionally concealed the foregoing from West Virginia Plaintiffs and the West Virginia Subclass; and/or

    c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from West Virginia Plaintiffs and the West Virginia Subclass that contradicted these representations.

3769. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to West Virginia Plaintiffs and the West Virginia Subclass.

3770. West Virginia Plaintiffs and the West Virginia Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and

failure to disclose material information. West Virginia Plaintiffs and the West Virginia Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the West Virginia CCPA.

3771. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the West Virginia CCPA.

3772. As a direct and proximate result of Ford's violations of the West Virginia CCPA, West Virginia Plaintiffs and the West Virginia Subclass have suffered injury-in-fact and/or actual damage.

3773. Ford's violations present a continuing risk to West Virginia Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

3774. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

3775. Pursuant to W. VA. CODE § 46A-6-106, West Virginia Plaintiffs seek monetary relief against Ford measured as the greater of (a) actual damages in an

amount to be determined at trial and (b) statutory damages in the amount of $200 per violation of the West Virginia CCPA for each Plaintiff.

3776. West Virginia Plaintiffs also seek punitive damages against Ford because it carried out despicable conduct with willful and conscious disregard of the rights of others, subjecting West Virginia Plaintiffs to cruel and unjust hardship as a result.

3777. West Virginia Plaintiffs further seek an order enjoining Ford's unfair or deceptive acts or practices, restitution, punitive damages, costs of Court, attorney's fees under W. VA. CODE § 46A-5-101, *et seq.*, and any other just and proper relief available under the West Virginia CCPA.

3778. On June 20, 2019, Plaintiffs sent a letter complying with W. VA. CODE § 46A-6-106(b) to Ford.

## COUNT 290

## BREACH OF CONTRACT
## (BASED ON WEST VIRGINIA LAW)

3779. West Virginia Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3780. This claim is brought by West Virginia Plaintiffs on behalf of the West Virginia Subclass.

3781. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy

than advertised and certified, caused West Virginia Plaintiffs and the West Virginia Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, West Virginia Plaintiffs and the West Virginia Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, West Virginia Plaintiffs and the West Virginia Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

3782. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to West Virginia Plaintiffs and the West Virginia Subclass defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

3783. As a direct and proximate result of Ford's breach of contract, West Virginia Plaintiffs and the Class have been damaged in an amount to be proven at

trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 291

### BREACH OF EXPRESS WARRANTY
### (W. VA. CODE § 46-2-313)

3784. West Virginia Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3785. This claim is brought by West Virginia Plaintiffs on behalf of the West Virginia Subclass.

3786. Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to W. Va. Code § 46-2-104.

3787. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

3788. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles

achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

3789. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

3790. These affirmations and promises were part of the basis of the bargain that was reached when West Virginia Plaintiffs and the other West Virginia Subclass members purchased or leased the Coastdown Cheating Vehicles.

3791. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

3792. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

3793. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make West Virginia Plaintiffs and the West Virginia Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

3794. Accordingly, recovery by the West Virginia Plaintiffs and the West Virginia Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and West Virginia Plaintiffs, individually and on behalf of the other West Virginia Subclass members, seek all remedies as allowed by law.

3795. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. West Virginia Plaintiffs and the West Virginia Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

3796. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

3797. As a direct and proximate result of Ford's breach of express warranties, West Virginia Plaintiffs and the West Virginia Subclass have been damaged in an amount to be determined at trial.

## COUNT 292

## FRAUDULENT CONCEALMENT
## (BASED ON WEST VIRGINIA LAW)

3798. West Virginia Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3799. This claim is brought by West Virginia Plaintiffs on behalf of the West Virginia Subclass.

3800. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied West Virginia Plaintiffs and the West Virginia Subclass information that is highly relevant and material to their purchasing decision.

3801. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

3802. Ford further affirmatively misrepresented to West Virginia Plaintiffs in advertising and other forms of communication, including standard and uniform

material provided with each car, that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

3803. Ford knew these representations were false when made.

3804. The Coastdown Cheating Vehicles purchased or leased by West Virginia Plaintiffs and the West Virginia Subclass were, in fact, defective, with reduced fuel efficiency.

