# EXHIBIT 5

Wyeth v. Levine, 555 U.S. 555 (2009)

Case 2:19-md-02901-SFC   ECF No. 85-6, PageID.4309   Filed 01/08/21   Page 2 of 35

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by In re Roundup Products Liability Litigation, N.D.Cal.,
March 7, 2019

129 S.Ct. 1187
Supreme Court of the United States

WYETH, Petitioner,

v.

Diana LEVINE.

No. 06–1249.
|
Argued Nov. 3, 2008.
|
Decided March 4, 2009.

**Synopsis**

**Background:** Patient brought action against drug
manufacturer for failure to warn of dangers of administration
of nausea medication directly into patient's vein, which
resulted in onset of gangrene and amputation of patient's
arm. The Washington Superior Court, Geoffrey W. Crawford,
J., entered judgment on jury's verdict in patient's favor,
and manufacturer appealed. The Vermont Supreme Court,
Johnson, J., 183 Vt. 76, 944 A.2d 179, affirmed. Certiorari
was granted.

**[Holding:]** The United States Supreme Court, Justice
Stevens, held that state law failure-to-warn claims against
manufacturer of antihistamine that was used to treat nausea,
for failing to adequately warn of dangers of administering
drug intravenously using an IV-push, rather than IV-drip,
methodology, were not preempted by federal law, either on
theory that manufacturer could not have modified warning
label placed on drug once it had been approved by the Food
and Drug Administration (FDA), and that it was impossible
for manufacturer to comply with both state law duties
underlying failure-to-warn claims and its federal labeling
duties, or on theory that requiring manufacturer to comply
with state law duty to provide stronger warning about IV-
push administration, after the Food and Drug Administration
(FDA) had previously approved warning label placed on
drug, would obstruct purposes and objectives of federal drug
labeling regulation.

Affirmed.

Justice Breyer concurred and filed opinion.

Justice Thomas concurred in judgment and filed opinion.

Justice Alito dissented and filed opinion, in which Chief
Justice Roberts and Justice Scalia joined.

West Headnotes (11)

**[1]    States   Congressional intent**

Purpose of Congress is ultimate touchstone in
every pre-emption case. U.S.C.A. Const. Art. 6,
cl. 2.

184 Cases that cite this headnote

**[2]    States   State police power**

In all pre-emption cases, and particularly in those
in which Congress has legislated in field which
the states have traditionally occupied, court starts
with assumption that historic police powers of
states were not to be superseded by federal act,
unless that was clear and manifest purpose of
Congress. U.S.C.A. Const. Art. 6, cl. 2.

378 Cases that cite this headnote

**[3]    States   State police power**

Presumption, in all pre-emption cases, that
historic police powers of states are not to be
superseded by federal act is not dependent on
absence of federal regulation, but upon historic
presence of state law. U.S.C.A. Const. Art. 6, cl.
2.

203 Cases that cite this headnote

**[4]    States   State police power**

Presumption that historic police powers of states
are not to be superseded by federal act also
applies to claims of implied conflict pre-emption.
U.S.C.A. Const. Art. 6, cl. 2.

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

156 Cases that cite this headnote

**[5]**   **Products Liability** 🔑 **Drugs in general**

**States** 🔑 **Product safety;  food and drug laws**

Drug user's state law failure-to-warn claims against manufacturer of antihistamine that was used to treat nausea, for failing to adequately warn of dangers of administering drug intravenously using an IV-push, rather than IV-drip, methodology, were not preempted by federal law on theory that manufacturer could not have modified warning label placed on drug once it had been approved by the Food and Drug Administration (FDA) and that it was impossible for manufacturer to comply with both state law duties underlying failure-to-warn claims and its federal labeling duties; pursuant to FDA regulation, manufacturer could have modified label to "add or strengthen a contraindication, warning, precaution, or adverse reaction" or to "add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product," without waiting for FDA approval. U.S.C.A. Const. Art. 6, cl. 2; 21 C.F.R. § 314.70(c)(6)(iii)(A, C).

372 Cases that cite this headnote

**[6]**   **Health** 🔑 **Labeling Requirements**

Through the many amendments to the Federal Food, Drug, and Cosmetic Act (FDCA) and to the Food and Drug Administration (FDA) regulations, it has remained central premise of federal drug regulation that drug manufacturer bears responsibility for content of its label at all times; the drug manufacturer is charged both with crafting an adequate label and with ensuring that its warnings remain adequate as long as drug is on the market. Federal Food, Drug, and Cosmetic Act, § 1 et seq., 21 U.S.C.A. § 301 et seq.; 21 C.F.R. § 201.80(e).

145 Cases that cite this headnote

**[7]**   **Products Liability** 🔑 **Drugs in general**

**States** 🔑 **Product safety;  food and drug laws**

Drug user's state law failure-to-warn claims against manufacturer of antihistamine that was used to treat nausea, for failing to adequately warn of dangers of administering drug intravenously using an IV-push, rather than IV-drip, methodology, were not preempted by federal law on theory that requiring manufacturer to comply with state law duty to provide stronger warning about IV-push administration, after the Food and Drug Administration (FDA) had previously approved warning label placed on drug, would obstruct purposes and objectives of federal drug labeling regulation; if Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted express pre-emption provision at some point during the 70-year history of the Federal Food, Drug, and Cosmetic Act (FDCA). U.S.C.A. Const. Art. 6, cl. 2; Federal Food, Drug, and Cosmetic Act, § 1 et seq., 21 U.S.C.A. § 301 et seq.

284 Cases that cite this headnote

**[8]**   **States** 🔑 **Congressional intent**

Case for federal pre-emption is particularly weak where Congress has indicated its awareness of operation of state law in field of federal interest and has nonetheless decided to stand by both concepts and to tolerate whatever tension there is between them. U.S.C.A. Const. Art. 6, cl. 2.

106 Cases that cite this headnote

**[9]**   **Products Liability** 🔑 **Drugs in general**

**States** 🔑 **Product safety;  food and drug laws**

In deciding whether federal drug labeling law preempted the failure-to-warn claims asserted by musician who developed gangrene and ultimately needed to have her forearm amputated as alleged result of drug manufacturer's failure to adequately warn of dangers posed by intravenous administration of drug, court would not defer to statement made by the Food and Drug Administration (FDA) in preamble to regulation, that the Federal Food, Drug, and Cosmetic Act (FDCA) establishes "both a 'floor' and a 'ceiling,' " such that "FDA approval of labeling preempts conflicting or contrary State law,"

where the FDA had finalized regulation without offering states or other interested parties notice or opportunity for comment, and where statements made in preamble reversed the FDA's own longstanding position without providing any reasoned explanation, including any discussion of how state law had interfered with the FDA's regulation of drug labeling during decades of coexistence. U.S.C.A. Const. Art. 6, cl. 2.

350 Cases that cite this headnote

[10]    **States**  ⚷  Federal administrative regulations

While agencies have no special authority to pronounce on pre-emption issues absent delegation by Congress, they do have unique understanding of statutes that they administer and an attendant ability to make informed determinations about how state requirements may pose an obstacle to accomplishment and execution of full purposes and objectives of Congress. U.S.C.A. Const. Art. 6, cl. 2.

108 Cases that cite this headnote

[11]    **States**  ⚷  Federal administrative regulations

Weight that court accords to agency's explanation of state law's impact on federal scheme, for purpose of deciding whether state law is pre-empted, depends on its thoroughness, consistency, and persuasiveness. U.S.C.A. Const. Art. 6, cl. 2.

102 Cases that cite this headnote

**1189 *Syllabus* [*]

Petitioner Wyeth manufactures the antinausea drug Phenergan. After a clinician injected respondent Levine with Phenergan by the "IV-push" method, whereby a drug is injected directly into a patient's vein, the drug entered Levine's artery, she developed gangrene, and doctors amputated her forearm. Levine brought a state-law damages action, alleging, *inter alia*, that Wyeth had failed to provide an adequate warning about the significant risks of administering Phenergan by the IV-push method. The Vermont jury

determined that Levine's injury would not have occurred if Phenergan's label included an adequate warning, and it awarded damages for her pain and suffering, substantial medical expenses, and loss of her livelihood as a professional musician. Declining to overturn the verdict, the trial court rejected Wyeth's argument that Levine's failure-to-warn claims were pre-empted by federal law because Phenergan's labeling had been approved by the federal Food and Drug Administration (FDA). The Vermont Supreme Court affirmed.

*Held:* Federal law does not pre-empt Levine's claim that Phenergan's label did not contain an adequate warning about the IV-push method of administration. Pp. 1193 – 1204.

(a) The argument that Levine's state-law claims are pre-empted because it is impossible for Wyeth to comply with both the state-law duties underlying those claims and its federal labeling duties is rejected. Although a manufacturer generally may change a drug label only after the FDA approves a supplemental application, the agency's "changes being effected" (CBE) regulation permits certain preapproval labeling changes that add or strengthen a warning to improve drug safety. Pursuant to the CBE regulation, Wyeth could have unilaterally added a stronger warning about IV-push administration, and there is no evidence that the FDA would ultimately have rejected such a labeling change. Wyeth's cramped reading of the CBE regulation and its broad assertion that unilaterally changing the Phenergan label would have violated federal law governing unauthorized distribution and misbranding of drugs are based on the fundamental misunderstanding that the FDA, rather than the manufacturer, bears primary responsibility for drug labeling. It is a central premise of the Federal Food, Drug, and Cosmetic Act (FDCA) and the FDA's regulations that the manufacturer bears responsibility for the content **1190 of its label at all times. Pp. 1196 – 1199.

(b) Wyeth's argument that requiring it to comply with a state-law duty to provide a stronger warning would interfere with Congress' purpose of entrusting an expert agency with drug labeling decisions is meritless because it relies on an untenable interpretation of congressional intent and an overbroad view of an agency's power to pre-empt state law. The history of the FDCA shows that Congress did not intend to pre-empt state-law failure-to-warn actions. In advancing the argument that the FDA must be presumed to have established a specific labeling standard that leaves no room for different state-law judgments, Wyeth relies not on

Case 2:19-md-02901-SFC   ECF No. 85-6, PageID.4312   Filed 01/08/21   Page 5 of 35

Wyeth v. Levine, 555 U.S. 555 (2009)

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

any statement by Congress but on the preamble to a 2006 FDA regulation declaring that state-law failure-to-warn claims threaten the FDA's statutorily prescribed role. Although an agency regulation with the force of law can pre-empt conflicting state requirements, this case involves no such regulation but merely an agency's assertion that state law is an obstacle to achieving its statutory objectives. Where, as here, Congress has not authorized a federal agency to pre-empt state law directly, the weight this Court accords the agency's explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness. Cf., *e.g.,Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124. Under this standard, the FDA's 2006 preamble does not merit deference: It is inherently suspect in light of the FDA's failure to offer interested parties notice or opportunity for comment on the pre-emption question; it is at odds with the available evidence of Congress' purposes; and it reverses the FDA's own longstanding position that state law is a complementary form of drug regulation without providing a reasoned explanation. *Geier v. American Honda Motor Co.,* 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914, is distinguished. Pp. 1199 – 1204.

183 Vt. 76, 944 A.2d 179, affirmed.

STEVENS, J., delivered the opinion of the Court, in which KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. BREYER, J., filed a concurring opinion, *post,* p. 1204. THOMAS, J., filed an opinion concurring in the judgment, *post,* pp. 1204 – 1217. ALITO, J., filed a dissenting opinion, in which ROBERTS, C.J., and SCALIA, J., joined, *post,* pp. 1217 – 1231.

**Attorneys and Law Firms**

Edwin S. Kneedler for the United States as amicus curiae, by special leave of the Court, supporting petitioner.

David C. Frederick, for respondent.

Bert W. Rein, Karyn K. Ablin, Brendan J. Morrissey, Wiley Rein LLP, Washington, DC, Allan R. Keyes, R. Joseph O'Rourke, Ryan, Smith, Carbine, Ltd., Rutland, VT, Seth P. Waxman, Counsel of Record, Paul R.Q. Wolfson, Catherine M.A. Carroll, Margaret Williams, Smith Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, William J. Ruane, Wyeth, Madison, NJ, for petitioner.

Richard I. Rubin, Rubin, Kidney, Myer & DeWolfe, Barre, Vermont, David C. Frederick, Counsel of Record, Scott H.

Angstreich, Scott K. Attaway, Brendan J. Crimmins, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C., for respondent.

**Opinion**

Justice STEVENS delivered the opinion of the Court.

 *558  Directly injecting the drug Phenergan into a patient's vein creates a significant risk of catastrophic consequences. A Vermont **1191  jury found that petitioner Wyeth, the manufacturer of the drug, had failed to provide an adequate warning of that risk and awarded damages to respondent Diana Levine to compensate her for the amputation of her arm. The warnings on Phenergan's label had been deemed sufficient by the federal Food and Drug Administration (FDA) when it approved Wyeth's new drug application in 1955 and when it later approved changes in the drug's labeling. The question we must decide is whether the FDA's approvals provide  *559  Wyeth with a complete defense to Levine's tort claims. We conclude that they do not.

I

Phenergan is Wyeth's brand name for promethazine hydrochloride, an antihistamine used to treat nausea. The injectable form of Phenergan can be administered intramuscularly or intravenously, and it can be administered intravenously through either the "IV-push" method, whereby the drug is injected directly into a patient's vein, or the "IV-drip" method, whereby the drug is introduced into a saline solution in a hanging intravenous bag and slowly descends through a catheter inserted in a patient's vein. The drug is corrosive and causes irreversible gangrene if it enters a patient's artery.

Levine's injury resulted from an IV-push injection of Phenergan. On April 7, 2000, as on previous visits to her local clinic for treatment of a migraine headache, she received an intramuscular injection of Demerol for her headache and Phenergan for her nausea. Because the combination did not provide relief, she returned later that day and received a second injection of both drugs. This time, the physician assistant administered the drugs by the IV-push method, and Phenergan entered Levine's artery, either because the needle penetrated an artery directly or because the drug escaped from the vein into surrounding tissue (a phenomenon called "perivascular extravasation") where it came in contact with arterial blood. As a result, Levine developed gangrene, and

Case 2:19-md-02901-SFC   ECF No. 85-6, PageID.4313   Filed 01/08/21   Page 6 of 35

Wyeth v. Levine, 555 U.S. 555 (2009)
129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

doctors amputated first her right hand and then her entire forearm. In addition to her pain and suffering, Levine incurred substantial medical expenses and the loss of her livelihood as a professional musician.

After settling claims against the health center and clinician, Levine brought an action for damages against Wyeth, relying on common-law negligence and strict-liability theories. Although Phenergan's labeling warned of the danger of gangrene and amputation following inadvertent intra-arterial *560 injection,[1] Levine alleged **1192 that the labeling was defective because it failed to instruct clinicians to use the IV-drip method of intravenous administration instead of the higher risk IV-push method. More broadly, she alleged Phenergan is not reasonably safe for intravenous administration because the foreseeable risks of gangrene and loss of limb are great in relation to the drug's therapeutic benefits. App. 14–15.

Wyeth filed a motion for summary judgment, arguing that Levine's failure-to-warn claims were pre-empted by federal law. The court found no merit in either Wyeth's field pre-emption argument, which it has since abandoned, or its conflict pre-emption argument. With respect to the contention that there was an "actual conflict between a specific FDA order," id., at 21, and Levine's failure-to-warn action, the *561 court reviewed the sparse correspondence between Wyeth and the FDA about Phenergan's labeling and found no evidence that Wyeth had "earnestly attempted" to strengthen the intra-arterial injection warning or that the FDA had "specifically disallowed" stronger language, id., at 23. The record, as then developed, "lack[ed] any evidence that the FDA set a ceiling on this matter." Ibid.

The evidence presented during the 5–day jury trial showed that the risk of intra-arterial injection or perivascular extravasation can be almost entirely eliminated through the use of IV-drip, rather than IV-push, administration. An IV drip is started with saline, which will not flow properly if the catheter is not in the vein and fluid is entering an artery or surrounding tissue. See id., at 50–51, 60, 66–68, 75. By contrast, even a careful and experienced clinician using the IV-push method will occasionally expose an artery to Phenergan. See id., at 73, 75–76. While Phenergan's labeling warned against intra-arterial injection and perivascular extravasation and advised that "[w]hen administering any irritant drug intravenously it is usually preferable to inject it through the tubing of an intravenous infusion set that is known to be functioning satisfactorily," id.,

at 390, the labeling did not contain a specific warning about the risks of IV-push administration.

The trial record also contains correspondence between Wyeth and the FDA discussing Phenergan's label. The FDA first approved injectable Phenergan in 1955. In 1973 and 1976, Wyeth submitted supplemental new drug applications, which the agency approved after proposing labeling changes. Wyeth submitted a third supplemental application in 1981 in response to a new FDA rule governing drug labels. Over the next 17 years, Wyeth and the FDA intermittently corresponded about Phenergan's label. The most notable activity occurred in 1987, when the FDA suggested different warnings about the risk of arterial exposure, and in 1988, when Wyeth submitted revised labeling incorporating the *562 proposed changes. The FDA did not respond. Instead, in 1996, it requested from Wyeth the labeling then in use and, without addressing Wyeth's 1988 submission, instructed it to "[r]etain verbiage in current label" regarding intra-arterial injection. Id., at 359. After a few further changes to the labeling not related to intra-arterial injection, the FDA approved Wyeth's 1981 application in 1998, instructing that Phenergan's final printed label "must be identical" to the approved package insert. Id., at 382.

Based on this regulatory history, the trial judge instructed the jury that it could **1193 consider evidence of Wyeth's compliance with FDA requirements but that such compliance did not establish that the warnings were adequate. He also instructed, without objection from Wyeth, that FDA regulations "permit a drug manufacturer to change a product label to add or strengthen a warning about its product without prior FDA approval so long as it later submits the revised warning for review and approval." Id., at 228.

