UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: FORD MOTOR CO. F-150
AND RANGER TRUCK FUEL
ECONOMY MARKETING AND
SALES PRACTICES LITIGATION

Case No. 2:19-md-02901

Sean F. Cox
United States District Court Judge

_____/

**OPINION & ORDER**
**GRANTING DEFENDANT'S MOTION TO DISMISS**

The Judicial Panel on Multidistrict Litigation transferred several putative class actions to

this Court for coordinated pretrial proceedings.  At this juncture, the operative complaint is

Plaintiffs' First Amended Consolidated Master Class Action Complaint, wherein Plaintiffs assert

a variety of state-law claims under the laws of fifty states, and a related federal claim, against

Defendant Ford Motor Company ("Ford").  The First Amended Consolidated Master Class

Action Complaint spans nearly a thousand pages and includes three hundred and eleven counts.

The matter is currently before the Court on Ford's Motion to Dismiss it. The parties have

extensively briefed the issues and the Court heard oral argument on June 17, 2021.

The central argument presented in Ford's motion is that Plaintiffs' claims are preempted

under federal law.  As explained below, this Court concludes that Plaintiffs' claims are

preempted under federal law, both express preemption and implied conflict preemption.  In

addition, the Court finds several of Ford's additional or alternative arguments to have merit and

rules that:  1) Plaintiffs lack standing to assert claims arising under the laws of the twenty-two

states where no named Plaintiff claims to reside or have been injured;  2) Plaintiffs claims are

barred under the doctrine of primary jurisdiction; 3) Plaintiffs' misrepresentation-based

consumer fraud and consumer protection claims fail for additional reasons; 4) Plaintiffs'

representative claims brought under the consumer protection statutes of several states are subject

to dismissal based on statutory class-action bars; 5) Plaintiffs' breach of contract claims are

subject to dismissal because Plaintiffs do not allege the existence of an enforceable contract with

Ford; 6) Plaintiffs' express warranty claims are also barred by federal and state laws; 7)

Plaintiffs' Magnuson-Moss Warranty Act claims must also be dismissed for failure to allege

sufficient pre-suit notice; and 8) Plaintiffs' transactions are exempt from the Michigan Consumer

Protection Act.

## BACKGROUND

The Judicial Panel on Multidistrict Litigation, with the consent of this Court, transferred

and assigned various putative class action cases pending in the Eastern District of Michigan and

other districts to the undersigned.  Thereafter, this Court appointed interim lead counsel for

Plaintiffs.

On December 16, 2019, this Court issued a "Joint Case Management Order" that, among

other things, ordered Plaintiffs to file a consolidated master amended complaint no later than

January 27, 2020, and Ford to respond to it by March 27, 2020.

On January 27, 2020, Plaintiffs filed a "Consolidated Amended Master Class Action

Complaint." (ECF No. 64).  After Ford filed a Motion to Dismiss to that complaint, however,

Plaintiffs advised that they intended to file another amended complaint that would render that

Motion to Dismiss moot.  The parties agreed that Plaintiffs would file their amended complaint

on or before August 21, 2020.

Plaintiffs' First Amended Consolidated Master Class Action Complaint ("FAC")[1], filed on August 21, 2020 (ECF No. 78), which now spans nearly a thousand pages and includes three hundred and eleven counts, is the operative complaint.

The FAC includes an "Introduction" section that provides an overview of Plaintiffs' claims. "Car makers know that one of the most important factors for a consumer purchasing a vehicle is fuel economy. With vehicle purchases and leases being among the largest transactions most consumers will carry out in their lifetime, consumers trust the fuel economy rating displayed in a vehicle's window sticker to help them make important financial decisions." (FAC at ¶ 1). In this case, Plaintiffs allege that Ford "cheated on its fuel economy testing on some of its best-selling and most popular trucks. Ford then used its inaccurate fuel economy ratings on the window stickers to sell and lease these trucks to consumers. Over a million Ford truck owners are now driving vehicles that will cost them thousands of dollars more to own or lease than they anticipated. Because of Ford's deception, all purchasers and lessees of these vehicles paid more for these vehicles than they are actually worth." (*Id*. at ¶ 2). Plaintiffs bring this putative class action, asking this Court to certify a class defined as:

> All persons who purchased or leased a Ford vehicle whose published EPA fuel economy ratings, as printed on the vehicles' window sticker, were more than the fuel economy rating produced by a properly conducted applicable federal mileage test. The vehicles in the Class include but are not limited to the model year 2019 and 2020 Ford Ranger and the 2018, 2019, and 2020 Ford F-150.

(*Id*. at ¶ 3). "These vehicles are hereinafter referred to as the 'Coastdown Cheating Vehicles' and include the 2019 and 2020 Ford Ranger and the 2018, 2019, and 2020 F-150 series trucks,

---

[1]In their briefs, Plaintiffs refer to this pleading as the "FACC" and Ford refers to it as the "ACAC." For simplicity, this Court will refer to it as the FAC.

and likely also include other Ford vehicles." (*Id*. at ¶ 4).

"A Coastdown test is a procedure that determines metrics used to calculate a vehicles's fuel economy values of 'MPG Rating' (miles per gallon). Coastdown testing tells a manufacturer how much rolling resistance and drag a vehicle has so that when a vehicle is testing on a dynamometer, the manufacturer knows how much drag and rolling resistance to apply to the vehicle to simulate the road." (*Id*. at ¶ 5). Plaintiffs allege that "Ford fudged its coastdown testing and used inaccurate drag and resistance figures to boost the vehicles' EPA (Environmental Protection Agency) mileage ratings." (*Id*. at ¶ 6).

"On the window sticker of every Ford F-150 and Ford Ranger are EPA-required indications of fuel economy including city and highway mileage, miles per gallon, and a combined city and highway miles per gallon statement." (*Id*. at ¶ 7). "Ford knows that fuel economy is material to consumers. Testing of the 2018 F-150 using the mandated coastdown procedure reveals that Ford did not follow appropriate coastdown testing procedures." (*Id*. at ¶ 8). "The window sticker or 'Monroney sticker' for a 2018 F-150 V6 indicates mileage of 20 city, 26 highway, and 22 combined. Accurate coastdown testing of a 2018 Ford F-150 V6 reveals the following: The real highway fuel number is 22.7 MGP compared to 26.6 reported by Ford to the EPA. Thus, the highway fuel difference is 15% and the city difference 10%. Assuming the lifetime of a truck is 150,000 miles, at the real city miles per gallon rates, city driving would consume an extra 821 gallons over the lifetime of the truck. The highway extra fuel (extra means real MPG versus Ford's reported MPG) is 968 gallons." (*Id*. at ¶ 9). "These are material differences as manufacturers fight for every 1/10th of a difference in miles per gallon both to attract customers and to earn credits under the applicable environmental emissions

4

regulations." (*Id*. at ¶ 10).

"Ford's motives in overstating vehicle miles per gallon were: (1) to advertise the vehicles as 'Best in Class' for fuel economy or to advertise a fuel economy that would beat the competition and/or be attractive to consumers, (2) to attract customers based on fuel economy ratings, and (3) to earn more credits for Ford under the U.S. CAFÉ environmental regulations since less fuel burned means less emission." (*Id*. at ¶ 11). "Ford has admitted that the 2019 Ranger is just the first model that is being investigated by the government for improper coastdown testing. As explained herein, Plaintiffs' testing of the 2018 F-150 reveals similar coastdown cheating." (*Id*. at ¶ 12). "Ford sold approximately 1 million 2018 and 2019 F-150s. The extra fuel costs, with the same assumptions above, for all 2018 and 2019 F-150s would be approximately $2.32 billion for city driving, $2.09 billion highway, and $1.9 billion combined." (*Id*. at ¶ 13).

"The 2018, 2019, and 2020 F-150 are virtually identical in engine and body configuration. In fact, on its applications to certify fuel economy ratings and emissions certifications for the 2019 and 2020 F-150, Ford used the same vehicle serial numbers and presented the same emissions test numbers to the EPA as it did for the 2018 F-150 applications. Likewise, the 2020 Ranger is virtually identical in engine and body configuration to the 2019 Ranger and Ford has used the same vehicle serial number and presented the same emissions test numbers to the EPA as it did for the 2019 Ranger application." (*Id*. at ¶ 14).

"Ford deliberately misrepresented or miscalculated certain road testing factors during internal vehicle testing processes in order to report that its vehicles were more fuel efficient than they actually were. In particular, Ford miscalculated something called 'Road Load,' which is the

force that is imparted on a vehicle while driving at a constant speed over a smooth, level surface from sources such as tire rolling resistance, driveline losses, and aerodynamic drag.  Ford's internal lab tests did not account for these forces, which lead to better – and entirely inaccurate – fuel economy projections."  (*Id*. at ¶ 15).

"Despite Ford's own employees questioning its testing practices and the calculations that Ford was utilizing for fuel economy ratings, at least by September 2018, Ford took no action to correct the problems nor to alert customers that their test methods were flawed and that consumers would not get the promised fuel economy."  (*Id*. at ¶ 16).  "With respect to its 2019 Ford Ranger, Ford promised that its midsize truck 'will deliver with durability, capability and fuel efficiency, while also providing in-city maneuverability and the freedom desired by many midsize pickup truck buyers to go off the grid.'  Ford also claimed that its 'All-New Ford Ranger [was] Rated Most Fuel Efficient Gas-Powered Midsize Pickup in America.'  'With EPA-estimated fuel economy ratings of 21 mpg city, 26 mpg highway and 23 mpg combined, 2019 Ford Ranger is the most fuel efficient gas-powered midsize pickup in America.'  Ford claimed the 2019 Ranger 'is the no-compromise choice for power, technology, capability, and efficiency whether the path is on road or off.'" (*Id*. at ¶ 17).