3805. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because West Virginia Plaintiffs and the West Virginia Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

3806. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

3807. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; West Virginia Plaintiffs and the West

Virginia Subclass did not know of these facts and Ford actively concealed these facts from West Virginia Plaintiffs and the West Virginia Subclass.

3808. West Virginia Plaintiffs and the West Virginia Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, West Virginia Plaintiffs and the West Virginia Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive West Virginia Plaintiffs and the West Virginia Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

3809. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that West Virginia Plaintiffs and the West Virginia Subclass placed in its representations.

3810. Ford's false representations and omissions were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including West Virginia Plaintiffs and the West

Virginia Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

3811. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by West Virginia Plaintiffs and the West Virginia Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to West Virginia Plaintiffs and the West Virginia Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by West Virginia Plaintiffs and the West Virginia Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to West Virginia Plaintiffs and

the West Virginia Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

3812. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of West Virginia Plaintiffs and the West Virginia Subclass.

3813. Ford has still not made full and adequate disclosures and continues to defraud West Virginia Plaintiffs and the West Virginia Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

3814. West Virginia Plaintiffs and the West Virginia Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. West Virginia Plaintiffs' and the West Virginia Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such

facts were not generally known to the public, West Virginia Plaintiffs, or West Virginia Subclass members.

3815. Because of the concealment and/or suppression of the facts, West Virginia Plaintiffs and the West Virginia Subclass have been injured and sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, West Virginia Plaintiffs and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

3816. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to West Virginia Plaintiffs and the West Virginia Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

3817. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of West Virginia Plaintiffs' and the West Virginia Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 293

## NEGLIGENT MISREPRESENTATION
## (BASED ON WEST VIRGINIA LAW)

3818. West Virginia Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3819. This claim is brought by the West Virginia Plaintiffs on behalf of the West Virginia Subclass.

3820. Defendant made fuel economy representations to West Virginia Plaintiffs and members of the Class that were not true.

3821. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that West Virginia Plaintiffs and West Virginia Subclass members rely on these misrepresentations.

3822. West Virginia Plaintiffs reasonably relied on Defendant's representations and as a result West Virginia Plaintiffs and West Virginia Subclass members were harmed.

## COUNT 294

## UNJUST ENRICHMENT
## (BASED ON WEST VIRGINIA LAW)

3823. West Virginia Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3824. This claim is brought by the West Virginia Plaintiffs on behalf of the West Virginia Subclass.

3825. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to West Virginia Plaintiffs and the West Virginia Subclass.

3826. Defendant enjoyed the benefit of increased financial gains, to the detriment of West Virginia Plaintiffs and other West Virginia Subclass members. It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

3827. West Virginia Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the West Virginia Subclass.

## WW. Claims Brought on Behalf of the Wisconsin Subclass

### COUNT 295

### VIOLATION OF THE WISCONSIN
### DECEPTIVE TRADE PRACTICES ACT
### (WIS. STAT. § 110.18)

3828. Plaintiff Stephen Leszczynski ("Wisconsin Plaintiff") hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

3829. This claim is brought by the Wisconsin Plaintiff on behalf of Wisconsin Subclass.

3830. The Wisconsin Deceptive Trade Practices Act (Wisconsin DTPA) prohibits a "representation or statement of fact which is untrue, deceptive or misleading." WIS. STAT. § 100.18(1).

3831. Ford is a "person, firm, corporation or association" within the meaning of WIS. STAT. § 100.18(1).

3832. Wisconsin Plaintiff and Wisconsin Class members are members of "the public" within the meaning of WIS. STAT. § 100.18(1). Plaintiff purchased or leased one or more Coastdown Cheating Vehicles.

3833. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

3834. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Wisconsin Plaintiff and the Wisconsin Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel

economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

3835. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Wisconsin Plaintiff and the Wisconsin Subclass.

3836. Ford knew or should have known that its conduct violated the Wisconsin DTPA.

3837. Ford owed Wisconsin Plaintiff and the Wisconsin Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

      a.    Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

      b.    Intentionally concealed the foregoing from Wisconsin Plaintiff and the Wisconsin Subclass; and/or

      c.    Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Wisconsin Plaintiff and the Wisconsin Subclass that contradicted these representations.