Answering questions on a special verdict form, the jury found that Wyeth was negligent, that Phenergan was a defective product as a result of inadequate warnings and instructions, and that no intervening cause had broken the causal connection between the product defects and the plaintiff's injury. Id., at 233–235. It awarded total damages of $7,400,000, which the court reduced to account for Levine's earlier settlement with the health center and clinician. Id., at 235–236.

On August 3, 2004, the trial court filed a comprehensive opinion denying Wyeth's motion for judgment as a matter of law. After making findings of fact based on the trial record (supplemented by one letter that Wyeth found after

the trial), the court rejected Wyeth's pre-emption arguments. It determined that there was no direct conflict between FDA regulations and Levine's state-law claims because those regulations permit strengthened warnings without FDA approval on an interim basis and the record contained evidence **\*563** of at least 20 reports of amputations similar to Levine's since the 1960's. The court also found that state tort liability in this case would not obstruct the FDA's work because the agency had paid no more than passing attention to the question whether to warn against IV-push administration of Phenergan. In addition, the court noted that state law serves a compensatory function distinct from federal regulation. *Id.*, at 249–252.

The Vermont Supreme Court affirmed. It held that the jury's verdict "did not conflict with FDA's labeling requirements for Phenergan because [Wyeth] could have warned against IV-push administration without prior FDA approval, and because federal labeling requirements create a floor, not a ceiling, for state regulation." 183 Vt. 76, 84, 944 A.2d 179, 184 (2006). In dissent, Chief Justice Reiber argued that the jury's verdict conflicted with federal law because it was inconsistent with the FDA's conclusion that intravenous administration of Phenergan was safe and effective.

The importance of the pre-emption issue, coupled with the fact that the FDA has changed its position on state tort law and now endorses the views expressed in Chief Justice Reiber's dissent, persuaded us to grant Wyeth's petition for certiorari. 552 U.S. 1161, 128 S.Ct. 1118, 169 L.Ed.2d 845 (2008). The question presented by the petition is whether the FDA's drug labeling judgments "preempt state law product liability claims premised on the theory that different labeling judgments were necessary to make drugs reasonably safe for use." Pet. for Cert. *i.*

II

Wyeth makes two separate pre-emption arguments: first, that it would have been impossible for it to comply with the state-law duty to modify Phenergan's labeling without violating federal law, see *Fidelity Fed. Sav. & Loan Assn. v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982), and second, that recognition of Levine's state tort action creates an unacceptable "obstacle to the accomplishment and execution of the full purposes **\*564** and objectives of Congress," **\*\*1194** *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941), because it

substitutes a lay jury's decision about drug labeling for the expert judgment of the FDA. As a preface to our evaluation of these arguments, we identify two factual propositions decided during the trial court proceedings, emphasize two legal principles that guide our analysis, and review the history of the controlling federal statute.

The trial court proceedings established that Levine's injury would not have occurred if Phenergan's label had included an adequate warning about the risks of the IV-push method of administering the drug. The record contains evidence that the physician assistant administered a greater dose than the label prescribed, that she may have inadvertently injected the drug into an artery rather than a vein, and that she continued to inject the drug after Levine complained of pain. Nevertheless, the jury rejected Wyeth's argument that the clinician's conduct was an intervening cause that absolved it of liability. See App. 234 (jury verdict), 252–254. In finding Wyeth negligent as well as strictly liable, the jury also determined that Levine's injury was foreseeable. That the inadequate label was both a but-for and proximate cause of Levine's injury is supported by the record and no longer challenged by Wyeth.[2]

The trial court proceedings further established that the critical defect in Phenergan's label was the lack of an adequate warning about the risks of IV-push administration. Levine also offered evidence that the IV-push method **\*565** should be contraindicated and that Phenergan should never be administered intravenously, even by the IV-drip method. Perhaps for this reason, the dissent incorrectly assumes that the state-law duty at issue is the duty to contraindicate the IV-push method. See, *e.g.,post,* at 1221, 1230 – 1231. But, as the Vermont Supreme Court explained, the jury verdict established only that Phenergan's warning was insufficient. It did not mandate a particular replacement warning, nor did it require contraindicating IV-push administration: "There may have been any number of ways for [Wyeth] to strengthen the Phenergan warning without completely eliminating IV-push administration." 183 Vt., at 92, n. 2, 944 A.2d, at 189, n. 2. We therefore need not decide whether a state rule proscribing intravenous administration would be pre-empted. The narrower question presented is whether federal law pre-empts Levine's claim that Phenergan's label did not contain an adequate warning about using the IV-push method of administration.

 **[1]   [2]   [3]   [4]**   Our answer to that question must be guided by two cornerstones of our pre-emption jurisprudence. First, "the purpose of Congress is the ultimate touchstone in every

Wyeth v. Levine, 555 U.S. 555 (2009)

Case 2:19-md-02901-SFC ECF No. 85-6, PageID.4315 Filed 01/08/21 Page 8 of 35

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

pre-emption case." *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (internal quotation marks omitted); see *Retail Clerks v. Schermerhorn,* 375 U.S. 96, 103, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963). Second, "[i]n all pre-emption cases, and particularly in those in which Congress has 'legislated ... in a field which the States have traditionally occupied,' ... we 'start with the assumption that the historic police **1195** powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *Lohr,* 518 U.S., at 485, 116 S.Ct. 2240 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)).[3]

**\*566** In order to identify the "purpose of Congress," it is appropriate to briefly review the history of federal regulation of drugs and drug labeling. In 1906, Congress enacted its first significant public health law, the Federal Food and Drugs Act, ch. 3915, 34 Stat. 768. The Act, which prohibited the manufacture or interstate shipment of adulterated or misbranded drugs, supplemented the protection for consumers already provided by state regulation and common-law liability. In the 1930's, Congress became increasingly concerned about unsafe drugs and fraudulent marketing, and it enacted the Federal Food, Drug, and Cosmetic Act (FDCA), ch. 675, 52 Stat. 1040, as amended, 21 U.S.C. § 301 *et seq.* The FDCA's most substantial innovation was its provision for premarket approval of new drugs. It required every manufacturer to submit a new drug application, including reports of investigations and specimens of proposed labeling, to the FDA for review. Until its application became effective, a manufacturer was prohibited from distributing a drug. The FDA could reject an application if it determined that the drug was not safe for use as labeled, though if the agency failed to act, an application became effective 60 days after the filing. FDCA, § 505(c), 52 Stat. 1052.

**\*567** In 1962, Congress amended the FDCA and shifted the burden of proof from the FDA to the manufacturer. Before 1962, the agency had to prove harm to keep a drug out of the market, but the amendments required the manufacturer to demonstrate that its drug was "safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling" before it could distribute the drug. §§ 102(c), 104(b), 76 Stat. 781, 784. In addition, the amendments required the manufacturer to prove the drug's effectiveness by introducing "substantial evidence that the drug will have the effect it purports or is represented to have under the conditions

of use prescribed, recommended, or suggested in the proposed labeling." § 102(c), *id.,* at 781.

As it enlarged the FDA's powers to "protect the public health" and "assure the safety, effectiveness, and reliability of **1196** drugs," *id.,* at 780, Congress took care to preserve state law. The 1962 amendments added a saving clause, indicating that a provision of state law would only be invalidated upon a "direct and positive conflict" with the FDCA. § 202, *id.,* at 793. Consistent with that provision, state common-law suits "continued unabated despite ... FDA regulation." *Riegel v. Medtronic, Inc.,* 552 U.S. 310, 340, 128 S.Ct. 999, 1017, 169 L.Ed.2d 892 (2008) (GINSBURG, J., dissenting); see *ibid.,* n. 11 (collecting state cases). And when Congress enacted an express pre-emption provision for medical devices in 1976, see § 2, 90 Stat. 574 (codified at 21 U.S.C. § 360k(a)), it declined to enact such a provision for prescription drugs.

In 2007, after Levine's injury and lawsuit, Congress again amended the FDCA. 121 Stat. 823. For the first time, it granted the FDA statutory authority to require a manufacturer to change its drug label based on safety information that becomes available after a drug's initial approval. § 901(a), *id.,* at 924–926. In doing so, however, Congress did not enact a provision in the Senate bill that would have required the FDA to preapprove all changes to drug labels. See S. 1082, 110th Cong., 1st Sess., § 208, pp. 107–114 (2007) **\*568** as passed) (proposing new § 506D). Instead, it adopted a rule of construction to make it clear that manufacturers remain responsible for updating their labels. See 121 Stat. 925–926.

III

[5] Wyeth first argues that Levine's state-law claims are pre-empted because it is impossible for it to comply with both the state-law duties underlying those claims and its federal labeling duties. See *de la Cuesta,* 458 U.S., at 153, 102 S.Ct. 3014. The FDA's premarket approval of a new drug application includes the approval of the exact text in the proposed label. See 21 U.S.C. § 355; 21 CFR § 314.105(b) (2008). Generally speaking, a manufacturer may only change a drug label after the FDA approves a supplemental application. There is, however, an FDA regulation that permits a manufacturer to make certain changes to its label before receiving the agency's approval. Among other things, this "changes being effected" (CBE) regulation provides that if a manufacturer is changing a label

Wyeth v. Levine, 555 U.S. 555 (2009)

Case 2:19-md-02901-SFC    ECF No. 85-6, PageID.4316    Filed 01/08/21    Page 9 of 35

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

to "add or strengthen a contraindication, warning, precaution, or adverse reaction" or to "add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product," it may make the labeling change upon filing its supplemental application with the FDA; it need not wait for FDA approval. §§ 314.70(c)(6)(iii) (A), (C).

Wyeth argues that the CBE regulation is not implicated in this case because a 2008 amendment provides that a manufacturer may only change its label "to reflect newly acquired information." 73 Fed.Reg. 49609. Resting on this language (which Wyeth argues simply reaffirmed the interpretation of the regulation in effect when this case was tried), Wyeth contends that it could have changed Phenergan's label only in response to new information that the FDA had not considered. And it maintains that Levine has not pointed to any such information concerning the risks of IV-push administration. Thus, Wyeth insists, it was impossible for it *569 to discharge its state-law obligation to provide a stronger warning about IV-push administration without violating federal law. Wyeth's argument misapprehends both the federal drug regulatory scheme and its burden in establishing a pre-emption defense.

We need not decide whether the 2008 CBE regulation is consistent with the FDCA and the previous version of the **1197 regulation, as Wyeth and the United States urge, because Wyeth could have revised Phenergan's label even in accordance with the amended regulation. As the FDA explained in its notice of the final rule, " 'newly acquired information' " is not limited to new data, but also encompasses "new analyses of previously submitted data." Id., at 49604. The rule accounts for the fact that risk information accumulates over time and that the same data may take on a different meaning in light of subsequent developments: "[I]f the sponsor submits adverse event information to FDA, and then later conducts a new analysis of data showing risks of a different type or of greater severity or frequency than did reports previously submitted to FDA, the sponsor meets the requirement for 'newly acquired information.' " Id., at 49607; see also id., at 49606.

The record is limited concerning what newly acquired information Wyeth had or should have had about the risks of IV-push administration of Phenergan because Wyeth did not argue before the trial court that such information was required for a CBE labeling change. Levine did, however, present evidence of at least 20 incidents prior to her injury

in which a Phenergan injection resulted in gangrene and an amputation. See App. 74, 252.[4] After the first such incident came to Wyeth's attention in 1967, it notified the FDA and worked with the agency to change Phenergan's label. *570 In later years, as amputations continued to occur, Wyeth could have analyzed the accumulating data and added a stronger warning about IV-push administration of the drug.

Wyeth argues that if it had unilaterally added such a warning, it would have violated federal law governing unauthorized distribution and misbranding. Its argument that a change in Phenergan's labeling would have subjected it to liability for unauthorized distribution rests on the assumption that this labeling change would have rendered Phenergan a new drug lacking an effective application. But strengthening the warning about IV-push administration would not have made Phenergan a new drug. See 21 U.S.C. § 321(p)(1) (defining "new drug"); 21 CFR § 310.3(h). Nor would this warning have rendered Phenergan misbranded. The FDCA does not provide that a drug is misbranded simply because the manufacturer has altered an FDA-approved label; instead, the misbranding provision focuses on the substance of the label and, among other things, proscribes labels that fail to include "adequate warnings." 21 U.S.C. § 352(f). Moreover, because the statute contemplates that federal juries will resolve most misbranding claims, the FDA's belief that a drug is misbranded is not conclusive. See §§ 331, 332, 334(a)-(b). And the very idea that the FDA would bring an enforcement action against a manufacturer for strengthening a warning pursuant to the CBE regulation is difficult to accept—neither Wyeth nor the United States has identified a case in which the FDA has done so.

[6]  Wyeth's cramped reading of the CBE regulation and its broad reading of the FDCA's misbranding and unauthorized distribution provisions are premised on a more fundamental misunderstanding. Wyeth suggests that the FDA, rather than the manufacturer, bears primary responsibility for drug labeling. Yet through many amendments to the FDCA and to FDA regulations, it has remained a central premise of federal drug regulation that the **1198 manufacturer bears responsibility *571 for the content of its label at all times. It is charged both with crafting an adequate label and with ensuring that its warnings remain adequate as long as the drug is on the market. See, e.g., 21 CFR § 201.80(e) (requiring a manufacturer to revise its label "to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug"); § 314.80(b) (placing responsibility for postmarketing surveillance on the

manufacturer); 73 Fed.Reg. 49605 ("Manufacturers continue to have a responsibility under Federal law ... to maintain their labeling and update the labeling with new safety information").

Indeed, prior to 2007, the FDA lacked the authority to order manufacturers to revise their labels. See 121 Stat. 924–926. When Congress granted the FDA this authority, it reaffirmed the manufacturer's obligations and referred specifically to the CBE regulation, which both reflects the manufacturer's ultimate responsibility for its label and provides a mechanism for adding safety information to the label prior to FDA approval. See *id.,* at 925–926 (stating that a manufacturer retains the responsibility "to maintain its label in accordance with existing requirements, including subpart B of part 201 and *sections* 314.70 and 601.12 of title 21, Code of Federal Regulations (or any successor regulations)" (emphasis added)). Thus, when the risk of gangrene from IV-push injection of Phenergan became apparent, Wyeth had a duty to provide a warning that adequately described that risk, and the CBE regulation permitted it to provide such a warning before receiving the FDA's approval.

Of course, the FDA retains authority to reject labeling changes made pursuant to the CBE regulation in its review of the manufacturer's supplemental application, just as it retains such authority in reviewing all supplemental applications. But absent clear evidence that the FDA would not have approved a change to Phenergan's label, we will not conclude that it was impossible for Wyeth to comply with both federal and state requirements.

**\*572**  Wyeth has offered no such evidence. It does not argue that it attempted to give the kind of warning required by the Vermont jury but was prohibited from doing so by the FDA.[5] See Tr. of Oral Arg. 12–13; see also Brief for United States as *Amicus Curiae* 25. And while it does suggest that the FDA intended to prohibit it from strengthening the warning about IV-push administration because the agency deemed such a warning inappropriate in reviewing Phenergan's drug applications, both the trial court and the Vermont Supreme Court rejected this account as a matter of fact. In its decision on Wyeth's motion for judgment as a matter of law, **\*\*1199** the trial court found "no evidence in this record that either the FDA or the manufacturer gave more than passing attention to the issue of" IV-push versus IV-drip administration. App. 249. The Vermont Supreme Court likewise concluded that the FDA had not made an affirmative decision to preserve

the IV-push method or intended to prohibit Wyeth from strengthening its warning about IV-push administration. 183 Vt., at 91 – 92, 944 A.2d, at 188 – 189. Moreover, Wyeth does not argue that it supplied the FDA with an evaluation **\*573**  or analysis concerning the specific dangers posed by the IV-push method. We accordingly cannot credit Wyeth's contention that the FDA would have prevented it from adding a stronger warning about the IV-push method of intravenous administration.[6]

Impossibility pre-emption is a demanding defense. On the record before us, Wyeth has failed to demonstrate that it was impossible for it to comply with both federal and state requirements. The CBE regulation permitted Wyeth to unilaterally strengthen its warning, and the mere fact that the FDA approved Phenergan's label does not establish that it would have prohibited such a change.

IV

**[7]**  Wyeth also argues that requiring it to comply with a state-law duty to provide a stronger warning about IV-push administration would obstruct the purposes and objectives of federal drug labeling regulation. Levine's tort claims, it maintains, are pre-empted because they interfere with "Congress's purpose to entrust an expert agency to make drug labeling decisions that strike a balance between competing objectives." Brief for Petitioner 46. We find no merit in this argument, which relies on an untenable interpretation of congressional intent and an overbroad view of an agency's power to pre-empt state law.

Wyeth contends that the FDCA establishes both a floor and a ceiling for drug regulation: Once the FDA has approved **\*574**  a drug's label, a state-law verdict may not deem the label inadequate, regardless of whether there is any evidence that the FDA has considered the stronger warning at issue. The most glaring problem with this argument is that all evidence of Congress' purposes is to the contrary. Building on its 1906 Act, Congress enacted the FDCA to bolster consumer protection against harmful products. See *Kordel v. United States,* 335 U.S. 345, 349, 69 S.Ct. 106, 93 L.Ed. 52 (1948);*United States v. Sullivan,* 332 U.S. 689, 696, 68 S.Ct. 331, 92 L.Ed. 297 (1948). Congress did not provide a federal remedy for consumers harmed by unsafe or ineffective drugs in the 1938 statute or in any subsequent amendment. Evidently, it determined that widely available state rights of action provided appropriate relief for injured consumers.[7] It

Case 2:19-md-02901-SFC   ECF No. 85-6, PageID.4318   Filed 01/08/21   Page 11 of 35

Wyeth v. Levine, 555 U.S. 555 (2009)

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

may also have recognized that **1200 state-law remedies further consumer protection by motivating manufacturers to produce safe and effective drugs and to give adequate warnings.