"Ford knew that to sell the Ranger, it had to tout it had fuel efficiency, and this promise was material to consumers."  (*Id*. at ¶ 18).  "There is no question that Ford used the fuel efficiency ratings as a selling tool to entice consumers into purchasing the 2019 Ford Ranger. Indeed, Ford promised that '[t]he adventure-ready 2019 Ford Ranger is the most fuel-efficient gas-powered midsize pickup in America – providing a superior EPA-estimated city fuel economy rating and an unsurpassed EPA-estimated combined fuel economy rating versus the

competition.  The all-new Ranger has earned EPA-estimated fuel economy ratings of 21 mpg city, 26 mpg highway, and 23 mpg combined for 4x2 trucks.'  Ford claimed that '[t]his is the best-in-class EPA-estimated city fuel economy rating of any gasoline-powered four-wheel-drive midsize pickup and it is an unsurpassed EPA-estimated combined fuel economy rating.'" (*Id*. at ¶ 19),

"Fuel economy was also used as a tool to entice customers to buy the Ford F-150.  Ford promised that certain of the 2018 F-150s were 'best in class' for fuel economy, or promised certain city, highway and combined fuel miles per gallon for other F-150 models that were robust enough that Ford believed would make them attractive to consumers."  (*Id*. at ¶ 20).  "In contrast to Ford's promises, as noted above, scientifically valid testing has revealed that the vehicles (i) are not as fuel efficient as promised; (ii) are not what a reasonable consumer would expect; and (iii) are not what Ford had advertised.  Further, the vehicles' promised power, fuel economy and efficiency, and towing capacity are obtained only by altering the testing calculations."  (*Id*. at ¶ 21).  "Ford's representations are deceptive and false, and Ford sold its 2019 and 2020 Ford Rangers and 2018, 2019, and 2020 F-150 models while omitting information that would be material to a reasonable consumer; namely, that Ford miscalculated factors during internal vehicle testing processes in order to report that its vehicles were more fuel efficient than they actually were, and discounted common real-world driving conditions."  (*Id*. at ¶ 22).

"Plaintiffs bring this action individually and on behalf of all other current and former owners or lessees of the Coastdown Cheating Vehicles.  Plaintiffs seek damages, injunctive relief, and equitable relief for Ford's misconduct related to the design, manufacture, marketing,

7

sale, and lease of the Coastdown Cheating Vehicles, as alleged in this Complaint."  (*Id*. at ¶ 23).

The FAC includes named Plaintiffs from the following twenty eight states: Alabama, Arizona, California, Florida, Georgia, Hawaii, Illinois, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, New Jersey, New York, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, and Wisconsin.  There are no named Plaintiffs who assert claims under the law of the remaining twenty-two states.

The Court includes here some factual allegations in the FAC that are relevant to the challenges in the pending Motion to Dismiss.

Plaintiffs allege that "Ford deliberately miscalculated and misrepresented factors used in vehicle certification testing in order to report that its vehicles used less fuel and emitted less pollution than they actually did.  The certification test-related cheating centers on the 'Coastdown' testing and "Road Load" calculations."  (FAC at ¶ 397).

"The Coastdown test results are sent by Ford to the EPA to be used as the basis for mileage information used on window stickers, also called a 'Monroney sticker.'" (FAC at ¶ 404).

"The Monroney sticker is on the window of every new car and included information about the vehicles's price, engine and transmission specifications, other mechanical and performance specs, fuel economy and emissions ratings, safety ratings, and standard and optional features."  (*Id*. at ¶ 405).  "The Monroney sticker is named for A.S. 'Mike' Monroney, a longtime Oklahoma congressman who wrote the 1958 Automobile Information Disclosures Act, the federal law that requires the Monroney sticker."  (*Id*. at ¶ 406).

Included on the Monroney sticker "is a section called 'the EPA sticker.'  The

Environmental Protection Agency section of the sticker tells how many miles per gallon of gas the vehicle gets on the highway and in the city.  The EPA label provides miles-per-gallon equivalent (MPGe) figures for electric and hybrid cars to help consumers compare the fuel economy of these vehicles with gas- and diesel-powered cars. The EPA section hereinafter will detail the vehicles's potential environmental impact with green house gas emissions." (*Id*. at ¶ 407).

"The fuel economy figures are used by car reviewers and used by consumers to rate cars." (*Id*. at ¶ 408).

"Ford has admitted that in September of 2018 several of its own employees were questioning its computer modeling and physical test practices for certification of fuel economy and emissions.  Yet, Ford took no action to correct these ongoing misrepresentations or to alert consumers." (FAC at ¶ 410).  Plaintiffs allege that, "[p]ressured by a pending governmental criminal investigation, Ford has now stated that it will look into the testing of the 2019 Ranger truck before looking at its other vehicles." (*Id*. at ¶ 411).

Plaintiffs allege that Ford's "March 2019 Securities and Exchange Commission filing revealed that it is under criminal investigation by the United States Department of Justice for its emissions certification practices." (FAC at ¶ 430).  They further allege that in "September 2018, several Ford employees expressed concerns about the testing practices at Ford pertaining to emissions and fuel efficiency.  In February 2019, Ford admitted it was looking into these concerns about its 'computer-modeling methods and calculations used to measure fuel economy and emissions.'" (*Id*. at ¶ 432).

"Even after Ford employees had come forward about the cheating, Ford's media center

touted the 2019 Ranger truck as having amazing performance without compromise," with claims about fuel efficiency "front and center."  (FAC at ¶ 462).  "Ford's claim of *most fuel efficient in its class*" is set forth in its "sales brochures for the 2019 Ranger."  (*Id.* at ¶ 463) (emphasis added).

Ford's "F-150 is the best-selling vehicle in the United States and has been for decades." (FAC at ¶ 464).  "To stimulate F-150 sales and maintain its lead over competitors like the Dodge Ram, Ford announced that the 2018 Ford F-150 would be best in class for fuel economy and/or published inflated MPG estimates."  (*Id.* at ¶ 465).

Exhibit 18 to the FAC is a Monroney sticker for a 2018 F-150 2.7 V6.  The sticker notes that "This label is affixed pursuant to the Federal Automobile Information Disclosure Act."  The sticker lists the "Fuel Economy" as "22 MPG" for combined city/hwy, "20 city," and "26 highway," with "4.5 gallons per 100 miles."  (*Id.* at ¶ Ex. 18).  The sticker states that "Actual results will vary for many reasons, including driving conditions and how you drive and maintain your vehicle."  (*Id.*).

"The 2018 F-150 brochure lists the estimated fuel economy for the various types of 150s," with various "EPA-estimated ratings" for each of the types and stating that "[a]ctual mileage will vary."  (Ex. 20 to FAC).

Plaintiffs allege that, as a result of Ford's "unfair, deceptive, and/or fraudulent business practices, Plaintiffs did not receive the fuel efficiency that was advertised and will incur increased fuel costs over the life of their vehicle.  Had Ford told the truth, that it was cheating on its coastdown testing, Plaintiffs would not have bought their vehicle or would have paid substantially less."  (FAC at ¶ 471).

The FAC asks this Court to certify a "Nationwide Class" that would consist of "[a]ll persons who purchased or leased a Ford vehicle whose published EPA fuel economy ratings, as printed on the vehicles' window sticker, were more than the fuel economy rating produced by a properly conducted applicable federal mileage test.  The vehicles in the Class include but are not limited to the model year 2019 and 2020 Ford Ranger and the 2018, 2019, and 2020 Ford F-150."  (FAC at ¶ 481).

The FAC also asks the Court to certify fifty subclasses, one for each of the states in the United States (ie, an "Alabama Subclass," an "Alaska Subclass," etc.).

The FAC contains three-hundred and eleven separate counts, consisting mostly of state-law claims, that are organized by subclasses.  That is, the FAC first asserts all of the causes of action brought on behalf of the Alabama subclass under Alabama law, and then does the same for each of the proposed subclasses.  It then asserts five counts as a "Nationwide Class."

The FAC's request for relief asks this Court to certify this case as a class action.  It also asks the Court to declare that Ford's conduct is "unlawful, unfair, and deceptive."  (FAC at 960). It further asks this Court to require that "all Class members be *notified about the lower fuel economy ratings* and higher emissions at Ford's expense" and *provide* "*correct fuel economy* and emissions *ratings*" to Class members.  (*Id*. at 961) (emphasis added).  The FAC also seeks an award of compensatory and exemplary damages, "disgorgement of all profits wrongfully received by Ford for the Coastdown Cheating Vehicles," and an award of statutory penalties. (*Id*.).

## STANDARD OF DECISION

Ford brings the instant Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and

12(b)(6).

Fed. R. Civ. P. 12(b)(1) provides for the dismissal of an action for lack of subject matter jurisdiction. "Article III standing is a question of subject matter jurisdiction properly decided under 12(b)(1)." *American BioCare, Inc. v. Howard & Howard Attorneys, Pllc*, 702 F. App'x 416, 419 (6th Cir. 2017). Because Ford challenges subject matter jurisdiction, Plaintiffs have the burden of proof to show that subject matter jurisdiction exists. *Id*. When ruling on a motion to dismiss for lack of standing under Rule 12(b)(1), the district court must accept all material allegations of the complaint as true. *Courtney v. Smith*, 297 F. App'x 455, 459 (6th Cir. 2002).

"To survive a motion to dismiss" under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim is facially plausible when a plaintiff pleads factual content that permits a court to reasonably infer that the defendant is liable for the alleged misconduct. *Id.* When assessing the sufficiency of a plaintiff's claim, this Court must accept the complaint's factual allegations as true. *Ziegler v. IBP Hog Mkt., Inc*., 249 F.3d 509, 512 (6th Cir. 2001). "Mere conclusions," however, "are not entitled to the assumption of truth. While legal conclusions can provide the complaint's framework, they must be supported by factual allegations." *Iqbal,* 556 U.S. at 664, 129 S.Ct. 1937. Thus, a plaintiff must provide "more than labels and conclusions," or a "formulaic recitation of the elements of a cause of action" in order to survive a motion to dismiss. *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do no suffice." *Iqbal*, 556 U.S. at

12

678, 129 S.Ct. 1937.

Rule 9(b) of the Federal Rules of Civil Procedure "sets the pleading standard for 'alleging fraud or mistake' and governs state fraudulent concealment claims in diversity cases." *Smith v. General Motors, LLC*, 988 F.3d 873, 883 (6th Cir. 2021).   "Rule 9(b) requires parties to 'state with particularity the circumstances constituting fraud or mistake' for fraud claims but permits general allegations about the defendant's knowledge to avoid a 12(b)(6) motion to dismiss.  The adequacy of 9(b) pleadings in the face of a motion to dismiss under 12(b)(6) are analyzed under the *Twombly/Iqbal* framework." *Id.*  "To satisfy Rule 9(b), 'the plaintiff must allege (1) 'the time, place, and content of the alleged misrepresentation,' (2) 'the fraudulent scheme,' (3) the defendant's fraudulent intent, and (4) the resulting injury.'" *Smith*, *supra* (citations omitted).