3838. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Wisconsin Plaintiff and the Wisconsin Subclass.

3839. Wisconsin Plaintiff and the Wisconsin Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Wisconsin Plaintiff and the Wisconsin Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Wisconsin DTPA.

3840. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Wisconsin DTPA. As a direct and proximate result of Ford's violations of the Wisconsin DTPA, Wisconsin Plaintiff and the Wisconsin Subclass have suffered injury-in-fact and/or actual damage.

3841. Ford's violations present a continuing risk to Wisconsin Plaintiff as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

3842. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

3843. Plaintiff is entitled to damages and other relief provided for under WIS. STAT. § 100.18(11)(b)(2). Because Ford's conduct was committed knowingly and/or

intentionally, Plaintiff is entitled to treble damages. Plaintiffs also seek an award of punitive damages due to Ford's aggravated and outrageous conduct.

3844. Plaintiff also seeks court costs and attorneys' fees under WIS. STAT. § 110.18(11)(b)(2).

**COUNT 296**

**BREACH OF CONTRACT
(BASED ON WISCONSIN LAW)**

3845. Wisconsin Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3846. This claim is brought by the Wisconsin Plaintiff on behalf of Wisconsin Subclass.

3847. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Wisconsin Plaintiff and the Wisconsin Subclass members to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Wisconsin Plaintiff and the Wisconsin Subclass members would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly,

Wisconsin Plaintiff and the Wisconsin Subclass members overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

3848. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Wisconsin Plaintiff and the Wisconsin Subclass members defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

3849. As a direct and proximate result of Ford's breach of contract, Wisconsin Plaintiff and the Wisconsin Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 297

### BREACH OF EXPRESS WARRANTY
### (WIS. STAT. § 402.313)

3850. Wisconsin Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3851. This claim is brought by Wisconsin Plaintiff on behalf of the Wisconsin Subclass.

3852. Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to Wis. Stat. § 402.104.

3853. In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

3854. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

3855. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

3856. These affirmations and promises were part of the basis of the bargain that was reached when Wisconsin Plaintiff and the other Wisconsin Subclass members purchased or leased the Coastdown Cheating Vehicles.

3857. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that

produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

3858. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

3859. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Wisconsin Plaintiff and the Wisconsin Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

3860. Accordingly, recovery by the Wisconsin Plaintiff and the Wisconsin Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Wisconsin Plaintiff, individually and on behalf of the other Wisconsin Subclass members, seek all remedies as allowed by law.

3861. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Wisconsin

Plaintiff and the Wisconsin Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

3862. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

3863. As a direct and proximate result of Ford's breach of express warranties, Wisconsin Plaintiff and the Wisconsin Subclass have been damaged in an amount to be determined at trial.

**COUNT 298**

**FRAUDULENT CONCEALMENT
(BASED ON WISCONSIN LAW)**

3864. Wisconsin Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

3865. This claim is brought by the Wisconsin Plaintiff on behalf of the Wisconsin Subclass.

3866. Ford intentionally concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Wisconsin Plaintiff and the

Wisconsin Subclass members information that is highly relevant to their purchasing decision.

3867. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

3868. Ford further affirmatively misrepresented to Wisconsin Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

3869. Ford knew these representations were false when made.

3870. The Coastdown Cheating Vehicles purchased or leased by Wisconsin Plaintiff and the Wisconsin Subclass members were, in fact, defective, with reduced fuel efficiency.

3871. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Wisconsin Plaintiff and the Wisconsin Subclass members relied on Ford's material representations or omissions

of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

3872. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

3873. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Wisconsin Plaintiff and the Wisconsin Subclass members did not know of these facts and Ford actively concealed these facts from Wisconsin Plaintiff and the Wisconsin Subclass members.

3874. Wisconsin Plaintiff and the Wisconsin Subclass members reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Wisconsin Plaintiff and the Wisconsin Subclass members did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Wisconsin Plaintiff and the Wisconsin Subclass members by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

3875. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and

sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Wisconsin Plaintiff and the Wisconsin Subclass members placed in its representations.