[8]   If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express preemption provision at some point during the FDCA's 70–year history. But despite its 1976 enactment of an express preemption provision for medical devices, see § 2, 90 Stat. 574 (codified at 21 U.S.C. § 360k(a)), Congress has not enacted such a provision for prescription drugs. See *Riegel,* 552 U.S., at 327, 128 S.Ct., at 1009 ("Congress could have applied the pre-emption clause to the entire FDCA. It did not do so, but instead wrote a pre-emption clause that applies only to medical devices *575 ").[8] Its silence on the issue, coupled with its certain awareness of the prevalence of state tort litigation, is powerful evidence that Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness. As Justice O'Connor explained in her opinion for a unanimous Court: "The case for federal preemption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 166–167, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989) (internal quotation marks omitted); see also *supra,* at 1194 (discussing the presumption against pre-emption).

[9]   Despite this evidence that Congress did not regard state tort litigation as an obstacle to achieving its purposes, Wyeth nonetheless maintains that, because the FDCA requires the FDA to determine that a drug is safe and effective under the conditions set forth in its labeling, the agency must be presumed to have performed a precise balancing of risks and benefits and to have established a specific labeling standard that leaves no room for different state-law judgments. In advancing this argument, Wyeth relies not on any statement by Congress, but instead on the preamble to a 2006 FDA regulation governing the content and format of prescription drug labels. See Brief for Petitioner 8, 11, 42, 45, and 50 (citing 71 Fed.Reg. 3922 (2006)). In that preamble, the FDA declared that the FDCA establishes "both a 'floor' and a 'ceiling,' " so that "FDA approval of labeling ... preempts conflicting or contrary State law." *Id.,* at 3934–3935. It further stated that certain state-law actions, such as those involving failure-to-warn claims, "threaten FDA's statutorily **576

prescribed role as the expert Federal agency responsible for evaluating and regulating drugs." *Id.,* at 3935.

This Court has recognized that an agency regulation with the force of law can pre-empt conflicting state requirements. See, *e.g.,Geier v. American Honda Motor Co.,* 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000); *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). In such cases, the Court has **1201 performed its own conflict determination, relying on the substance of state and federal law and not on agency proclamations of pre-emption. We are faced with no such regulation in this case, but rather with an agency's mere assertion that state law is an obstacle to achieving its statutory objectives. Because Congress has not authorized the FDA to pre-empt state law directly, cf. 21 U.S.C. § 360k (authorizing the FDA to determine the scope of the Medical Devices Amendments' pre-emption clause),[9] the question is what weight we should accord the FDA's opinion.

[10]   [11]   In prior cases, we have given "some weight" to an agency's views about the impact of tort law on federal objectives when "the subject matter is technica[l] and the relevant history and background are complex and extensive." *Geier,* 529 U.S., at 883, 120 S.Ct. 1913. Even in such cases, however, we have not deferred to an agency's *conclusion* that state law is pre-empted. Rather, we have attended to an agency's explanation of how state law affects the regulatory scheme. While *577 agencies have no special authority to pronounce on pre-emption absent delegation by Congress, they do have a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements may pose an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines,* 312 U.S, at 67, 61 S.Ct. 399; see *Geier,* 529 U.S., at 883, 120 S.Ct. 1913; *Lohr,* 518 U.S., at 495–496, 116 S.Ct. 2240. The weight we accord the agency's explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness. Cf. *United States v. Mead Corp.,* 533 U.S. 218, 234–235, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001); *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

Under this standard, the FDA's 2006 preamble does not merit deference. When the FDA issued its notice of proposed rulemaking in December 2000, it explained that the rule would "not contain policies that have federalism implications or that preempt State law." 65 Fed.Reg. 81103; see also 71

Case 2:19-md-02901-SFC   ECF No. 85-6, PageID.4319   Filed 01/08/21   Page 12 of 35

Wyeth v. Levine, 555 U.S. 555 (2009)

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

*id.,* at 3969 (noting that the "proposed rule did not propose to preempt state law"). In 2006, the agency finalized the rule and, without offering States or other interested parties notice or opportunity for comment, articulated a sweeping position on the FDCA's pre-emptive effect in the regulatory preamble. The agency's views on state law are inherently suspect in light of this procedural failure.

Further, the preamble is at odds with what evidence we have of Congress' purposes, and it reverses the FDA's own longstanding position without providing a reasoned explanation, including any discussion of how state law has interfered with the FDA's regulation of drug labeling during decades of coexistence. The FDA's 2006 position plainly does not reflect the agency's own view at all times relevant to this litigation. Not once prior to Levine's injury **1202 did the FDA suggest that state tort law stood as an obstacle to its statutory mission. To the contrary, it cast federal labeling standards as a floor upon which States could build and repeatedly disclaimed *578 any attempt to pre-empt failure-to-warn claims. For instance, in 1998, the FDA stated that it did "not believe that the evolution of state tort law [would] cause the development of standards that would be at odds with the agency's regulations." 63 *id.,* at 66384. It further noted that, in establishing "minimal standards" for drug labels, it did not intend "to preclude the states from imposing additional labeling requirements." *Ibid.*[10]

In keeping with Congress' decision not to pre-empt common-law tort suits, it appears that the FDA traditionally regarded state law as a complementary form of drug regulation. The FDA has limited resources to monitor the 11,000 drugs on the market,[11] and manufacturers have superior access *579 to information about their drugs, especially in the postmarketing phase as new risks emerge. State tort suits uncover unknown drug hazards and provide incentives for drug manufacturers to disclose safety risks promptly. They also serve a distinct compensatory function that may motivate injured persons to come forward with information. Failure-to-warn actions, in particular, lend force to the FDCA's premise that manufacturers, not the FDA, bear primary responsibility for their drug labeling at all times. Thus, the FDA long maintained that state law offers an additional, and important, layer of consumer protection that complements FDA regulation. **1203 [12] The agency's 2006 preamble represents a dramatic change in position.

Largely based on the FDA's new position, Wyeth argues that this case presents a conflict between state and federal law

analogous to the one at issue in *Geier.* There, we held that state tort claims premised on Honda's failure to install airbags conflicted with a federal regulation that did not require airbags for all cars. The Department of Transportation *580 DOT) had promulgated a rule that provided car manufacturers with a range of choices among passive restraint devices. *Geier,* 529 U.S., at 875, 120 S.Ct. 1913. Rejecting an " 'all airbag' " standard, the agency had called for a gradual phase-in of a mix of passive restraints in order to spur technological development and win consumer acceptance. *Id.,* at 879, 120 S.Ct. 1913. Because the plaintiff's claim was that car manufacturers had a duty to install airbags, it presented an obstacle to achieving "the variety and mix of devices that the federal regulation sought." *Id.,* at 881, 120 S.Ct. 1913.

Wyeth and the dissent contend that the regulatory scheme in this case is nearly identical, but, as we have described, it is quite different. In *Geier,* the DOT conducted a formal rulemaking and then adopted a plan to phase in a mix of passive restraint devices. Examining the rule itself and the DOT's contemporaneous record, which revealed the factors the agency had weighed and the balance it had struck, we determined that state tort suits presented an obstacle to the federal scheme. After conducting our own pre-emption analysis, we considered the agency's explanation of how state law interfered with its regulation, regarding it as further support for our independent conclusion that the plaintiff's tort claim obstructed the federal regime.

By contrast, we have no occasion in this case to consider the pre-emptive effect of a specific agency regulation bearing the force of law. And the FDA's newfound opinion, expressed in its 2006 preamble, that state law "frustrate[s] the agency's implementation of its statutory mandate," 71 Fed.Reg. 3934, does not merit deference for the reasons we have explained.[13] Indeed, the "complex and extensive" regulatory *581 history and background relevant to this case, *Geier,* 529 U.S., at 883, 120 S.Ct. 1913, undercut the FDA's recent pronouncements of pre-emption, as they reveal the longstanding coexistence of state and federal law and the FDA's traditional recognition of state-law remedies—a recognition in place each time the agency reviewed Wyeth's Phenergan label.[14]

**1204 In short, Wyeth has not persuaded us that failure-to-warn claims like Levine's obstruct the federal regulation of drug labeling. Congress has repeatedly declined to pre-empt state law, and the FDA's recently adopted position that state tort suits interfere with its statutory mandate is entitled

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

to no weight. Although we recognize that some state-law claims might well frustrate the achievement of congressional objectives, this is not such a case.

## V

We conclude that it is not impossible for Wyeth to comply with its state- and federal-law obligations and that Levine's common-law claims do not stand as an obstacle to the accomplishment of Congress' purposes in the FDCA. Accordingly, the judgment of the Vermont Supreme Court is affirmed.

*It is so ordered.*

Justice BREYER, concurring.

I write separately to emphasize the Court's statement that "we have no occasion in this case to consider the pre-emptive effect of a specific agency regulation bearing the force of law." *Ante,* at 1203. State tort law will sometimes help the **\*582** Food and Drug Administration (FDA) "uncover unknown drug hazards and [encourage] drug manufacturers to disclose safety risks." *Ante,* at 1202. But it is also possible that state tort law will sometimes interfere with the FDA's desire to create a drug label containing a specific set of cautions and instructions. I also note that some have argued that state tort law can sometimes raise prices to the point where those who are sick are unable to obtain the drugs they need. See Lasagna, The Chilling Effect of Product Liability on New Drug Development, in The Liability Maze 334, 335–336 (P. Huber & R. Litan eds.1991). The FDA may seek to determine whether and when state tort law acts as a help or a hindrance to achieving the safe drug-related medical care that Congress sought. *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 506, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (BREYER, J., concurring in part and concurring in judgment); cf *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 454–455, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005) (BREYER, J., concurring). It may seek to embody those determinations in lawful specific regulations describing, for example, when labeling requirements serve as a ceiling as well as a floor. And it is possible that such determinations would have pre-emptive effect. See *Lohr, supra,* at 505, 116 S.Ct. 2240 (opinion of BREYER, J.) (citing *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985)). I agree with the Court, however, that such a regulation is not at issue in this case.

Justice THOMAS, concurring in the judgment.

I agree with the Court that the fact that the Food and Drug Administration (FDA) approved the label for petitioner Wyeth's drug Phenergan does not pre-empt the state-law judgment before the Court. That judgment was based on a jury finding that the label did not adequately warn of the risk involved in administering Phenergan through the IV-push injection method. Under federal law, without prior approval from the FDA, Wyeth could have "add[ed] or strengthen[ed]" information on its label about "a contraindication, **\*583** warning, precaution, or adverse reaction," **\*\*1205** 21 CFR § 314.70(c)(6)(iii)(A) (2008), or "about dosage and administration that is intended to increase the safe use of the drug product," § 314.70(c)(6)(iii)(C), in order to "reflect newly acquired information," including "new analyses of previously submitted data," about the dangers of IV-push administration of Phenergan, 73 Fed.Reg. 49603, 49609 (2008). It thus was possible for Wyeth to label and market Phenergan in compliance with federal law while also providing additional warning information on its label beyond that previously approved by the FDA. In addition, federal law does not give drug manufacturers an unconditional right to market their federally approved drug at all times with the precise label initially approved by the FDA. The Vermont court's judgment in this case, therefore, did not directly conflict with federal law and is not pre-empted.

I write separately, however, because I cannot join the majority's implicit endorsement of far-reaching implied pre-emption doctrines. In particular, I have become increasingly skeptical of this Court's "purposes and objectives" pre-emption jurisprudence. Under this approach, the Court routinely invalidates state laws based on perceived conflicts with broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not embodied within the text of federal law. Because implied pre-emption doctrines that wander far from the statutory text are inconsistent with the Constitution, I concur only in the judgment.

## I

### A

In order "to ensure the protection of our fundamental liberties," *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) (internal

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

quotation marks omitted), the "Constitution establishes a system of dual sovereignty between the States and the Federal Government," **\*584** *Gregory v. Ashcroft,* 501 U.S. 452, 457, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). The Framers adopted this " 'constitutionally mandated balance of power,' " *Atascadero State Hospital, supra,* at 242, 105 S.Ct. 3142, to "reduce the risk of tyranny and abuse from either front," because a "federalist structure of joint sovereigns preserves to the people numerous advantages," such as "a decentralized government that will be more sensitive to the diverse needs of a heterogeneous society" and "increase[d] opportunity for citizen involvement in democratic processes," *Gregory, supra,* at 458, 111 S.Ct. 2395. Furthermore, as the Framers observed, the "compound republic of America" provides "a double security ... to the rights of the people" because "the power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments." The Federalist No. 51, p. 266 (M. Beloff ed., 2d ed.1987).

Under this federalist system, "the States possess sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause." *Tafflin v. Levitt,* 493 U.S. 455, 458, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990). In this way, the Supremacy Clause gives the Federal Government "a decided advantage in [a] delicate balance" between federal and state sovereigns. *Gregory,* 501 U.S., at 460, 111 S.Ct. 2395. "As long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States." *Ibid.* That is an "extraordinary power in a federalist system." *Ibid.*

Nonetheless, the States retain substantial sovereign authority. U.S. Const., Amdt. 10 ("The powers not delegated to **\*\*1206** the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people"); see also *Alden v. Maine,* 527 U.S. 706, 713, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999); *Printz v. United States,* 521 U.S. 898, 918–922, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997); *New York v. United States,* 505 U.S. 144, 155–156, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992); *Gregory,supra,* at 457–459, 111 S.Ct. 2395; *Tafflin, supra,* at 458, 110 S.Ct. 792. In accordance with the text and structure of the Constitution, "[t]he powers delegated by the proposed constitution to the **\*585** federal government, are few and defined" and "[t]hose which are to remain in the state governments, are numerous and indefinite." The Federalist No. 45, at 237–238. Indeed, in protecting our constitutional government, "the preservation of the States, and the maintenance of their governments, are

as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National government." *Texas v. White,* 7 Wall. 700, 725, 19 L.Ed. 227 (1869), quoted in *New York v. United States, supra,* at 162, 112 S.Ct. 2408.

As a result, in order to protect the delicate balance of power mandated by the Constitution, the Supremacy Clause must operate only in accordance with its terms. The Clause provides:

> "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Art. VI, cl. 2.

With respect to federal laws, then, the Supremacy Clause gives "supreme" status only to those that are "made in Pursuance" of "[t]his Constitution." *Ibid.;* see 3 J. Story, Commentaries on the Constitution of the United States § 1831, p. 694 (1833) (hereinafter Story) ("It will be observed, that the supremacy of the laws is attached to those only, which are made in pursuance of the constitution").

Federal laws "made in Pursuance" of the Constitution must comply with two key structural limitations in the Constitution that ensure that the Federal Government does not amass too much power at the expense of the States. The first structural limitation, which the parties have not raised in this case, is "the Constitution's conferral upon Congress of not all governmental powers, but only discrete, enumerated ones." *Printz,supra,* at 919, 117 S.Ct. 2365; see also **\*586** *United States v. Morrison,* 529 U.S. 598, 618, n. 8, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000); *New York v. United States, supra,* at 155–157, 112 S.Ct. 2408; *McCulloch v. Maryland,* 4 Wheat. 316, 405, 4 L.Ed. 579 (1819) ("This government is acknowledged by all to be one of enumerated powers").[1]

The second structural limitation is the complex set of procedures that Congress **\*\*1207** and the President must follow to enact "Laws of the United States." See *INS v. Chadha,* 462 U.S. 919, 945–946, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (setting forth the Constitution's Bicameral and Presentment Clauses, Art. I, § 7, cls. 2–3, which "prescribe and define the respective functions of the Congress and of the Executive in the legislative process"). "[T]he Framers were acutely conscious that the bicameral requirement and

Case 2:19-md-02901-SFC    ECF No. 85-6, PageID.4322    Filed 01/08/21    Page 15 of 35

Wyeth v. Levine, 555 U.S. 555 (2009)
129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

the Presentment Clauses would serve essential constitutional functions," *Chadha,* 462 U.S., at 951, 103 S.Ct. 2764, by allowing the passage of legislation only after it has proceeded through "a step-by-step, deliberate and deliberative process," *id.,* at 959, 103 S.Ct. 2764, that was "finely wrought and exhaustively considered" by the Framers, *id.,* at 951, 103 S.Ct. 2764. The Supremacy Clause thus requires that pre-emptive effect be given only to those federal standards and policies that are set forth in, or necessarily follow from, the statutory text that was produced through the constitutionally required bicameral and presentment procedures. See Story § 1831, at 694 (Actions of the Federal Government "which are not pursuant to its constitutional powers, but which are invasions of the residuary authorities of the smaller societies," are not "the **\*587** supreme law of the land. They will be merely acts of usurpation, and will deserve to be treated as such").

### B

In light of these constitutional principles, I have become "increasing[ly] reluctan[t] to expand federal statutes beyond their terms through doctrines of implied pre-emption." *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 459, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005) (THOMAS, J., concurring in judgment in part and dissenting in part). My review of this Court's broad implied pre-emption precedents, particularly its "purposes and objectives" pre-emption jurisprudence, has increased my concerns that implied pre-emption doctrines have not always been constitutionally applied. Under the vague and "potentially boundless" doctrine of "purposes and objectives" pre-emption, *Geier v. American Honda Motor Co.,* 529 U.S. 861, 907, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) (STEVENS, J., dissenting), for example, the Court has pre-empted state law based on its interpretation of broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not contained within the text of federal law. See, *e.g.,Pharmaceutical Research and Mfrs. of America v. Walsh,* 538 U.S. 644, 678, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003) (THOMAS, J., concurring in judgment) (referring to the "concomitant danger of invoking obstacle pre-emption based on the arbitrary selection of one purpose to the exclusion of others"); *Crosby v. National Foreign Trade Council,* 530 U.S. 363, 388–391, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (SCALIA, J., concurring in judgment) (criticizing the majority's reliance on legislative history to discern statutory intent when that intent was "perfectly obvious on the face of th[e] statute");

*Geier, supra,* at 874–883, 120 S.Ct. 1913 (relying on regulatory history, agency comments, and the Government's litigating position to determine that federal law pre-empted state law).