## ANALYSIS

### I.    **Plaintiffs' Claims Are Preempted By Federal Law.**

As its opening and central argument, Ford asserts that all of Plaintiffs' claims in this action are preempted under federal law and must be dismissed.  The Court agrees.

"The federal preemption doctrine has grown out the Supremacy Clause of the United States Constitution, which provides in part 'the Laws of the United States which shall be made in Pursuance' of the Constitution 'shall be the supreme Law of the Land.'  U.S. Const., art. VI, cl. 2.*"  State Farm v. Reardon*, 539 F.3d 336, 341 (6th Cir. 2008).  "According to the Supreme Court, '[t]he phrase 'Laws of the United States' encompasses both federal statutes themselves and federal regulations that are properly adopted in accordance with statutory authorization.'" *Id.* (quoting *City of New York, v. FCC*, 486 U.S. 57, 63, 108 S.Ct. 100 L.Ed.2d 664 (1982)).

"Federal law may preempt state law either expressly or impliedly."  *Id.*

Here, Ford makes arguments regarding both express preemption and implied preemption. Before analyzing those arguments, the Court will discuss the basic federal framework relating to fuel economy estimates.

The testing and disclosure of estimated fuel economy for new vehicles sold in the United States is governed by a comprehensive federal regulatory scheme created by the Environmental Policy and Conservation Act ("EPCA"), and enforced by the Federal Trade Commission ("FTC") and the Environmental Protection Agency ("EPA").

"The EPCA provides that every new vehicle sold in the United States be labeled with a sticker (a 'Monroney Sticker') indicating estimated fuel economy, and that a booklet comparing fuel economies of similar vehicles, prepared by the EPA, be made available by vehicle dealerships."  *In re Ford Fusion & C-MAX Fuel Econ. Litig.,* 2015 WL 7018369 (S.D. N.Y. 2015 *"(C-Max I"), supra*, at *4 (citing 49 U.S.C. § 32908(b) and *Giles v. Ford Motor Co.*, 24 F.Supp.3d 1039, 1045 (D. Colo. 2014)).  "The Monroney Sticker must also include a disclaimer indicating that '[a]ctual results will vary for many reasons, including driving conditions and how you drive and maintain your vehicle."  *Id.* (citing 40 C.F.R. 600.302-12(b)(4) and *Giles, supra*).

"The EPA regulates the calculation of estimated fuel economy."  *C-MAX I, supra*.  The current regime allows automobile manufacturers like Ford to choose between two methods of calculating fuel economy.  40 C.F.R. § 600.210-12.

"The FTC, by contrast, regulates the advertisement of fuel economy estimates to consumers.  As explained in *C-MAX I:*

> Its regulations provide, in relevant part, that "[n]o manufacturer or dealer shall make any express or implied representation in advertising concerning the fuel

economy of any new automobile unless . . . the [EPA] is the source of the 'estimated city mpg' and 'estimated highway mpg' and that the numbers are estimates" and marked as such.  16 C.F.R. § 259.2(a); *see also Gilles*, 24 F.Supp.2d at 1046-47 (describing these regulations and noting that, "[s]imply put, when a manufacturer includes miles per gallon numbers in an advertisement, it must, in a clear and conspicuous manner, include the EPA mileage estimates, state that they are estimates, and indicate that the EPA is the source of the estimates.").  The FTC regulations further provide that "[f]uel economy estimates derived from a non-EPA test may be disclosed provided that," inter alia, the EPA estimates have  "substantially more prominence than any other estimate."  16 C.F.R. § 259.2(c). Unlike the EPA regulations, the FTC regulations do not require an "actual results will vary" disclaimer.  *Gilles*, 24 F.Supp.3d at 1047. If a manufacturer fails to comply, the FTC may take "corrective action . . . under appropriate statutory provisions."  16 C.F.R. § 1.5.

*C-MAX I, supra*, at *5.

As Ford's brief notes, "EPA fuel economy estimates are not, and have never been,

guarantees of real-world fuel economy performance," explaining:

As the EPA itself has stressed, its fuel economy "ratings are a useful tool for comparing the fuel economies of different vehicles but may not accurately predict the average [miles per gallon] *you* will get.  EPA Your Mileage Will Vary, available at https://www.fueleconomy.gov/feg/why_differ.shtml (last visited Oct. 12, 2020) (emphasis in original).  Indeed, a vehicle's fuel economy "will vary." *Id.*  For this reason, when designing the Monroney label, regulators acknowledged that it must contain a "statement . . . informing the buyer that the values on the label are not guaranteed[.]" 76 Fed. Reg. at 39505.  And as the EPA has long-acknowledged, its required fuel economy estimates are not – and can never be – "perfect" figures that can predict the performance of each vehicle for each driver under all conditions:

> It is important to emphasize that fuel economy varies from driver to driver for a wide variety of reasons, such as different driving styles, climates, traffic patterns, use of accessories, loads, weather, and vehicle maintenance.  Even different drivers of the same vehicle will experience different fuel economy as these and other factors vary.  Therefore, *it is impossible to design a "perfect" fuel economy test* that will provide accurate, real-world economy estimates for every consumer.  With any estimate, there will always be consumers that get better or worse actual fuel economy. The EPA estimates are meant to be a general guideline for consumers, particularly, to compare the relative fuel economy of

15

one vehicle to another.

> 71 Fed. Reg. at 77874; *see also* 76 Fed. Reg. at 39505 (emphasizing "tradition" of
> ensuring consumers know estimates do not reflect real world economy); EPA
> Your Mileage Will Vary, available at
> https://www.fueleconomy.gov/feg/why_differ.shtml (last visited Oct. 12, 2020).

(Def.'s Br. at 6-7).

### A.      Express Preemption

"Express preemption exists where either a federal statute or regulation contains explicit

language indicating that a specific type of state law is preempted."  *State Farm*, 539 F.3d at 341-

42.

Chapter 329 of Title 49 of the United States Code ("Transportation") is titled

"Automobile Fuel Economy."  Section 32919 of Chapter 329 is titled "Preemption," and

provides, in its entirety:

> (a) General. – When an average fuel economy standard prescribed under this
> chapter is in effect, a State or a political subdivision of a State may not adopt or
> enforce a law or regulation related to fuel economy standards or average fuel
> economy standards for automobiles covered by an average fuel economy standard
> under this chapter.

> (b) Requirements must be identical. – When a requirement under section 32908 of
> this title is in effect, a State or a political subdivision of a State may adopt or
> enforce a law or regulation on disclosure of fuel economy or fuel operating costs
> for an automobile covered by section 32908 only if the law or regulation is
> identical to that requirement.

> (c) State and political subdivision automobiles.– A State or political subdivision
> of a State may prescribe requirements for fuel economy for automobiles obtained
> for its own use.

49 U.S.C. § 32919.

Where, as here, the "statute contains an express preemption clause," the Court should

"not invoke any presumption against pre-emption but instead focus on the plain wording of the

clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Puerto*

*Rico v. Franklin California Tax-Free Trust*, 579 U.S. 115, 136 S.Ct. 1938, 1946 (2016) (internal

quotations omitted); *see also Dialysis Newco, Inc. v. Community Health Sys. Group Health Plan*,

938 F.3d 246, 258 (8th Cir. 2019).

Ford asserts that Plaintiffs' claims in this action are expressly preempted by 49 U.S.C. §

32919(a) and (b).

Ford argues that the vehicles at issue in this case "are undisputedly covered by 49 U.S.C.

§ 32908, the general fuel economy labeling provision.  And the accompanying preemption

provision expresses Congress's intent clearly:  no State may obligate a vehicle manufacturer to

comply with any requirement pertaining to the disclosure of a vehicle's fuel economy unless an

identical requirement is already imposed by Section 32908."  (Def.'s Br. at 15).  Ford contends

that "[b]ecause Plaintiffs' core theory of this case would impose such forbidden 'non-identical'

testing and disclosure requirements, their claims are expressly preempted."  (*Id*.).  Ford asserts

that "the plain wording of Congress's express preemption clause, combined with the overall

structure and purpose of the surrounding regulatory scheme, leaves no doubt that Congress

intended to preempt all state-law efforts to impose differing fuel economy testing and disclosure

obligations on vehicle manufacturers." (Def.'s Br. at 16).

Ford argues that Plaintiffs' claims in this action are expressly preempted under §

32919(b), arguing:

> Plaintiffs claim that Ford "cheated" on fuel economy testing and produced fuel
> economy estimates for the subject vehicles that are *per se* deceptive.  *See, e.g.*,
> [FAC] ¶ 2.  They bring this action seeking a judicial decree requiring Ford to,
> inter alia, "correct" those estimates.  *Id*. at Prayer for Relief.  As their chosen
> means to achieve that result, Plaintiffs invoke various state laws that would
> impose widely differing obligations than those contained in 49 U.S.C. § 32908.

17

Thus, under the plain language of Section 32919(b)'s express preemption clause, Plaintiff's state law claims must be dismissed.

(Def.'s Br. at 16-17).