3876. Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Wisconsin Plaintiff and the Wisconsin Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

3877. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Wisconsin Plaintiff and the Wisconsin Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth

above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Wisconsin Plaintiff and the Wisconsin Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Wisconsin Plaintiff and the Wisconsin Subclass members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Wisconsin Plaintiff and the Wisconsin Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

3878. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Wisconsin Plaintiff and the Wisconsin Subclass members.

3879. Ford has still not made full and adequate disclosures and continues to defraud Wisconsin Plaintiff and the Wisconsin Subclass members by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

- 935 -

3880. Wisconsin Plaintiff and the Wisconsin Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Wisconsin Plaintiff's and the Wisconsin Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Wisconsin Plaintiff, or the Wisconsin Subclass members.

3881. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Wisconsin Plaintiff and the Wisconsin Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

3882. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Wisconsin Plaintiff's and Wisconsin Subclass members' rights and the representations that Ford made to them were made in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 299

## NEGLIGENT MISREPRESENTATION
## (BASED ON WISCONSIN LAW)

3883. Wisconsin Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

3884. This claim is brought by the Wisconsin Plaintiff on behalf of the Wisconsin Subclass.

3885. Defendant made fuel economy representations to Wisconsin Plaintiff and members of the Class that were not true.

3886. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Wisconsin Plaintiff and Wisconsin Subclass members rely on these misrepresentations.

3887. Wisconsin Plaintiff reasonably relied on Defendant's representations and as a result Wisconsin Plaintiff and Wisconsin Subclass members were harmed.

## COUNT 300

## UNJUST ENRICHMENT
## (BASED ON WISCONSIN LAW)

3888. Wisconsin Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

3889. This claim is brought by the Wisconsin Plaintiff on behalf of the Wisconsin Subclass.

3890. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Wisconsin Plaintiff and the Wisconsin Subclass.

3891. Defendant enjoyed the benefit of increased financial gains, to the detriment of Wisconsin Plaintiff and other Wisconsin Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

3892. Wisconsin Plaintiff, therefore, seeks any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Wisconsin Subclass.

**XX.   Claims brought on behalf of the Wyoming Subclass**

**COUNT 301**

**VIOLATION OF THE WYOMING CONSUMER PROTECTION ACT
(WYO. STAT. § 40-12-105 *et seq.*)**

3893. Wyoming Plaintiffs, therefore, seeks an order requiring Ford to make restitution to them and other members of the Wyoming Subclass.

3894. This claim is brought by Wyoming Plaintiffs on behalf of the Wyoming Subclass.

3895. In the course of its business, Ford willfully failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy and that fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

3896. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Coastdown Cheating Vehicles.

3897. Ford's unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including Wyoming Plaintiffs and the Wyoming Subclass members, about the true performance of the Coastdown Cheating Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, the increased environmental impact of Ford vehicles, and the true value of the Coastdown Cheating Vehicles.

3898. Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Wyoming Plaintiffs and the Wyoming Subclass.

3899. Ford knew or should have known that its conduct violated the Wyoming CPA.

3900. Ford owed Wyoming Plaintiffs and the Wyoming Subclass a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

a.   Possessed exclusive knowledge that it manipulated the testing, certification, and representations of fuel efficiency;

b.   Intentionally concealed the foregoing from Wyoming Plaintiffs and the Wyoming Subclass; and/or

c.   Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Wyoming Plaintiffs and the Wyoming Subclass that contradicted these representations.

3901. Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Wyoming Plaintiffs and the Wyoming Subclass.

3902. Wyoming Plaintiffs and the Wyoming Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Wyoming Plaintiffs and the Wyoming Subclass members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Wyoming CPA.

3903. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Wyoming CPA.

3904. As a direct and proximate result of Ford's violations of the Wyoming CPA, Wyoming Plaintiffs and the Wyoming Subclass have suffered injury-in-fact and/or actual damage.

3905. Ford's violations present a continuing risk to Wyoming Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

3906. Because Ford fraudulently concealed the true fuel economy of the Coastdown Cheating Vehicles, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

3907. Pursuant to WYO. STAT. § 40-12-108(a), Wyoming Plaintiffs seek monetary relief against Ford measured as actual damages in an amount to be determined at trial, in addition to any other just and proper relief available under the Wyoming CPA. Plaintiffs also seek an award of punitive damages due to Ford's aggravated and outrageous conduct.