Congressional and agency musings, however, do not satisfy the Article I, § 7, requirements for enactment of federal law and, therefore, do not pre-empt state law under the Supremacy **\*588** Clause. When analyzing the pre-emptive effect of federal statutes or regulations validly promulgated thereunder, "[e]vidence of pre-emptive purpose [must be] sought in the text and structure of the [provision] at issue" to comply with the Constitution. **\*\*1208** *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993); see also *New York v. FERC,* 535 U.S. 1, 18, 122 S.Ct. 1012, 152 L.Ed.2d 47 (2002) ("[A] federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority ... [for] an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it" (internal quotation marks omitted; second alteration in original)); *Camps Newfound/Owatonna, Inc. v. Town of Harrison,* 520 U.S. 564, 617, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997) (Thomas, J., dissenting) (noting that "treating unenacted congressional intent as if it were law would be constitutionally dubious"). Pre-emption analysis should not be "[a] freewheeling judicial inquiry into whether a state statute is in tension with federal objectives," but an inquiry into whether the ordinary meanings of state and federal law conflict." *Bates, supra,* at 459, 125 S.Ct. 1788 (THOMAS, J., concurring in judgment in part and dissenting in part) (internal quotation marks and citation omitted); see also *Geier, supra,* at 911, 120 S.Ct. 1913 (STEVENS, J., dissenting) ("[P]re-emption analysis is, or at least should be, a matter of precise statutory [or regulatory] construction rather than an exercise in free-form judicial policymaking" (internal quotation marks omitted)). Pre-emption must turn on whether state law conflicts with the text of the relevant federal statute or with the federal regulations authorized by that text. See *Foster v. Love,* 522 U.S. 67, 71, 118 S.Ct. 464, 139 L.Ed.2d 369 (1997) (finding that conflict pre-emption question "turn[ed] entirely on the meaning of the state and federal statutes" at issue before the Court); see also *New York v. FERC, supra,* at 19, 122 S.Ct. 1012.

### II

Case 2:19-md-02901-SFC   ECF No. 85-6, PageID.4323   Filed 01/08/21   Page 16 of 35

Wyeth v. Levine, 555 U.S. 555 (2009)
129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

This Court has determined that there are two categories of conflict pre-emption, both of which Wyeth contends are at **\*589** issue in this case. First, the Court has found pre-emption "where compliance with both federal and state regulations is a physical impossibility for one engaged in interstate commerce." *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–143, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963). Second, the Court has determined that federal law pre-empts state law when, "under the circumstances of [a] particular case, [state] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941).[2]


A

Wyeth first contends that "it would have been impossible for it to comply with the state-law duty to modify Phenargen's labeling without violating federal law." *Ante,* at 1193 (opinion for the Court by STEVENS, J.). But, as the majority explains, the text of the relevant federal statutory provisions and the corresponding regulations do not directly conflict with the state-law judgment before us.

This Court has used different formulations of the standard to be used in deciding **\*\*1209** whether state and federal law conflict, and thus lead to pre-emption, under the "impossibility" doctrine. See, *e.g.,Geier, supra,* at 873, 120 S.Ct. 1913 ("a case in which state law penalizes what federal law requires"); *American Telephone & Telegraph Co. v. Central Office Telephone, Inc.,* 524 U.S. 214, 227, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998)(*AT & T*) (when state-law claims "directly conflict" with federal law), cited in *Geier, supra,* at 874, 120 S.Ct. 1913 (describing *AT & T* as a "cas[e] involving impossibility"); *Florida* **\*590** *Lime & Avocado Growers,supra,* at 142–143, 83 S.Ct. 1210 ("where compliance with both federal and state regulations is a physical impossibility"). The Court has generally articulated a very narrow "impossibility standard," see *Crosby,* 530 U.S., at 372–373, 120 S.Ct. 2288 (citing *Florida Lime & Avocado Growers, supra,* at 142–143, 83 S.Ct. 1210); see also *Sprietsma v. Mercury Marine,* 537 U.S. 51, 64–65, 123 S.Ct. 518, 154 L.Ed.2d 466 (2002); *United States v. Locke,* 529 U.S. 89, 109, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000)—in part because the overly broad sweep of the Court's "purposes and objectives" approach, see *infra,* at 1211 – 1217, has rendered it unnecessary for the Court to rely on "impossibility" pre-emption.

The Court, in fact, has not explained why a narrow "physical impossibility" standard is the best proxy for determining when state and federal laws "directly conflict" for purposes of the Supremacy Clause. There could be instances where it is not "physically impossible" to comply with both state and federal law, even when the state and federal laws give directly conflicting commands. See Nelson, Preemption, 86 Va. L.Rev. 225, 260–261 (2000). For example, if federal law gives an individual the right to engage in certain behavior that state law prohibits, the laws would give contradictory commands notwithstanding the fact that an individual could comply with both by electing to refrain from the covered behavior. *Ibid.* Therefore, "physical impossibility" may not be the most appropriate standard for determining whether the text of state and federal laws directly conflict. See *ibid.* (concluding that the Supremacy Clause does not limit direct conflicts to cases with "physically impossible" conflicts and arguing that evidence from the founding supports a standard of "logical-contradiction"); see also *AT & T, supra,* at 227, 118 S.Ct. 1956 (requiring that the state-law claims "directly conflict" with federal law); Story § 1836, at 701 (suggesting instead that a state law is pre-empted by the Supremacy Clause when it is "*repugnant* to the constitution of the United States" (emphasis added)).

**\*591** Nonetheless, whatever the precise constitutional contours of implied pre-emption may be, I am satisfied that it does not operate against respondent's judgment below. The text of the federal laws at issue do not require that the state-court judgment at issue be pre-empted, under either the narrow "physical impossibility" standard, *Florida Lime & Avocado Growers, supra,* at 142–143, 83 S.Ct. 1210, or a more general "direc[t] conflict" standard, *AT & T, supra,* at 227, 118 S.Ct. 1956.

Under the FDA's "changes being effected" regulation, 21 CFR § 314.70(c)(6)(iii), which was promulgated pursuant to the FDA's statutory authority, it is physically possible for Wyeth to market Phenergan in compliance with federal and Vermont law. As the majority explains, Wyeth could have changed the warning on its label regarding IV-push without violating federal law. See *ante,* at 1196 – 1197. The "changes being effected" regulation allows drug manufacturers to change their labels without the FDA's preapproval if the changes "add or strengthen a contraindication, warning, precaution, or adverse **\*\*1210** reaction," § 314.70(c)(6)(iii)(A), or "add or strengthen an instruction about dosage and administration that is intended to increase the safe

**Wyeth v. Levine, 555 U.S. 555 (2009)**

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

use of the drug product," § 314.70(c)(6)(iii)(C), in order to "reflect newly acquired information," including "new analyses of previously submitted data," 73 Fed.Reg. 49603, 49609. Under the terms of these regulations, after learning of new incidences of gangrene-induced amputation resulting from the IV-push administration of Phenergan, see *ante*, at 1196 – 1197, federal law gave Wyeth the authority to change Phenergan's label to "strengthen a ... warning," "strengthen a ... precaution," § 314.70(c)(6)(iii)(A), or to "strengthen an instruction about ... administration [of the IV-push method] ... to increase the safe use of the drug product," § 314.70(c)(6)(iii)(C). Thus, it was physically possible for Wyeth to comply with a state-law requirement to provide stronger warnings on Phenergan about the risks of the IV-push administration method **\*592** while continuing to market Phenergan in compliance with federal law.

In addition, the text of the statutory provisions governing FDA drug labeling, and the regulations promulgated thereunder, do not give drug manufacturers an unconditional right to market their federally approved drug at all times with the precise label initially approved by the FDA. Thus, there is no "direct conflict" between the federal labeling law and the state-court judgment. The statute prohibits the interstate marketing of any drug, except for those that are federally approved. See 21 U.S.C. § 355(a) ("*No person shall* introduce or deliver for introduction into interstate commerce any new drug, *unless* an approval of an application filed pursuant to subsection (b) or (j) of this section is effective with respect to such drug" (emphasis added)). To say, as the statute does, that Wyeth may not market a drug without federal approval (*i.e.*, without an FDA-approved label) is not to say that federal approval gives Wyeth the unfettered right, for all time, to market its drug with the specific label that was federally approved. Initial approval of a label amounts to a finding by the FDA that the label is safe for purposes of gaining federal approval to market the drug. It does not represent a finding that the drug, as labeled, can never be deemed unsafe by later federal action, or as in this case, the application of state law.

Instead, FDA regulations require a drug manufacturer—after initial federal approval of a drug's label—to revise the federally approved label "to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug." 21 CFR § 201.80(e). Drug manufacturers are also required to "establish and maintain records and make reports" to the FDA about "[a]ny adverse event associated with the use of a drug in humans, whether or not considered drug related," after it has received federal approval. §§

314.80(a), (c), (j). In addition, the manufacturer must make periodic reports about "adverse drug **\*593** experience[s]" associated with its drug and include "a history of actions taken since the last report because of adverse drug experiences (for example, labeling changes or studies initiated)." §§ 314.80(c)(2)(i)-(ii). When such records and reports are not made, the FDA can withdraw its approval of the drug. § 314.80(j); see also 21 U.S.C. § 355(e) ("The Secretary may ... withdraw the approval of an application ... if the Secretary finds ... that the applicant has failed to establish a system for maintaining required records, or has repeatedly or deliberately failed to maintain such records or to make required reports"). The FDA may also determine that a drug is no longer safe for use based on "clinical or other experience, tests, or other scientific **\*\*1211** data." *Ibid.* (approval may be withdrawn if "the Secretary finds ... that clinical or other experience, tests, or other scientific data show that such drug is unsafe for use under the conditions of use upon the basis of which the application was approved").

The text of the statutory provisions and the accompanying regulatory scheme governing the FDA drug approval process, therefore, establish that the FDA's initial approval of a drug is not a guarantee that the drug's label will never need to be changed. And nothing in the text of the statutory or regulatory scheme necessarily insulates Wyeth from liability under state law simply because the FDA has approved a particular label.

In sum, the relevant federal law did not give Wyeth a right that the state-law judgment took away, and it was possible for Wyeth to comply with both federal law and the Vermont-law judgment at issue here. The federal statute and regulations neither prohibited the stronger warning label required by the state judgment, nor insulated Wyeth from the risk of state-law liability. With no "direct conflict" between the federal and state law, then, the state-law judgment is not pre-empted. Cf. *AT & T,* 524 U.S., at 221–226, 118 S.Ct. 1956 (finding pre-emption where federal law forbade common carriers from extending communications privileges requested by state-law **\*594** claims); *Foster,* 522 U.S., at 68–69, 118 S.Ct. 464 (finding pre-emption where the federal statute required congressional elections on a particular date different from that provided by state statute).

B

Wyeth also contends that state and federal law conflict because "recognition of [this] state tort action creates an

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

unacceptable 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941), because it substitutes a lay jury's decision about drug labeling for the expert judgment of the FDA." *Ante,* at 1193 – 1194 (majority opinion). This Court's entire body of "purposes and objectives" pre-emption jurisprudence is inherently flawed. The cases improperly rely on legislative history, broad atextual notions of congressional purpose, and even congressional inaction in order to pre-empt state law. See *supra,* at 1192 – 1194. I, therefore, cannot join the majority's analysis of this claim, see *ante,* at 1199 – 1204, or its reaffirmation of the Court's "purposes and objectives" jurisprudence, *ante,* at 1199 – 1200 (analyzing congressional purposes); *ante,* at 1201 (quoting the " 'purposes and objectives' " pre-emption standard from *Hines,* 312 U.S., at 67, 61 S.Ct. 399, 85 L.Ed. 581, and *Geier, supra,* 120 S.Ct. 1913); *ante,* at 1202 – 1203, and nn. 13–14 (analyzing this case in light of *Geier,* 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914).

1

The Court first formulated its current "purposes and objectives" pre-emption standard in *Hines* when it considered whether the federal Alien Registration Act pre-empted an Alien Registration Act adopted by the Commonwealth of Pennsylvania. The Court did not find that the two statutes, by their terms, directly conflicted. See *Hines, supra,* at 59–60, and n. 1, 61 S.Ct. 399 (citing Pa. Stat. Ann., Tit. 35, §§ 1801–1806 (Purdon Supp.1940)); 312 U.S., at 60, and n. 5, 61 S.Ct. 399 (citing Act of June 28, 1940, 54 Stat. 670); 312 U.S., at 69–74, 61 S.Ct. 399 (analyzing numerous extratextual sources and finding pre-emption without *\*595* concluding that the terms of the federal and state laws directly conflict); see also *id.,* at 78, 61 S.Ct. 399 (Stone, J., dissenting) (noting that "[i]t is **\*\*1212** conceded that the federal act in operation does not at any point conflict with the state statute").[3] Nonetheless, the Court determined that it was not confined to considering merely the terms of the relevant federal law in conducting its pre-emption analysis. Rather, it went on to ask whether the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.,* at 67, 61 S.Ct. 399.

In so doing, the Court looked far beyond the relevant federal statutory text and instead embarked on its own freeranging speculation about what the purposes of the federal law must

have been. See *id.,* at 69–74, 61 S.Ct. 399. In addition to the meaning of the relevant federal text, the Court attempted to discern "[t]he nature of the power exerted by Congress, the object sought to be attained, and the character of the obligations **\*596** imposed by the law." *Id.,* at 70, 61 S.Ct. 399. To do so, the Court looked in part to public sentiment, noting that "[o]pposition to laws ... singling out aliens as particularly dangerous and undesirable groups, is deep-seated in this country." *Ibid.* The Court also relied on statements by particular Members of Congress and on congressional inaction, finding it pertinent that numerous bills with requirements similar to Pennsylvania's law had failed to garner enough votes in Congress to become law. *Id.,* at 71–73, and nn. 32–34, 61 S.Ct. 399. Concluding that these sources revealed a federal purpose to "protect the personal liberties of law-abiding aliens through one uniform national registration system," the Court held that the Pennsylvania law was pre-empted. *Id.,* at 74, 61 S.Ct. 399.

Justice Stone, in dissent, questioned the majority's decision to read an exclusive registration system for aliens into a statute that did not specifically provide such exclusivity. See *id.,* at 75, 61 S.Ct. 399. He noted his concern that state power would be improperly diminished through a pre-emption doctrine driven by the Court's "own conceptions of a policy which Congress ha[d] not expressed and which is not plainly to be inferred from the legislation which it ha[d] enacted." *Ibid.* In his view, nothing that Congress enacted had "denie[d] the states the practicable means of identifying their alien residents and of recording their whereabouts." *Id.,* at 78, 61 S.Ct. 399. Yet, the *Hines* majority employed pre-emption to override numerous state alien-registration laws even though enacted federal law "at no point conflict[ed] with the state legislation and [was] **\*\*1213** harmonious with it." *Id.,* at 79, 61 S.Ct. 399.[4]

**\*597** 2

The consequences of this Court's broad approach to "purposes and objectives" pre-emption are exemplified in this Court's decision in *Geier,* which both the majority and the dissent incorporate into their analysis today. See *ante,* at 1202 – 1203, and nn. 13–14; *post,* at 1220 – 1222 (opinion of ALITO, J.). In *Geier,* pursuant to the National Traffic and Motor Vehicle Safety Act of 1966 (Safety Act), 80 Stat. 718, 15 U.S.C. § 1381 *et seq.* (1988 ed.), the Department of Transportation (DOT) had promulgated a Federal Motor Vehicle Safety Standard that "required auto manufacturers to equip some but

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4143, Prod.Liab.Rep. (CCH) P 18,176...

not all of their 1987 vehicles with passive restraints." 529 U.S., at 864–865, 120 S.Ct. 1913. The case required this Court to decide whether the Safety Act pre-empted a state common-law tort action in which the plaintiff claimed that an auto manufacturer, though in compliance with the federal standard, should nonetheless have equipped a 1987 automobile with airbags. Id., at 865, 120 S.Ct. 1913. The Court first concluded that the Safety Act's express pre-emption provision and its saving clause, read together, did not expressly pre-empt state common-law claims. See id., at 867–868, 120 S.Ct. 1913.[5] The Court **598 then proceeded to consider whether the state action was nonetheless pre-empted as an "obstacle" to the purposes of the federal law. The Court held that the state tort claim was pre-empted, relying in large part on comments that DOT made when promulgating its regulation, statements that the Government made in its brief to the Court, and regulatory history that related to the federal regulation of passive restraints. See id., at 874–886, 120 S.Ct. 1913.

In particular, the majority found that DOT intended to "deliberately provid[e] the manufacturer[s] with a range of choices among different passive restraint devices" and to "bring about a mix of different devices introduced gradually over time," based on comments that DOT made when promulgating its regulation, rather **1214 than the Safety Act's text. Id., at 875, 120 S.Ct. 1913. The majority also embarked on a judicial inquiry into "why and how DOT sought these objectives," ibid., by considering regulatory history and the Government's brief, which described DOT's safety standard as " 'embod[ying] the Secretary's policy judgment that safety would best be promoted if manufacturers installed alternative protection systems in their fleets rather than one particular system in every car,' " id., at 881, 120 S.Ct. 1913 (quoting Brief for United States as Amicus Curiae in Geier v. American Honda Motor Co., O.T.1999, No. 98–1811, p. 25); see also 529 U.S., at 883–884, 120 S.Ct. 1913. Based on this "ex post administrative litigating position and inferences from regulatory history and final commentary," id., at 910–911, 120 S.Ct. 1913 (STEVENS, J., dissenting), the Court found that the state action was pre-empted because it would have required manufacturers of all cars similar to that in which the plaintiff was injured to "install airbags rather than other passive restraint systems" and would have, therefore, "presented an obstacle to the variety and mix of devices that the federal regulation sought" to phase in gradually, id., at 881, 120 S.Ct. 1913.