Ford also argues that while § 32919(b) "preempts the use of state law to impose different labeling standards than those in Section 32908, Section 32919(a) sweeps much more broadly and also compels the dismissal of this litigation in its entirety," arguing:

> Specifically, that provision bars any "law or regulation related to fuel economy standards for automobiles covered by an average fuel economy standard[.]" 49 U.S.C. §32919(a).  "The words 'related to,' as used in this context, 'express a broad presumptive purpose.'" *Wellons v. Northwest Airlines, Inc.*, 165 F.3d 493, 495 (6th Cir. 1999) (quoting *Morales v. Trans World Airlines, Inc*., 504 U.S. 374 (1992)).  That broad preemptive construction applies in the context of many federal statutory regimes, including the EPCA.  *See, e.g, Metro Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156-57 (2d Cir. 2010) (holding that the "related to" language in § 32919(a) should be interpreted consistent with other statutory preemption provisions containing that phrase and citing case law noting its "expansive" nature).
>
> Federal law defines the term "average fuel economy standard" as "a performance standard specifying a minimum level of average fuel economy applicable to a manufacturer in a year."  49 U.S.C. § 32901(a)(6). Courts have used this phrase interchangeably with the term "fuel economy standard," which is not separately defined.  *See, e.g., In re Ctr. for Auto Safety,* 793 F.2d 1346, 1348 (D.C. Cir. 1986).  Given the rules of broad interpretation, "[r]elated to fuel economy standards' means having "a connection with, or reference to" those standards, *Morales,* 504 U.S. at 383-84, when viewed in light of the objectives of the statutory scheme.  *Egelhoff v. Egelhoff ex. rel. Breiner*, 532 U.S. 141, 147 (2001).
>
> Here, the procedures designed by the EPA to test fuel economy – in accordance with the EPA's mandate under 49 U.S.C. § 32904 – are undoubtedly "related to fuel economy standards or average fuel economy standards."  Indeed, these testing procedures, and the resulting fuel-economy figures, are used to determine whether vehicle manufacturers meet the fuel economy and emissions standards by the federal government.  *See* 40 C.F.R. 600.210-12, 600.210-08(a) (2008).  Plaintiffs repeatedly acknowledge these governing standards in the [FAC].  *See, e.g.*, [FAC] ¶¶ 436 (noting that "the FTP-75 (Federal Test Procedure) cycle [] has been created by the EPA and is used for emission certification and fuel economy testing of passenger vehicles in the United States"), 439 ("The standardized technique for performing a coastdown is prescribed in the Code of Federal Regulations"), 442 (alluding to "[t]he processes

18

required by the Code of Federal Regulations").

       Nevertheless, Plaintiffs go beyond those requirements by implausibly claiming that Ford had a duty to disclose the "true fuel economy" for the subject vehicles, as if such a figure actually exists.  And by advancing claims that are untethered from the standards and procedures that the EPA has prescribed for estimating and disclosing fuel economy, Plaintiffs introduce an inherent conflict with the words and intentions of Congress.  (*See, e.g*,, [FAC] ¶¶ 31, 25 & others). This should not be permitted. Indeed, under the Supremacy Clause of the U.S. Constitution, where conflict exists between a state claim and an express preemption of federal law, the federal law must be held supreme.  See U.S. Const. art. VI, CL. 2; *Maryland v Louisiana*, 451 U.S. 725, 746 (1981) ("It is basic to this constitutional command that all conflicting state provisions be without effect.").  Plaintiffs' claims are undoubtedly preempted.

(Def.'s Br. at 16-18).

In support of its position that Plaintiffs' claims in this case are expressly preempted by federal law, Ford directs this Court to cases such as *C-MAX I* and *Paduano v. Am. Honda Motor Co., Inc*., 169 Cal. App. 4th 1453, 1468 (Cal. App. 2009).

The C-Max Fuel Economy Litigation case against Ford was an MDL that was assigned to a district court judge in the Southern District of New York.  *C-Max I, supra.*  Like this case, the plaintiffs asserted state-law statutory claims under various consumer protection acts and common law claims such as fraud, negligent misrepresentation, breach of contract, unjust enrichment and breach of warranty claims.  After the plaintiffs filed a consolidated amended class action complaint, Ford filed a motion to dismiss in which it made a number of challenges – including that the claims are expressly preempted by federal law.  Ford made the same express preemption arguments it makes here.

In an opinion and order issued in 2015, the district court ruled that the plaintiffs' claims were "partially preempted."  *Id*. at *25.  In doing so, the district court stated that the plaintiffs' "claims appear to rest on two separate strands of alleged wrongdoing:" 1) allegations that

challenged Ford's "guarantees of a real-world fuel economy that go beyond including EPA estimates in advertisements," (i.e., allegations that Ford's advertisements emphasized that the MPG estimates were something their vehicles would "actually deliver"); and 2) allegations that "appear to challenge the mere use of EPA fuel estimates, in ways that the EPA contemplated using them, as opposed to 'actual' fuel economy." *Id.*

The district court concluded that claims based upon allegations concerning advertisements that functioned to "guarantee specific, real-world performance," are not preempted by federal law. *Id*. at *26. On the other hand, it concluded that to the extent plaintiffs' claims were based on Ford's mere use of EPA estimates, such claims are preempted. It explained that "[t]he use of EPA estimates themselves clearly falls within the scope of the relevant FTC regulations, and any state law indicating otherwise would constitute 'a law or regulation on disclosures of fuel economy or fuel operating costs' that is not identical to those contained in, or contemplated by, the EPCA." *Id*. at *27. It further explained that:

> Likewise, as Defendant contends, any obligation to include "actual" fuel economy based on independent testing of each Vehicle goes beyond what automobile manufacturers are required to do under the EPCA. Accordingly, to the extent that Plaintiffs' claims are premised on the idea that the advertisements (or Monroney Stickers) included EPA estimates, rather than some other "actual" fuel economy calculation, or to the extent that Plaintiffs' claims are based on the contention that Defendant failed to independently test and disclose the fuel economy of the C-Max in order to determine its "actual" performance, (CAC ¶¶ 97, 100-01), the Court finds that those claims are preempted by the EPCA and FTC, because they seek to impose a regime above and beyond that required by those regulations.

*Id*. at *27. Thus, the district court ruled that "[t]o the extent that Plaintiffs made claims based on the mere use of EPA fuel economy estimates in advertisements or on Monroney Stickers, those claims are dismissed because they are preempted by federal law." *Id*. at *40.

*Paduano* is an earlier case that was cited in *C-MAX I* and has been followed in other

similar cases.  In *Paduano*,  the plaintiff asserted state-law claims against an automobile

manufacturer because he was displeased with the fuel efficiency of the vehicle he had purchased.

*Paduano v. Am. Honda Motor Co., Inc.*, 169 Cal. App. 4th 1453 (Cal. App. 2009).  The

defendant sought to dismiss the claims on several grounds, including express preemption by

federal law, and the trial court granted the motion.  The appellate court concluded that the

plaintiff raised claims that are not preempted by federal law and reversed the trial court's

judgment as to his state-law causes of action for deceptive advertising.

In addressing the preemption issue, the appellate court concluded that § 32919(a) had no

application to the claims.  *Id*. at 1475-76.  It then addressed express preemption under §

32919(b) and concluded that the particular claims asserted by Paduano were not preempted,

explaining:

> Contrary to Honda's characterization of Paduano's UCL and CLRA claims,
> Paduano is not claiming that disclosing the EPA mileage estimates is, by itself,
> deceptive.  Rather, Paduano maintains that Honda has *voluntarily made*
> *additional assertions, beyond the disclosure of the mileage estimates, that are*
> *untrue or misleading*, and that federal law does not require, or even address, these
> additional assertions.  Paduano's claims are based on statements Honda made in
> its advertising brochure to the effect that one may drive a Civic Hybrid in the
> same manner as one would a conventional car, and need not do anything
> "special," in order to achieve the beneficial fuel economy of the EPA estimates.
> It is not, as Honda maintains, the disclosure of the EPA estimates that Paduano
> claims is deceptive per se.  *What Paduano is challenging is Honda's added*
> *commentary in which it alludes to those estimates in a manner that may give*
> *consumers the misimpression that they will be able to achieve mileage close to*
> *the EPA estimates while driving a Honda hybrid in the same manner as they*
> *would a conventional vehicle*.  Paduano does not seek to require Honda to provide
> "additional alleged facts" regarding the Civic Hybrid's fuel economy, as Honda
> suggests, but rather, seeks to prevent Honda from making misleading claims
> about how easy it is to achieve better fuel economy. Contrary to Honda's
> assertions, *if Paduano were to prevail on his claims, Honda would not have to do*
> *anything differently with regard to its disclosures of the EPA mileage estimates*.

*Id*. at 1477 (emphasis added).

*Kim v. General Motors, LLC* is another case wherein the plaintiff asserted various state-law claims against an automobile manufacturer, asserting they were misled about the vehicle's fuel economy.  *Kim v. General Motors, LLC*, 99 F.Supp.3d 1096 (C.D. Calf. 2015).  The defendant moved to dismiss, arguing that the claims "are expressly preempted by 49 U.S.C. § 32919 because, if allowed to go forward, they would amount to 'inconsistent state regulation of fuel economy or the disclosure of fuel economy.'"  *Id*. at 1102.  The district court rejected the defendant's argument that the claims asserted against it were preempted by federal law.  In doing so, it first agreed with *Paduano* that § 32919(a) had no application to the claims.  It then went on to consider whether the claims were preempted under § 32919(b) and concluded they were not, relying on *Paduano*:

> Here, as in *Paduano*, Plaintiff does not challenge the disclosure of the EPA estimate itself, nor does it focus on representations made on the Monroney label. (FAC ¶ 26; Opp. at 4.) As in *Paduano*, Plaintiff cites to *additional statements, made in advertisements* rather than on a Monroney label, that Plaintiff alleges could lead a reasonable consumer to believe that the vehicle is *capable of achieving these EPA estimates under real world conditions*.  In other words, Plaintiff challenges GM's *use of the EPA estimates in a way that may give consumers the mistaken impression that they are able to achieve real-world mileage and tank range derived from those figures.*

*Kim*, 99 F.Supp.3d at 1104 (emphasis added).

In response to Ford's express preemption arguments, Plaintiffs make arguments against preemption under both subsections.

In arguing that their claims are not expressly preempted under § 32919(a), Plaintiffs note that Ford's own cited authorities, *C-MAX I* and *Paduano,* found no express preemption under subsection (a) because "§ 32919(a) pertains to fleet fuel efficiency standards, not the mileage of individual models."  (Pls.' Br. at 18).  Both of those cases so ruled (*see C-MAX-I, supra*, at *25

22

and *Paduano*, *supra,* at 1476), as did the district court in *Kim* (*see Kim*, 99 F. Supp.3d at 1102-03).  This Court rejects Ford's express preemption argument based upon § 32919(a) under that line of authority.