3908. On June 20, 2019, Plaintiffs sent a letter complying with WYO. STAT. § 40-12-109 to Ford. Because Ford failed to remedy its unlawful conduct within the requisite time period, Wyoming Plaintiffs seek all damages and relief to which they are entitled.

## COUNT 302

## BREACH OF CONTRACT
## (BASED ON WYOMING LAW)

3909. Wyoming Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3910. This claim is brought by Wyoming Plaintiffs on behalf of the Wyoming Subclass.

3911. Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the Coastdown Cheating Vehicles' lower fuel economy than advertised and certified, caused Wyoming Plaintiffs and the Wyoming Subclass to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Wyoming Plaintiffs and the Wyoming Subclass would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage. Accordingly, Wyoming Plaintiffs and the Wyoming Subclass overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

3912. Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Wyoming Plaintiffs and the Wyoming Subclass

defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

3913.  As a direct and proximate result of Ford's breach of contract, Wyoming Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 303

## BREACH OF EXPRESS WARRANTY
## (WYO. STAT. § 34.1-2-313)

3914.  Wyoming Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3915.  This claim is brought by Wyoming Plaintiffs on behalf of the Wyoming Subclass.

3916.  Ford is and was at all relevant times a merchant with respect to motor vehicles pursuant to Wyo. Stat. § 34.1-2-104.

3917.  In connection with the purchase or lease of each one of its new vehicles, Ford provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover

"defect in factory supplied material or workmanship." Ford also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 60,000 miles, whichever occurs first, for the Coastdown Cheating Vehicles.

3918. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles achieved certain fuel economy ratings in Ford's coastdown testing, depending on the vehicle.

3919. As a manufacturer of light-duty vehicles, Ford was required to provide these warranties to purchasers of the Coastdown Cheating Vehicles.

3920. These affirmations and promises were part of the basis of the bargain that was reached when Wyoming Plaintiffs and the other Wyoming Subclass members purchased or leased the Coastdown Cheating Vehicles.

3921. Ford breached these warranties arising from its advertisements, including window stickers, because Ford cheated on the coastdown testing that produced the reported fuel economy ratings, and accurate coastdown testing would have produced less favorable fuel economy ratings. Ford has not restored, and is unable to restore, the Coastdown Cheating Vehicles to the condition in which it had promised them to be.

3922. Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

3923. Furthermore, the NVLW promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Wyoming Plaintiffs and the Wyoming Subclass whole, and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

3924. Accordingly, recovery by the Wyoming Plaintiffs and the Wyoming Subclass is not limited to the NVLW promising to repair and/or correct a manufacturing defect, and Wyoming Plaintiffs, individually and on behalf of the other Wyoming Subclass members, seek all remedies as allowed by law.

3925. Also, as alleged in more detail herein, at the time Ford warranted and sold the Coastdown Cheating Vehicles, it knew that the Coastdown Cheating Vehicles did not conform to Ford's warranties, and Ford wrongfully and fraudulently concealed material facts regarding the Coastdown Cheating Vehicles. Wyoming Plaintiffs and the Wyoming Subclass were therefore induced to purchase or lease the Coastdown Cheating Vehicles under false and/or fraudulent pretenses.

3926. Plaintiffs provided notice of Ford's breach via certified mail as early as May 6, 2019. Furthermore, Ford has been provided notice of this breach through this

litigation and other complaints filed against it, as well as its internal knowledge of the inaccurate coastdown testing.

3927. As a direct and proximate result of Ford's breach of express warranties, Wyoming Plaintiffs and the Wyoming Subclass have been damaged in an amount to be determined at trial.

### COUNT 304

### FRAUDULENT CONCEALMENT
### (BASED ON WYOMING LAW)

3928. Wyoming Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

3929. This claim is brought by Wyoming Plaintiffs on behalf of the Wyoming Subclass.

3930. Ford concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Wyoming Plaintiffs and the Wyoming Subclass information that is highly relevant and material to their purchasing decision.