The Court's decision in Geier to apply "purposes and objectives" pre-emption based on agency comments, regulatory *599 history, and agency litigating positions was especially flawed, given that it conflicted with the plain statutory text of the saving clause within the Safety Act, which explicitly preserved state common-law actions by providing that "[c]ompliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law," 15 U.S.C. § 1397(k) (1988 ed.).[6] See Engine Mfrs. Assn. v. South Coast Air Quality Management Dist., 541 U.S. 246, 252, 124 S.Ct. 1756, 158 L.Ed.2d 529 (2004) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose" (internal quotation marks omitted)); West Virginia Univ. Hospitals, Inc. v. Casey, 499 U.S. 83, 98, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991) ("The best evidence of th[e] purpose [of a statute] is the statutory text adopted by both Houses of Congress and submitted to the President"). In addition, the Court's reliance on its divined purpose of the federal law —to gradually phase in a mix of *600 passive restraint **1215 systems—in order to invalidate a State's imposition of a greater safety standard was contrary to the more general express statutory goal of the Safety Act "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents," 15 U.S.C. § 1381 (1988 ed.). This Court has repeatedly stated that when statutory language is plain, it must be enforced according to its terms. See Jimenez v. Quarterman, 555 U.S. 113, 129 S.Ct. 681, 172 L.Ed.2d 475 (2009); see also, e.g.,Dodd v. United States, 545 U.S. 353, 359, 125 S.Ct. 2478, 162 L.Ed.2d 343 (2005); Lamie v. United States Trustee, 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004); Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A., 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000). The text in Geier "directly addressed the precise question at issue" before the Court, so that should have been "the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." National Assn. of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 665, 127 S.Ct. 2518, 2534, 168 L.Ed.2d 467 (internal quotation marks omitted). With text that allowed state actions like the one at issue in Geier, the Court had no authority to comb through agency commentaries to find a basis for an alternative conclusion.

Applying "purposes and objectives" pre-emption in Geier, as in any case, allowed this Court to vacate a judgment issued by another sovereign based on nothing more than assumptions and goals that were untethered from the constitutionally enacted federal law authorizing the federal

regulatory standard that was before the Court. See *Watters v. Wachovia Bank, N. A.,* 550 U.S. 1, 44, 127 S.Ct. 1559, 167 L.Ed.2d 389 (2007) (STEVENS, J., dissenting) (noting that pre-emption "affects the allocation of powers among sovereigns"). " '[A]n agency literally has no power to act, let alone pre-empt the [law] of a sovereign State, unless and until Congress confers power upon it.' " *New York v. FERC,* 535 U.S., at 18, 122 S.Ct. 1012 (quoting *Louisiana Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 374, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986)). Thus, no agency or individual Member of Congress can pre-empt a State's judgment by merely musing about goals or **\*601** intentions not found within or authorized by the statutory text. See *supra,* at 1206 – 1208.

The Court's "purposes and objectives" pre-emption jurisprudence is also problematic because it encourages an overly expansive reading of statutory text. The Court's desire to divine the broader purposes of the statute before it inevitably leads it to assume that Congress wanted to pursue those policies "at all costs"—even when the text reflects a different balance. See *Geier,* 529 U.S., at 904, 120 S.Ct. 1913 (STEVENS, J., dissenting) (finding no evidence to support the notion that the DOT Secretary intended to advance the purposes of the safety standard "at all costs"); Nelson, 86 Va. L.Rev., at 279–280. As this Court has repeatedly noted, " 'it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law.' " *E.g.,Norfolk Southern R. Co. v. Sorrell,* 549 U.S. 158, 171, 127 S.Ct. 799, 166 L.Ed.2d 638 (2007) (quoting *Rodriguez v. United States,* 480 U.S. 522, 526, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987)*(per curiam)*). Federal legislation is often the result of compromise between legislators and "groups with marked but divergent interests." See *Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81, 93–94, 122 S.Ct. 1155, 152 L.Ed.2d 167 (2002). Thus, a statute's text might reflect a compromise between parties who wanted to pursue a particular goal to different extents. See, *e.g.,ibid.* (noting that the Family and Medical Leave Act's provision of only 12 workweeks **\*\*1216** of yearly leave "was the result of compromise" that must be given effect by courts); *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 257, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) (finding that a state law was not pre-empted though it allegedly frustrated a primary purpose of the Atomic Energy Act because the Act provided that its purpose was to be furthered only "to the extent it is consistent 'with the health and safety of the public' " (quoting 42 U.S.C. § 2013(d) (1982 ed.))); see also Manning, *What Divides Textualists from Purposivists?* 106 Colum. L.Rev. 70,

104 (2006) ("Legislators may compromise on a statute that does not fully address a perceived mischief, accepting half a loaf to **\*602** facilitate a law's enactment"). Therefore, there is no factual basis for the assumption underlying the Court's "purposes and objectives" pre-emption jurisprudence that every policy seemingly consistent with federal statutory text has necessarily been authorized by Congress and warrants pre-emptive effect. Instead, our federal system in general, and the Supremacy Clause in particular, accords pre-emptive effect to only those policies that are actually authorized by and effectuated through the statutory text.

3

The majority, while reaching the right conclusion in this case, demonstrates once again how application of "purposes and objectives" pre-emption requires inquiry into matters beyond the scope of proper judicial review. For example, the majority relies heavily on Congress' failure "during the ... 70–year history" of the federal Food, Drug, and Cosmetic Act to enact an express pre-emption provision that addresses approval of a drug label by the FDA. *Ante,* at 1200. That "silence on the issue, coupled with [Congress'] certain awareness of the prevalence of state tort litigation," the majority reasons, is evidence that Congress did not intend for federal approval of drug labels to pre-empt state tort judgments. *Ante,* at ——; see also *ante,* at 1199 – 1200 (construing from inaction that Congress "[e]vidently [had] determined that widely available state rights of action provided appropriate relief"). Certainly, the absence of a statutory provision pre-empting all state tort suits related to approved federal drug labels is pertinent to a finding that such lawsuits are not pre-empted. But the relevance is in the fact that no statute explicitly pre-empts the lawsuits, and not in any inferences that the Court may draw from congressional silence about the motivations or policies underlying Congress' failure to act. See *Brown v. Gardner,* 513 U.S. 115, 121, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994) ( "[C]ongressional silence lacks persuasive significance" (internal **\*603** quotation marks omitted)); *O'Melveny & Myers v. FDIC,* 512 U.S. 79, 85, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) ("[M]atters left unaddressed in [a comprehensive and detailed federal] scheme are presumably left subject to the disposition provided by state law"); *Camps Newfound,* 520 U.S., at 616, 117 S.Ct. 1590 ("[O]ur pre-emption jurisprudence explicitly rejects the notion that mere congressional silence on a particular issue may be read as pre-empting state law").

In this case, the majority has concluded from silence that Congress believed state lawsuits pose no obstacle to federal drug approval objectives. See *ante,* at 1200. That is the required conclusion, but only because it is compelled by the text of the relevant statutory and regulatory provisions, not judicial suppositions about Congress' unstated goals. The fact that the Court reaches the proper conclusion does not justify its speculation about the reasons for congressional inaction. In this case, the Court has relied on the perceived **\*\*1217** congressional policies underlying inaction to find that state law is *not* pre-empted. But once the Court shows a willingness to guess at the intent underlying congressional inaction, the Court could just as easily rely on its own perceptions regarding congressional inaction to give unduly broad pre-emptive effect to federal law. See, *e.g.,Americans Ins. Assn. v. Garamendi,* 539 U.S. 396, 401, 405–408, 429, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003) (finding that Congress' failure to pass legislation indicating that it disagreed with the President's executive agreement supported, at least in part, the Court's determination that the agreement pre-empted state law). Either approach is illegitimate. Under the Supremacy Clause, state law is pre-empted only by federal law "made in Pursuance" of the Constitution, Art. VI, cl. 2—not by extratextual considerations of the purposes underlying congressional inaction. See *Hoffman v. Connecticut Dept. of Income Maintenance,* 492 U.S. 96, 104, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989) (plurality opinion) (finding that policy arguments that "are not based in the text of the statute ... **\*604** are not helpful"); *TVA v. Hill,* 437 U.S. 153, 194, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) ("Our individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside in the process of interpreting a statute"). Our role, then, is merely "to interpret the language of the statute[s] enacted by Congress." *Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, 461, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002).

III

The origins of this Court's "purposes and objectives" pre-emption jurisprudence in *Hines,* and its broad application in cases like *Geier,* illustrate that this brand of the Court's pre-emption jurisprudence facilitates freewheeling, extratextual, and broad evaluations of the "purposes and objectives" embodied within federal law. This, in turn, leads to decisions giving improperly broad pre-emptive effect to judicially manufactured policies, rather than to the statutory text enacted by Congress pursuant to the Constitution and the

agency actions authorized thereby. Because such a sweeping approach to pre-emption leads to the illegitimate—and thus, unconstitutional—invalidation of state laws, I can no longer assent to a doctrine that pre-empts state laws merely because they "stan[d] as an obstacle to the accomplishment and execution of the full purposes and objectives" of federal law, *Hines,* 312 U.S., at 67, 61 S.Ct. 399, as perceived by this Court. I therefore respectfully concur only in the judgment.

Justice ALITO, with whom THE CHIEF JUSTICE and Justice SCALIA join, dissenting.

This case illustrates that tragic facts make bad law. The Court holds that a state tort jury, rather than the Food and Drug Administration (FDA), is ultimately responsible for regulating warning labels for prescription drugs. That result cannot be reconciled with *Geier v. American Honda Motor Co.,* 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000), or general principles of conflict pre-emption. I respectfully dissent.

**\*605** I

The Court frames the question presented as a "narro[w]" one—namely, whether Wyeth has a duty to provide "an adequate warning about using the IV-push method" to administer Phenergan. *Ante,* at 1194. But that ignores the antecedent question of who—the FDA or a jury in Vermont—has the authority and responsibility for determining the "adequacy" of Phenergan's warnings. Moreover, it is unclear how a "stronger" warning could have helped respondent, see *ante,* at 1199; after **\*\*1218** all, the physician's assistant who treated her disregarded at least six separate warnings that are already on Phenergan's labeling, so respondent would be hard pressed to prove that a seventh would have made a difference.[1]

More to the point, the question presented by this case is not a "narrow" one, and it does not concern whether Phenergan's label should bear a "stronger" warning. Rather, the real issue is whether a state tort jury can countermand the FDA's considered judgment that Phenergan's FDA-mandated warning label renders its intravenous (IV) use "safe." Indeed, respondent's amended complaint alleged that Phenergan is "not reasonably safe for intravenous administration," App. 15, ¶ 6; respondent's attorney told the jury that Phenergan's label should say, " 'Do not use this drug intravenously,' " *id.,* at 32; respondent's expert told the **\*606** jury, "I think

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

the drug should be labeled 'Not for IV use,' " *id.,* at 59; and during his closing argument, respondent's attorney told the jury, "Thank God we don't rely on the FDA to ... make the safe[ty] decision. You will make the decision. ... The FDA doesn't make the decision, you do,"*id.,* at 211–212.[2]

Federal law, however, *does* rely on the FDA to make safety determinations like the one it made here. The FDA has long known about the risks associated with IV push in general and its use to administer Phenergan in particular. Whether wisely or not, the FDA has concluded—over the course of extensive, 54–year–long regulatory proceedings—that the drug is "safe" and "effective" when used in accordance with its FDA-mandated labeling. The unfortunate fact that respondent's healthcare providers ignored Phenergan's labeling may make this an ideal medical-malpractice case.[3] But turning a common-law tort suit into a "frontal assault" on the FDA's regulatory regime for drug labeling upsets the well-settled meaning of the Supremacy Clause and our conflict pre-emption jurisprudence. Brief for United States as *AmicusCuriae* 21.

**1219  *607  II

A

To the extent that "[t]he purpose of Congress is the ultimate touchstone in every pre-emption case," *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (internal quotation marks omitted), Congress made its "purpose" plain in authorizing the FDA—not state tort juries —to determine when and under what circumstances a drug is "safe." "[T]he process for approving new drugs is at least as rigorous as the premarket approval process for medical devices," *Riegel v. Medtronic, Inc.,* 552 U.S. 312, 343, 128 S.Ct. 999, 1018, 169 L.Ed.2d 892 (2008) (GINSBURG, J., dissenting), and we held that the latter pre-empted a state-law tort suit that conflicted with the FDA's determination that a medical device was "safe," *id.,* at 324 – 325, 128 S.Ct., at 1018 (opinion of the Court).

Under the Federal Food, Drug, and Cosmetic Act (FDCA), a drug manufacturer may not market a new drug before first submitting a new drug application (NDA) to the FDA and receiving the agency's approval. See 21 U.S.C. § 355(a). An NDA must contain, among other things, "the labeling proposed to be used for such drug," § 355(b)(1)(F), "full

reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use," § 355(b)(1)(A), and "a discussion of why the benefits exceed the risks [of the drug] under the conditions stated in the labeling," 21 CFR § 314.50(d)(5)(viii) (2008). The FDA will approve an NDA only if the agency finds, among other things, that the drug is "safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof," there is "substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof," and the proposed labeling is not "false or misleading in any particular." 21 U.S.C. § 355(d).

*608  After the FDA approves a drug, the manufacturer remains under an obligation to investigate and report any adverse events associated with the drug, see 21 CFR § 314.80, and must periodically submit any new information that may affect the FDA's previous conclusions about the safety, effectiveness, or labeling of the drug, 21 U.S.C. § 355(k). If the FDA finds that the drug is not "safe" when used in accordance with its labeling, the agency "shall" withdraw its approval of the drug. § 355(e). The FDA also "shall" deem a drug "misbranded" if "it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof." § 352(j).

Thus, a drug's warning label "serves as the standard under which the FDA determines whether a product is safe and effective." 50 Fed.Reg. 7470 (1985). Labeling is "[t]he centerpiece of risk management," as it "communicates to health care practitioners the agency's formal, authoritative conclusions regarding the conditions under which the product can be used safely and effectively." 71 Fed.Reg. 3934 (2006). The FDA has underscored the importance it places on drug labels by promulgating comprehensive regulations—spanning an entire part of the Code of Federal Regulations, see 21 CFR pt. 201, with seven subparts and 70 separate sections—that set forth drug manufacturers' labeling obligations. Under those regulations, the FDA must be satisfied that a drug's warning label contains, among other things, "a summary of the essential scientific information needed for the safe and effective use of the drug," § 201.56(1), including a **1220  description of "clinically significant adverse reactions," "other potential safety hazards," "limitations in use imposed by them ..., and steps that should be taken if they occur," § 201.57(c)(6)(i).

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

Neither the FDCA nor its implementing regulations suggest that juries may second-guess the FDA's labeling decisions.

**\*609  B**

1

Where the FDA determines, in accordance with its statutory mandate, that a drug is on balance "safe," our conflict pre-emption cases prohibit any State from countermanding that determination. See, *e.g.,Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 348, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001) (after the FDA has struck "a somewhat delicate balance of statutory objectives" and determined that petitioner submitted a valid application to manufacture a medical device, a State may not use common law to negate it); *International Paper Co. v. Ouellette,* 479 U.S. 481, 494, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987) (after the Environmental Protection Agency has struck "the balance of public and private interests so carefully addressed by" the federal permitting regime for water pollution, a State may not use nuisance law to "upse[t]" it); *Chicago & North Western Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 321, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981) (after the Interstate Commerce Commission has struck a "balance" between competing interests in permitting the abandonment of a railroad line, a State may not use statutory or common law to negate it).

Thus, as the Court itself recognizes, it is irrelevant in conflict pre-emption cases whether Congress "enacted an express pre-emption provision at some point during the FDCA's 70–year history." *Ante,* at 1200; see also *Geier,* 529 U.S., at 869, 120 S.Ct. 1913 (holding the absence of an express pre-emption clause "does *not* bar the ordinary working of conflict pre-emption principles") Rather, the ordinary principles of conflict pre-emption turn solely on whether a State has upset the regulatory balance struck by the federal agency. *Id.,* at 884–885, 120 S.Ct. 1913; see also *Chicago & North Western Transp. Co., supra,* at 317, 101 S.Ct. 1124 (describing conflict pre-emption as "a two-step process of first ascertaining the construction of the [federal and state laws] and then determining the constitutional question  **\*610**  whether they are actually in conflict" (internal quotation marks omitted)).

2

A faithful application of this Court's conflict pre-emption cases compels the conclusion that the FDA's 40–year–long effort to regulate the safety and efficacy of Phenergan pre-empts respondent's tort suit. Indeed, that result follows directly from our conclusion in *Geier.*

*Geier* arose under the National Traffic and Motor Safety Vehicle Act of 1966, which directs the Secretary of the Department of Transportation (DOT) to "establish by order ... motor vehicle safety standards," 15 U.S.C. § 1392(a) (1988 ed.), which are defined as "minimum standard[s] for motor vehicle performance, or motor vehicle equipment performance," § 1391(2). Acting pursuant to that statutory mandate, the Secretary of Transportation promulgated Federal Motor Vehicle Safety Standard 208, which required car manufacturers to include passive restraint systems (*i.e.,* devices that work automatically to protect occupants from injury during a collision) in a certain percentage of their cars built in or after 1987. See 49 CFR § 571.208 (1999). Standard 208 did not require installation of any particular type of passive restraint; instead, it gave manufacturers the option to install automatic  **\*\*1221**  seatbelts, airbags, or any other suitable technology that they might develop, provided the restraint(s) met the performance requirements specified in the rule. *Ibid.*

Alexis Geier drove her 1987 Honda Accord into a tree, and although she was wearing her seatbelt, she nonetheless suffered serious injuries. She then sued Honda under state tort law, alleging that her car was negligently and defectively designed because it lacked a driver's-side airbag. She argued that Congress had empowered the Secretary to set only "minimum standard[s]" for vehicle safety.15 U.S.C. § 1391(2). She also emphasized that the National Traffic and Motor Safety Vehicle Act contains a saving clause, which  **\*611**  provides that "[c]ompliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law." § 1397(k).