But that still leaves Ford's express preemption argument under § 32919(b).  As to that, Plaintiffs argue that "Ford premises its argument on a series of cases in which plaintiffs did not challenge the underlying Monroney Sticker information but alleged that non-Sticker misrepresentations were actionable under state law – as opposed to Plaintiffs here, who allege both sorts of misrepresentations."  (Pls.' Br. at 20).  In other words, Plaintiffs characterize the cases cited by Ford as: 1) not having addressed the issue of whether a "false-sticker claim" was preempted; and 2) having found that claims based on "non-sticker misrepresentations" (ie, assertions other than stating EPA mileage estimates) were actionable under state law.

Plaintiffs mischaracterize those decisions as not having rejected the issue of whether federal law preempts state-law claims based on a manufacturer's use of EPA estimates in advertisements or Monroney Stickers, rather than the vehicle's "actual" or "true" fuel economy calculation.  The district court in *C-MAX I* rejected that very argument:

> Likewise, as Defendant contends, any obligation to include "actual" fuel economy based on independent testing of each Vehicle goes beyond what automobile manufacturers are required to do under the EPCA.  Accordingly, to the extent that Plaintiffs' claims are premised on the idea that the advertisements (or Monroney Stickers) included EPA estimates, rather than some other "actual" fuel economy calculation, or to the extent that Plaintiffs' claims are based on the contention that Defendant failed to independently test and disclose the fuel economy of the C-Max in order to determine its "actual" performance, (CAC ¶¶ 97, 100-01), the Court finds that those claims are preempted by the EPCA and FTC, because they seek to impose a regime above and beyond that required by those regulations.

*C-MAX I, supra,* at *27.

And recall that in rejecting the express preemption argument in *Paduano*, the court

explained that "if Paduano were to prevail on his claims, Honda would not have to do anything differently with regard to its disclosures of the EPA mileage estimates." *Paduano, supra*, at 1477. Here, the same is not true. The FAC asks this Court to certify a "Nationwide Class" that would consist of "[a]ll persons who purchased or leased a Ford vehicle whose published EPA fuel economy ratings, as printed on the vehicles' window sticker, were more than the fuel economy rating produced by a properly conducted applicable federal mileage test." (FAC at ¶ 481). If Plaintiffs were to prevail on their claims in this case, the very relief Plaintiffs seek includes that this Court require that all Class members be notified about the "correct fuel economy" of the vehicles. (FAC at ¶ 961).

This Court concludes that Plaintiffs' "false-sticker" claims are expressly preempted by federal law.

There is case law that does reflect, however, that claims that are based upon certain representations, that go beyond including EPA estimates in advertisements, are not preempted. For example, in *C-MAX I*, the court concluded that the "Plaintiffs' allegation that Ford did not only rely on the EPA estimate, but also guaranteed real-world fuel economy based upon it, is an allegation that goes 'beyond' that estimate. The Court therefore concur[red] with holdings of other courts that considered similar allegations, namely that advertisements functioned to guarantee specific, real-world performance, and conclude[d] that such claims are not preempted." *C-MAX I, supra*, at *26.

In responding to Ford's motion, Plaintiffs contend their state-law claims in this case are not expressly preempted because they are based upon alleged misstatements made by Ford that go beyond the *EPA* estimates in advertising or Monroney Stickers. The problem for Plaintiffs is

that, unlike the plaintiffs in *C-MAX I*, *Paduano*, and *Kim,* they do not allege that Ford made any statements that went beyond EPA estimates to state (or even suggest) that such real-world fuel economy could be achieved by their vehicles.

Instead, Plaintiffs direct the Court to  alleged "other" kinds of representations that they contend are "extrinsic" to fuel economy estimates and, therefore, are not preempted.  Plaintiffs allege that Ford claimed in an advertisement "that '[w]ith EPA-estimated fuel economy ratings of 21 mpg city, 26 mpg highway and 23 mph combined, the 2019 Ford Ranger is the *most fuel efficient* gas-powered midsize pickup in America" and that another vehicle was "*best in class*" for fuel economy with stated EPA fuel economy estimates.  (Pls.' Br. at 27) (emphasis added).

Plaintiffs have not directed the Court to any case wherein a court has ruled that claims based upon those kind of allegations are not expressly preempted by federal law.

Moreover, under the reasoning in the above cases, Ford persuasively argues that it used the EPA fuel estimates of its vehicles in the very way the EPA contemplated they would be used – to compare the estimated fuel economy of different vehicles.

This Court therefore concludes that all of Plaintiffs' claims in this action, that are based upon Ford's alleged use of the EPA mileage estimates in the Monroney stickers and in its challenged advertisements, are preempted under federal law and shall be dismissed on that basis.

Given this ruling, the Court need not address Ford's alternative or additional challenges raised in the pending motion.  Because the Court finds a number of those challenges also have merit, however, it shall address them.

### B.    Implied Conflict Preemption

Ford contends that, in addition to being expressly preempted, Plaintiffs claims also fail

due to implied conflict preemption.

"Implied preemption has been subdivided into 'field preemption' and 'conflict preemption." *State Farm*, 539 F.3d at 342.  Here, Ford asserts that conflict preemption exists.

Conflict preemption "occurs 'when compliance with both state and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *United States v. Locke*, 529 U.S. 89, 109, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000) (citations omitted); *see also Chrysler Group LLC v. Fox Hills Motor Sales, Inc.*, 776 F.3d 411, 424 (6th Cir. 2015) ("Conflict preemption occurs when a state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"). "In other words, '[i]f the purpose of the act cannot otherwise be accomplished – if its operation within its chosen field . . . must be frustrated and its provisions be refused their natural effect – the state law must yield to the regulation of Congress.'" *Id*. (quoting *Savage v. Jones*, 225 U.S. 501, 533, 32 S.Ct. 715, 56 L.Ed. 1192 (1912)).

In support of this argument that Plaintiffs' claims in this action are also barred by conflict preemption Ford asserts:

> The federal government, through the EPA, and at direction of Congress, promulgated a comprehensive set of statutes and regulations to further the federal objective of providing consumers with uniform and comparable fuel economy information.  *See, e.g.*, 49 U.S.C. § 32904 (vesting EPA with responsibility to establish test methods and calculation procedures for determining fuel economy estimates); 49 U.S.C. § 32908(b)(1) (requiring automobile manufacturers to display EPA fuel economy estimates on each new automobile offered for retail sale in the United States); 49 U.S.C. § 32908(c)(3) (mandating that the EPA prepare an annual Fuel Economy Guide); 40 C.F.R. § 533.6 (setting forth measurement and calculation procedures for light trucks); 40 C.F.R. §§ 600.405-08 and 600.407-08 (requiring dealers to make available a printed copy of the annual Fuel Economy Guide).  In furtherance of this pervasive federal scheme, the FTC has adopted the aforementioned directives that require manufacturers to generate EPA fuel economy estimates and to use them in any advertising referring

26

to fuel-economy performance.  The FTC's definitive advertising requirements, and the EPA's explicit testing/labeling requirements, together evidence a comprehensive federal scheme to provide consumers with consistent and comparable fuel economy information.

(Def.'s Br. at 21-22).  Ford persuasively argues that "Plaintiffs' position in this litigation, if sustained, would wholly frustrate this federal scheme" and explains:

> Each of the 45 named Plaintiffs complain that Ford acted unlawfully by failing to disclose the "true fuel economy" for the subject vehicles.  (*See, e.g.*, ACAC ¶ 31 (stating that a Plaintiff would not have purchased, or would have paid less for the subject vehicles, "[h]ad Ford disclosed the [vehicle's] true fuel economy[.]").) Even if "true" fuel economy existed for any vehicle – it does not, as fuel performance is highly dependent on operating conditions, driving habits, etc. – this is not what federal law requires.  As explained in detail above, manufacturers are instructed to provide fuel economy estimates generated according to EPA-mandated testing procedures, which prescribe the actual fuel type and driving cycle to be administered during the test, and to explain that a consumer's actual mileage "will vary."  Plaintiffs' claims are impliedly preempted because they would require Ford not only to make disclosures that are different from what federal law requires, but also to construct and disclose supposed "true" fuel economy, which is impossible and would surely mislead consumers.

(Def.'s Br. at 22).

In response, Plaintiffs assert that it is not clear "which theory of implied preemption Ford relies upon – field or conflict preemption" and so they address both.  Ford's brief is clear, however, that it asserts that *conflict preemption* applies.  (*See, e.g.*, Def.'s Statement of Issues Presented No. 1, arguing "conflict preemption" applies, Def.'s Br. at 20 with heading stating that "conflict preemption also bars Plaintiffs' claims.").

As to conflict preemption, Plaintiffs argue that "Ford incorrectly argues that disclosure of the vehicles' true fuel economy would require Ford 'to make disclosures that are different from what federal law requires' and to construct and disclose a supposed 'true' fuel economy, which is impossible and would surely mislead consumers.'" (Pls.' Br. at 33).  Plaintiffs argue that their

"claims are that because of Ford's false advertising, Ford had a duty under state law to disclose the **true fuel economy** *in addition to* the Monroney Sticker." (*Id*. at 33-34) (italics in original, bolding added for emphasis). Plaintiffs argue that claim does not create a conflict, because it is not impossible to comply with both the regulation and the obligation that Plaintiffs identify. (*Id*. at 34). Plaintiffs rely on *C-MAX I*, where the district court found no conflict preemption,[2] and then direct the Court to various cases dealing with emissions that are not analogous to this fuel economy case.

The federal government, through the EPA, and at direction of Congress, has established a comprehensive set of statutes and regulations to further the federal objective of providing consumers with uniform and comparable fuel economy information. This Court agrees with Ford that Plaintiffs' state-law claims in this case – that they admit would require Ford to construct and disclose to consumers an additional, supposed "true fuel economy" for their vehicles – stand as an obstacle to the accomplishment and execution of that federal regime.

**II.     Plaintiffs Lack Standing To Assert Claims Arising Under The Laws Of The States Where No Named Plaintiff Claims To Reside Or Have Been Injured.**

Ford's Motion to Dismiss includes alternative or additional arguments pertaining to standing. Among other things, Ford asserts that Plaintiffs lack Article III standing to assert

---

[2]*See C-MAX-I, supra*, at *28. This Court does not agree with this ruling, wherein the district court concluded that "a manufacturer could disclose an alternative fuel economy estimate yet still ensure that EPA estimates are the most prominent." Moreover, Plaintiffs are not suggesting that Ford should provide an alternative "estimate." Plaintiffs assert that Ford should have to disclose the "true fuel economy" of its vehicles. If Ford were required to provide "true fuel economy" figures for their vehicles, that would directly conflict with the federally-mandated language on the Monroney Stickers that "[a]ctual results will vary for many reasons, including driving conditions and how you drive and maintain your vehicle," which is the whole reason why the federal government requires that "estimates" of the fuel economy of new vehicles be provided to consumers.

claims arising under the laws of the twenty two states where no named Plaintiff claims to reside or have been injured.  (Def.'s Br. at 28).  In response, Plaintiffs assert that this challenge is premature and should be addressed later, at the class certification stage.