3931. The Monroney sticker, which was provided to every person who purchased or leased a Coastdown Cheating Vehicle, is false. Ford materially omitted to these purchasers and lessees that the Monroney sticker is false and failed to

provide accurate information concerning the fuel economy of the Coastdown Cheating Vehicles.

3932. Ford further affirmatively misrepresented to Wyoming Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Coastdown Cheating Vehicles it was selling had no significant defects and had the advertised and certified fuel efficiency.

3933. Ford knew these representations were false when made.

3934. The Coastdown Cheating Vehicles purchased or leased by Wyoming Plaintiffs and the Wyoming Subclass were, in fact, defective, with reduced fuel efficiency.

3935. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Wyoming Plaintiffs and the Wyoming Subclass relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

3936. As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed

to disclose the important facts concerning the lack of fuel efficiency, making other disclosures about the fuel efficiency deceptive.

3937. The truth about the lack of fuel efficiency and Ford's manipulations of certifications was known only to Ford; Wyoming Plaintiffs and the Wyoming Subclass did not know of these facts and Ford actively concealed these facts from Wyoming Plaintiffs and the Wyoming Subclass.

3938. Wyoming Plaintiffs and the Wyoming Subclass reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Wyoming Plaintiffs and the Wyoming Subclass did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Wyoming Plaintiffs and the Wyoming Subclass by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

3939. Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Wyoming Plaintiffs and the Wyoming Subclass placed in its representations.

3940. Ford's false representations and omissions were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and

also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Wyoming Plaintiffs and the Wyoming Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

3941. Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Wyoming Plaintiffs and the Wyoming Subclass members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles. Having volunteered to provide information to Wyoming Plaintiffs and the Wyoming Subclass members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Wyoming Plaintiffs and the Wyoming Subclass members. Whether an automobile is fuel efficient and whether

it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Wyoming Plaintiffs and the Wyoming Subclass members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

3942. Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Wyoming Plaintiffs and the Wyoming Subclass.

3943. Ford has still not made full and adequate disclosures and continues to defraud Wyoming Plaintiffs and the Wyoming Subclass by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

3944. Wyoming Plaintiffs and the Wyoming Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Wyoming Plaintiffs' and the Wyoming Subclass members' actions were

justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Wyoming Plaintiffs, or Wyoming Subclass members.

3945. Because of the concealment and/or suppression of the facts, Wyoming Plaintiffs and the Wyoming Subclass have been injured and sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Wyoming Plaintiffs and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

3946. Accordingly, as a direct and proximate result of Ford's actions, Ford is liable to Wyoming Plaintiffs and the Wyoming Subclass for damages in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

3947. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Wyoming Plaintiffs' and the Wyoming Subclass's rights and the representations that Ford made to them in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 305

## NEGLIGENT MISREPRESENTATION
## (BASED ON WYOMING LAW)

3948. Wyoming Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3949. This claim is brought by the Wyoming Plaintiffs on behalf of the Wyoming Subclass.

3950. Defendant made fuel economy representations to Wyoming Plaintiffs and members of the Class that were not true.

3951. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Wyoming Plaintiffs and Wyoming Subclass members rely on these misrepresentations.

3952. Wyoming Plaintiffs reasonably relied on Defendant's representations and as a result Wyoming Plaintiffs and Wyoming Subclass members were harmed.

## COUNT 306

## UNJUST ENRICHMENT
## (BASED ON WYOMING LAW)

3953. Wyoming Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3954. This claim is brought by the Wyoming Plaintiffs on behalf of the Wyoming Subclass.

3955. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Wyoming Plaintiffs and the Wyoming Subclass.

3956. Defendant enjoyed the benefit of increased financial gains, to the detriment of Wyoming Plaintiffs and other Wyoming Subclass members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

3957. Wyoming Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Wyoming Subclass.

**YY.   Claims Brought on Behalf of the Nationwide Class**

**COUNT 307**

**VIOLATION OF THE MAGNUSSON-MOSS WARRANTY ACT
(15 U.S.C. §§ 2301 *et seq.*)**

3958. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

3959. Plaintiffs bring this Count on behalf of themselves and the Nationwide Class.

3960. This Court has jurisdiction to decide claims brought under the Magnuson-Moss Warranty Act (for the purpose of this Count, the "Act") by virtue of 28 U.S.C. § 1332(a)-(d).