Notwithstanding the statute's saving clause, and notwithstanding the fact that Congress gave the Secretary authority to set only "minimum" safety standards, we held Geier's state tort suit pre-empted. In reaching that result, we relied heavily on the view of the Secretary of Transportation—expressed in an *amicus* brief—that Standard

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

208 " 'embodies the Secretary's policy judgment that safety would best be promoted if manufacturers installed *alternative* protection systems in their fleets rather than one particular system in every car.' " 529 U.S., at 881, 120 S.Ct. 1913 (quoting Brief for United States as *Amicus Curiae,* O.T.1999, No. 98–1811, p. 25). Because the Secretary determined that a menu of alternative technologies was "safe," the doctrine of conflict pre-emption barred Geier's efforts to deem some of those federally approved alternatives "unsafe" under state tort law.

The same rationale applies here. Through Phenergan's label, the FDA offered medical professionals a menu of federally approved, "safe" and "effective" alternatives—including IV push—for administering the drug. Through a state tort suit, respondent attempted to deem IV push "unsafe" and "ineffective." To be sure, federal law does not prohibit Wyeth from contraindicating IV push, just as federal law did not prohibit Honda from installing airbags in all its cars. But just as we held that States may not compel the latter, so, too, are States precluded from compelling the former. See also *Fidelity Fed. Sav. & Loan Assn. v. de la Cuesta,* 458 U.S. 141, 155, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) ("The conflict does not evaporate because the [agency's] regulation simply permits, but does not compel," the action forbidden by state law). If anything, a finding of pre-emption is even more appropriate here because the FDCA—unlike the National Traffic and Motor Safety Vehicle Act—contains no evidence that Congress intended *612 the FDA to set only "minimum standards," and the FDCA does not contain a saving clause.[4] See also **1222 *ante,* at 1200 (majority opinion) (conceding Congress' "silence" on the issue).

III

In its attempt to evade *Geier* 's applicability to this case, the Court commits both factual and legal errors. First, as a factual matter, it is demonstrably untrue that the FDA failed to consider (and strike a "balance" between) the specific costs and benefits associated with IV push. Second, as a legal matter, *Geier* does not stand for the legal propositions espoused by the dissenters (and specifically rejected by the majority) in that case. Third, drug labeling by jury verdict undermines both our broader pre-emption jurisprudence and the broader workability of the federal drug-labeling regime.

A

Phenergan's warning label has been subject to the FDA's strict regulatory oversight since the 1950's. For at least the last 34 years, the FDA has focused specifically on whether IV-push administration of Phenergan is "safe" and "effective" when performed in accordance with Phenergan's label. The agency's ultimate decision—to retain IV push as one *613 means for administering Phenergan, albeit subject to stringent warnings—is reflected in the plain text of Phenergan's label (sometimes in boldfaced font and all-capital letters). And the record contains ample evidence that the FDA specifically considered and reconsidered the strength of Phenergan's IV-push-related warnings in light of new scientific and medical data. The majority's factual assertions to the contrary are mistaken.

1

The FDA's focus on IV push as a means of administering Phenergan dates back at least to 1975. In August of that year, several representatives from both the FDA and Wyeth met to discuss Phenergan's warning label. At that meeting, the FDA specifically proposed "that Phenergan Injection should not be used in Tubex & reg;." 2 Record 583, 586 (Plaintiff's Trial Exh. 17, Internal Correspondence from W.E. Langeland to File (Sept. 5, 1975) (hereinafter 1975 Memo)). "Tubex" is a syringe system used exclusively for IV push. See App. 43. An FDA official explained that the agency's concerns arose from medical-malpractice lawsuits involving IV push of the drug, see 1975 Memo 586, and that the FDA was aware of "5 cases involving amputation where the drug had been administered by Tubex together with several additional cases involving necrosis," *id.,* at 586–587. Rather than contraindicating Phenergan for IV push, however, the agency and Wyeth agreed "that there was a need for better instruction regarding the problems of intraarterial injection." *Id.,* at 587.

The next year, the FDA convened an advisory committee to study, among other things, the risks associated with the Tubex system and IV push. App. 294. At the conclusion of its study, the committee recommended an additional IV-push-specific warning for Phenergan's label, see *ibid.,* but did not recommend eliminating IV push from the drug label altogether. In response to the committee's recommendations, the FDA instructed Wyeth to make several changes to *614

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

strengthen Phenergan's label, including the addition of upper case warnings related to IV push. See *id.,* at 279–280, 282–283.

**\*\*1223** In 1987, the FDA directed Wyeth to amend its label to include the following text:

" '[1] When used intravenously, [Phenergan] should be given in a concentration no greater than 25 mg/ml and at a rate not to exceed 25 mg/minute. [2] Injection through a properly running intravenous infusion may enhance the possibility of detecting arterial placement.' " *Id.,* at 311–312.

The first of the two quoted sentences refers specifically to IV push; as respondent's medical expert testified at trial, the label's recommended rate of administration (not to exceed 25 mg per minute) refers to "IV push, as opposed to say being in a bag and dripped over a couple of hours." *Id.,* at 52. The second of the two quoted sentences refers to IV drip. See *id.,* at 15–16 (emphasizing that a "running IV" is the same thing as "IV drip").

In its 1987 labeling order, the FDA cited voluminous materials to "suppor[t]" its new and stronger warnings related to IV push and the preferability of IV drip.[5] *Id.,* at 313. One of those articles specifically discussed the relative advantages and disadvantages of IV drip compared to IV push, as **\*615** well as the costs and benefits of administering Phenergan via IV push.[6] The FDA also cited published case reports from the 1960's of gangrene caused by the intra-arterial injection of Phenergan,[7] and the FDA instructed Wyeth to amend Phenergan's label in accordance with the latest medical research.[8] The FDA also studied drugs similar to Phenergan and cited numerous cautionary articles—one of which urged the agency to consider contraindicating **\*\*1224** such drugs for IV use altogether.[9]

**\*616** In "support" of its labeling order, the FDA also cited numerous articles that singled out the inner crook of the elbow—known as the "antecubital fossa" in the medical community—which is both a commonly used injection site, see *id.,* at 70 (noting that respondent's injection was pushed into "the antecubital space"), and a universally recognized high-risk area for inadvertent intra-arterial injections. One of the articles explained:

"Because of the numerous superficial positions the ulnar artery might occupy, it has often been entered during attempted venipuncture [of the antecubital fossa]. ...

However, the brachial and the radial arteries might also be quite superficial in the elbow region .... The arterial variations of the arm, especially in and about the cubital fossa, are common and numerous. If venipuncture must be performed in this area, a higher index of suspicion must be maintained to forestall misdirected injections." Stone & Donnelly, The Accidental Intra-arterial Injection of Thiopental, 22 Anesthesiology **\*617** 995, 996 (1961) (footnote omitted; cited in App. 315, no. 20).[10]

**\*\*1225** Based on this and other research, the FDA ordered Wyeth to include a specific warning related to the use of the antecubital space for IV push.[11]

2

When respondent was injured in 2000, Phenergan's label specifically addressed IV push in several passages (sometimes in lieu and sometimes in addition to those discussed above). For example, the label warned of the risks of intra-arterial injection associated with "aspiration," which is a technique used only in conjunction with IV push.[12] The **\*618** label also cautioned against the use of "syringes with rigid plungers," App. 390, which are used only to administer the drug via IV push. As respondent's medical expert testified at trial, "by talking plungers and rigid needles, that's the way you do it, to push it with the plunger." *Id.,* at 53 (testimony of Dr. John Matthew). Moreover, Phenergan's 2000 label devoted almost a full page to discussing the "Tubex system," see *id.,* at 391, which, as noted above, is used only to administer the drug via IV push.

While Phenergan's label very clearly authorized the use of IV push, it also made clear that IV push is the delivery method of last resort. The label specified that "[t]he preferred parenteral route of administration is by deep intramuscular injection." *Id.,* at 390. If an intramuscular injection is ineffective, then "it is usually preferable to inject [Phenergan] through the tubing of an intravenous infusion set that is known to be functioning satisfactorily." *Ibid.* See also *id.,* at 50–51 (testimony of respondent's medical expert, Dr. John Matthew) (conceding that the best way to determine that an IV set is functioning satisfactorily is to use IV drip). Finally, if for whatever reason a medical professional chooses to use IV push, he or she is on notice that **"INADVERTENT INTRA–ARTERIAL INJECTION CAN RESULT IN GANGRENE OF THE AFFECTED EXTREMITY."** *Id.,* at 391; see also *id.,* at

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

390 ("Under no circumstances should Phenergan Injection be given by intra-arterial injection due to the likelihood of severe arteriospasm and the possibility of resultant gangrene").

Phenergan's label also directs medical practitioners to choose veins wisely when using IV push:

> "Due to the close proximity of arteries and veins in the areas most commonly used for intravenous injection, extreme *619 care should be exercised to avoid perivascular extravasation or inadvertent intra-arterial injection. Reports compatible with inadvertent intra-arterial injection of Phenergan Injection, usually in conjunction with other drugs intended for intravenous use, suggest that pain, severe chemical irritation, severe spasm of distal vessels, and resultant gangrene requiring amputation are likely under such circumstances." *Ibid.*

Thus, it is demonstrably untrue that, as of 2000, Phenergan's "labeling did not contain a specific warning about the risks of **1226 IV-push administration." *Ante,* at 1192 (majority opinion). And whatever else may be said about the extensive medical authorities and case reports that the FDA cited in "support" of its approval of IV-push administration of Phenergan, it cannot be said that the FDA "paid no more than passing attention to" IV push, *ante,* at 1193 (majority opinion); nor can it be said that the FDA failed to weigh its costs and benefits, Brief for Respondent 50.

3

For her part, respondent does not dispute the FDA's conclusion that IV push has certain benefits. At trial, her medical practitioners testified that they used IV push in order to help her "in a swift and timely way" when she showed up at the hospital for the second time in one day complaining of "intractable" migraines, "terrible pain," inability to "bear light or sound," sleeplessness, hours-long spasms of "retching" and "vomiting," and when "every possible" alternative treatment had "failed." App. 40 (testimony of Dr. John Matthew); *id.,* at 103, 106, 109 (testimony of physician's assistant Jessica Fisch).

Rather than disputing the benefits of IV push, respondent complains that the FDA and Wyeth underestimated its costs (and hence did not provide sufficient warnings regarding its risks). But when the FDA mandated that Phenergan's label read, "**INADVERTENT INTRA–**

**ARTERIAL INJECTION *620 CAN RESULT IN GANGRENE OF THE AFFECTED EXTREMITY**," *id.,* at 391, and when the FDA required Wyeth to warn that "[u]nder no circumstances should Phenergan Injection be given by intra-arterial injection," *id.,* at 390, the agency could reasonably assume that medical professionals would take care not to inject Phenergan intra-arterially. See also 71 Fed.Reg. 3934 (noting that a drug's warning label "communicates to health care practitioners the agency's formal, authoritative conclusions regarding the conditions under which the product can be used safely and effectively"). Unfortunately, the physician's assistant who treated respondent in this case disregarded Phenergan's label and pushed the drug into the single spot on her arm that is *most* likely to cause an inadvertent intra-arterial injection.

As noted above, when the FDA approved Phenergan's label, it was textbook medical knowledge that the "antecubital fossa" creates a high risk of inadvertent intra-arterial injection, given the close proximity of veins and arteries. See *supra,* at 1224 – 1225; see also The Lippincott Manual of Nursing Practice 99 (7th ed.2001) (noting, in a red-text "NURSING ALERT," that the antecubital fossa is "not recommended" for administering dangerous drugs, "due to [the] potential for extravasation").[13] According to the physician's assistant who injured respondent, however, "[i]t never crossed my mind" that an antecubital injection of Phenergan could hit an artery. App. 110; see also *ibid.* ("[It] just wasn't something that I was aware of at the time"). Oblivious to the risks emphasized in Phenergan's warnings, the physician's assistant pushed a double dose of the drug into an antecubital artery over the course of "[p]robably about three to four minutes," *id.,* at 111; *id.,* at 105, notwithstanding respondent's *621 complaints of a " 'burn[ing]' " sensation that she subsequently described as " 'one of the most extreme pains that I've ever **1227 felt,' " *id.,* at 110, 180–181. And when asked why she ignored Phenergan's label and failed to stop pushing the drug after respondent complained of burning pains, the physician's assistant explained that it would have been "just crazy" to "worr[y] about an [intra-arterial] injection" under the circumstances, *id.,* at 111.

The FDA, however, did not think that the risks associated with IV push—especially in the antecubital space—were "just crazy." That is why Phenergan's label so clearly warns against them.

B

Given the "balance" that the FDA struck between the costs and benefits of administering Phenergan via IV push, *Geier* compels the pre-emption of tort suits (like this one) that would upset that balance. The contrary conclusion requires turning yesterday's dissent into today's majority opinion.

First, the Court denies the existence of a federal-state conflict in this case because Vermont merely countermanded the FDA's determination that IV push is "safe" when performed in accordance with Phenergan's warning label; the Court concludes that there is no conflict because Vermont did not "mandate a particular" label as a "replacement" for the one that the jury nullified, and because the State stopped short of altogether "contraindicating IV-push administration." *Ante,* at 1194. But as we emphasized in *Geier* (over the dissent's assertions to the contrary), the degree of a State's intrusion upon federal law is irrelevant—the Supremacy Clause applies with equal force to a state tort law that merely countermands a federal safety determination and to a state law that altogether prohibits car manufacturers from selling cars without airbags. Compare 529 U.S., at 881–882, 120 S.Ct. 1913, with *id., at 902, 120 S.Ct. 1913* (STEVENS, J., dissenting). Indeed, as recently as last Term, we held that the Supremacy Clause pre-empts **\*622** a "[s]tate tort law that requires a manufacturer's catheters to be safer, but hence less effective, than the model the FDA has approved ...." *Riegel,* 552 U.S., at 325, 128 S.Ct., at 1008. It did not matter there that the State stopped short of altogether prohibiting the use of FDA-approved catheters —just as it does not matter here that Vermont stopped short of altogether prohibiting an FDA-approved method for administering Phenergan. See also *Lohr,* 518 U.S., at 504, 116 S.Ct. 2240 (BREYER, J., concurring in part and concurring in judgment) (noting it would be an "anomalous result" if pre-emption applied differently to a state tort suit premised on the inadequacy of the FDA's safety regulations and a state law that specifically prohibited an FDA-approved design).

Second, the Court today distinguishes *Geier* because the FDA articulated its pre-emptive intent "without offering States or other interested parties notice or opportunity for comment."*Ante,* at 1201; see also *ante,* at 1203. But the *Geier* Court specifically rejected the argument (again made by the dissenters in that case) that conflict pre-emption is appropriate only where the agency expresses its pre-emptive intent through notice-and-comment rulemaking. Compare 529 U.S., at 885, 120 S.Ct. 1913 ("To insist on

a specific expression of agency intent to pre-empt, made after notice-and-comment rulemaking, would be in certain cases to tolerate conflicts that an agency, and therefore Congress, is most unlikely to have intended. The dissent, as we have said, apparently welcomes that result .... We do not"), with *id., at 908–910, 120 S.Ct. 1913* (STEVENS, J., dissenting) (emphasizing that "we generally expect an administrative regulation to declare any intention to **\*\*1228** pre-empt state law with some specificity," and that "[t]his expectation ... serves to ensure that States will be able to have a dialog with agencies regarding pre-emption decisions *ex ante* through the normal notice-and-comment procedures of the Administrative Procedure Act" (internal quotation marks omitted)). Indeed, pre-emption is arguably more appropriate here than in *Geier* because the FDA (unlike the DOT) declared its pre-emptive intent in the Federal Register. **\*623** See 71 Fed.Reg. 3933–3936. Yet the majority dismisses the FDA's published preamble as "inherently suspect," *ante,* at 1201, and an afterthought that is entitled to "no weight," *ante,* at 1204. Cf. *Lohr, supra,* at 506, 116 S.Ct. 2240 (opinion of BREYER, J.) (emphasizing that the FDA has a "special understanding of the likely impact of both state and federal requirements, as well as an understanding of whether (or the extent to which) state requirements may interfere with federal objectives," and that "[t]he FDA can translate these understandings into particularized pre-emptive intentions ... through statements in 'regulations, preambles, interpretive statements, and responses to comments' ").

Third, the Court distinguishes *Geier* because the DOT's regulation "bear[s] the force of law," whereas the FDA's preamble does not. *Ante,* at 1203; see also *ante,* at 1200. But it is irrelevant that the FDA's preamble does not "bear the force of law" because the FDA's labeling decisions surely do. See 21 U.S.C. § 355. It is well within the FDA's discretion to make its labeling decisions through administrative adjudications rather than through less formal and less flexible rulemaking proceedings, see *SEC v. Chenery Corp.,* 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), and we have never previously held that our pre-emption analysis turns on the agency's choice of the latter over the former. Moreover, it cannot be said that *Geier* 's outcome hinged on the agency's choice to promulgate a rule. See *ante,* at 1200, 1203. The *Geier* Court relied—again over the dissenters' protestations— on materials other than the Secretary's regulation to explain the conflict between state and federal law. Compare 529 U.S., at 881, 120 S.Ct. 1913, with *id., at 899–900, 120 S.Ct. 1913* (STEVENS, J., dissenting), and *ante,* at 1204 (BREYER, J., concurring).