This Court has addressed this very same challenge in other putative class actions.  *See In re Refrigerant Compressors Antitrust Litig.*, 2012 WL 2917465 at *4 (E.D. Mich. 2012); *Flores v. FCA US LLC,* 2021 WL 1122216 at *24-25 (E.D. Mich. 2021).  Other district courts in this district have as well.  *See, eg., In re Packaged Ice Antitrust Litig.*, 779 F. Supp 2d 642, 657 (E.D. Mich. 2011, Judge Borman).  This Court shall follow that same approach here and rules that Plaintiffs lack standing to assert claims arising under the laws of the twenty two states where no named Plaintiff claims to reside or have been injured.

Accordingly, the following counts are also subject to dismissal on this basis:  Counts 7-12 (asserted under Alaska law), Counts 19-24 (asserted under Arkansas law), Counts 33-38 (asserted under Colorado law), Counts 39-44 (asserted under Connecticut law), Counts 45-50 (asserted under Delaware law), Counts 70-75 (asserted under Idaho law), Counts 82-87 (asserted under Indiana law), Counts 88-93 (asserted under Iowa law), Counts 94-99 (asserted under Kansas law), Counts 100-105 (asserted under Kentucky law), Counts 112-117 (asserted under Maine law), Counts 143-148 (asserted under Mississippi law), Counts 155-160 (asserted under Montana law), Counts 167-172 (asserted under Nevada law), Counts 173-178 (asserted under New Hampshire Law), Counts 185-190 (asserted under New Mexico law), Counts 198-203 (asserted under North Carolina law), Counts 204-209 (asserted under North Dakota law), Counts 234-239 (asserted under Rhode Island law), Counts 271-276 (asserted under Vermont law), Counts 289-294 (asserted under West Virginia law), and Counts 301-306 (asserted under

Wyoming law).

**III.    Plaintiff's Claims Are Also Barred By The Doctrine Of Primary Jurisdiction.**

Ford contends that even if this Court were to find that some claims in the FAC are viable, "it should nevertheless decline to exercise jurisdiction over this case under the doctrine of primary jurisdiction." (Def.'s Br. at 34).

"The doctrine of primary jurisdiction 'arises when a claim is properly cognizable in court but contains some issue within the special competence of an administrative agency.'" *United States v. Any and All Radio Station Trans. Equip.*, 204 F.3d 658, 664 (6th Cir. 2000) (quoting *United States v. Haun*, 124 F.3d 745, 749 (6th Cir. 1997) (citing *Reiter v. Cooper*, 507 U.S. 258, 268, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993)).

"Unfortunately, '[n]o fixed formula exists for applying the doctrine.'" *Id*. (citing *United States v. Western Pacific R. Co.*, 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956)). Rather, a district court "must apply the doctrine of primary jurisdiction on a case-by-case basis," deferring to an administrative agency when the reasons for the existence of the doctrine are present. *Alltel Tennessee, Inc. v. Tennessee Pub. Serv. Comm'n*, 913 F.2d 305, 309 (6th Cir. 1990). "Those reasons, broadly speaking, are the desire for uniformity in adjudication and the belief that the decisionmaker with the most expertise and broadest perspective regarding a statutory or regulatory scheme will be most likely to resolve the issue correctly." *Any and All Radio Station Trans. Equip., supra*, at 664.

Here, Ford argues that the "EPA has primary jurisdiction regarding the accuracy of EPA-mandated fuel-economy estimates because their calculation is obviously within the EPA's special expertise and the Agency has a need to promote the uniformity of its administrative

policy in this important area.  These concerns are highlighted by the comprehensive and complex

nature of the federal regulatory scheme promulgated by the EPA."  (Def.'s Br. a 34-35).  In

support of this argument, at pages 35 to 36 of its brief, Ford details the regulatory scheme at

issue.  It also discusses the regulatory authority to enforce the regulations and notes that "the

federal government is currently exercising its authority to investigate Ford's fuel-economy

testing of the Subject Vehicles. (*See* ACAC, at Ex. 2)."  (Def.'s Br. at 36).

Ford argues that, despite the complexity of the EPA's regulatory scheme, and an ongoing

governmental investigation, "Plaintiffs continue to ask this Court – not the EPA – to determine

whether the fuel-economy estimates displayed on select Ford-brand vehicles are accurate."

(Def.'s Br. at 36).  Ford contends it would be improper to supplant the special expertise of the

EPA in this manner and direct the Court to both *C-Max I* and *Giles.*

In *C-Max I*, Ford argued that the district court should decline to exercise jurisdiction over

the plaintiffs' claims under the doctrine of primary jurisdiction.  *C-Max I, supra*, at *29.  The

district court accepted that argument in part and rejected it in part.  As to the plaintiffs' claims

that were based upon advertisements that went beyond using the EPA mileage estimates being

misleading, the district court concluded those claims were not barred by the doctrine.  *Id*. at 29-

30 (Concluding this court "properly may determine whether Defendant's alleged guarantees of

real-world fuel economy were misleading to consumers without treading on the calculation

methods devised by the EPA, or their disclosure as mandated by the EPA.").  But the district

court found that the other claims were barred by the doctrine:

> On the other hand, passing judgment on whether there is a way to calculate fuel
> economy for the C-Max, and whether that should be disclosed, directly implicates
> the methods devised by the EPA, and the disclosure requirements devised by the
> FTC.  Accordingly, those claims are barred here by the primary jurisdiction

doctrine, as they fall within the competence, and mandate, of the EPA and FTC.

*Id*. at \*30.  Here, Plaintiffs do not assert claims about guarantees of real-world fuel economy performance.  To the contrary, the only claims they raise in this case are the claims that the district court found were barred in *C-Max I* – claims challenging the accuracy of Ford's EPA fuel economy estimates and Ford's disclosure of them.

The district court in *Giles* also considered whether it should decline to exercise jurisdiction over claims under the doctrine of primary jurisdiction.  *Giles,* 24 F.Supp.3d 1039 at 1049-50.  The district court rejected Ford's primary jurisdiction argument because the claims in that case were not based upon the accuracy of the EPA estimates:

> The problem with Ford's argument is that this case does not involve claims based on matters within an agency's special competence.  In support of this argument, Ford points out that the "EPA has primary jurisdiction regarding the accuracy of EPA mileage estimates." [ECF No. 16 at 25.] This is undoubtedly true, and those estimates surely depend on technical information not within the conventional experience of this Court.  However, as noted above, *this case is not about the accuracy of the EPA estimates*. Rather, Mr. Giles is challenging specific advertisements which failed to disclose that they were based on the EPA estimates and, in his opinion, misled him and other purchasers of the Ford Escape. These claims are closer to the garden variety fraud cases that are very much within the conventional experience of the courts.  This Court therefore declines Ford's invitation to refer the case to the EPA.

*Giles, supra,* at \*1050 (emphasis added).  Unlike the *Giles* case, this case *is about* the accuracy of the EPA estimates.

This Court agrees with Ford that the claims in this action are barred by the doctrine of primary jurisdiction.

## IV. Plaintiffs' Misrepresentation-Based Consumer Fraud And Consumer Protection Claims Fail For Additional Reasons.

In addition to preemption, Ford's motion also challenges Plaintiffs' consumer fraud and

32

consumer protection claims and focus on their misrepresentation-based claims.  Plaintiffs

misrepresentation-based claims can be divided into two categories: 1) claims based on materials

that simply disclose EPA-mandated fuel-economy estimates; and 2) claims based upon

representations other than EPA estimates.

> **A.**    **Claims Based On Materials Merely Containing EPA-Mandated Fuel-Economy Estimates Fail To State A Claim.**

Numerous courts have found that a plaintiff fails to state a consumer protection act claim

where the claim is based upon materials that merely contain EPA-mandated fuel-economy

estimates.  *See, e.g.*, *In re Ford Fusion & C-MAX Fuel Econ. Litig.*, 2015 WL 7018369 * 32

("[T]he Court is persuaded that any [consumer protection] claims based on the mere inclusion of

EPA estimated fuel economy and associated disclaimers do not state a claim upon which relief

can be granted.  The case law makes clear . . .  that the mere use of EPA estimates, as opposed to

any other supposed estimates of 'actual' fuel-economy, are not actionable."); *Paduano v. Am.

Honda Motor Co.*, 88 Cal.Rptr.3d at 105 ("As a matter of law, there is nothing false or

misleading about Honda's advertising with regard to its statements that identify the EPA fuel

economy estimates for the two Civic Hybrid models."); *Gray v. Toyota Motor Sales*, *USA*, 2012

WL 313703 at *6 (D. Cal. 2012) ("[T]he claims must fail as they rely solely on advertisements

that merely repeat the approved EPA mileage estimates, without any additional representations

as to, for example, a consumer's ability to achieve those figures under normal driving

conditions"), *aff'd, Gray v. Totoya Motor Sales, USA, Inc*., 554 F. App'x 608, 609 (9th Cir.

2014) ("[N]o misrepresentation occurs when a manufacturer merely advertises EPA estimates.");

*Kim v. General Motors, LLC,* 99 F.Supp.3d 1096, 1108 (C.D. Calf. 2015) (District court

agreeing with other authorities "which held that [consumer protection] claims that 'rely solely on

advertisements that merely repeat the approved EPA mileage estimates, without any additional representations as to, for example, *a consumer's ability to achieve those figures under normal driving conditions*,' must fail.") (emphasis in original).

Plaintiffs do not appear to dispute that the authority Ford relies on, "stands for the narrow proposition 'that the mere use of EPA estimates, as opposed to any other supposed estimates of 'actual' fuel-economy, are not actionable.'"  (Pls.' Br. at 68).