3961. Plaintiffs and the other Nationwide Class members are "consumers" who purchased "consumer products" for purposes of 15 U.S.C. § 2301(1) and (3) because they purchased Coastdown Cheating Vehicles for personal, family, or household purposes.

3962. Ford is a "supplier" and "warrantor" within the meaning of 15 U.S.C. § 2301(4) and (5) because the company regularly sells Ford vehicles accompanied by written Limited Warranties.

3963. The Coastdown Cheating Vehicles are "consumer products" within the meaning of the Act. 15 U.S.C. § 2301(1).

3964. 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

3965. The amount in controversy of the Plaintiffs' individual claims meets or exceeds $25.00 in value. In addition, the amount in controversy meets or exceeds $50,000 in value (exclusive of interest and costs) on the basis of all claims to be determined in this lawsuit.

3966. Ford provided Plaintiffs and the members of the Nationwide Class with written and implied warranties, which are covered under 15 U.S.C. § 2301(6) and (7), respectively.

3967. Ford breached these written and implied warranties as described in detail above. Ford expressly warranted in advertisements and consumer-facing communications, including on the window stickers themselves that were affixed to the Coastdown Cheating Vehicles, that the Coastdown Cheating Vehicles achieve a fuel economy rating of specific MPGs. Ford impliedly warranted that the Coastdown Cheating Vehicles would conform to the descriptions promised in Ford's advertisements and consumer-facing communications.

3968. Ford breached these express warranties because the Coastdown Cheating Vehicles did not achieve the specific fuel economy rating Ford advertised. Moreover, Ford breached these implied warranties because the Coastdown Cheating Vehicles did not and do not conform to the descriptions advertised.

3969. The terms of the warranties became part of the basis of the bargain between Ford and the Plaintiffs and all other Class members when deciding to purchase a Coastdown Cheating Vehicle.

3970. Plaintiffs and each of the other Nationwide Class members have had sufficient direct dealings with either Ford or its agents (including Ford dealerships) to establish privity of contract between Ford, on the one hand, and Plaintiffs and each of the other Nationwide Class members, on the other hand. Moreover, privity is not required here because Plaintiffs and each of the other Nationwide Class members are intended third-party beneficiaries of contracts between Ford and its

dealers. The dealers were not intended to be the ultimate consumers of the Coastdown Cheating Vehicles and have no rights under warranty agreements provided with the Coastdown Cheating Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

3971. Because Ford knew of the defect at the time of the sale, it has waived any opportunity to cure.

3972. As a direct and proximate result of Ford's breach of written warranties and implied warranties of merchantability, Plaintiffs and Nationwide Class members have suffered damages in an amount to be determined at trial.

3973. Plaintiffs, individually and on behalf of the Nationwide Class, seek all damages permitted by law, including without limitation compensation for the additional fuel required to drive the Coastdown Cheating Vehicles, compensation for the inconvenience associated with the additional fill-ups, and the monetary difference between the Coastdown Cheating Vehicles as warranted and as sold, along with all other incidental and consequential damages, statutory attorney fees, and all other relief allowed by law.

3974. Plaintiffs have provided Ford with an opportunity to cure and provided multiple forms of written notice that they will be initiating suit.

## COUNT 308

## BREACH OF EXPRESS WARRANTY

3975. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3976. This claim is brought by Plaintiffs on behalf of the Nationwide Class or, in the alternative, the State Classes.

3977. Defendant was a merchant with respect to motor vehicles.

3978. In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles provided a favorable fuel economy of specific MPGs, depending on the vehicle.

3979. These affirmations and promises were part of the basis of the bargain between the parties.

3980. Defendant breached these warranties arising from its advertisements, including window stickers, because the fuel economy ratings for its vehicles were inaccurate.

3981. As a direct and proximate result of Ford's breach of express warranties, Plaintiffs and members of the Class have been damaged in an amount to be determined at trial.