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

Fourth, the Court sandwiches its discussion of *Geier* between the "presumption against pre-emption," *ante,* at 1200, and heavy emphasis on "the longstanding coexistence of state and federal law and the FDA's traditional recognition of state-law remedies," *ante,* at 1203. But the *Geier* Court specifically rejected the argument (again made by the dissenters **\*624** in that case) that the "presumption against pre-emption" is relevant to the conflict pre-emption analysis. See 529 U.S., at 906–907, 120 S.Ct. 1913 (STEVENS, J., dissenting) ("[T]he Court simply ignores the presumption [against pre-emption]"). Rather than invoking such a "presumption," the Court emphasized that it was applying "ordinary," "longstanding," and "experience-proved principles of conflict pre-emption." *Id.,* at 874, 120 S.Ct. 1913. Under these principles, the sole question is whether there is an "actual conflict" between state and federal law; if so, then pre-emption follows automatically by operation of the Supremacy Clause.*Id.,* at 871–872, 120 S.Ct. 1913. See also *Buckman,* 531 U.S., at 347–348, 121 S.Ct. 1012 ("[P]etitioner's dealings with the FDA were prompted by [federal law], and the very subject matter of petitioner's statements [to the FDA] were dictated by [federal law]. Accordingly—and in contrast to situations implicating 'federalism concerns and the historic primacy of state regulation of matters of health and safety'— no **\*\*1229** presumption against pre-emption obtains in this case" (citation omitted)).[14]

 **\*625** Finally, the *Geier* Court went out of its way to emphasize (yet again over the dissenters' objections) that it placed "some weight" on the DOT's *amicus* brief, which explained the agency's regulatory objectives and the effects of state tort suits on the federal regulatory regime. 529 U.S., at 883, 120 S.Ct. 1913; cf. *id.,* at 910–911, 120 S.Ct. 1913 (STEVENS, J., dissenting) (criticizing the majority for "uph[olding] a regulatory claim of frustration-of-purposes implied conflict pre-emption based on nothing more than an *ex post* administrative litigating position and inferences from regulatory history and final commentary"). See also *Lohr,* 518 U.S., at 496, 116 S.Ct. 2240 (recognizing that the FDA is "uniquely qualified" to explain where state law conflicts with the FDA's objectives). Yet today, the FDA's explanation of the conflict between state tort suits and the federal labeling regime, set forth in the agency's *amicus* brief, is not even mentioned in the Court's opinion. Instead of relying on the FDA's explanation of its own regulatory purposes, the Court relies on a decade-old and now-repudiated statement, which the majority finds preferable. See *ante,* at 1201 – 1202, 1203, n. 13. Cf. *Riegel,* 552 U.S., at 327, 128 S.Ct., at 1010 (noting

that "the agency's earlier position (which the dissent describes at some length and finds preferable) is ... compromised, indeed deprived of all claim to deference, by the fact that it is no longer the agency's position" (citation omitted)); *Altria Group, Inc. v. Good, ante,* at 70, 129 S.Ct. 538, 549 – 550, 172 L.Ed.2d 398 (2008) (rejecting petitioners' reliance on the pre-emptive effect of the agency's "longstanding policy" because it is inconsistent with the agency's current one). And Justice BREYER suggests that state tort suits may "help the [FDA]," *ante,* at 1204 (concurring opinion), notwithstanding the FDA's insistence that state tort suits will "disrupt the agency's balancing of health risks and benefits," Brief for United States as *Amicus Curiae* 9.

*Geier* does not countenance the use of state tort suits to second-guess the FDA's labeling decisions. And the Court's contrary conclusion has potentially far-reaching consequences.

 **\*626** C

By their very nature, juries are ill equipped to perform the FDA's cost-benefit-balancing function. As we explained in *Riegel,* juries tend to focus on the risk of a **\*\*1230** particular product's design or warning label that arguably contributed to a particular plaintiff's injury, not on the overall benefits of that design or label; "the patients who reaped those benefits are not represented in court." 552 U.S., at 325, 128 S.Ct., at 1008. Indeed, patients like respondent are the only ones whom tort juries ever see, and for a patient like respondent—who has already suffered a tragic accident—*Phenergan's* risks are no longer a matter of probabilities and potentialities.

In contrast, the FDA has the benefit of the long view. Its drug-approval determinations consider the interests of all potential users of a drug, including "those who would suffer without new medical [products]" if juries in all 50 States were free to contradict the FDA's expert determinations. *Id.,* at 326, 128 S.Ct., at 1009. And the FDA conveys its warnings with one voice, rather than whipsawing the medical community with 50 (or more) potentially conflicting ones. After today's ruling, however, parochialism may prevail.

The problem is well illustrated by the labels borne by "vesicant" drugs, many of which are used for chemotherapy. As a class, vesicants are much more dangerous than drugs like Phenergan,[15] but the vast majority of vesicant labels— like Phenergan's—either allow or do not disallow IV push.

See Appendix, *infra*. Because vesicant extravasation can have devastating consequences, and because the potentially lifesaving benefits of these drugs offer hollow solace to the victim **\*627** of such a tragedy, a jury's cost-benefit analysis in a particular case may well differ from the FDA's.

For example, consider Mustargen (mechlorethamine HCl)— the injectable form of mustard gas—which can be used as an anticancer drug. Mustargen's FDA-approved label warns in several places that "This drug is **HIGHLY TOXIC**."[16] Indeed, the drug is so highly toxic:

> "Should accidental eye contact occur, copious irrigation for at least 15 minutes with water, normal saline or a balanced salt ophthalmic irrigating solution should be instituted immediately, followed by prompt ophthalmologic consultation. Should accidental skin contact occur, the affected part must be irrigated immediately with copious amounts of water, for at least 15 minutes while removing contaminated clothing and shoes, followed by 2% sodium thiosulfate solution. Medical attention should be sought immediately. Contaminated clothing should be destroyed."[17]

Yet when it comes to administering this highly toxic drug, the label provides that "the drug may be injected *directly into any suitable vein,* [but] it is injected preferably into the rubber or plastic tubing of a flowing intravenous infusion set. This reduces the possibility of severe local reactions due to extravasation or high concentration of the drug." (Emphasis added.) Similarly, the FDA-approved labels for other powerful chemotherapeutic vesicants **\*\*1231**—including Dactinomycin, Oxaliplatin, Vinblastine, and Vincristine—specifically allow IV push, notwithstanding their devastating effects when extravasated.

**\*628** The fact that the labels for such drugs allow IV push is striking—both because vesicants are much more dangerous than Phenergan, and also because they are so frequently extravasated, see Boyle & Engelking, Vesicant Extravasation: Myths and Realities, 22 Oncology Nursing Forum 57, 58 (1995) (arguing that the rate of extravasation is "considerably higher" than 6.4% of all vesicant administrations). Regardless of the FDA's reasons for not contraindicating IV push for these drugs, it is odd (to say the least) that a jury in Vermont can now order for Phenergan what the FDA has chosen not to order for mustard gas.[18]

\* \* \*

To be sure, state tort suits can peacefully coexist with the FDA's labeling regime, and they have done so for decades. *Ante,* at 1199 – 1200 (majority opinion). But this case is far from peaceful coexistence. The FDA told Wyeth that Phenergan's label renders its use "safe." But the State of Vermont, through its tort law, said: "Not so."

The state-law rule at issue here is squarely pre-empted. Therefore, I would reverse the judgment of the Supreme Court of Vermont.

## APPENDIX

| Vesicant[1] | IV Push[2] |
|---|---|
| Dactinomycin | Specifically allowed |
| Mechlorethamine (Mustargen) | Specifically allowed |
| Oxaliplatin | Specifically allowed |
| Vinblastine | Specifically allowed |
| Vincristine | Specifically allowed |
| Bleomycin | Neither mentioned nor prohibited |
| Carboplatin | Neither mentioned nor prohibited |

Case 2:19-md-02901-SFC ECF No. 85-6, PageID.4337 Filed 01/08/21 Page 30 of 35

Wyeth v. Levine, 555 U.S. 555 (2009)

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

| Dacarbazine | Neither mentioned nor prohibited |
|---|---|
| Mitomycin | Neither mentioned nor prohibited |
| Carmustine | Not prohibited; IV drip recommended |
| Cisplatin | Not prohibited; IV drip recommended |
| Epirubicin | Not prohibited; IV drip recommended |
| Etoposide | Not prohibited; IV drip recommended |
| Ifosfamide | Not prohibited; IV drip recommended |
| Mitoxantrone | Not prohibited; IV drip recommended |
| Paclitaxel | Not prohibited; IV drip recommended |
| Teniposide | Not prohibited; IV drip recommended |
| Vinorelbine | Not prohibited; IV drip recommended |
| Daunorubicin | Prohibited |
| Doxorubicin | Prohibited |

Serv. 2644, 2009 Daily Journal D.A.R. 3199, 21 Fla. L. Weekly Fed. S 675

**All Citations**

555 U.S. 555, 129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176, 09 Cal. Daily Op.

Footnotes

\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1 The warning for "Inadvertent Intra-arterial Injection" stated: "Due to the close proximity of arteries and veins in the areas most commonly used for intravenous injection, extreme care should be exercised to avoid perivascular extravasation or inadvertent intra-arterial injection. Reports compatible with inadvertent intra-arterial injection of Phenergan Injection, usually in conjunction with other drugs intended for intravenous use, suggest that pain, severe chemical irritation, severe spasm of distal vessels, and resultant gangrene requiring amputation are likely under such circumstances. Intravenous injection was intended in all the cases reported but perivascular extravasation or arterial placement of the needle is now suspect. There is no proven successful management of this condition after it occurs.... Aspiration of dark blood does not preclude intra-arterial needle placement, because blood is discolored upon contact with Phenergan Injection. Use of syringes with rigid plungers or of small bore needles might obscure typical arterial backflow if this is relied upon alone. When used intravenously, Phenergan Injection should be given in a concentration no greater than 25 mg per mL and at a rate not to exceed 25 mg per minute. When administering any irritant drug intravenously, it is usually preferable to inject it through the tubing of an intravenous infusion set that is known to be functioning satisfactorily. In the event that a patient complains of pain during intended intravenous injection of Phenergan Injection, the injection should be stopped immediately to provide for evaluation of possible arterial placement or perivascular extravasation." App. 390.

2 The dissent nonetheless suggests that physician malpractice was the exclusive cause of Levine's injury. See, *e.g., post,* at 1217 (opinion of ALITO, J.) ("[I]t is unclear how a 'stronger' warning could have helped respondent"); *post,* at 1225 –

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

1227 (suggesting that the physician assistant's conduct was the sole cause of the injury). The dissent's frustration with the jury's verdict does not put the merits of Levine's tort claim before us, nor does it change the question we must decide —whether federal law pre-empts Levine's state-law claims.

3   Wyeth argues that the presumption against pre-emption should not apply to this case because the Federal Government has regulated drug labeling for more than a century. That argument misunderstands the principle: We rely on the presumption because respect for the States as "independent sovereigns in our federal system" leads us to assume that "Congress does not cavalierly pre-empt state-law causes of action." *Lohr*, 518 U.S., at 485, 116 S.Ct. 2240, 135 L.Ed.2d 700. The presumption thus accounts for the historic presence of state law but does not rely on the absence of federal regulation.

For its part, the dissent argues that the presumption against pre-emption should not apply to claims of implied conflict pre-emption at all, *post*, at 1228, but this Court has long held to the contrary. See, *e.g., California v. ARC America Corp.*, 490 U.S. 93, 101–102, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989); *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 716, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985); see also *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 387, 122 S.Ct. 2151, 153 L.Ed.2d 375 (2002). The dissent's reliance on *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001), see *post*, at 1229, and n. 14, is especially curious, as that case involved state-law fraud-on-the-agency claims, and the Court distinguished state regulation of health and safety as matters to which the presumption does apply. See 531 U.S., at 347–348, 121 S.Ct. 1012.

4   Levine also introduced evidence that Pfizer had withdrawn Vistaril, another antinausea drug, from intravenous use several decades earlier because its intravenous injection had resulted in gangrene and amputations. See App. 79.

5   The record would not, in any event, support such an argument. In 1988, Wyeth did propose different language for Phenergan's warning about intra-arterial injection, adapted from revisions the FDA proposed in 1987. See *id.*, at 339–341, 311–312. When the FDA approved Wyeth's application, it instructed Wyeth to retain the wording in its current label. During the trial court proceedings, Levine indicated that the language proposed in 1988 would have more strongly warned against IV-push administration. But the trial court and the Vermont Supreme Court found that the 1988 warning did not differ in any material respect from the FDA-approved warning. See 183 Vt. 76, 92, 944 A.2d 179, 189 (2006) ( "Simply stated, the proposed warning was different, but not stronger. It was also no longer or more prominent than the original warning ..."); App. 248–250. Indeed, the United States concedes that the FDA did not regard the proposed warning as substantively different: "[I]t appears the FDA viewed the change as non-substantive and rejected it for formatting reasons." Brief for United States as *Amicus Curiae* 25; see also 183 Vt., at 92 – 93, 944 A.2d, at 189.

6   The dissent's suggestion that the FDA intended to prohibit Wyeth from strengthening its warning does not fairly reflect the record. The dissent creatively paraphrases a few FDA orders—for instance by conflating warnings about IV-push administration and intra-arterial injection, see, *e.g., post*, 1223 – 1224, 1225 – 1226—to suggest greater agency attention to the question, and it undertakes a study of Phenergan's labeling that is more elaborate than any FDA order. But even the dissent's account does not support the conclusion that the FDA would have prohibited Wyeth from adding a stronger warning pursuant to the CBE regulation.

7   Although the first version of the bill that became the FDCA would have provided a federal cause of action for damages for injured consumers, see H.R. 6110, 73d Cong., 1st Sess., § 25 (1933) (as introduced), witnesses testified that such a right of action was unnecessary because common-law claims were already available under state law. See Hearings on S.1944 before a Subcommittee of the Senate Committee on Commerce, 73d Cong., 2d Sess., 400 (1933) (statement of W.A. Hines); see *id.*, at 403 (statement of J.A. Ladds) ("This act should not attempt to modify or restate the common law with respect to personal injuries").

8   In 1997, Congress pre-empted certain state requirements concerning over-the-counter medications and cosmetics but expressly preserved product liability actions. See 21 U.S.C. §§ 379r(e), 379s(d) ("Nothing in this section shall be construed to modify or otherwise affect any action or the liability of any person under the product liability law of any State").

9   For similar examples, see 47 U.S.C. §§ 253(a), (d) (2000 ed.) (authorizing the Federal Communications Commission to pre-empt "any [state] statute, regulation, or legal requirement" that "may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service"); 30 U.S.C. § 1254(g) (2006 ed.) (pre-empting any statute that conflicts with "the purposes and the requirements of this chapter" and permitting the Secretary of the Interior to "set forth any State law or regulation which is preempted and superseded"); and 49 U.S.C. § 5125(d) (2000 ed. and Supp. V) (authorizing the Secretary of Transportation to decide whether a state or local statute that conflicts with the regulation of hazardous waste transportation is pre-empted).

10   See also 44 Fed.Reg. 37437 (1979) ("It is not the intent of the FDA to influence the civil tort liability of the manufacturer"); 59 Fed.Reg. 3948 (1994) ("[P]roduct liability plays an important role in consumer protection"); Porter, *The Lohr* Decision:

FDA Perspective and Position, 52 Food & Drug L.J. 7, 10 (1997) (former chief counsel to the FDA stating that the FDA regarded state law as complementing the agency's mission of consumer protection).

11    In 1955, the same year that the agency approved Wyeth's Phenergan application, an FDA advisory committee issued a report finding "conclusively" that "the budget and staff of the [FDA] are inadequate to permit the discharge of its existing responsibilities for the protection of the American public." Citizens Advisory Committee on the FDA, Report to the Secretary of Health, Education, and Welfare, H.R. Doc. No. 227, 84th Cong., 1st Sess., 53. Three recent studies have reached similar conclusions. See FDA Science Board, Report of the Subcommittee on Science and Technology: FDA Science and Mission at Risk 2, 6 (2007), online at http://www.fda.gov/ohrms/ dockets/ac/07/ briefing/2007–4329b_02_01_FDA% 20Report% 20**on**% 20Science% 20and% 20Technology.pdf (all Internet materials as visited Feb. 23, 2009, and available in Clerk of Court's case file) ("[T]he Agency suffers from serious scientific deficiencies and is not positioned to meet current or emerging regulatory responsibilities"); National Academies, Institute of Medicine, The Future of Drug Safety: Promoting and Protecting the Health of the Public 193–194 (2007) ("The [FDA] lacks the resources needed to accomplish its large and complex mission .... There is widespread agreement that resources for postmarketing drug safety work are especially inadequate and that resource limitations have hobbled the agency's ability to improve and expand this essential component of its mission"); GAO, Drug Safety: Improvement Needed in FDA's Postmarket Decision-making and Oversight Process 5 (GAO–06–402, 2006), http://www.gao.gov/new.items/ d06402.pdf ("FDA lacks a clear and effective process for making decisions about, and providing management oversight of, postmarket safety issues"); see also House Committee on Oversight and Government Reform, Majority Staff Report, FDA Career Staff Objected to Agency Preemption Policies 4 (2008) ("[T]he Office of Chief Counsel ignored the warnings from FDA scientists and career officials that the preemption language [of the 2006 preamble] was based on erroneous assertions about the ability of the drug approval process to ensure accurate and up-to-date drug labels").

12    See generally Brief for Former FDA Commissioners Drs. Donald Kennedy and David Kessler as *Amici Curiae;* see also Kessler & Vladeck, A Critical Examination of the FDA's Efforts To Preempt Failure–To–Warn Claims, 96 Geo. L.J. 461, 463 (2008); *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 451, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005) (noting that state tort suits "can serve as a catalyst" by aiding in the exposure of new dangers and prompting a manufacturer or the federal agency to decide that a revised label is required).

13    The United States' *amicus* brief is similarly undeserving of deference. Unlike the Government's brief in *Geier v. American Honda Motor Co.,* 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000), which explained the effects of state law on the DOT's regulation in a manner consistent with the agency's prior accounts, see *ibid.,* 120 S.Ct. 1913, the Government's explanation of federal drug regulation departs markedly from the FDA's understanding at all times relevant to this case.