This Court concurs with that line of authority and rules that, to the extent that any of the consumer protection act claims are based upon materials that merely contain EPA-mandated fuel-economy estimates, those claims fail to state a claim.

> ### B.   Plaintiffs' Claims Based On Misrepresentations Other Than EPA Estimates Also Fail To State A Claim.

Plaintiffs argue, however, that "even Ford's authority recognizes 'additional' representations that go beyond EPA estimates are sufficient to establish claims."  (Pls.' Br. at 68).  Plaintiff contends their statutory claims should not be dismissed because they "have alleged reliance on misrepresentations other than EPA estimates."  (Pls.' Br. at 69) (emphasis added). The only such alleged "other" misrepresentations that Plaintiffs direct the Court to are Ford "falsely claiming" that the "Class Vehicles were 'most fuel efficient' and 'best in class' for fuel economy – in other words better than the competition to induce sales – in places like Ford's website, dealer brochures and sales pamphlets, television and radio commercials, and/or on the Vehicle's window Stickers.  (See ¶¶ 11, 17-22, 414-415, 456, 462-470)."  (*Id*.).

For example, in paragraph 17, Plaintiffs allege that, "[w]ith respect to its 2019 Ford Ranger, Ford promised that its midsize truck 'will deliver with durability, capability, and fuel efficiency" and "also claimed that its All-New Ford Ranger [was] Rated Most Fuel Efficient

Gas-Powered Midsize Pickup in America." "With EPA-estimated fuel economy ratings of 21 mpg city, 26 mpg highway and 23 mpg combined, 2019 Ford Ranger is the most fuel efficient gas-powered midsize pickup in America." (FAC at ¶ 19).

In paragraph 19, Plaintiffs allege that "Ford promised that '[t]he adventure-ready 2019 Ford Ranger is the most fuel-efficient gas-powered midsize pickup in America – providing a superior EPA-estimated city fuel economy rating and an unsurpassed EPA-estimated combined fuel economy rating versus the competition. The all-new Ranger has earned EPA-estimated fuel economy ratings of 21 mpg city, 26 mpg highway and 23 mpg combined for 4x2 trucks.' Ford claimed that '[t]his is the best-in-class EPA-estimated city fuel economy rating of any gasoline-powered four-wheel-drive midsize pickup and it is an unsurpassed EPA-estimated combined fuel economy rating.'" (FAC at ¶ 19).

Unlike the representations found to be sufficient to be actionable in the above cases, Plaintiffs have not alleged that Ford made any representations that the vehicles at issue would actually achieve the EPA-estimated figures under real-world conditions.

Rather, Plaintiffs take issue with alleged statements wherein Ford stated that its vehicles were "best-in-class" or "most fuel efficient" – comparative statements about ratings.

In its reply brief, Ford makes two points. First, it asserts that the "additional" alleged statements about "most fuel efficient" is non-actionable "puffery," and direct the Court to *Raymo v. FCA US LLC*, 475 F. Supp.3d 680, 706 (E.D. Mich. 2020). In that case, Judge Berg ruled alleged statements, such as "leading fuel economy" are "general and nonquantifiable" and are therefore "nonactioanble puffery."

Second, Ford asserts that the additional statements Plaintiffs rely on are "generalized

35

statements about comparing the EPA-estimated fuel-economy figures among vehicles" that are

not actionable.  (Def.'s Reply Br. at 24).  Ford directs the Court to "*C-Max II*," wherein the court

ruled that statements that "C-Max [ ] bests in MPG" and "most fuel-efficient midsize hybrid in

America" are not actionable.  In this regard, Ford asserts that "[c]omparisons are, after all, the

*purpose* of the EPA estimates.  EPA Your Mileage Will vary, available at

https://www.fueleconomy.gov/feg/why_differ.shtml (last visited Feb. 2, 2021) (estimates 'are a

useful tool for comparing the fuel economies of different vehicles.').  Yet that is all Plaintiffs

allege."  (*Id.*) (emphasis in original).

In *C-MAX II,* the district court rejected the argument that the comparative statements at

issue in that case were mere puffery, because the statements are "capable of verification."  *Id*. at

*10.  It agreed, however, that the comparative statements were not actionable, explaining:

> Nowhere in these commercials does Ford promise that the C-MAX will achieve
> better gas mileage than the Prius V or that the Fusion's fuel economy "doubles
> the fuel economy of the average vehicle" under real-world conditions.  Instead,
> the commercials rely on the EPA-estimated fuel economy of the Vehicles in
> making these comparisons . . .

*In re Ford Fusion and C-Max Fuel Econ. Litig*., 2017 WL 3142078 at * 10 (S.D. 2017).

This Court concludes that Plaintiffs have not sufficiently alleged a misrepresentation-

based consumer protection claim against Ford.

**V.      The Consumer Protection Claims Under The Law Of Several State's Laws Fail Due
          To Statutory Class-Action Bars.**

In addition to preemption, Ford asserts that several of Plaintiffs' state consumer

protection act claims fail as a result of statutory class-action bars.  (Def.'s Br. at 39).  Ford notes

that the "Alabama, Arkansas, Georgia, Louisiana, Mississippi, Montana, Ohio, South Carolina,

Tennessee and Virginia consumer protection statutes preclude class actions or otherwise provide

36

a private right of action exclusively for individuals acting in their own capacities.  *See, e.g.*, Ala. Code § 8-19-10(f); Ark. Code Ann. 4-88-113(f)(1)(B); Ga. Code Ann. § 10-1-399(a); La. Stat. Ann. § 51:1409(A); Miss. Code Ann. § 75-24-15(4); Mont. Code Ann. § 30-14-133(1); Ohio Rev. Code Ann. § 1345.09(A); S.C. Code Ann. § 39-5-140(a); Tenn. Code Ann. § 47-18-109(a)(1); Va. Code § 59.1-204."  (*Id*.).  Ford claims that, as federal courts in this district have decided, this "means that Plaintiffs' claims under these statutes, seeking class-wide recovery, are inappropriate and subject to dismissal."  (*Id*.).

In response, Plaintiffs do not dispute that the consumer protection act statutes of the above-referenced states contain provisions that bar class actions.  They contend, however, that Fed. R. Civ. P. 23 displaces such state statutory provisions in a diversity case like this one.

There is a split of authority on this issue.  Several district courts within the Sixth Circuit – including this Court – have rejected Plaintiffs' argument and enforced the statutory bars. *See, e.g., Matanky v. Gen. Motors LLC*, 370 F. Supp.3d 772, 987-99 (E.D. Mich. 2019); *In re Packaged Ice Antitrust Litig*., 779 F. Supp.2d at 663 n.4; *McKinney v. Bayer Corp*., 744 F. Supp.2d 733, 749 (N.D. Ohio 2010); *Flores v. FCA US LLC, supra*, at *23-24.  This Court concludes that Plaintiffs' representative claims brought under the consumer protection statutes of the following states are subject to dismissal on this basis: Alabama (Count 1), Georgia (Count 57), Louisiana (Count 106), Ohio (210), South Carolina (Count 240), Tennessee (Count 253), and Virginia (Count 277).[3]

---

[3]The representative consumer protection act claims brought under the laws of Arkansas, Mississippi, and Montana are also subject to dismissal on this same basis, but as explained above, are being dismissed for lack of standing.

**VI.     Plaintiffs' Breach Of Contract Claims Are Also Subject To Dismissal Because Plaintiffs Do Not Allege The Existence Of An Enforceable Contract With Ford.**

Ford asserts that Plaintiffs breach of contract claims against it should also be dismissed because Plaintiffs do not allege the existence of an enforceable contract with Ford.  (Def.'s Br. at 43).  In support of this challenge, Ford notes that Plaintiffs allege that "[e]ach and every sale or lease of a [ ] vehicle constitutes a contract between Ford and the purchasers or lessee."  (*See, eg.*, FAC at  ¶ 518).  Ford notes that "[a]t no point, however, do Plaintiffs plead facts plausibly showing that Ford is a party to any such contract, much less specify the offers that Ford allegedly made, what consideration supposedly passed between them, or what contractual provision was supposedly breached."  (Def.'s Br. at 43).  Ford further states "there is no allegation that Ford offered to sell, or sold, a vehicle directly to any individual Plaintiff, as each individual lead Plaintiff alleges that they purchased or leased their vehicle from an 'authorized Ford dealership.' *See, e.g.*, [FAC] ¶ 29."  (*Id*.).  Ford therefore argues that Plaintiffs' contract claims fail "upon review of the hornbook elements of contract law. They fail to allege facts showing that Ford made an offer to them, that they accepted that offer, that they paid any consideration to Ford, and that Ford failed to honor a binding promise made to them."  (*Id*. at 43-44).  Ford asserts that the "mere conclusory allegations that the purchase or a lease of a vehicle 'constitutes a contract' with Ford is insufficient" and argues that all of Plaintiffs' breach of contract claims should be dismissed.  (*Id*.).

Plaintiffs barely respond to this challenge.  (*See* Pls.' Br. at 72-73).  They address this challenge in a single paragraph wherein they state that "Plaintiffs alleged that they bought or leased a Ford vehicle from an authorized Ford dealership" and claim they need not allege a direct relationship with Ford to sufficiently plead their breach of contract claims against Ford."  (*Id*.).

38

Plaintiffs do not attempt to explain how their allegations in the FAC are sufficient to state a breach of contract claim under any of the applicable states' laws.

Plaintiffs have not identified a contract between Plaintiffs and Ford in their allegations in the FAC and have not identified the term(s) of the alleged contract that were allegedly breached by Ford. As such, Plaintiffs have failed to plead a plausible breach of contract claim against Ford. *See, e.g.*, *Northhampton Restaurant Group, Inc. v. FirstMerit Bank, N.A.*, 492 F. App'x 518, 522 (6th Cir. 2012) (It is a basic tenant of contract that a party can only advance a claim of breach of written contract by identifying and presenting the actual terms of the contract allegedly breached); *Alchaibani v. Litton Loan Servicing, LP*, 528 F. App'x 462, 465 (6th Cir. 2013) (mere vague legal conclusions fall short of *Twombly's* plausibility standard).