## COUNT 309

## FRAUD

3982. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3983. This claim is brought by Plaintiffs on behalf of the Nationwide Class or, in the alternative, the State Classes.

3984. Defendant affirmatively misrepresented and concealed material facts concerning the fuel economy of its vehicles.

3985. Defendant had a duty to disclose the true fuel economy based on its superior knowledge and affirmative misrepresentations to the contrary.

3986. Defendant affirmatively misrepresented and/or actively concealed material facts, in whole or in part, intending to induce Plaintiffs and members of the Class to purchase or lease their vehicles and at a higher price than they otherwise would have.

3987. Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.

## COUNT 310

## NEGLIGENT MISREPRESENTATION

3988. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3989. This claim is brought by Plaintiffs on behalf of the Nationwide Class or, in the alternative, the State Classes.

3990. Defendant made fuel economy representations to Plaintiffs and members of the Class that were not true.

3991. Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

3992. Plaintiff reasonably relied on Defendant's representations and as a result Plaintiff and Class member were harmed.

## COUNT 311

## UNJUST ENRICHMENT

3993. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3994. This claim is brought by Plaintiffs on behalf of the Nationwide Class or, in the alternative, the State Classes.

3995. Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Plaintiffs.

3996. Defendant enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

3997. Plaintiffs, therefore, seek any and all available equitable relief, including but not limited to disgorgement and/or restitution to them and other members of the Class.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

A.      Determining this action may be maintained as a Class action with respect to the Class and certify it as such under Rule 23(b)(2) and (b)(3), or alternatively certify all issues and claims that are appropriately certified, and designate and appoint Plaintiffs as Class Representatives and their counsel as Class Counsel;

B.      Declaring, adjudging, and decreeing the conduct of the Defendant as alleged herein to be unlawful, unfair, and deceptive;

C.     Requiring that all Class members be notified about the lower fuel economy ratings and higher emissions at Ford's expense and providing correct fuel economy and emissions ratings;

D.     Awarding Plaintiffs and Class members restitution of all monies paid to Defendant as a result of unlawful, deceptive, and unfair business practices;

E.     Awarding Plaintiffs and Class members actual, compensatory damages as proven at trial;

F.     Ordering disgorgement of all profits wrongfully received by Ford for the Coastdown Cheating Vehicles.

G.     Awarding Plaintiffs and Class members all statutory penalties and exemplary damages, as allowed by law;

H.     Awarding Plaintiffs and Class members any and all equitable relief;

I.     Awarding Plaintiffs and Class members reasonable attorneys' fees, costs, and pre- and post-judgment interest;

J.     Awarding restitution, including at the election of Class members, recovery of the purchase price of their Coastdown Cheating Vehicles, or the overpayment or diminution in value of their Coastdown Cheating Vehicles; and

K.     Such other or further relief as may be appropriate.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: August 21, 2020                    Respectfully Submitted,

**THE MILLER LAW FIRM, P.C.**

By: */s/ E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Emily E. Hughes (P68724)
Dennis A. Lienhardt (P81118)
William Kalas (P82113)
950 West University Drive, Suite 300
Rochester, MI  48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com
eeh@millerlawpc.com
dal@millerlawpc.com
wk@millerlawpc.com

*Interim Lead Counsel for Plaintiffs
and the Class*

**HAGENS BERMAN SOBOL
SHAPIRO LLP**
Steve W. Berman
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-05594
steve@hbsslaw.com

Christopher R. Pitoun
301 N. Lake Ave., Suite 920
Pasadena, CA 91101
Tel: (213) 330-7150
Fax: (213) 330-7152
christopherp@hbsslaw.com

**DICELLO LEVITT GUTZLER LLC**
Adam J. Levitt
John E. Tangren
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone: (312) 214-7900
alevitt@dicellolevitt.com
jtangren@dicellolevitt.com

*Additional Counsel for Plaintiffs and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on August 21, 2020 I electronically filed the foregoing with the Clerk of the Court using the ECF system which will notify all counsel of record authorized to receive such filings.

**THE MILLER LAW FIRM, P.C.**

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
950 W. University Dr., Ste. 300
Rochester, Michigan 48307
Telephone: (248) 841-2200
epm@millerlawpc.com