14    Wyeth's more specific contention—that this case resembles *Geier* because the FDA determined that no additional warning on IV-push administration was needed, thereby setting a ceiling on Phenergan's label—is belied by the record. As we have discussed, the FDA did not consider and reject a stronger warning against IV-push injection of Phenergan. See also App. 249–250 ("[A] tort case is unlikely to obstruct the regulatory process when the record shows that the FDA has paid very little attention to the issues raised by the parties at trial").

1    This structural limitation may be implicated in a pre-emption case if the federal law at issue is beyond the scope of Congress' enumerated powers. Expansion of congressional power through an "increasingly generous ... interpretation of the commerce power of Congress," for example, creates "a real risk that Congress will gradually erase the diffusion of power between State and Nation on which the Framers based their faith in the efficiency and vitality of our Republic." *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 583–584, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) (O'Connor, J., dissenting); see also *Marbury v. Madison,* 1 Cranch 137, 176, 2 L.Ed. 60 (1803) ("The powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the constitution is written").

2    The majority's pre-emption analysis relies in part on a presumption against pre-emption. *Ante,* at 1194, and n. 3 (opinion of STEVENS, J.). Because it is evident from the text of the relevant federal statutes and regulations themselves that the state-law judgment below is not pre-empted, it is not necessary to decide whether, or to what extent, the presumption should apply in a case such as this one, where Congress has not enacted an express-pre-emption clause. Cf. *Altria Group, Inc. v. Good,ante,* at 90 – 92, 129 S.Ct. 538, 551–552, 172 L.Ed.2d 398 (2008) (THOMAS, J., dissenting) (rejecting the use of a presumption against pre-emption in express pre-emption cases).

3    According to the Court, the Pennsylvania Act required:
     "every alien 18 years or over, with certain exceptions, to register once each year; provide such information as is required by the statute, plus any 'other information and details' that the Department of Labor and Industry may direct; pay $1 as an annual registration fee; receive an alien identification card and carry it at all times; show the card whenever it may be demanded by any police officer or any agent of the Department of Labor and Industry; and exhibit the card as a

Case 2:19-md-02901-SFC   ECF No. 85-6, PageID.4340   Filed 01/08/21   Page 33 of 35

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

condition precedent to registering a motor vehicle in his name or obtaining a license to operate one. ... Nonexempt aliens who fail to register are subject to a fine ... or imprisonment .... For failure to carry an identification card or for failure to show it upon proper demand, the punishment is a fine ... or imprisonment ...." *Hines,* 312 U.S., at 59–60, 61 S.Ct. 399 (footnote omitted).

The Court explained that the federal Alien Registration Act required:

"a single registration of aliens 14 years of age and over; detailed information specified by the Act, plus 'such additional matters as may be prescribed by the Commissioner, with the approval of the Attorney General'; finger-printing of all registrants; and secrecy of the federal files .... No requirement that aliens carry a registration card to be exhibited to police or others is embodied in the law, and only the wilful failure to register is made a criminal offense ...." *Id.,* at 60–61, 61 S.Ct. 399.

4    According to Justice Stone, the *Hines* majority's analysis resembled an inquiry into whether the federal Act " 'occupied the field,' " rather than an application of simple conflict pre-emption principles. *Id., at 78, 61 S.Ct. 399* (dissenting opinion). Regardless of whether *Hines* involved field or conflict pre-emption, the dissent accurately observed that in assessing the boundaries of the federal law—*i.e.,* the scope of its pre-emptive effect—the Court should look to the federal statute itself, rather than speculate about Congress' unstated intentions. *Id., at 78–79, 61 S.Ct. 399.* See also *Camps Newfound/ Owatonna, Inc. v. Town of Harrison,* 520 U.S. 564, 616–617, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997) (THOMAS, J., dissenting) (noting that "field pre-emption is itself suspect, at least as applied in the absence of a congressional command that a particular field be pre-empted").

5    The Safety Act's express pre-emption provision stated in part:

"Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State ... shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment[,] any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard." 15 U.S.C. § 1392(d) (1988 ed.).

The Safety Act also included a saving clause, which stated: "Compliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law." § 1397(k). The majority and dissent in *Geier v. American Honda Motor Co.,* 529 U.S. 861 (2000) agreed that the import of the express pre-emption provision and the saving clause, read together, was that by its terms, the Safety Act did not expressly pre-empt state common-law actions. See *id.,* at 867–868, 120 S.Ct. 1913; *id.,* at 895–898, 120 S.Ct. 1913 (STEVENS, J., dissenting).

6    In addition to the impropriety of looking beyond the plain text of the saving clause to regulatory history, DOT comments, and an administrative litigating position to evaluate the Safety Act's pre-emptive effect, it is unclear that the Court in *Geier* accurately assessed the federal objectives of the relevant federal law. As the dissent in *Geier* pointed out, the purpose of the Safety Act, as stated by Congress, was generally " 'to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents.' " *Id., at 888–889, 120 S.Ct. 1913* (opinion of STEVENS, J.) (quoting 15 U.S.C. § 1381 (1988 ed.)). On its face, that goal is of course consistent with a state-law judgment that a particular vehicle needed a passive restraint system that would better protect persons from death and injury during traffic accidents. Furthermore, the dissent observed that "by definition all of the standards established under the Safety Act ... impose minimum, rather than fixed or maximum, requirements." 529 U.S., at 903, 120 S.Ct. 1913 (citing 15 U.S.C. § 1391(2)). Thus, in the dissent's view, the requirements of the DOT regulation were not ceilings, and it was "obvious that the Secretary favored a more rapid increase" than required by the regulations. 529 U.S., at 903, 120 S.Ct. 1913. That goal also would be consistent with a state-law judgment finding that a manufacturer acted negligently when it failed to include an airbag in a particular car. See *id., at 903–904, 120 S.Ct. 1913.*

1    Indeed, respondent conceded below that Wyeth *did* propose an adequate warning of Phenergan's risks. See Plaintiff Diana Levine's Memorandum in Opposition to Wyeth's Motion for Summary Judgment in *Levine v. American Home Products Corp.* (now Wyeth), No. 670–12–01 Wncv (Super. Ct. Washington Cty., Vt.), ¶ 7, p. 26. Specifically, respondent noted: "In 1988, Wyeth proposed language that would have prevented this accident by requiring a running IV and explaining why a running IV will address and reduce the risk [of intra-arterial injection]." *Ibid.* See also *id.,* at 24 ("Although not strong enough, this improved labeling instruction, if followed, would have prevented the inadvertent administration of Phenergan into an artery ..."). The FDA rejected Wyeth's proposal. See App. 359.

2    Moreover, in the trial judge's final charge, he told the jury that "the critical factual issue which you must decide" is whether Phenergan's FDA-mandated label reflects a proper balance between "the risks and benefits of intravenous administration and the potential for injury to patients." *Id.,* at 220. See also 183 Vt. 76, 82, 944 A.2d 179, 182 (2006) (recognizing that respondent's argument is that Phenergan's "label should not have allowed IV push as a means of administration").

Wyeth v. Levine, 555 U.S. 555 (2009)

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

3    Respondent sued her physician, physician's assistant, and hospital for malpractice. After the parties settled that suit for an undisclosed sum, respondent's physician sent her a letter in which he admitted " 'responsibility' " for her injury and expressed his " 'profoun [d] regre[t]' " and " 'remors[e]' " for his actions. 1 Tr. 178–179 (Mar. 8, 2004) (testimony of Dr. John Matthew); see also App. 102–103 (testimony of physician's assistant Jessica Fisch) (noting that her "sense of grief" was so "great" that she "would have gladly cut off [her own] arm" and given it to respondent). Thereafter, both the physician and the physician's assistant agreed to testify on respondent's behalf in her suit against Wyeth.

4    To be sure, Congress recognized the principles of conflict pre-emption in the FDCA. See Drug Amendments of 1962, § 202, 76 Stat. 793 ("Nothing in the amendments made by this Act to the Federal Food, Drug, and Cosmetic Act shall be construed as invalidating any provision of State law ... unless there is a direct and positive conflict between such amendments and such provision of State law"). But a provision that simply recognizes the background principles of conflict pre-emption is not a traditional "saving clause," and even if it were, it would not displace our conflict pre-emption analysis. See *Geier v. American Honda Motor Co.,* 529 U.S. 861, 869, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) ("[T]he saving clause ... does *not* bar the ordinary working of conflict pre-emption principles"); *id.,* at 873–874, 120 S.Ct. 1913 ("The Court has ... refused to read general 'saving' provisions to tolerate actual conflict both in cases involving impossibility *and* in 'frustration-of-purpose' cases" (emphasis deleted; citation omitted)).

5    The FDA cited numerous articles that generally discuss the costs and benefits associated with IV push. See, *e.g.,* Nahrwold & Phelps, Inadvertent Intra–Arterial Injection of Mephenteramine, 70 Rocky Mountain Medical J. 38 (Sept.1973) (cited in App. 314, no. 14); Albo, Cheung, Ruth, Snyder, & Reemtsma, Effect of Intra–Arterial Injections of Barbiturates, 120 Am. J. of Surgery 676 (1970) (cited in App. 314, no. 12); Corser, Masey, Jacob, Kernoff, & Browne, Ischaemia Following Self-administered Intra-arterial Injection of Methylphenidate and Diamorphine, 40 Anaesthesia 51 (1985) (cited in App. 314, no. 9); Correspondence Regarding Thiopental and Thiamylal (3 letters), 59 Anesthesiology 153 – 155 (1983) (cited in App. 314, no. 11); Miller, Arthur, & Stratigos, Intra-arterial Injection of a Barbiturate, 23 Anesthesia Progress 25 (1976) (cited in App. 315, no. 19).

6    See Webb & Lampert, Accidental Arterial Injections, 101 Am. J. Obstetrics & Gynecology 365 (1968) (cited in App. 313, no. 5).

7    See Hager & Wilson, Gangrene of the Hand Following Intra-arterial Injection, 94 Archives of Surgery 86 (1967) (cited in App. 313, no. 7); Enloe, Sylvester, & Morris, Hazards of Intra–Arterial Injection of Hydroxyzine, 16 Canadian Anaesthetists' Society J. 425 (1969) (hereinafter Enloe) (noting "recent reports" of "the occurrence of severe necrosis and gangrene following [administration of] promethazine (Phenergan & reg;)" (cited in App. 314, no. 15)). See also Mostafavi & Samimi, Accidental Intra-arterial Injection of Promethazine HCl During General Anesthesia, 35 Anesthesiology 645 (1971) (reporting a case of gangrene, which required partial amputation of three fingers, after Phenergan was inadvertently pushed into an artery in the "antecubital" area); Promethazine, p. 7, in Clinical Pharmacology (Gold Standard Multimedia Inc. CD–ROM, version 1.16 (1998)) (noting that "[i]nadvertent intra-arterial injection [of Phenergan] can result in arteriospasm ... and development of gangrene").

8    Hager and Wilson noted that the most common reactions to intra-arterial injections of drugs like Phenergan include "[i]mmediate, severe, burning pain," as well as "blanching." 94 Archives of Surgery, at 87–88. The FDA required Wyeth to include Hager and Wilson's observations on Phenergan's label. See App. 311 (requiring the label to warn that " '[t]he first sign [of an intra-arterial injection] may be the patient's reaction to a sensation of fiery burning' " pain and " '[b]lanching' ").

9    See Enloe 427 (discussing hydroxyzine—an antihistamine with chemical properties similar to those of Phenergan—and suggesting its "temporary" benefits can never outweigh the risks of intra-arterial injection); see also Goldsmith & Trieger, Accidental Intra–Arterial Injection: A Medical Emergency, 22 Anesthesia Progress 180 (1975) (noting the risks of intra-arterial administration of hydroxyzine) (cited in App. 315, no. 18); Klatte, Brooks, & Rhamy, Toxicity of Intra–Arterial Barbiturates and Tranquilizing Drugs, 92 Radiology 700 (1969) (same) (cited in App. 314, no. 13). With full knowledge of those risks, the FDA retained IV push for Phenergan, although the agency required Wyeth to incorporate observations from the Enloe article into Phenergan's label. Compare Enloe 427 (arguing that "every precaution should be taken to avoid inadvertent intra-arterial injection," including the use of "an obviously well-functioning venoclysis") with App. 312 (the FDA's 1987 changes to Phenergan's label). In contrast, at some time around 1970, the FDA prohibited all intravenous use of hydroxyzine. See *id.,* at 79 (testimony of Dr. Harold Green). The FDA's decision to regulate the two drugs differently —notwithstanding (1) the agency's knowledge of the risks associated with both drugs and (2) the agency's recognition of the relevance of hydroxyzine-related articles and case reports in its regulation of Phenergan—further demonstrates that the FDA intentionally preserved IV-push administration for Phenergan. See also Haas, Correspondence, 33 Anesthesia Progress 281 (1986) ("[Hydroxyzine's] restriction does not lie with the medicine itself, but in the practice and malpractice

129 S.Ct. 1187, 173 L.Ed.2d 51, 77 USLW 4165, Prod.Liab.Rep. (CCH) P 18,176...

of intravenous techniques. Unfortunately, the practitioner who knows how to treat injection technique problems is usually not the practitioner with the intravenous technique problems").

10    See also Engler, Freeman, Kanavage, Ogden, & Moretz, Production of Gangrenous Extremities by Intra–Arterial Injections, 30 Am. Surgeon 602 (1964) ("Accidental arterial injection most often occurs in the antecubital region because this is a favorite site for venopuncture and in this area the ulnar and brachial arteries are superficial and easily entered" (cited in App. 313, no. 6)); Engler et al., Gangrenous Extremities Resulting from Intra-arterial Injections, 94 Archives of Surgery 644 (1966) (similar) (cited in App. 314, no. 16); Lynas & Bisset, Intra-arterial Thiopentone, 24 Anaesthesia 257 (1969) ("Most [anesthesiologists] agree that injections on the medial aspect of the antecubital fossa are best avoided" (cited in App. 314, no. 8)); Waters, Intra-arterial Thiopentone, 21 Anaesthesia 346 (1966) ("The risk of producing gangrene of the forearm by accidental injection of sodium thiopentone into an artery at the elbow has been recognised for many years" (cited in App. 314, no. 10)); see also Hager & Wilson, 94 Archives of Surgery, at 88 (emphasizing that one of the best ways to prevent inadvertent intra-arterial injections is to be aware of "aberrant or superficial arteries at the antecubital, forearm, wrist, and hand level"); Mostafavi & Samimi, *supra* (warning against antecubital injections).

11    See App. 311 (requiring Phenergan's label to warn that practitioners should " '[b]eware of the close proximity of arteries and veins at commonly used injection sites and consider the possibility of aberrant arteries' ").

12    "Aspiration" refers to drawing a small amount of blood back into the needle to determine whether the needle is in an artery or a vein. Ordinarily, arterial blood is brighter than venous blood—but contact with Phenergan causes discoloration, which makes aspiration an unreliable method of protecting against intra-arterial injection. See *id.,* at 282. Therefore, the label warned that when using IV push, a medical professional should beware that "[a]spiration of dark blood does not preclude intra-arterial needle placement, because blood is discolored upon contact with Phenergan Injection." *Id.,* at 390.

13    In addition, respondent's own medical expert testified at trial that it is a principle of "basic anatomy" that the antecubital fossa contains aberrant arteries. See 2 Tr. 34–35 (Mar. 9, 2004) (testimony of Dr. Daniel O'Brien); see also *ibid.* (noting that Gray's Anatomy, which is "the Bible of anatomy," also warns of arteries in the antecubital space).

14    Thus, it is not true that "this Court has long" applied a presumption against pre-emption in conflict pre-emption cases. *Ante,* at 1195, n. 3 (majority opinion). As long ago as *Gibbons v. Ogden,* 9 Wheat. 1, 210, 6 L.Ed. 23 (1824), the Court inquired whether a state law "interfer[ed] with," was "contrary to," or "c[a]me into collision with" federal law—and it did so without ever invoking a "presumption." See also Davis, Unmasking the Presumption in Favor of Preemption, 53 S.C.L.Rev. 967, 974 (2002) (noting that many of the Court's early pre-emption cases "resulted in almost automatic preemption of concurrent state regulation"). In subsequent years the Court has sometimes acknowledged a limited "presumption against pre-emption," but it nonetheless remained an open question—before today—whether that presumption applied in conflict pre-emption cases. See *Crosby v. National Foreign Trade Council,* 530 U.S. 363, 374, n. 8, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) ("We leave for another day a consideration in this context of a presumption against preemption"). Moreover, this Court has never held that the "presumption" applies in an area—such as drug labeling—that has long been "reserved for federal regulation." *United States v. Locke,* 529 U.S. 89, 111, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000). See also *Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 347–348, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001).

15    Vesicants may cause "blistering, severe tissue injury, or tissue necrosis" upon extravasation—even if the drug is not injected into an artery. See, *e.g.,* Schulmeister, Administering Vesicants, 9 Clinical J. of Oncology Nursing 469, 469–470 (2005). See also *ante,* at 1192 (majority opinion) (noting that Phenergan is labeled as an " 'irritant' "); cf. Brief for Anju Budhwani et al. as *Amici Curiae* 15 (suggesting Phenergan should be considered a "vesicant").

16    FDA, Oncology Tools Product Label Details, online at http://www.accessdata.fda.gov/scripts/cder/onctools/labels.cfm? GN=mechlorethamine,% 20nitrogen% 20mustard (as visited Mar. 2, 2009, and available in Clerk of Court's case file).

17    *Ibid.*

18    The same is true of the FDA's regulation of hydroxyzine. See n. 9, *supra.*

1     Wilkes & Barton–Burke, 2008 Oncology Nursing Drug Handbook 27–33 (2008) (Table 1.6).

2     IV-push information is derived from the "dosage and administration" sections of individual drug labels (available in Clerk of Court's case file).

---

**End of Document**                                               © 2021 Thomson Reuters. No claim to original U.S.
                                                                          Government Works.