## VII.   Plaintiffs' Express Warranty Claims Are Also Barred By Federal And State Laws.

In addition to preemption, Ford contends that Plaintiffs have failed to state any valid warranty-based claims in the FAC. Plaintiffs allege that Ford made two different warranties: 1) the EPA fuel economy estimates on the Monroney label; and 2) the New Vehicle Limited Warranty ("NVLW"). Ford contends that both claims fail. The Court agrees.

### A.   The EPA Fuel Economy Estimates Do Not Establish A Warranty Under Federal Or State Law.

First, Ford persuasively argues that, as a matter of law, the EPA fuel economy estimates do not establish a warranty under federal or state law:

> The same federal statute that requires Ford to generate and disclose EPA fuel economy estimates explicitly bars any claim that such estimates constitute a warranty under state or federal law. *See* 49 U.S.C. § 32908(d) ("[a] disclosure about fuel economy or estimated annual fuel costs under this section ***does not establish a warranty*** under the law of the United States or a State."). That statute bars **all** such warranty claims, regardless of whether they are directed to the EPA estimate on the window sticker itself, or to other advertising statements that

39

reiterate the EPA estimated fuel economy.  *See, e.g., Paduano*, 169 Cal.App. 4tth
at 1453, 1467 ("Thus, to the extent that Honda identified the EPA fuel economy
estimates in its own advertising, Honda's provision of those estimates does not
constitute an independent warranty that [plaintiff's] vehicle would achieve the
EPA fuel economy estimates or a similar level of fuel economy.").  Plaintiffs base
their express warranty claim directly on the Monroney labels on Ford's vehicles,
which federal law makes clear do not establish warranty.  (*See, e.g.*, ACAC¶ 524
("Ford expressly warranted in advertisements, ***including in the stickers affixed to
the windows of its vehicles, that its vehicles provided a favorable fuel economy
of specific MPGs***, depending on the vehicle.").  Based on this straightforward
application of § 32908(d), Plaintiffs' breach of express warranty claim should be
dismissed with prejudice.

(Def.'s Br. at 47-48) (emphasis in original).

In response to this argument, Plaintiffs rely on *C-MAX I,* wherein the district court found

that § 32908(d) did not bar claims based upon guarantees in advertising that went beyond a mere

disclosure of EPA estimates.  (Pls.' Br. at 47-48).  Again, however, this case does not involve

claims based on such guarantees of real-world performance.  Rather, Plaintiffs assert express

warranty claims based upon the EPA estimates themselves.  These claims are barred by 49

U.S.C. § 32908(d) that provides that a "disclosure about fuel economy or estimated annual fuel

costs under this section does not establish a warranty under a law of the United States or a

State."

### B.    Any Express Warranty Claims Based Upon The NVLW Also Fail Because The Alleged Design Defects Are Not Covered.

Ford also asserts that, to the extent Plaintiffs' express warranty claim is based upon the

New Vehicle Limited Warranty ("NVLW"), that covers defects in factory supplied material or

workmanship, the claims fail because they have not pleaded any facts showing that the alleged

defect falls within the scope of the warranty coverage.  (Def.'s Br. at 48).  Ford asserts that, in

fact, Plaintiffs characterize the "issue as one of design.  *See* ACAC ¶¶2164, 2238 (' . . . Ford

failed to inform [the Mississippi and Missouri Plaintiffs] that the [subject vehicles] were *defectively designed*, and failed to fix the defectively *designed* [vehicles] free of charge.'" (*Id*. at 49) (emphasis added).

In response, Plaintiffs direct the Court to a non-binding district court case that rejected distinctions between design and materials/workmanship defects at the motion-to-dismiss phase.

This Court, however, has already taken a position on this issue, in *Flores,* wherein it followed *Matanky v. Gen. Motors, LLC*, 370 F.Supp.3d 772 (E.D. Mich. 2019) and ruled that the plaintiffs pleaded a design defect that was not covered under the express warranty provided. *Flores v. FCA US LLC*, 2021 WL 1122216 at * 7-8 (E.D. Mich. 2021).  The Court concludes that this is an additional ground for dismissal of the express warranty claims in this case.

## VIII.   Plaintiffs' MMWA Claims Must Also Be Dismissed For Failure To Allege Sufficient Pre-Suit Notice.

Count 307 of Plaintiffs' FAC asserts claims under the federal Magnuson-Moss Warranty Act ("MMWA).

Ford contends that Plaintiffs cannot sustain an MMWA claim.  Among other things, Ford asserts that Plaintiffs have failed to allege sufficient pre-suit notice.  Ford argues that even if Plaintiffs "had stated a viable warranty claim, their MMWA claim should still be dismissed because they failed to meet the Act's pre-suit notice requirements."  (Def.'s Br. at 52).

Class actions brought under the MMWA are subject to specific notice requirements.  15 U.S.C. § 2310(e); *Bhatt v. Mercedes-Benz USA, LLC*, 2018 WL 5094932 at *4 (C.D. Cal. 2018); *Kuns v. Ford Motor Co.*, 543 F. App'x 572, 576 (6th Cir. 2013).  First, the MMWA "requires each named plaintiffs to give the warrantor a reasonable opportunity to cure any failure to comply with the express or implied terms of the warranty."  *Bhatt, supra,* (citing 15 U.S.C. §

2310(e)); *Kuns, supra* (noting the "requirement that a warrantor have an opportunity to cure is codified at section 2310(e), which states that 'no action . . . may be brought under subsection (d) of this section for failure to comply with any obligation under any written or implied warranty . . . unless the person obligated under the warranty . . . is afforded a reasonable opportunity to cure such failure to comply.'"). Second, "[a]fter this reasonable opportunity is afforded, each plaintiff must, then, notify the warrantor that the plaintiff is going to initiate a suit on behalf of a class." *Bhatt, supra;* 15 U.S.C. § 2310(e).

Failure to comply with these notice requirements compels dismissal. *See, e.g.*, *Bearden v. Honeywell Intern., Inc*., 720 F.Supp.2d 932, 936 (M.D. Tenn. 2010) (Noting mandatory language of notice language in MMWA and dismissing claims for failure to allege that required notice was provided); *Stearns v. Select Comfort Retail Corp*., 2009 WL 4723366 at *10 (N.D. Cal. 2009) (dismissing MMWA claims in putative class action for failure to allege that named plaintiffs provided required notice under the MMWA); *Nadler v. Nature's Way Pods., LLC*, 2014 WL 12601567 at *3 (C.D. Cal. 2014) (same).

Here, Ford claims that Plaintiffs failed to comply with the MMWA's notice requirements because each named Plaintiff does not allege to have given the required pre-suit notice. It also contends that the second requirement is not met as Plaintiffs have not alleged that they notified Ford of their intent to initiate a suit on behalf of a class.

Plaintiffs respond to this two-part challenge in the following paragraph of their brief, wherein they argue:

> Plaintiffs allege that (1) Ford was provided an opportunity to cure and multiple written notices of the intent to sue (¶3974); (2) Ford knew of the defect at the time of the sale, thus waiving an opportunity to cure (¶3971); and (3) that it would be futile to afford Ford an opportunity to cure its breach (*see, e.g.*, ¶ 528).

42

These allegations sufficiently plead a viable MMWA claim. *See Persad*, 2018 WL 3428690, at *6 (holding that plaintiffs' complaint properly alleged futility and denied motion to dismiss based on lack of pre-suit notice).

(Pls.' Br. at 56).

As the *Stearns* court noted, the language requiring notice in the MMWA is mandatory. And in *Kuns*, the plaintiff made the same futility argument that Plaintiffs make here and the Sixth Circuit did not find it persuasive. *Kuns*, 543 F. App'x at 576 (Noting the plaintiff's argument that any request to cure the defect would have been futile, and rejecting it because the plaintiff "does not cite – and we cannot locate – any case law indicating that this statutory requirement can be waived if a plaintiff subjectively determines that demand would be futile and does not so much as request the seller to cover the necessary repair.").

Thus, Plaintiffs' failure to allege that they provided adequate pre-suit notice under the statute is an additional basis for dismissal of Plaintiffs' MMWA count.

## IX. Plaintiffs' Transactions Are Exempt From The Michigan Consumer Protection Act.

In addition to preemption, Ford argues that Plaintiffs' claims under the Michigan Consumer Protection Act (Count 130) also fail because their motor vehicle sales and lease transactions are exempt from the Act. In support of this argument, Ford asserts

The MCPA does not apply to transactions that are specifically authorized and fully regulated by state and federal law. *See* Mich. Comp. Laws § 445.904(a); accord *Zaher v. Argent Mortg. Co., LLC*, No. 14-111848, 2017 WL 193550, at *5 (E.D. Mich. Jan. 18, 2017). This exemption is construed broadly and looks to the general transaction. *See Divis v. General Motors, LLC*, No. 18-13025, 2019 WL 4735405, at *9 (E.D. Mich. Sept. 27, 2019) (citing *Liss v. Lewiston-Richards, Inc.,* 478 Mich. 203, 210 (2007)). Indeed, the Michigan Court of Appeals confirmed that 'the manufacture, sale, and lease of automobiles, and the provision of express and implied warranties concerning those automobiles and their components are all conduct that is 'specifically authorized' under federal and state law." *Cyr v. Ford Motor Co.,* 2019 WL 7206100, a *2-3 (Mich. Ct. App. Dec. 26, 2019).

43

(Def.'s Br. at 60-61).

In response, Plaintiffs direct the Court to single district court decision wherein the court declined to make a ruling on this issue at the motion-to-dismiss phase, and choosing to revisit the issue on summary judgment.

This Court very recently addressed this same issue in *Gant*, concluding that the exemption applies to motor vehicle sales. *Gant v. Ford Motor Co.*, 2021 WL 364250 at *7-8 (E.D. Mich. Feb. 3, 2021). Plaintiffs' claims under the Michigan Consumer Protection Act (Count 130 of the FAC) are subject to dismissal on this same basis.

## CONCLUSION & ORDER

Accordingly, the Court ORDERS that Defendant Ford's Motion to Dismiss is GRANTED because the Court concludes that Plaintiffs' claims are preempted under federal law, and because the claims are subject to dismissal for the additional reasons discussed above.

IT IS SO ORDERED.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  February 23, 2022

I hereby certify that a copy of the foregoing document was served upon counsel of record on February 23, 2022, by electronic and/or ordinary mail.

s/Jennifer McCoy
Case Manager

44